# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **MARGARET CZERWIENSKI, LILIA KILBURN, and AMULYA MANDAVA** | |
| *Plaintiffs,* | CASE NO. _____ |
| v. | |
| **HARVARD UNIVERSITY AND THE PRESIDENT AND FELLOWS OF HARVARD COLLEGE** | JURY TRIAL DEMANDED |
| *Defendants.* | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

1.       This is a case about Harvard's decade-long failure to protect students from sexual abuse and career-ending retaliation. Harvard Anthropology Professor John Comaroff[1] is a renowned scholar and a gatekeeper in his field. For years, he has used that power and his perch at Harvard to exploit aspiring scholars: he kissed and groped students without their consent, made unwelcome sexual advances, and threatened to sabotage students' careers if they complained. When students reported him to Harvard and sought to warn their peers about him, Harvard watched as he retaliated by foreclosing career paths and ensuring that those students would have "trouble getting jobs." Harvard even allowed its investigatory process to be used in service of Professor Comaroff's campaign of professional blacklisting. The results have been devastating: Professor Comaroff and his enablers have destroyed the educational opportunities and careers of countless students. Among them are the plaintiffs in this case: Margaret Czerwienski, Lilia Kilburn, and

---

[1] Any reference to "Professor Comaroff" or "Professor John Comaroff" refers to Professor John Comaroff. Any reference to "Professor Jean Comaroff" refers to his wife, Professor Jean Comaroff.

Amulya Mandava, three graduate students in Harvard's Anthropology Department (the "Department").

2.      Harvard's deliberate indifference allowed Professor Comaroff to repeatedly and forcibly kiss Ms. Kilburn, grope her in public, imagine aloud her rape and murder, cut her off from other professors, and derail her academic trajectory. It also allowed Professor Comaroff to threaten Ms. Mandava and Ms. Czerwienski, poison their reputations in their fields of study, and upend their careers. All three Plaintiffs repeatedly complained to Harvard administrators. But the University brushed them aside and opted to protect its star professor over vulnerable students.

3.      Plaintiffs are far from alone. A Harvard committee tasked with examining the climate within Harvard's Anthropology Department recently concluded that the Department is plagued by a "longstanding pattern of sexism, misogyny, and sexual and gender-based misconduct" that "has gone largely unchecked by a predominantly white, male faculty."[2] In a survey, about a third of the graduate students in the Department reported harassment.[3] Students rarely speak out about harassment or sexual misconduct, because when they do, they risk their education and their careers. In short, the report concluded, Harvard has condoned a "culture in which the abuse of power is normalized and accommodated."[4]

4.      This lawsuit targets that abuse of power. Plaintiffs Margaret Czerwienski, Lilia Kilburn, and Amulya Mandava ("Plaintiffs"), by and through their undersigned counsel, Sanford Heisler Sharp, LLP, bring this action against Defendant Harvard University and the President and

---

[2] Harvard University Anthropology Department, Standing Committee for a Supportive Departmental Community Final Report 10 (2021).

[3] *Id.* at 18.

[4] *Id.* at 10.

Fellows of Harvard College ("Harvard" or the "University") under Title IX[5] and Massachusetts law to remedy the gender discrimination, sexual harassment, hostile environment, and retaliation that has defined their time at Harvard.[6]

## I.   INTRODUCTION

5.     Harvard is one of the most prestigious academic institutions in the world. It has maintained that reputation by recruiting the world's foremost scholars.

6.     John Comaroff, Harvard Professor of Anthropology and of African and African American Studies, is one such scholar. He is one of the world's leading experts on Africa and the Global South, legal and political anthropology, crime and policing, the anthropology of colonialism and postcolonialism, and historical anthropology. He wields extraordinary power through a sprawling professional network, having mentored generations of tenured professors placed at nearly every major anthropology department and having held visiting professorships all over the world. To Harvard, Professor Comaroff's worldwide reputation and influence make him a valuable asset.

7.     Harvard has protected that asset despite a decades-long pattern of harassment and retaliation by Professor Comaroff—a pattern that was known to Harvard when it hired him in 2012. From 1979 to 2012, Professor Comaroff worked at the University of Chicago ("UChicago"). Graduate students and faculty there considered Professor Comaroff a "predator" and a "groomer." At least one of them warned Harvard about Professor Comaroff while the University was considering Professor Comaroff's candidacy. But Harvard welcomed him anyway.

---

[5] Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* ("Title IX").

[6] Plaintiffs allege upon knowledge concerning their own acts and upon information and belief as to all other matters.

8.    The result was predictable. Shortly after he arrived at Harvard, the University[7] received ***repeated*** complaints of sexual harassment, including forced kissing, groping, and offensive—even violent—sexual comments by Professor Comaroff.

9.    Plaintiffs were among those complainants. In spring 2017, Plaintiffs Margaret Czerwienski and Amulya Mandava learned that Professor Comaroff was making ongoing sexual advances on his advisee, a second-year graduate student: he forcibly kissed her, groped her buttocks, and, upon information and belief, sent her early-morning texts demanding to know with whom she had slept. Ms. Czerwienski and Ms. Mandava reported this sexual harassment to faculty, including the soon-to-be Chair of the Anthropology Department. The advisee herself also reported the harassment to the University's Title IX Office.[8] Yet, on information and belief, Harvard chose not to investigate these reports. The University instead stood by while the abuse continued unchecked.

10.    Harvard's deliberate indifference to these complaints enabled retaliation by Professor Comaroff. In October 2017, Professor Comaroff summoned Ms. Mandava to his office and told her that he knew she and Ms. Czerwienski were warning others of his sexual misconduct. He threatened that if they continued to do so, they would have "trouble getting jobs," as his detractors had in the past. Ms. Czerwienski reported this retaliation to Harvard's Title IX Office. But, still, Harvard took no apparent steps to stop Professor Comaroff from following through on his threats or targeting others.

11.    Because of Harvard's inaction, Professor Comaroff abused Lilia Kilburn. In 2017, before Ms. Kilburn even enrolled at Harvard, Professor Comaroff kissed her on the mouth without

---

[7] "Harvard" or "the University" herein means Harvard and University officials with supervisory authority and the power to institute corrective measures on Harvard's behalf.

[8] Upon information and belief, Harvard's Title IX Office is located within its Office for Gender Equity.

her consent during a campus visit. That fall, after she matriculated, he graphically described varying ways in which she "would" be raped, murdered, or "left for dead" in South Africa—a country thousands of miles away from the country she studied. Harvard allowed Professor Comaroff's behavior to continue for two years—subjecting Ms. Kilburn to a continuing nightmare that included more forced kissing, groping, persistent invitations to socialize alone off-campus, and coercive control. When Ms. Kilburn tried to avoid Professor Comaroff, he forbade her to work with her other advisor.

12.     Ms. Kilburn complained to Harvard's Title IX Office in May 2019. Again, however, the Title IX Office took no meaningful action—except to admit that Harvard had known about Professor Comaroff's behavior for years. In fact, a Harvard Title IX Resource Coordinator referred Ms. Kilburn to one of Professor Comaroff's other victims: the graduate student who reported similar abuse two years earlier. Professor Comaroff, meanwhile, continued teaching and mentoring students.

13.     In 2020, *The Harvard Crimson* (the "*Crimson*") and *The Chronicle of Higher Education* (the "*Chronicle*") publicly exposed Professor Comaroff's misconduct. Only then, with its reputation to protect, did Harvard launch an investigation.

14.     But Harvard's investigation only exacerbated Plaintiffs' nightmare. Harvard dragged the process out for over a year, foisted inordinate burdens on Plaintiffs, then willfully ignored the overwhelming evidence they marshalled. During the process, Harvard obtained Ms. Kilburn's ***private therapy records without her consent*** and disclosed them to Professor Comaroff. The investigatory process that unfolded was neither "prompt" nor "equitable"; nor was it designed to "stop discrimination, remedy any harm," or "prevent its recurrence," as Harvard's written

policies promise.[9] In the end, Harvard denied that Professor Comaroff engaged in repeated sexual harassment or retaliation and allowed him to continue teaching after a slap on the wrist.

15.     Harvard faculty moved swiftly to forestall further complaints. Hours after Harvard announced the investigation's results, Harvard Law Professor Janet Halley issued a statement calling Professor Comaroff's description of Ms. Kilburn's rape and his threats against Plaintiffs "*perfectly legitimate office-hours advice.*" She further blasted Plaintiffs' complaints as an "attack on academic freedom." Professor Comaroff's wife, Professor Jean Comaroff, promptly disseminated the statement to Harvard faculty and others in her professional network. A few days later, 38 Harvard faculty members—including faculty currently supervising Plaintiffs' studies— wrote a letter publicly supporting Professor Comaroff and minimizing his abuse.

16.     Harvard's deliberate indifference to this pattern of retaliation has upended Plaintiffs' careers in anthropology. And Plaintiffs' ordeal is just one example of Harvard's broader pattern of deliberate indifference: sexual misconduct, abuse, and retaliation are endemic to the Anthropology Department. As the *Crimson* and *Chronicle* reports revealed, for over a decade, Harvard willfully ignored sexual harassment complaints against not just Professor Comaroff, but also against two Department Chairs, Gary Urton and Theodore Bestor. As a result, from 2007 to 2018—11 of the past 14 years—the Department was *chaired* by men who, according to these reports, leveraged their power to prey on women students and junior faculty.

17.     Harvard's continued failure to act on repeated reports of harassment against Professor Comaroff—until spurred to do so by the media—demonstrates an institutional policy of indifference: a system designed to protect the University, its reputation, and the faculty who sustain

---

[9]   Harvard University Sexual and Gender-Based Harassment Policy at 1, *available at* https://hwpi.harvard.edu/files/oge/files/sexual-and-gender-based-harassment-policy.pdf?m=1624890819.

that reputation at the expense of its students. The University ignores the misconduct of star faculty for as long as possible, acting only when compelled by public outrage. When Harvard does investigate, it employs a process stacked against survivors, in which even University officials lack confidence. Instead of stopping abuse, Harvard perpetrates it, subjecting students to a second trauma that exacerbates the original abuse and leaves the students vulnerable to retaliation at the hands of faculty.

18.     Harvard's cycle of institutional betrayal violates Title IX and Massachusetts law.

## II.     PARTIES

19.     **PLAINTIFF MARGARET CZERWIENSKI** is a natural person, and, at all relevant times, has been domiciled in Massachusetts. She is a doctoral student in Harvard's Anthropology Department. She holds a B.A. in Women's Studies and a Master's of Public Health with a graduate certificate in Afroamerican and African Studies from the University of Michigan, and conducted research at the University of Michigan medical school throughout her Master's program. She joined Harvard for her graduate studies in 2014, where she has worked as a Ph.D. student and teaching fellow. She is a highly credentialed member of the Department, and is the recipient of the National Science Foundation Doctoral Dissertation Research Improvement Grant.

20.     **PLAINTIFF LILIA KILBURN** is a natural person, and, at all relevant times, has been domiciled in Massachusetts. She is a doctoral student at Harvard. Ms. Kilburn holds a Master's degree in Comparative Media Practice from Massachusetts Institute of Technology and a B.A. in Anthropology from Amherst College. Her research has been supported by multiple prestigious grants in her field. Ms. Kilburn came to Harvard in 2017. She specifically applied to Harvard's Anthropology Department to work with the Comaroffs, and eventually accepted

Harvard's offer—turning down opportunities from other universities—because Professor John Comaroff urged her to and promised her mentorship and pedagogic support.

21.    **PLAINTIFF AMULYA MANDAVA** is a natural person, and, at all relevant times, has been domiciled in Massachusetts and/or Maine. She is a doctoral student in Harvard's Anthropology Department. She holds a B.A. with Honors in Anthropology from the University of Chicago and a Master's degree from Harvard Divinity School. She enrolled in graduate studies at Harvard in 2012 and has worked as a Ph.D. student and teaching fellow. While at Harvard, Ms. Mandava has won multiple prestigious grants in her field, including the Wenner-Gren Dissertation Fieldwork Grant and the American Institute of Indian Studies Junior Fellowship.

22.    **DEFENDANT HARVARD UNIVERSITY AND THE PRESIDENT AND FELLOWS OF HARVARD COLLEGE** is a non-profit corporation organized and existing under the laws of Massachusetts that maintains its principal place of business at Massachusetts Hall, Cambridge, Massachusetts 02138.

### III.    JURISDICTION AND VENUE

23.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, because Plaintiffs' statutory claims under Title IX present a federal question over which this Court has jurisdiction. Plaintiffs also assert state-law claims over which this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

24.    This Court has personal jurisdiction over Defendant pursuant to Federal Rule of Civil Procedure 4(k)(1)(A) because Defendant is domiciled in and conducts business within this Judicial District.

25.    This Court is the proper venue under 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f) because Harvard is headquartered in this District and many of the unlawful practices

complained of herein occurred in this District, and the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## IV.    FACTUAL ALLEGATIONS

### A.  Professor Comaroff Harassed Students for Years Before Coming to Harvard

26.    Harvard had good reason to be wary of Professor Comaroff. Before Harvard hired him, Professor Comaroff taught at UChicago, where he was surrounded by "pervasive allegations of sexual misconduct."  Indeed, multiple UChicago students and faculty complained to UChicago about his behavior.

27.    In or around 1979, immediately after Professor Comaroff began teaching at UChicago, he lured an undergraduate student ("UChicago Student 1") to his home promising advice on her thesis. Alone with her, he forcibly hugged her, ran his hand down her back, and groped her buttocks without her consent. UChicago Student 1 contemporaneously recounted the incident to a graduate student, who replied that Professor Comaroff was well-known for his sexual behavior toward students, and that he was engaged in an affair with another student. UChicago Student 1—once a promising anthropology student—was so disturbed by her experience with Professor Comaroff that she abandoned her plans to pursue a Ph.D. in anthropology.

28.    This behavior continued for decades at UChicago. Between 2006 and 2007, Professor Comaroff sent a female UChicago graduate student ("UChicago Student 2") violent pornography without her consent, commented on her choice of underwear, and assaulted her in his office. During the assault, he kissed her forcibly on the lips, groped her buttocks, and repeatedly grabbed her thigh without her consent. UChicago Student 2 contemporaneously reported the assault to another graduate student, who in turn reported the incident to UChicago faculty. But when Professor Comaroff learned of the complaint, he ensured that the student had "trouble"

finding a job. Professor Comaroff then pressured UChicago Student 2 to delete the explicit emails he had sent her.

29.    In 2007, on information and belief, Professor Comaroff initiated a sexual relationship with another female UChicago graduate student ("UChicago Student 3"). But, on information and belief, once Professor Comaroff lost sexual interest in her, he used his influence to damage her career.

30.    And in winter 2009, Professor Comaroff targeted Plaintiff Mandava, who was then an undergraduate at UChicago. Professor Comaroff took a focused interest in Ms. Mandava during a study-abroad trip in South Africa. He repeatedly invited her to sit next to him on long drives and commented on the neckline of her clothing, all of which made Ms. Mandava uncomfortable. Ms. Mandava told Professor David Bunn, who was also on the trip, about Professor Comaroff's bizarre actions in hopes that he would intervene. But Professor Bunn responded that Professor Comaroff's behavior was part of a pattern; he regularly crossed boundaries on study-abroad trips. During each trip, he developed a "crush" on a female student and "obsessively" focused on her throughout the program.

**B. Harvard Knew That Professor Comaroff Had Harassed Students and Brought Him to Harvard Anyway**

31.    Harvard knew of this pattern by the time it offered Professor Comaroff a position to start in 2012. It hired him anyway.[10]

32.    Upon information and belief, around the time Harvard hired Professor Comaroff, UChicago faculty warned the Chair of Harvard's Department of African and African American Studies ("AAAS")—who could have influenced the hiring decision, supervised Professor

---

[10] In 2020, in a meeting with Ms. Czerwienski about Plaintiffs' Title IX complaints, the Assistant Dean of Student Affairs *admitted* that Harvard's administration had known about Professor Comaroff's behavior for years.

Comaroff, or at least managed his interactions with students—about Professor Comaroff's misconduct at UChicago. Harvard could have heeded this warning and passed on Professor Comaroff or implemented safeguards—and protected Harvard's students. Instead, Harvard empowered Professor Comaroff.

33. Professor George Meiu, who joined Harvard's faculty in or around 2014, was also aware of Professor Comaroff's sexual misconduct at UChicago, where Professor Meiu studied under the Comaroffs. After the *Crimson* exposed Professor Comaroff's misconduct in 2020, Professor Meiu apologized to more than 100 assembled members of the Department, including Plaintiffs, "for what I knew and what I didn't say anything about."

34. Professor Nicholas Harkness, who joined Harvard's faculty in or around 2011, was likewise aware of complaints against Professor Comaroff. He, too, had learned of Professor Comaroff's history of sexual harassment and inappropriate sexual relationships with students at UChicago, where he had been a graduate student until 2010. Indeed, after Plaintiffs filed their Title IX complaints, he described Professor Comaroff to Ms. Kilburn as a "groomer" and "predator." But Harvard overlooked this history even when warned about it.

35. Harvard instead welcomed Professor Comaroff to the faculty. In or around 2011, Harvard extended an offer to Professor Comaroff and his wife, Professor Jean Comaroff, to join the Department of Anthropology and the Department of AAAS. It implemented no safeguards on his contact with students.

C. **Professor Comaroff Sexually Harasses Students at Harvard**

36. The results of Harvard's inaction were predictable.

37. In 2015, Professor Comaroff made persistent unwanted sexual advances toward at least two Harvard graduate students. To the first ("Harvard Student 1"), he made repeated

11

comments on her physical appearance—telling her "you're a very beautiful woman" during meetings—and kissed her on the cheek.

38.     To another ("Harvard Student 2"), his advisee, he commented on her appearance; shared his attraction to other students (describing one student as "beautiful" and another as "out of [his] league"); recounted his sexual history and sexual preferences to her in detail; and frequently shared sexual jokes that made her uncomfortable. He also winked at her in class, drank out of her water bottle in the middle of a course he was teaching, called her "my date," and kissed her on the forehead without her consent—all in view of other students. He told her that three students at UChicago would say he had sex with them, but he branded them as "liars."

39.     Professor Comaroff eventually escalated his harassment against Harvard Student 2 to physical assault. He cornered her in his office, brushed up against her, sat unnecessarily close to her in meetings, and touched her inappropriately. In fall 2016, during an annual brunch at his house, Professor Comaroff cornered her in his laundry room and forcibly kissed her on the mouth without her consent. His abuse continued throughout the semester: he kissed her, grabbed her buttocks, and, on information and belief, sent her messages late at night asking about her sexual partners.

40.     Finally, at a meeting in his office, Harvard Student 2 confronted Professor Comaroff about his behavior. He responded with more: he knelt in front of her, laid his head on her breasts, and told her he was impotent.

**D.  Professor Comaroff Threatens Retaliation to Silence Warnings**

41.     Harvard Student 2 reported Professor Comaroff's harassment to a Harvard postdoctoral research fellow and former advisee of Professor Comaroff at UChicago ("Harvard

Post-Doc 1"). Harvard Post-Doc 1 advised Harvard Student 2 to report the conduct to Harvard's Title IX Office.

42.    Professor Comaroff learned of this advice and swiftly retaliated: in fall 2017, Professor Comaroff called Harvard Post-Doc 1 to his office and threatened that if Harvard Post-Doc 1 continued "spreading gossip," he would "find it impossible" to get a permanent academic position.

43.    At the time, Harvard Post-Doc 1 was relying on letters of recommendation from Professors John and Jean Comaroff to find a teaching position. Professor John Comaroff's threat was thus clear and effective: if Harvard Post-Doc 1 did not stop engaging in oppositional activity, the Comaroffs would thwart his prospects of finding a permanent teaching position.

**E.  Professor Comaroff Retaliates Against Plaintiffs Czerwienski and Mandava**

**a.  Plaintiff Margaret Czerwienski Engages in Protected Activity**

44.    Harvard Student 2 also reported Professor Comaroff's harassment to her classmate, Plaintiff Margaret Czerwienski. Around the same time, yet another student ("Harvard Student 3") told Ms. Czerwienski that Professor Comaroff was acting as though he had a "crush" on her.

45.    In spring 2017, Ms. Czerwienski complained to her advisor, Professor Susan Greenhalgh, about Professor Comaroff's harassment of Harvard Student 2 and shared her concern that he was pursuing Harvard Student 3.

46.    Professor Greenhalgh was a mandatory reporter under Harvard's Title IX policies, and should therefore have reported Professor Comaroff. Professor Greenhalgh expressed concern, but, because Harvard had not properly trained her on her reporting obligations, she took no steps to intercede and neither did Harvard.

47.     Ms. Czerwienski also began warning other students of the dangers Professor Comaroff posed.

48.     Finally, Ms. Czerwienski urged Harvard Student 2 to report Professor Comaroff's harassment and assaults to Harvard's Title IX Office.

### b. Harvard Receives and Ignores Harvard Student 2's Complaint

49.     In spring 2017, following Ms. Czerwienski's advice, Harvard Student 2 reported Professor Comaroff's sexual harassment to Seth Avakian, a University Program Officer for Title IX and Professional Conduct who served as a Title IX Resource Coordinator for Harvard's Faculty of Arts and Sciences ("FAS") graduate students and faculty, among others.

50.     Under Harvard's Sexual and Gender-Based Harassment Policy and the Sexual and Gender-Based Harassment Policy and Procedures for the Faculty of Arts and Sciences, Mr. Avakian was responsible for "identifying and responding to sexual harassment and its harm to equal educational opportunity" and "stopping or preventing sexual or gender-based harassment." He also had authority to "put in place any appropriate supportive measures to protect the educational and work environment," and to initiate a formal investigation. But he did none of these things.

51.     Mr. Avakian also had the responsibility, under University policy, to convey complaints about Professor Comaroff to the University Title IX Coordinator. University policy *required* as much if he received more than one complaint about Professor Comaroff. And he should have received many. Upon information and belief, Harvard Student 2 reported Professor Comaroff's harassment to multiple other faculty members. But these faculty and Mr. Avakian apparently did nothing.

52.     Nor did anyone else—except Professor Comaroff. Professor Comaroff obtained a

copy of Harvard Student 2's complaint and read portions of her complaint back to her verbatim. This intimidation tactic worked. It pressured Harvard Student 2 to withdraw her complaint and would, apparently, dissuade her from participating in any further investigations, including of Plaintiffs' complaints.

### c. Plaintiff Amulya Mandava Engages in Protected Activity

53.     By spring 2017, Ms. Mandava had also learned that Professor Comaroff had sexually harassed Harvard Student 2 and was pursuing Harvard Student 3. Ms. Mandava, like Ms. Czerwienski, warned other students about Professor Comaroff's sexual harassment.

54.     Also like Ms. Czerwienski, Ms. Mandava reported Professor Comaroff's sexual harassment to Harvard. Ms. Mandava informed Professor Ajantha Subramanian—who, in 2018, would become the Chair of the Anthropology Department—that Professor Comaroff had sexually harassed two graduate students at Harvard; that he had given Ms. Mandava herself unwanted sexual attention when she was an undergraduate at UChicago; and that he had had several sexual relationships with graduate students at UChicago.

55.     Professor Subramanian expressed distress, but took no action. She informed Ms. Mandava that, under her understanding of Harvard policy, she could not elevate or act on Ms. Mandava's report unless the affected students (Harvard Students 2 and 3) made the reports directly.

### c. Professor Comaroff Threatens Plaintiffs Mandava and Czerwienski

56.     Harvard's indifference had a predictable result. By October 2017, Professor Comaroff had learned that Ms. Mandava and Ms. Czerwienski were warning others about his behavior. He swiftly sought to silence them.

57.     On or about October 13, 2017, Ms. Mandava met Professor Comaroff in his office to discuss a grant application. During the meeting, Professor Comaroff told Ms. Mandava that

graduate students, including Ms. Czerwienski, were spreading "nasty rumors" about his sexual misconduct with students, and that he knew Ms. Mandava had participated in those conversations. Ms. Mandava responded by confirming that she had warned others in the Department about his sexual encounters with students. In reply, Professor Comaroff first sought to dispel the "nasty rumors" by claiming that he had "been sexually inactive for seven years" because he was impotent—an admission that caused Ms. Mandava great discomfort because she was alone in his office with him.

58.     Next, Professor Comaroff threatened Ms. Mandava and Ms. Czerwienski. He told Ms. Mandava that there had been "rumors" about him at UChicago, too. He referenced three specific UChicago graduate students—including Harvard Post-Doc 1—who perpetuated these "rumors" about him, and he told her that those other students had subsequently experienced "trouble getting jobs." He warned that he would not want the same to happen to Ms. Mandava.

59.     Professor Comaroff further threatened that if Ms. Mandava continued to speak out, she would lose her relationship with her recommender, Professor Jean Comaroff. He reminded Ms. Mandava that he and his wife were responsible for her admission to Harvard and reiterated multiple times how much "support" they had given her over the years. He cautioned that Professor Jean Comaroff would be "furious" at anyone who told her about his conduct.

60.     Finally, Professor Comaroff warned that if Ms. Mandava and Ms. Czerwienski continued their "gossip," he and his wife would find out, because "our students will always tell us."

61.     Professor Comaroff's threats were serious and credible. As Dean for Faculty Affairs and Planning Nina Zipser acknowledges, academics "rely on narrow networks of

individuals."[11] Harvard Professor Stephen Blyth affirms that "[t]he influence a senior professor holds over a PhD student's career . . . is immense: a poor letter of recommendation torpedoes job prospects."[12] Anthropology is a small and tight-knit field. There are seldom more than a handful of tenure-track positions available to graduating doctoral students. Each position receives hundreds of applications. And Professor Comaroff's influence permeates the field. His former students and acolytes sit on hiring committees in almost every major anthropology department across the globe. A down-vote from Professor Comaroff is thus the death knell of an anthropologist's career.

62.    Ms. Mandava shared Professor Comaroff's threats with Ms. Czerwienski. Both began fearing for their academic futures at Harvard and their career plans.

**F.    Ms. Czerwienski Reports Professor Comaroff's Threats, but Harvard Again Fails to Act, Derailing Plaintiffs' Academic Careers**

63.    Ms. Czerwienski reported Professor Comaroff's threats to Harvard Title IX Resource Coordinator Seth Avakian three days later, on or about October 16, 2017. She also told Mr. Avakian (as others had before) that Professor Comaroff had been sexually harassing students.

64.    On information and belief, Harvard ignored Ms. Czerwienski's complaints. In fact, Mr. Avakian explicitly discouraged Ms. Czerwienski from filing a formal report with Harvard's Office for Dispute Resolution ("ODR") because, he said, doing so would be futile.

65.    With no response from Harvard, Professor Comaroff's threats had their intended chilling effect on Ms. Mandava and Ms. Czerwienski. Ms. Czerwienski did not file a formal complaint, and, after the October 13, 2017 meeting, Ms. Czerwienski and Ms. Mandava both

---

[11] Letter from Stephen Blyth, Professor, Harvard Univ., to Drew G. Faust, President, Harvard Univ. (May 7, 2018), https://www.bostonglobe.com/2019/05/24/read-letter/h2qAM6WfEOWiRHQVmu0N2M/story.html?camp=bg%3Abrief%3Arss%3Afeedly&rss_id=feedly_rss_brief&s_campaign=bostonglobe%3Asocialflow%3Atwitter.

[12] *Id.*

stopped warning other students about Professor Comaroff's sexual misconduct. Indeed, later in the fall of 2017, when Plaintiff Kilburn approached Ms. Mandava seeking guidance regarding Professor Comaroff's harassment, Ms. Mandava, fearful of retaliation, refused to assist Ms. Kilburn.

66.     Professor Comaroff, meanwhile, continued to harass students with impunity. He even boasted about it publicly. At an October 2017 dinner with faculty and graduate students, Professor Comaroff compared himself to Harvey Weinstein, and remarked, "They're coming for me next!" Professor Jean Comaroff, also in attendance, disparaged women who confront or report sexual violence, commenting, "Whatever happened to rolling with the punches?"

67.     These remarks rattled Ms. Mandava and Ms. Czerwienski. To mitigate the risk of retaliation from the Comaroffs, Ms. Czerwienski ended her advising relationship with Professor Jean Comaroff; dropped a required course then taught only by the Comaroffs (thereby delaying her completion of that requirement); and shifted her academic focus away from Africa, a region studied in Harvard's Social Anthropology program exclusively by the Comaroffs and a former student of theirs. Ms. Czerwienski also actively sought to avoid Professor Comaroff. Professor John Comaroff's tentacular influence in the field, however, made it impossible to avoid him, and Ms. Czerwienski continued to encounter him on campus.

68.     Ms. Mandava, too, ultimately ended her mentoring relationship with both Professor Jean Comaroff and Professor John Comaroff, changed the focus of her dissertation, and did not apply for a grant in their area of expertise to avoid them. Ms. Mandava had previously relied on the Comaroffs for letters of recommendation for nearly every major application since college. Ms. Mandava also felt persistent anxiety resulting from Professor Comaroff's threat.

69.     Harvard's inaction thus upended the academic careers of Ms. Mandava and Ms. Czerwienski. It would soon do the same to Ms. Kilburn.

**G. Professor Comaroff Subjects Plaintiff Kilburn to Repeated Sexual Harassment**

70.     From the day Ms. Kilburn first visited Harvard as a prospective student in 2017 through April of 2019, Professor Comaroff subjected her to pervasive sexual harassment, including unwanted kissing and touching and a graphic description of her own imagined rape and murder.

> **a. Professor Comaroff Kisses Ms. Kilburn When She Was an Admitted Student**

71.     Professor Comaroff began making unwanted sexual advances on Ms. Kilburn before she even matriculated at Harvard. On or about February 27, 2017, Ms. Kilburn met with Professors John and Jean Comaroff to discuss her acceptance to the program. Professor John Comaroff offered to walk Ms. Kilburn back to Harvard's campus. As they approached the building in which his office is located, Professor Comaroff stepped in front of Ms. Kilburn, hugged her tightly—pressing the length of his body against hers—and kissed her on the lips without her consent. Continuing to hug her tightly, he whispered in her ear that she should "go visit Columbia [University], but then come back here."

72.     Ms. Kilburn was distressed by Professor Comaroff's assault. She feared for her future at Harvard, in a program she had dreamed of attending. But, not knowing of Professor Comaroff's history, she sought to forget the incident and move on.

> **b. Ms. Kilburn's First Day of Grad School: "You Would Be Raped and Killed"**

73.     Ms. Kilburn's fears, however, proved well founded. On the first day of Ms. Kilburn's doctoral program, on or about August 27, 2017, she met with Professor Comaroff, now her advisor, in his office to discuss her planned study of a country in Central Africa.

74.     During the meeting, Professor Comaroff repeatedly described various ways in which Ms. Kilburn would be raped and killed in South Africa—approximately 3,000 miles away from Central Africa—because she is in a same-sex relationship. He told her, "there are many places where you would go where you would be raped," "you would certainly be raped," and "you would be raped and killed." He then identified specific places where "corrective rapes" had been carried out, and stated over and over that Ms. Kilburn, too, "would be raped," "would be killed," would be "left for dead," and that "they would finish you off." Ms. Kilburn sat frozen in shock, while Professor Comaroff continued for approximately five minutes.

75.     As he had with Ms. Mandava, Professor Comaroff ended the meeting by reminding Ms. Kilburn of the power he now wielded over her career. He told her that he had "fought very hard for [her]" in the admissions process and that Ms. Kilburn needed to trust him because he had been advising students for fifty years.

### c.   Professor Comaroff Kisses Ms. Kilburn Again at His Home Without Consent

76.     Professor Comaroff's harassment again turned physical.

77.     On or about September 24, 2017, Ms. Kilburn attended an annual brunch held at the Comaroffs' house. Professor John Comaroff greeted Ms. Kilburn with a hug and a kiss on the cheek and began singling her out for unwanted attention; he placed his hand uncomfortably low on her back to guide her through the room, expressed disappointment that she was not drinking alcohol, and touched her lower back again when he returned with coffee.

78.     When Ms. Kilburn went to leave the brunch, Professor Comaroff followed her. Ms. Kilburn bent to retrieve her bag, and when she stood, Professor Comaroff had moved close to her. He again hugged her forcibly and kissed her on the mouth without her consent. Ms. Kilburn pushed him away and wiped her mouth, only to find Professor Comaroff smiling at her.

79.     Ms. Kilburn was disturbed. Over the remainder of the fall semester of 2017, she avoided Professor Comaroff. She did not attend the weekly meetings with Professor Comaroff that were customary for first-year graduate students, and she began dressing more conservatively. She also stopped attending the weekly African Studies Workshop led by Professors John and Jean Comaroff, even though the workshop was crucial to expanding her network in her field and one of the reasons she had decided to matriculate at Harvard over other institutions.

### d. Harvard's Program Administrator Rebuffs Ms. Kilburn's Attempted Disclosure: "Those Are Just Nasty Rumors"

80.     Throughout the fall of 2017, Ms. Kilburn sought assistance from classmates and staff. None offered aid because of Professor Comaroff's threats and Harvard's indifference.

81.     First, in or around October 2017, Ms. Kilburn approached the Graduate Program Administrator in the Anthropology Department. She asked whether the Graduate Program Administrator was aware of Professor Comaroff ever having made students uncomfortable. But before she could finish, the Graduate Program Administrator cut her off and responded, "Those are just nasty rumors!"—mimicking the language used by Professor Comaroff.

82.     Then, in late fall 2017, Ms. Kilburn sought out Ms. Mandava to share her experience with Professor Comaroff. Chilled by Professor Comaroff's threat to damage her career if she spoke about his conduct, however, Ms. Mandava demurred.

83.     Professor Comaroff's threatened retaliation and Harvard's inaction thus had their predictable effect: Ms. Kilburn continued to believe that she needed to remain quiet about Professor Comaroff's abuse, and that she was alone in her experience.

### e. Professor Comaroff Harasses Ms. Kilburn and Squeezes Her Thigh in Public

84.     Professor Comaroff took advantage of the University's indifference to continue harassing Ms. Kilburn.

85.     In late 2017, Professor Comaroff saw Ms. Kilburn in the atrium of the Anthropology Department's building. Despite Ms. Kilburn's noticeable attempts to avoid him that semester, he approached her, touched her back again, and insisted that she meet with him.

86.     During a required meeting on or about January 23, 2018, Professor Comaroff criticized Ms. Kilburn for avoiding meetings with him. He then told her that if she ever needed to "talk to a woman," she could approach his wife, Professor Jean Comaroff.

87.     In or around February 2018, Ms. Kilburn was attending a departmental colloquium. As Professor Comaroff was leaving the colloquium, he passed by Ms. Kilburn's seat in the back row and forcibly squeezed her thigh several inches above her knee in view of faculty and students.

88.     And throughout the fall 2018 semester, Professor Comaroff repeatedly asked Ms. Kilburn to meet him alone off-campus for reasons unrelated to her work. These unwelcome proposals made Ms. Kilburn fearful and uncomfortable.

### f.   Professor Comaroff Continues His Harassment Through April 2019

89.     By the spring 2019 semester, Professor Comaroff apparently recognized Ms. Kilburn's efforts to avoid him. He responded by becoming increasingly possessive over her.

90.     In April 2019, Professor Comaroff repeatedly pressured Ms. Kilburn to direct her forthcoming project to a topic in which he (rather than her other advisor, Professor Harkness) specialized—a topic that had never been Ms. Kilburn's area of focus, would be dangerous to undertake, and was not tenable given the political situation in her country of study. Ms. Kilburn expressed these concerns to Professor Comaroff during a meeting on the topic, but Professor Comaroff exploded in response, with no apparent explanation. Shortly thereafter, he forbade Ms. Kilburn from working with Professor Harkness at all, making her entirely beholden to him and more vulnerable to his sexual advances.

22

### g. Ms. Kilburn Reports Professor Comaroff's Harassment to Harvard and Discovers Harvard's Past Indifference to Harvard Student 2's Complaint

91.    The situation soon got worse. On or about April 26, 2019, Ms. Kilburn was in the glassed-in waiting area of the Graduate Program Administrator's office. Professor Comaroff saw her and tried to open the door and enter the waiting area. Ms. Kilburn, seeking to avoid contact with him, and perceiving his approach as another potential sexual advance, told him that she had a meeting and held the door shut. Against Ms. Kilburn's physical resistance, Professor Comaroff continued to try to force his way inside.

92.    This moment was a breaking point for Ms. Kilburn. Before the events in April 2019, she had believed she could manage Professor Comaroff's behavior by avoiding him and seeking joint meetings with Professor Jean Comaroff. But her avoidance had made him more possessive. She feared that she would have to leave the program if Professor Comaroff did not stop harassing her.

93.    This fear drove Ms. Kilburn to report Professor Comaroff's conduct, his threats notwithstanding. On or about April 26, 2019, the same day as the door incident, Ms. Kilburn complained to Professors Joana Pimenta and Lucien Castaing-Taylor that Professor Comaroff had twice kissed her without her consent, told her on her first day of school that she would be raped and killed, and repeatedly harassed her throughout her graduate career.

94.    On or about May 2, May 6, and May 29, 2019, Ms. Kilburn met with Title IX Officer Seth Avakian, Anthropology Department Chair Ajantha Subramanian, and Professor Nicholas Harkness, respectively, to report Professor Comaroff's sexual harassment of her.

95.    Ms. Kilburn's May 2, 2019 complaint to Mr. Avakian was met with predictable indifference. Ms. Kilburn began describing her complaint, but before she even named her harasser, Mr. Avakian guessed that her complaint concerned Professor Comaroff. Mr. Avakian's notes

23

record, "Seth [said] to [Ms. Kilburn:] I should let you know that you don't have to mention the faculty member's name, but I know who you are talking about"—a tacit admission that Harvard's administration was well aware of Professor Comaroff's history of harassment. Then, in an *explicit* admission (also recorded in his notes), Mr. Avakian acknowledged to Ms. Kilburn that "there was another student w[ith] a similar issue w[ith] the same person" who had previously filed a complaint.

96.     Again, however—just like he had done in 2017 with Harvard Student 2—Mr. Avakian did not stop or remedy Professor Comaroff's harassment. Mr. Avakian instead put Ms. Kilburn in contact with Harvard Student 2.

97.     Ms. Kilburn met with Harvard Student 2, who shared with Ms. Kilburn that (as alleged above) Professor Comaroff had engaged in a similar pattern of harassment against her: kissing her, groping her, and isolating her from others.

98.     The meeting confirmed for Ms. Kilburn that Harvard would not protect students who complained about Professor Comaroff, and that his misconduct would therefore continue to go unchecked. Before she learned of Harvard Student 2, Ms. Kilburn had not known that Professor Comaroff had sexually harassed other students, nor that other students had reported his behavior to Harvard. Nor had she suspected that Harvard would ignore repeated complaints that a professor subjected students to serial sexual harassment. These revelations shocked Ms. Kilburn.

99.     Ms. Kilburn shared her experience of harassment with Ms. Mandava in June 2019. Ms. Mandava, in turn, sought out Professor Subramanian to complain of Professor Comaroff's 2017 retaliation and also made a complaint to Professor Harkness about the same.

100.     On information and belief, both Professor Subramanian and Professor Harkness reported those complaints to the Title IX Office, but Mr. Avakian and Harvard did not act on them.

101. Because the Title IX Office failed to act, Professor Comaroff remained unrestricted in his teaching and supervising of students throughout the spring and fall 2019 semesters. Harvard even allowed him to take undergraduate students on a study-abroad trip in the summer of 2019. Harvard waited even though it had received at least *seven* separate complaints to faculty and one direct complaint to Harvard's Title IX office in 2019 alone. In the interim, it left Plaintiffs vulnerable to further harassment and retaliation by Professor Comaroff.

### H. Harvard Fails to Act Until the Media Exposes Professor Comaroff's Misconduct

102. Harvard apparently did not investigate Professor Comaroff's misconduct until a year later, in May 2020—when *The Harvard Crimson* contacted the Title IX Office seeking comment on an article it was set to publish in the coming days. The article concerned sexual harassment by multiple professors in the Anthropology Department, including Professor Comaroff.

103. Now, on or about May 19, 2020, Mr. Avakian informed Plaintiffs that he had filed a formal complaint against Professor Comaroff with Harvard's ODR. This investigation came more than two and a half years after Ms. Czerwienski had first reported Professor Comaroff's threat, more than one year after Ms. Kilburn had reported her own harassment to Harvard's Title IX Office, and eleven months after Ms. Mandava had reported Professor Comaroff's threat to the Department Chair.

104. Still, Harvard officials openly disparaged the ODR process. Mr. Avakian expressly told Ms. Kilburn that reporting to the press would be more impactful than participating in the ODR process. He cited Professor Jorge Dominguez, a Harvard professor who, on information and belief, had serially abused women students for over 40 years, telling Ms. Kilburn that Professor Dominguez's victims found speaking to the press more effective than Harvard's ODR process and

encouraged Ms. Kilburn to do the same. Department Chair Subramanian, too, urged all three Plaintiffs to speak to the *Crimson* and subsequently with *The Chronicle of Higher Education*, because, she said, *that* would give Harvard a reason to act. And Dean Zipser pressed Plaintiffs to speak to the *Chronicle*, because, she said, only a public article would give her cover to take action against Professor Comaroff.

105.    Ms. Kilburn, Ms. Czerwienski, and Ms. Mandava had been reluctant to go public with their stories. But, because Harvard's faculty, Title IX Resource Coordinator, and top-level decision-making officials now disparaged the ODR process and urged them to go to the press, they did so.

**I.    The *Crimson* and *Chronicle* Reports Bring Other Victims Forward and Reveal Harvard's Deliberate Indifference to Rampant Harassment in the Department**

106.    On May 29, 2020, the *Crimson* published an article revealing a decades-long pattern of sexual abuse perpetrated by senior male professors in Harvard's Anthropology Department. The *Chronicle* followed suit on August 25, 2020, publishing an article detailing Professor Comaroff's sexual harassment and retaliation against Plaintiffs, sexual misconduct by two other professors, and Harvard's longstanding indifference thereto. Those reports spurred other victims to come forward.

107.    Before those articles were published, Ms. Czerwienski, Ms. Mandava, and Ms. Kilburn were aware only of the harm Professor Comaroff had caused them and two other students—Harvard Students 2 and 3. Plaintiffs did not suspect that Harvard had failed to respond to prior reports of sexual harassment. Only through the articles and the resulting fallout did Plaintiffs learn of Harvard's longstanding complicity in his abuse.

### a. More Students Speak Up About Professor Comaroff's Longstanding Abuse

108. After the *Crimson* article's publication, multiple students contacted Plaintiffs to share their experiences of sexual harassment by Professor Comaroff and other professors in the Department. These included UChicago Student 2, Harvard Student 1, and a faculty member at another institution who shared that Professor Comaroff harassed her at a 2018 conference. In addition, another current female Harvard Anthropology graduate student ("Harvard Student 4") reported that, in 2018, Professor Comaroff had made an inappropriate sexualized remark to her. And yet another graduate student shared that she had been harassed by Professor Comaroff at a conference.

109. Following the publication of the *Chronicle* article, Plaintiffs also learned that Professor Comaroff had retaliated against Harvard Post-Doc 1 in 2017 when he encouraged Harvard Student 2 to file her complaint of sexual harassment against Professor Comaroff.

110. UChicago Student 2, Harvard Post-Doc 1, Harvard Student 1, and Harvard Student 4 all complained to Harvard about Professor Comaroff's misconduct towards them, but Harvard did not meaningfully act on their complaints. Instead, as it had done to Plaintiffs, Harvard sent the students elsewhere: Dean Zipser advised UChicago Student 2 to make her allegations public through the press, and Mr. Avakian informed Harvard Post-Doc 1 that no investigation would be conducted unless Harvard Post-Doc 1 filed a formal complaint.

### b. The *Crimson* Reveals Harassment by Other Professors in the Department

111. The *Crimson* article also revealed that since at least 2013, Harvard had been willfully ignoring complaints not just against Professor Comaroff, but also against two other professors who served as *chairs* of the Department.

### i. *Professor Theodore Bestor*

112.    Through the *Crimson* article, Plaintiffs learned that Harvard administrators and the Title IX Office knew about multiple complaints of sexual harassment against Professor Theodore Bestor[13] since at least 2013.

113.    Harvard enabled Professor Bestor's longstanding pattern of harassment through its deliberate inaction, according to the *Crimson*. The *Crimson* revealed that, in 2013, a student complained to then-Department Chair Gary Urton that Professor Bestor had subjected her to a pattern of sexual harassment over the course of seven years. Professor Bestor's harassment, according to the article, included unwanted kissing and touching and inappropriate late-night emails. Although Professor Urton told the student that he had relayed the complaint to Harvard's ombudsman, no action was taken at the time, the *Crimson* said.

114.    The *Crimson* further revealed that Harvard's Title IX Office had received reports that Professor Bestor had sexually harassed multiple women, and that, because of his power and influence in the tight-knit field of anthropology, the women feared reprisal should they file formal complaints. Harvard had, however, declined to pursue a formal complaint against Professor Bestor, the *Crimson* said, because Harvard believed that it could not prevent Professor Bestor from retaliating against the women.[14]

115.    The *Crimson* reported that Harvard had finally pursued an ODR complaint against Professor Bestor in 2017 based on a UCLA professor's complaint that Professor Bestor had attempted to hug her and kiss her and had made inappropriate comments to her—and only then

---

[13] Professor Bestor was Chair of the Anthropology Department from 2007 to 2012.

[14] James S. Bikales, *Protected by Decades-Old Power Structures, Three Renowned Harvard Anthropologists Face Allegations of Sexual Harassment*, The Harvard Crimson (May 29, 2020), https://www.thecrimson.com/article/2020/5/29/harvard-anthropology-gender-issues/.

after she appealed ODR's initial refusal to investigate her complaint. The investigation eventually found that Professor Bestor committed two counts of sexual misconduct against the UCLA professor, but Harvard allowed him to return to work before completing his required sanctions, the *Crimson* reported.

### ii. Professor Gary Urton

116.    The *Crimson* also described years of sexual harassment by Professor Urton.

117.    The *Crimson* revealed that, in 2011, Professor Urton pressured a student into unwelcome sex by propositioning her in exchange for a letter of recommendation and a high grade in his class. Fearing professional reprisals if she did not assent, the student remained silent for years, the *Crimson* said. The student eventually complained in 2016 to then-University President Drew Faust and Harvard's sexual harassment officer, yet the University took no steps to investigate or protect other students, according to the *Crimson*.[15]

118.    In a subsequent article, the *Crimson* further reported that Professor Urton had propositioned a female graduate student on a research trip in 2003, and for the following nine years, made her professional development at Harvard contingent on a sexual relationship with him.[16] According to the *Crimson*, she complained to Harvard's Dean for Graduate Student Affairs Garth McCavana, but, echoing Mr. Avakian, Dean McCavana responded that complaints rarely worked out in the victim's favor, which discouraged her from contacting the Title IX office. "I

---

[15] *Id.*

[16] James S. Bikales, *Anthropology Faculty Call for Urton's Resignation as More Former Students Accuse Him of Sexual Misconduct*, The Harvard Crimson (June 5, 2020), https://www.thecrimson.com/article/2020/6/5/urton-more-allegations-anthropology-faculty-demand-resignation/.

was essentially told that I could file a complaint or get a degree, but not both," the former student told the *Crimson*.[17]

119.    For his part, Professor Urton reminded the University that the allegations against him were "well known" and that "Harvard has had at its disposal (and has discounted) [the allegations] for three years."[18] He also acknowledged that Harvard knew "these are issues that do not affect the Department of Anthropology alone, but are pervasive within the University."[19]

120.    The articles, Professor Urton's response, and the resulting fallout laid bare Harvard's complicity in the abuse that, upon information and belief, Anthropology Department professors had been committing against women students for over a decade. Before the *Crimson*'s reporting, Plaintiffs were aware only of the misconduct to which they and a few others had been subjected. The *Crimson*, however, exposed both a broader pattern of abuse and that, for years, ODR, the Title IX Office, faculty, and administrators systematically refused to act on students' complaints. This inaction, in turn, facilitated new abuses (including Plaintiffs'), all perpetrated under threats to the careers of additional female students.

**J.    Harvard Conducts an Inadequate Title IX Investigation that Exposes Plaintiffs to Further Retaliation**

121.    After the publication of the *Crimson* and *Chronicle* articles in May and August, 2020, respectively, Harvard finally began to investigate Plaintiffs' longstanding allegations against Professor Comaroff. This investigation, however, was limited in scope, placed inordinate burdens

---

[17] *Id.*

[18] Letter from Gary Urton, Professor, Harvard Univ., to Claudine Gay, Edgerley Fam. Dean of the Fac. of Arts and Scis., Harvard Univ., and Lawrence Bobo, Dean of the Div. of Soc. Scis., Harvard Univ. 1-2 (May 31, 2020).

[19] *Id.*

on Plaintiffs, and proved woefully inadequate. It has left Plaintiffs vulnerable to further harassment and retaliation and perpetuated the hostile environment they face in the Department.

      **a.  Harvard Refuses to Investigate Professor Comaroff Unless Plaintiffs Proceed with Formal Complaints**

122.   In May 2020—shortly after assuring Plaintiffs that he had filed a formal complaint with ODR—Mr. Avakian backtracked. He now told Plaintiffs that he would not participate in the case, and that they would need to file formal complaints with ODR themselves if they intended to pursue the matter. ODR confirmed to Plaintiffs that unless they filed formal complaints, ODR would not fully investigate their case.

123.   Ms. Kilburn, Ms. Czerwienski, and Ms. Mandava thus filed formal complaints against Professor Comaroff with ODR on May 18, July 15, and July 31, 2020, respectively—knowing that if they did not, Harvard would continue to ignore Professor Comaroff's pattern of sexual harassment and future students would remain vulnerable to him.

      **b.  Harvard Allows Professor Comaroff to Tamper with Evidence**

124.   Professor Comaroff quickly poisoned the ODR process. Harvard allowed him to do so.

125.   On or about August 6, 2020, Professor Comaroff received a copy of Ms. Czerwienski's ODR complaint. The complaint relied, among other sources of proof, on messages Harvard Student 2 had sent to Ms. Czerwienski in 2017 detailing Professor Comaroff's ongoing abuse. Upon information and belief, that same day, Professor Comaroff pressured Harvard Student 2—over whose dissertation defense he would soon be presiding—to delete those messages.

126.   And throughout summer 2020, Professor Comaroff and his allies tampered with witnesses: they contacted Harvard Post-Doc 1 and two female UChicago graduate students,

threatening repercussions if they did not remain silent about their knowledge of his misconduct. These threats had their intended effect.

127.    This tampering violated Harvard's policies and procedures. Plaintiffs reported these issues to ODR's investigator (Ilissa Povich) and to Harvard deans. But Harvard refused to act.

### c.  Harvard Allows Professor Comaroff to Retaliate Against Ms. Kilburn

128.    Harvard also allowed Professor Comaroff to weaponize the ODR process to retaliate against Ms. Kilburn.

129.    Professor Comaroff named three of the most prominent scholars in Ms. Kilburn's field—Peter Geschiere, Caroline Elkins, and Sue Cook—as witnesses in his defense. These scholars had no firsthand knowledge of the relevant events and *did not even know* Ms. Kilburn. But, by drawing them into the process, Professor Comaroff ensured that they would know about Ms. Kilburn's formal complaint against him and his animus towards her.

130.    All three of these professors are preeminent scholars in Ms. Kilburn's field and would have been potential advisors and mentors available to replace Professor Comaroff. But because ODR allowed Professor Comaroff to needlessly involve them in Ms. Kilburn's case, Ms. Kilburn can no longer turn to them as advisors or mentors, nor can she count on them as impartial reviewers. Through this action, Professor Comaroff flatlined Ms. Kilburn's nascent career.

131.    Professor Comaroff did not stop there: he also named Professor George Meiu—one of Ms. Kilburn's *current* dissertation committee members—as a witness to testify about *the layout of a well-known seminar room*. Professor Meiu had no relevant testimony to provide in Professor Comaroff's defense. He was, however, set to preside over Ms. Kilburn's qualifying exams and charged with determining whether Ms. Kilburn would be awarded a doctorate at the end of her studies. He was also working closely with the Comaroffs. Although Professor Meiu refused to give

testimony, he made it clear to Ms. Kilburn that he did not support her complaint. Ms. Kilburn was thus forced to delay her qualifying exams for months.

132.    ODR played along with Professor Comaroff and approached the witnesses for interviews. It, predictably, found that they did not have information material to Ms. Kilburn's complaint. Nonetheless, ODR took no steps to investigate or forestall Professor Comaroff's efforts to use the ODR process to poison the well.

133.    Ms. Kilburn therefore complained to Mr. Avakian and Kwok Yu, the Harvard Associate Dean who was overseeing Plaintiffs' complaints, that Professor Comaroff was calling witnesses for the purpose of derailing her career. But the Title IX Office also took no discernable action.

### d.  Harvard Obtains and Discloses Ms. Kilburn's Confidential Medical Records to Professor Comaroff Without Her Consent

134.    The investigation only got worse. In 2020, ODR contacted Ms. Kilburn's psychotherapist, a private therapist unaffiliated with Harvard, and obtained the psychotherapy notes from her sessions with Ms. Kilburn. ODR did not obtain Ms. Kilburn's consent for the release of those records.

135.    After obtaining the notes without Ms. Kilburn's consent, ODR then withheld the full notes from Ms. Kilburn, redacting swaths of the notes and refusing to disclose the redacted portions even as ODR's investigator grilled her about the redacted contents during an interview.

136.    ODR then provided the notes to Professor Comaroff as part of its draft report. Professor Comaroff, in turn, deployed the notes to gaslight Ms. Kilburn, claiming that she must have imagined that he sexually harassed her because she was experiencing post-traumatic stress disorder—a condition that she developed *as a direct result* of his conduct.

137.    Finally, ODR published the notes in its Final Report concerning Ms. Kilburn's complaint against Professor Comaroff and appended them as exhibits, making Ms. Kilburn's medical records available to anyone with access to the Final Report.[20]

### e.    Harvard Refuses to Hold Professor Comaroff Responsible for his Pattern of Sexual Harassment and Retaliation

138.    ODR's findings were issued in August 2021, over *a year* after Plaintiffs had filed their complaints. Despite a process stacked against Plaintiffs, ODR made one finding in Ms. Kilburn's favor: it determined that Professor Comaroff had "over the course of approximately five minutes" repeatedly described how Ms. Kilburn "would be raped" in certain parts of Africa. ODR found that these unprompted and graphic descriptions constituted "severe" sexual harassment against Ms. Kilburn.

139.    As to Professor Comaroff's other, repeated sexual harassment and assaults against Ms. Kilburn (including his forced kissing and groping) and his retaliation against Ms. Mandava and Ms. Czerwienski, however, ODR found that Professor Comaroff had not violated Harvard's Sexual and Gender-Based Harassment Policy.

140.    ODR's reports—portraying Professor Comaroff's misconduct as a one-off verbal incident—reveal willful blindness to the overwhelming evidence that he engaged in a *pattern* of serial sexual harassment and retaliation that Harvard knew about but failed to stop.

### i.  Ms. Kilburn's ODR Report

141.    In Ms. Kilburn's case, ODR refused to interview *two thirds* of the witnesses Ms. Kilburn identified (even as it interviewed or attempted to interview all of the witnesses Professor

---

[20] Harvard persisted in this course despite a request from Ms. Kilburn that Harvard limit access to her confidential medical information. On or about September 28, 2021, Ms. Kilburn's counsel requested that Harvard not further disclose her medical records; inform her of individuals who have received a copy of her medical records; and instruct these individuals to turn over the records to Harvard's general counsel's office without retaining copies. Harvard rejected these requests.

Comaroff named). ODR also ignored the testimony of witnesses it did interview: throughout the investigation, Ms. Kilburn gave consistent, specific testimony detailing each of the repeated instances when Professor Comaroff kissed and touched her without consent. At least three separate witnesses confirmed that she had been reporting his pattern of abuse to them since 2017, while the harassment was ongoing, and long before she filed her complaint with ODR.

142.    ODR, however, cited "inconsistencies" in Ms. Kilburn's statements and used them to discount her testimony. These "inconsistencies" are, in reality, a pretext to avoid a finding of serial harassment and insulate Harvard from liability. To cite but a few examples:

    a.  Ms. Kilburn told ODR that Professor Comaroff kissed her in front of the Barker Center with force. Yet ODR rejected this live, corroborated testimony because ODR found it "inconsistent" with a sentence fragment from Mr. Avakian's notes. In fact, ODR did not even interview Mr. Avakian about this reference, but had it done so, ODR would have discovered that the reference did *not* contradict Ms. Kilburn's testimony.

    b.  Ms. Kilburn testified that Professor Comaroff kissed her at his home after a brunch. Another witness corroborated Ms. Kilburn's testimony, and ODR admitted that the witness's account was "credible" and "contemporaneous," because Ms. Kilburn had told her about the kiss "on the same day" it occurred. Nonetheless, ODR rejected this corroborated testimony because Ms. Kilburn could not recall against precisely *which wall* in the room Professor Comaroff had assaulted her.

    c.  Ms. Kilburn and three other witnesses testified that Professor Comaroff groped her thigh, but ODR rejected Ms. Kilburn's testimony based primarily on a non-existent "inconsistency" in her consistent statements about where Professor Comaroff was sitting before he groped her.

    d.  Professor Harkness testified at Ms. Kilburn's ODR proceeding that Ms. Kilburn had complained to him and that Professor Comaroff has sexually harassed students at UChicago. ODR ignored his testimony entirely.

143.    In addition, ODR entirely failed to consider multiple incidents of harassment against Ms. Kilburn, including Professor Comaroff's repeated invitations to meet off campus, his

forbidding her from working with her advisor, and his efforts (after Ms. Kilburn's clear and repeated efforts to avoid him) to forcibly enter an enclosed space with her over her resistance.

### ii. *Ms. Mandava and Ms. Czerwienski's Reports*

144.    ODR made no finding against Professor Comaroff on the central issue in Ms. Mandava and Ms. Czerwienski's cases: whether Professor Comaroff threatened them and other students in retaliation for discussing his sexual misconduct. Instead, ODR's finding in Ms. Mandava's case rested on its conclusion that Ms. Mandava had not engaged in protected activity. To reach that conclusion, ODR ignored Ms. Mandava's testimony (corroborated by contemporaneous messages referencing the conversations at issue) that she had complained of Professor Comaroff's harassment to Professor Subramanian and to multiple students. It also ignored her testimony that Professor Comaroff had *told* her he *knew* she had engaged in such conversations, and that she confirmed his belief before he threatened her.

145.    With respect to Ms. Czerwienski, ODR concluded that she "engaged in a protected activity by 'sharing with other students her knowledge of [Professor Comaroff's] purported . . . sexual harassment of' [Harvard Student 2]." Still, ODR determined that Professor Comaroff did not have "notice" that Ms. Czerwienski had engaged in protected activity. In doing so, ODR ignored Ms. Czerwienski's testimony that weeks before Professor Comaroff's October 13, 2017 threat, Harvard Student 2 *told* Professor Comaroff that Ms. Czerwienski was discussing his misconduct with other students. And ODR further ignored the testimony of three separate students who (in ODR's own words) "each understood the last student referenced by [Professor Comaroff] in the October 13 conversation . . . was [Ms. Czerwienski]."

146.    Moreover, ODR refused to consider any of Ms. Czerwienski's written communications with Harvard Student 2. These communications show Harvard Student 2 detailing

Professor Comaroff's sexual harassment and reference Ms. Czerwienski's discussions with other students about his harassment. They further reflect that Harvard Student 2 told Professor Comaroff about those discussions and notified him that Ms. Czerwienski engaged in protected activity.

### iii.   ODR Recommends No Discipline

147.    Based on these and other inequities that permeated its blinkered investigation, ODR did not recommend discipline for Professor Comaroff. Indeed, ODR proposed no action that would prevent further harassment or retaliation against Plaintiffs, much less remedy the harm they had suffered.

148.    Ms. Mandava, Ms. Czerwienski, and Ms. Kilburn therefore appealed ODR's decisions. The University's appellate panel, however, held to ODR's determination and summarily concluded that no "procedural violation occurred." The Title IX Office subsequently informed Plaintiffs that "[t]he findings and determinations reached in the course of [ODR's] investigation are . . . final and cannot be re-visited."

149.    Harvard's position is therefore clear: it views ODR's determination that Professor Comaroff is not responsible for most of his sexual harassment against Ms. Kilburn and for his retaliation against Ms. Mandava and Ms. Czerwienski as final and sound.

### K.  An External Review Confirms Ms. Mandava's Claims

150.    After ODR issued its Final Reports, the Faculty of Arts and Sciences ("FAS") (the division of Harvard to which the Department belongs) conducted a review to determine whether Professor Comaroff's "corrective rape" discussion with Ms. Kilburn violated its Professional Conduct Policy, and whether Professor Comaroff's October 2017 threat to Ms. Mandava and Ms. Czerwienski violated that policy. It appointed an external factfinder to review ODR's Final Report

and record of investigation concerning Ms. Mandava's case (i.e., the same evidence that ODR reviewed).

151.    In December 2021, the external factfinder concluded, based on this evidence, that, on October 13, 2017, Professor Comaroff threatened Ms. Mandava to stop her from participating in discussions about his sexual misconduct. The investigator found that his statements violated the FAS Professional Conduct Policy.

## L.   Harvard Announces Inadequate and Temporary Sanctions for Professor Comaroff

152.    On January 20, 2022—nearly five years after Ms. Mandava, Ms. Czerwienski, and Harvard Student 2 began reporting Professor Comaroff's sexual harassment, and over a decade after Harvard first learned of the risk he posed to students—Dean of FAS Claudine Gay announced limited findings and discipline against Professor Comaroff. Dean Gay wrote that after an investigation by ODR and FAS, Professor Comaroff "was found to have engaged in verbal conduct that violated the FAS Sexual and Gender-Based Harassment Policy and the FAS Professional Conduct Policy." She provided no further detail about his underlying conduct.

153.    Harvard imposed limited, temporary sanctions on Professor Comaroff in response: the FAS placed Professor Comaroff on leave for the spring 2022 semester and relieved him of teaching required courses (but evidently not elective courses), from serving on dissertation committees, and from advising graduate students who do not have at least one other co-advisor for the 2022-2023 academic year. Harvard did not take any measures to prevent Professor Comaroff or those in his network from engaging in further harassment or retaliation against Plaintiffs or other students.[21]

---

[21] Dean Gay's statement further referred victims of harassment to Harvard's Office of Sexual Assault Prevention and Response, a Harvard program that has been defunct for over a year.

**M. "Perfectly Legitimate Office-Hours Advice": Harvard Exposes Plaintiffs to Further Retaliation from the Comaroffs and Their Allies**

154.    Mere hours after Harvard released its statement, Professor Comaroff and his wife resumed their campaign of retaliation. On January 20, 2022, Professor Jean Comaroff disseminated a press release from Professor John Comaroff's lawyers disparaging Plaintiffs. She sent the message to a broad segment of the Comaroffs' professional network, including former students, Harvard faculty, and other Anthropology scholars with the power to influence Plaintiffs' careers. One of the recipients of Professor Jean Comaroff's email was Ms. Czerwienski's current advisor, whom Ms. Czerwienski selected after she was forced to drop Jean Comaroff as an advisor, and who is charged with determining whether Ms. Czerwienski will be awarded a Ph.D.

155.    In her email, Professor Jean Comaroff thanked the recipients for their "support and affirmation" during the ODR investigation and wrote that she was sharing the press release to provide "the full context" behind Harvard's findings, as she believed this case "speaks to social and political conditions in the contemporary academy" with "serious professional implications for the future."

156.    The statement Professor Jean Comaroff appended to her email—authored by Professor John Comaroff's lawyers—panned Plaintiffs' opposition to sexual harassment as an "attack on academic freedom."

157.    Harvard Law Professor Janet Halley joined in the press release's attack. She commented, "What this case boils down to: two students took offense at *perfectly legitimate office-hours advice*" (emphasis added). She exhorted "[e]veryone who advises at Harvard" to "note this attack on academic freedom."

158.    The press release and Professor Halley's comment not only grossly mischaracterized Professor Comaroff's conduct—including his insistence to Ms. Kilburn that she

39

would be raped and murdered in a country irrelevant to her studies, his unwarranted physical advances, and his threats against Ms. Mandava and Ms. Czerwienski for speaking out about his sexual harassment—it also evinced a clear intent to discredit Plaintiffs and to dissuade students from making complaints about similar harassment.

159.    The Comaroffs' efforts paid off. Within days, they convinced *38 faculty members* to sign a public letter that minimized Professor Comaroff's abuse and misrepresented the few factual findings ODR made. The letter falsely stated that Professor Comaroff had simply given Ms. Kilburn "advice intended to protect an advisee from sexual violence"—even though (as ODR credited) he had repeatedly described how Ms. Kilburn "would be raped" in a country far away from the one she planned to study. The Harvard faculty members further dismissed the external factfinder's conclusions, questioning why the review was "justif[ied]." And they bemoaned that Harvard would "sanction" a "committed university citizen" by investigating such complaints against a faculty member they "know . . . to be an excellent colleague." By signing the letter, Harvard faculty further curtailed Plaintiffs' narrowing universe of potential advisors: amongst the signatories are Professor Greenhalgh, Professor Elkins, and dozens of other faculty members.

160.    Both communications, distributed to academics with the power to influence Plaintiffs' careers, constitute textbook retaliation. Their message is clear: students who experience harassment should shut up. It is the price to pay for entry into academia.

### N. Harvard's Unlawful Policies Underpin Its Deliberate Indifference

161.    Plaintiffs' odyssey of abuse was not accidental. It was, instead, the product of at least five ongoing practices, the effects of which are now well known: to protect powerful faculty, even at the expense of students.

162.   First, Harvard does not investigate or otherwise act on credible reports of sexual harassment unless the victim proceeds with a formal ODR complaint, even if Harvard has received prior complaints against the same professor. Harvard maintains this policy despite a December 30, 2014 warning from the Department of Education's Office for Civil Rights that "if a recipient knows . . . about sexual harassment that creates a hostile environment, a recipient must take immediate and appropriate action to investigate or otherwise determine what occurred . . . regardless of whether a student has complained, asked the recipient to take action, or identified the harassment as a form of discrimination."[22] Harvard could respond to student complaints by investigating their allegations or bringing its own formal complaint; but Harvard has repeatedly chosen not to do so.

163.   Second, ODR ordinarily does not credit women's complaints unless they are corroborated by independent evidence, no matter how credible the complainant's testimony. Other survivors have publicly attested that Harvard has "ignored some of the most egregious cases of harm and sexual harassment that were brought to their office because of lack of documentary evidence."[23] At one time, Harvard's written procedures concerning complaints of sexual assault explicitly provided that Harvard ordinarily would not consider a case unless allegations were supported by "independent corroborating evidence." Harvard has since removed that requirement from its published procedures, but it has persisted in practice. There is a consensus among scholars

---

[22] Letter from Joel J. Berner, Reg'l Dir., U.S. Dep't of Educ., Off. for C.R., to Martha C. Minow, Dean, Harvard L. Sch. 3-4 (Dec. 30, 2014); *see also* Dear Colleague Letter from Russlynn Ali, Assistant Sec'y for C.R., U.S. Dep't of Educ., Off. for C.R., to Title IX Coordinators 4 (Apr. 4, 2011) (same).

[23] Ann Gibbons, *Harvard Bans Former Anthropology Chair After Finding Persistent Sexual Harassment*, Science (June 10, 2021), https://www.science.org/content/article/harvard-bans-former-anthropology-chair-after-finding-persistent-sexual-harassment.

that the archaic historical requirement of independent corroboration in cases of gender violence (and sexual assault in particular) rests on biases against women as lacking credibility.

164.    Third, even as Harvard requires corroboration, its rules sharply restrict the written corroboration that complainants may offer. Even when a complainant *has* corroborating communications, Harvard will not admit them unless both parties to the communication participate in the proceeding and make themselves available for cross-examination. This rule arbitrarily excludes (among other things) statements by witnesses who are dissuaded from participating in the ODR process by well-grounded fears of repercussions—even direct threats by the accused himself. For example, Professor Comaroff's intimidation (including reading her complaint aloud to her) and threats of retaliation deterred Harvard Student 2 from participating in the ODR process. As a result, Harvard ignored Harvard Student 2's contemporaneous written accounts of her abuse.

165.    Fourth, as a matter of policy, Harvard does not take measures to protect students from professional retaliation. Despite Plaintiffs' repeated complaints and expressed concerns that Professor Comaroff would damage their careers through contact with colleagues and former students at other institutions, and despite reports that Professor Comaroff did so, Harvard has done nothing to prevent him from disparaging Plaintiffs to prospective employers. Indeed, Harvard has professed that it will do nothing to prevent this.

166.    Fifth, Harvard failed to adequately train faculty in the Department to report sexual harassment by faculty against students. Despite knowing that some faculty would be reluctant to report misconduct committed by powerful senior faculty, and despite reports of sexual harassment by faculty in the Department (including Professor Comaroff), Harvard took no known steps to train or encourage faculty in the Department to make reports. As a result, faculty who knew of the

danger Professor Comaroff posed, dating back to his time at UChicago, did not timely report this knowledge to Harvard's Title IX Office, exposing Plaintiffs to abuse.

167.    These shortcomings were not public and were not known to Plaintiffs as their ordeal unfolded, but they were no mystery to Harvard. Harvard Professor Stephen Blyth wrote in a May 2018 letter to then-President Drew Faust that Harvard's "current institutional structure may actively discourage victims from pursuing complaints."[24] He explained that Harvard fails to instill "confidence that perpetrators will, when appropriate, be removed from the University," and concluded, "***Harvard has been an institution that does not act***" (emphasis added).[25] Similarly, in 2021, Harvard faculty sent a letter to Harvard complaining about the pervasive deficiencies in ODR's process. Indeed, Deputy Provost Peggy Newell and Dean of the Graduate School of Arts and Sciences Emma Dench admitted flaws in Harvard's ODR process to Plaintiffs. Dean Dench acknowledged to Plaintiffs that the ODR process made students "go mad" because it left them "in limbo forever," and Deputy Provost Newell affirmed that Mr. Avakian has mishandled Plaintiffs' complaints.

168.    To date, however, Harvard has failed to correct these inequities. It has, to the contrary, repeatedly resisted programmatic changes to the ODR process. Harvard's Graduate Student Union has suggested such changes. So have Plaintiffs. But Harvard persists in its archaic policies and customs, maintaining a "culture in which the abuse of power is normalized and accommodated."[26]

---

[24] Letter from Stephen Blyth, Professor, Harvard Univ., to Drew G. Faust, President, Harvard Univ. (May 7, 2018), https://www.bostonglobe.com/2019/05/24/read-letter/h2qAM6WfEOWiRHQVmu0N2M/story.html?camp=bg%3Abrief%3Arss%3Afeedly&rss_id=feedly_rss_brief&s_campaign=bostonglobe%3Asocialflow%3Atwitter.

[25] *Id.*

[26] Harvard University Anthropology Department, Standing Committee for a Supportive Departmental Community Final Report 10 (2021).

**O.** <u>**Harvard's Deliberate Indifference Has Harmed and Continues to Harm Plaintiffs**</u>

169.     Harvard's failure to prevent and redress Professor Comaroff's abuse and retaliation has profoundly altered the academic trajectories and career prospects of Ms. Czerwienski, Ms. Kilburn, and Ms. Mandava. It has also caused them significant emotional distress—emotional distress that will continue for the foreseeable future.

170.     All three Plaintiffs have been forced to delay their degree progress to participate in ODR's lengthy—and ultimately futile—process. They spent hundreds of hours marshalling evidence, preparing submissions, and struggling to understand ODR's arcane evidentiary rules, taking valuable time from their studies, writing, and other academic work—only for Harvard to refuse to acknowledge Professor Comaroff's serial harassment and threats against students, just as it has done for years. Learning and living with the reality that Harvard is, and has for years been, willing to protect a serial harasser at the expense of their careers has taken a significant toll on Plaintiffs.

171.     This ordeal has made it impossible for Ms. Kilburn to proceed with her doctorate as planned. As a fifth-year graduate student, she must form a dissertation committee consisting of advisors and faculty with expertise in her area of study, but her geographical region is studied by only three Harvard professors in her field: the Comaroffs and their former advisee, Professor Meiu. Nor can Ms. Kilburn look outside the Department to Professor Geschiere, Professor Elkins, or Dr. Cook, whom Professor Comaroff needlessly involved in her case. Ms. Kilburn must instead change her course of study and build an entirely new professional network. These limitations are profoundly damaging to Ms. Kilburn's academic progress; it will be virtually impossible for her to finish her doctorate within the planned seven-year timespan. If Ms. Kilburn is unable to find

new advisors and successfully develop a new field of expertise, she may be forced to leave academia entirely, having wasted years of her life and vast financial and personal resources.

172.    Ms. Czerwienski had to direct her course of study away from Professor Comaroff's regional expertise and sever her advising relationship with Professor Jean Comaroff. The effects are far-reaching: Ms. Czerwienski's current advisor was one of the recipients of Professor Jean Comaroff's retaliatory email. And a prominent anthropologist in Ms. Czerwienski's subspeciality derided Ms. Czerwienski and her co-complainants for their "Titld [sic] IX uptightness."

173.    Ms. Mandava had to change the focus of her dissertation away from Professor John Comaroff's subject matter expertise and has been unable to receive crucial letters of recommendation from Professors Jean and John Comaroff.

174.    Given Professor John Comaroff's influence in the field and retaliation against them, all three Plaintiffs face dismal job prospects upon completion of their degrees, which has caused and will continue to cause irreparable damage to their earning potential.

175.    In short, Harvard utterly failed Ms. Czerwienski, Ms. Kilburn, and Ms. Mandava, just as it has failed Professor Comaroff's many other victims.

176.    By hiring and retaining Professor Comaroff—and by ignoring complaints about him for years—Harvard recklessly disregarded the likelihood that its students would suffer serious harm.

## V.    COUNTS

### Count One

**Violation of Title IX of the Education Amendments of 1972**

**Deliberate Indifference to Gender Discrimination and Hostile Educational Environment**

**(20 U.S.C. § 1681)**
**(On Behalf of All Plaintiffs)**

177.    Plaintiffs re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

178.    This count is brought on behalf of all Plaintiffs.

179.    Plaintiffs are enrolled at Harvard as graduate students.

180.    At all times relevant to this action, Harvard has received, and continues to receive, federal financial assistance.

181.    Harvard has discriminated against Plaintiffs Czerwienski, Kilburn, and Mandava by subjecting them, through deliberate indifference, to discrimination based on their gender, including disparate treatment, retaliation, and a hostile environment that was sufficiently severe, pervasive, and objectively offensive to interfere with their educational opportunities and deprive them of the benefits of their educational programs. Relevant actions include, but are not limited to:

    a.  In October 2017, Professor Comaroff retaliated against Ms. Mandava and Ms. Czerwienski by threatening their careers because he believed they had reported and would report his sexual harassment to other students and faculty, which is a protected activity under Title IX.

    b.  From 2017 through 2022, Professors John and Jean Comaroff created a hostile educational environment for Ms. Mandava and Ms. Czerwienski because of the Comaroffs' belief that Ms. Mandava and Ms. Czerwienski had reported Professor Comaroff's sexual harassment and later his retaliation to other students, to faculty, and to Harvard. The Comaroffs' retaliatory actions at this time included, but are not limited to, threatening Ms. Mandava and Ms. Czerwienski's careers and disseminating disparaging and misleading statements about Plaintiffs.

    c.  From 2017 through 2021, Professor John Comaroff engaged in a pattern of sexual harassment and retaliation against Ms. Kilburn, which created a hostile educational environment.

    d.  In 2021, Professor Comaroff perpetuated the hostile environment by retaliating against Ms. Kilburn for complaining about his harassment. His acts of retaliation included, but are not limited to, baselessly naming prominent scholars in her field as witnesses in Harvard's ODR process.

e.  In January 2022, Professors John and Jean Comaroff disseminated disparaging and misleading statements about Plaintiffs in retaliation for Plaintiffs' filing of complaints of discrimination with Harvard's ODR.

f.  In February 2022, Professors John and Jean Comaroff and other Harvard faculty retaliated against Plaintiffs by publishing a false or misleading statement that would reasonably dissuade students from making complaints against faculty.

182.  Before Professor Comaroff took these actions, appropriate persons at Harvard with authority to implement corrective measures were on actual notice of the risk he posed to students. Harvard knew that Professor Comaroff had sexually harassed and otherwise discriminated against other students before he retaliated against Ms. Mandava and Ms. Czerwienski and before he sexually harassed and retaliated against Ms. Kilburn. In addition, since 2017, Harvard has been on actual notice of the hostile academic environment that Plaintiffs themselves have endured at Harvard. Harvard has shown continued deliberate indifference to Professor Comaroff's sexual harassment and retaliation by tolerating, condoning, ratifying, and failing to take remedial action to correct it.

183.  Harvard has also maintained an official policy, custom, and/or practice of deliberate indifference to a known overall risk of sexual harassment, retaliation, and gender-based disparate treatment against graduate students in the Anthropology Department. Specifically, Harvard has (among other things) failed to adequately train its employees to prevent, report, and correct sexual harassment and retaliation and to address its effects; failed to adequately act on multiple reports of sexual harassment and retaliation by multiple professors; maintained and enforced dispute resolution policies and processes that cause Harvard officials to fail to act on reports of sexual harassment and fail to deter systemic sexual harassment; and otherwise failed to implement adequate procedures to detect, monitor, and correct sexual harassment and retaliation. Harvard's official policy of deliberate indifference to gender discrimination has systemically deprived

women and non-binary graduate students in the Department of benefits, privileges, and placement services relative to men.

184.    Harvard's deliberate indifference to the known risk of sexual harassment and retaliation that Professor Comaroff posed, its inadequate response to Plaintiffs' complaints, and its failure to correct pervasive issues of sexual harassment and discrimination in the Department have themselves exacerbated the hostile environment that Plaintiffs experienced in the Department.

185.    Through its deliberate indifference, Harvard has denied all three Plaintiffs their rights to work and learn in an environment free of gender discrimination and associated retaliation. Plaintiffs have suffered and will continue to suffer harm, including loss of future educational and employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish, and other economic and non-economic damages.

186.    Because of the continuous nature of Harvard's unlawful conduct, Plaintiffs are entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

187.    Because a reasonable person in each Plaintiff's position would have first discovered that Harvard's unlawful practices and handling of prior complaints against professors in the Anthropology Department were the probable cause of her injury within the applicable limitations period, Plaintiffs are entitled to the application of the discovery rule to the unlawful acts alleged herein.

188.    Because Professor Comaroff threatened their careers if they spoke out about his misconduct, because Harvard ratified that threat by failing to act on it, and because Professor Comaroff's threat induced Plaintiffs Mandava and Czerwienski to keep silent about his misconduct until May 2019, equity estops Harvard from relying on the statute of limitations.

189.    Plaintiffs are entitled to all legal and equitable remedies available for violations of Title IX, including compensatory damages, injunctive relief, attorneys' fees and costs, and other appropriate relief.

**Count Two**

**Violation of Title IX of the Education Amendments of 1972**

**Retaliation**

**(20 U.S.C. § 1681)**
**(On Behalf of All Plaintiffs)**

190.    Plaintiffs re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

191.    This count is brought on behalf of all Plaintiffs.

192.    Plaintiffs are enrolled at Harvard as graduate students.

193.    At all times relevant to this action, Harvard has received, and continues to receive, federal financial assistance.

194.    In addition to discriminating against Plaintiffs through deliberate indifference to the risk and reality of a sex-based hostile environment, Harvard discriminated against Plaintiffs through its deliberate indifference to the retaliatory acts of its employees,[27] including:

    a.   In October 2017, Professor Comaroff retaliated against Ms. Mandava and Ms. Czerwienski by threatening their careers because he believed they had reported and would report his sexual harassment to other students and faculty, which is a protected activity under Title IX.

    b.   From 2017 through 2022, Professors John and Jean Comaroff created a hostile educational environment for Ms. Mandava and Ms. Czerwienski based on the Comaroffs' belief that Ms. Mandava and Ms. Czerwienski had reported Professor Comaroff's sexual harassment and later his retaliation to other students, to faculty, and to Harvard (a protected activity). This retaliation includes, but is not limited to, threatening Ms. Mandava and Ms. Czerwienski's

---

[27] Plaintiffs assert Count Two (along with their other claims) in addition to and in the alternative to Count One and maintain that retaliation for complaints of sexual harassment is a form of gender discrimination.

careers and disseminating disparaging and misleading statements about Plaintiffs for having filed complaints of discrimination.

c.  In 2021, Professor Comaroff perpetuated the hostile environment by retaliating against Ms. Kilburn for complaining about his harassment (a protected activity), including by baselessly naming prominent scholars in her field as witnesses in the ODR proceedings in retaliation for her formal complaint.

d.  In 2022, Professors John and Jean Comaroff and Professor Janet Halley retaliated against Plaintiffs by disseminating a false or misleading statement that would reasonably dissuade students from making complaints against faculty.

e.  In 2022, 38 Harvard faculty members retaliated against Plaintiffs by publishing a false or misleading statement that would reasonably dissuade students from making complaints against faculty (a protected activity).

195.   Before Professor Comaroff and his allies took these actions, appropriate persons at Harvard with authority to implement corrective measures were on actual notice of the risk they posed to students. Harvard also knew that its policies, customs, and practices unreasonably exposed students (including Plaintiffs) to retaliation. Harvard was further aware that from 2017 through 2020, the above retaliation continued to chill Plaintiffs' opposition to Professor Comaroff's discrimination and continued to harm their education and careers. Nonetheless, Harvard maintained a policy, custom, and practice of deliberate indifference to retaliation in its educational programs leaving Plaintiffs vulnerable to it.

196.   Harvard's actions would dissuade a reasonable student from making or supporting a charge of discrimination.

197.   Because of the continuous nature of Harvard's unlawful conduct, Plaintiffs are entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

198.   Because a reasonable person in each Plaintiff's position would have first discovered that Harvard's unlawful polices were the probable cause of her injury within the applicable limitations period, Plaintiffs are entitled to the application of the discovery rule.

199.    Plaintiffs are entitled to all legal and equitable remedies available under Title IX, including compensatory damages, injunctive relief, attorneys' fees and costs, and other appropriate relief.

## Count Three

### Violation of Title IX of the Education Amendments of 1972

### Gender Discrimination

### (20 U.S.C. § 1681)
### (On Behalf of All Plaintiffs)

200.    Plaintiffs re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

201.    This count is brought on behalf of all Plaintiffs.

202.    Plaintiffs are enrolled at Harvard as graduate students.

203.    At all times relevant to this action, Harvard has received, and continues to receive, federal financial assistance.

204.    In addition to discriminating against Plaintiffs through deliberate indifference to discrimination (including sexual harassment and retaliation) by its employees, Harvard has also discriminated against all three Plaintiffs by subjecting them to disparate treatment based on gender and gender-based bias or animus. Specifically, Harvard maintains official policies, procedures, and customs applicable to cases of sexual and gender-based harassment and retaliation based on bias against women, against students who complain about gender-based harassment and retaliation, and/or in favor of men. As a result, Harvard deprived Plaintiffs of the benefits of its educational programs and subjected them to discrimination based on their gender.

205.    Harvard's differential treatment of Plaintiffs is a direct and proximate result of gender discrimination.

51

206.     Harvard has failed to prevent, respond to, adequately investigate, and/or appropriately resolve instances of gender discrimination.

207.     Because of Harvard's continuous unlawful conduct, Plaintiffs have suffered and will continue to suffer harm, including, but not limited to, loss of future educational and employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish, and other economic damages and non-economic damages.

208.     Because of the continuous nature of Harvard's unlawful conduct, Plaintiffs are entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

209.     Because a reasonable person in each Plaintiff's position would have first discovered that Harvard's unlawful polices were the probable cause of her injury within the applicable limitations period, Plaintiffs are entitled to the application of the discovery rule.

210.     Plaintiffs are entitled to all legal and equitable remedies available for violations of Title IX, including compensatory damages, injunctive relief, attorneys' fees and costs, and other appropriate relief.

## Count Four

### Violation of the Massachusetts Civil Rights Act

**(Mass. Gen. Laws Chapter 12, § 11I)**
**(On Behalf of All Plaintiffs)**

211.     Plaintiffs re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

212.     This count is brought on behalf of all Plaintiffs.

213.     Plaintiffs are enrolled at Harvard as graduate students.

214.     At all times relevant to this action, Harvard was an educational institution and has received, and continues to receive, federal financial assistance.

215.    The Massachusetts Civil Rights Act ("MCRA") forbids efforts to "interfere" or "attempt to interfere by threats, intimidation or coercion" with another person's "exercise or enjoyment" of any "rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth" of Massachusetts. Mass. Gen. Laws ch. 12, § 11H(a)(1). The act gives any person aggrieved by a violation the right to bring an action for equitable relief and money damages. *Id.* § 11I.

216.    Professor Comaroff subjected Ms. Kilburn to a pattern of gender-based harassment and assault continuing from 2017 until at least April 2019 using threats, intimidation, and coercion.

217.    Professor Comaroff also threatened, intimidated, and coerced Plaintiffs for speaking about and opposing his sexual harassment and discrimination with the goal of inducing them to stop their speech and opposition to his sexual harassment and gender discrimination, all in violation of federal and state law. Relevant acts included, but are not limited to, the following:

   a.  In October 2017, Professor Comaroff threatened the careers of Ms. Mandava and Ms. Czerwienski because he believed they had reported and would report his sexual harassment to other students and faculty, which is a protected activity under Title IX.

   b.  From 2020 to 2022, Professor Comaroff disclosed Ms. Kilburn's allegations to faculty members in her field and enlisted them as witnesses.

   c.  In 2022, Professors John and Jean Comaroff and Professor Janet Halley disseminated an email disparaging Plaintiffs to other faculty with the power to influence Plaintiffs' careers.

   d.  In 2022, 38 Harvard faculty members published a false or misleading statement that would reasonably dissuade students from making complaints against faculty.

218.    In doing so, Professor John Comaroff, Professor Jean Comaroff, Professor Halley, and other Harvard faculty interfered and/or attempted to interfere by threats, intimidation, or coercion with Plaintiffs' rights under federal and Massachusetts law, including:

a. The right to be free of actions by an educational institution that "discriminate [on the basis of sex] against any student admitted to" a graduate "program or course of study in providing benefits, privileges and placement services," Mass. Gen. Laws ch. 151C § 2(d);

b. The right not to "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance" under Title IX, 20 U.S.C. § 1681(a); and

c. The right to "equality under the law" and freedom from discrimination on the grounds of sex, guaranteed by Article 1 of the Massachusetts Constitution.

219.    Harvard is vicariously liable for the actions of its faculty in violation of the MCRA because Harvard employees took those actions within the scope of their employment.

220.    The above-alleged threats, intimidation, and coercion in violation of the MCRA upended Plaintiffs' academic careers and caused and continue to cause them emotional, reputational, and economic harm, for which they are entitled to damages, including punitive damages, and equitable relief.

### Count Five

### Sexual Harassment Under Massachusetts Law

### (Violation of Mass. Gen. Laws Chapters 214 § 1C)
### (On Behalf of Plaintiff Kilburn)

221.    Plaintiffs re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

222.    This count is brought on behalf of Plaintiff Kilburn.

223.    Plaintiff Kilburn is enrolled at Harvard as a graduate student.

224.    At all times relevant to this action, Harvard was an educational institution and has received, and continues to receive, federal financial assistance.

225.    Mass. Gen. Laws ch. 151C § 2(g) prohibits an educational institution from sexually harassing students in any program or course of study.

226.    From 2017 to 2019, Professor Comaroff made sexual advances on Ms. Kilburn and engaged in verbal and physical conduct of a sexual nature.

227.    Ms. Kilburn understood that Professor Comaroff's conduct was a term or condition of the benefits, privileges, or placement services of her program and influenced the evaluation of academic achievement.

228.    Professor Comaroff's sexual harassment unreasonably interfered with Ms. Kilburn's education by creating an intimidating, hostile, humiliating or sexually offensive educational environment.

229.    Harvard is strictly liable for Professor Comaroff's sexual harassment of Ms. Kilburn.

230.    Professor Comaroff's harassment inflicted injuries and threatens future injuries for which Harvard is liable for damages, including punitive damages, and appropriate equitable relief under Massachusetts law.

## Count Six

### Violation of the Massachusetts Equal Rights Act

### (Mass. Gen. Laws Chapter 93, § 102)
### (On Behalf of All Plaintiffs)

231.    Plaintiffs re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

232.    This count is brought on behalf of all Plaintiffs.

233.    The Massachusetts Equal Rights Act ("MERA") guarantees "[a]ll persons within the commonwealth" the "same rights enjoyed by white male citizens" to "make and enforce contracts" and "to the full and equal benefit of all laws and proceedings for the security of persons and property." Mass. Gen. Laws ch. 93, § 102.

234.    As alleged in Count Eight, Plaintiffs made a contract with Harvard to provide them with graduate education free from gender discrimination and retaliation, in exchange for their matriculation, labor, tuition payments, and fees, among other things.

235.    By subjecting Ms. Kilburn to a pattern of gender discrimination, including gender-based harassment, by subjecting all Plaintiffs to retaliation in their graduate program, and by creating an unequal and hostile educational environment, Harvard, Professor Comaroff (acting within the scope of his employment), and other Harvard faculty members deprived Plaintiffs of the benefits of their contracts with Harvard and the full and equal benefit of state and federal law, including Mass. Gen. Laws ch. 151C § 2(d), Title IX, 20 U.S.C. § 1681(a), and the Massachusetts Constitution, based on their gender.

236.    In doing so, Harvard acted knowingly and with reckless indifference to Plaintiffs' rights.

237.    Harvard is vicariously liable for the actions of its faculty in violation of the MERA because Harvard faculty took those actions within the scope of their employment.

238.    Plaintiffs are therefore entitled to all legal and equitable remedies available under the MERA, including compensatory and punitive damages, injunctive relief, attorneys' fees and costs, and other appropriate relief.

### Count Seven

**Negligent Hiring and Supervision**

**(Massachusetts Common Law)**
**(On Behalf of All Plaintiffs)**

239.    Plaintiffs re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

240.    This count is brought on behalf of all Plaintiffs.

56

241.    Upon information and belief, at all times relevant to this action, Professor Comaroff was an agent of and employed by Harvard.

242.    Harvard owed Plaintiffs a duty of care to avoid selecting a professor it knew or had reason to know posed a significant risk of harm to students and to take reasonable measures to protect Plaintiffs from sexual harassment and retaliation by its employees.

243.    Harvard knew or should have known that Professor Comaroff posed a risk to and was unfit to work with, exercise influence over, or supervise women students. Harvard, however, failed to exercise due care in hiring Professor Comaroff and in retaining him in a position of access, influence, and authority over women students without adequate training or supervision.

244.    As a direct and proximate result of Harvard's breach of its duty of care, Plaintiffs were subjected to sexual harassment and retaliation by Professor Comaroff.

245.    Plaintiffs suffered damages and injuries for which Harvard is liable under state law.

## Count Eight

### Breach of Contract

### (Massachusetts Common Law)
### (On Behalf of All Plaintiffs)

246.    Plaintiffs re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

247.    This count is brought on behalf of all Plaintiffs.

248.    Harvard represents that it has a broad sexual misconduct policy and that it takes active measures to prevent and punish sexual harassment and assault. For example, Harvard's Sexual and Gender-Based Harassment Policy, applicable to conduct occurring between September 1, 2014 and August 14, 2020, states:

> Harvard University is committed to maintaining a safe and healthy educational and
> work environment in which no member of the University community is, on the

basis of sex, sexual orientation, or gender identity, excluded from participation in, denied the benefits of, or subjected to discrimination in any University program or activity. Gender-based and sexual harassment, including sexual violence, are forms of sex discrimination in that they deny or limit an individual's ability to participate in or benefit from University programs or activities.

. . .

Retaliation against an individual for raising an allegation of sexual or gender-based harassment, for cooperating in an investigation of such a complaint, or for opposing discriminatory practices is prohibited.

249.    Harvard's Sexual and Gender-Based Harassment Policy also promises that Harvard will "prevent incidents of sexual and gender-based harassment from denying or limiting an individual's ability to participate in or benefit from the University's programs." It commits that Harvard will "provide prompt and equitable methods of investigation and resolution to stop discrimination, remedy any harm, and prevent its recurrence."

250.    Harvard's Sexual and Gender-Based Harassment Policy also gives Harvard "an obligation to keep the community safe and to address incidents of alleged harassment that it knows about or reasonably should know about." Harvard's FAQs Concerning the Harvard University Sexual and Gender-Based Harassment Policy and Procedures No. 12.

251.    Similarly, Harvard's Interim Title IX Sexual Harassment Policy, applicable to conduct occurring on or after August 14, 2020, promises that the University will "respond promptly and equitably to sexual harassment in a manner that is not deliberately indifferent" and "prevent incidents of sexual harassment from denying or limiting an individual's ability to participate in or benefit from the University's programs or activities."

252.    Further, under Harvard's Interim Other Sexual Misconduct Policy, applicable to conduct occurring on or after August 14, 2020, the University will "respond promptly and equitably to allegations of other sexual misconduct."

253.    Harvard's Sexual and Gender-Based Harassment Policy and Procedures for the Faculty of Arts and Sciences, applicable to conduct occurring between September 1, 2014 and August 14, 2020, specifically charges the FAS with "maintaining a safe and healthy educational and work environment in which no member of the community is excluded from participation in, denied the benefits of, or subjected to discrimination in any University program or activity on the basis of sex, sexual orientation, or gender identity." And Harvard's Interim Policies and Procedures Addressing Title IX Sexual and Gender-Based Harassment and Other Sexual Misconduct for the Faculty of Arts and Sciences, applicable to conduct occurring on or after August 14, 2020, similarly charge the FAS with "maintaining a safe and healthy educational and work environment in which no member of the community is, on the basis of sex, including sexual orientation or gender identity, excluded from participation in, denied the benefits of, or subjected to discrimination in any University program or activity." Harvard's FAS Professional Conduct Policy also provides that "[f]aculty must comply with all applicable laws, rules, regulations, and professional standards including FAS policies and practices; this includes, but is not limited to, policies regarding discrimination and sexual and gender-based harassment" and that "[n]on-compliance . . . could result in varying sanctions."

254.    Harvard's Whistleblowing Policy further provides that "[t]he University will protect from retaliation members of the Harvard community who make good faith reports of suspected violations of the law or University policy."

255.    Similarly, Harvard's Non-Retaliation Policy provides that "[t]he University expressly forbids anyone to take any form of retaliatory action against any member of the Harvard community who in good faith voices concerns, seeks advice, files a complaint or grievance, seeks the aid of Human Resources, testifies or participates in investigations, compliance reviews,

proceedings or hearings, or opposes actual or perceived violations of Harvard University's policy or unlawful acts" and further promises that "retaliation will not be tolerated."

256.  These promises are part of the contract that Harvard makes with its students in exchange for their matriculation, labor, tuition payments, and fees.

257.  Plaintiffs performed under this contract. Harvard did not. Harvard permitted Professor Comaroff to sexually harass Ms. Kilburn and to retaliate against all three Plaintiffs. Harvard failed to take effective measures to "prevent incidents of sexual and gender-based harassment" and to "protect" Plaintiffs from retaliation. Indeed, contrary to Harvard's policy, Harvard has tolerated a sexually hostile environment within its Anthropology Department and failed to provide Plaintiffs with methods of investigation that were prompt and equitable or designed to stop discrimination, remedy any harm, and prevent its recurrence. Harvard thus failed to meet Plaintiffs' reasonable expectations of the equal educational benefits to which they are entitled under Harvard's policies.

258.  Harvard's breaches of contract have caused Plaintiffs substantial economic damages, including lost future earnings, among other injuries, for which Plaintiffs are entitled to monetary damages and appropriate equitable relief.

## Count Nine

### Breach of the Implied Covenant of Good Faith and Fair Dealing

### (Massachusetts Common Law)
### (On Behalf of All Plaintiffs)

259.  Plaintiffs re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

260.  This count is brought on behalf of all Plaintiffs.

261.    All contracts in the Commonwealth of Massachusetts contain an implied covenant of good faith and fair dealing, including the contract between Harvard and Plaintiffs. This implied covenant prohibits actions that will have the effect of destroying or injuring the rights of the other party to receive the fruits of the contract.

262.    Harvard's multiple Sexual and Gender-Based Harassment Policies, FAS Professional Conduct Policy, Whistleblowing Policy, Non-Retaliation Policy, and other materials applicable to students all contain promises to Plaintiffs that are part of binding contracts between Harvard and Plaintiffs Czerwienski, Kilburn, and Mandava.

263.    Harvard violated the reasonable expectations of Plaintiffs under these contracts.

264.    Harvard breached the implied covenant of good faith and fair dealing by maintaining an investigatory and dispute resolution process that is inadequate to effectively remedy sexual harassment and retaliation against students, by failing to take the steps necessary to prevent and correct the rampant sexual misconduct and retaliation committed by Professor Comaroff, by failing to provide Plaintiffs with a complaint process that comports with basic fairness, and by turning a blind eye to the hostile environment and unequal access to education afforded to Plaintiffs based on their gender. These acts and omissions have injured the rights of Plaintiffs to receive the benefits of their contracts with Harvard.

265.    Upon information and belief, Harvard's actions as alleged herein were performed in bad faith, in that the purpose behind Harvard's practices and policies was to facilitate the evasion of Harvard's obligations to address sexual misconduct and discrimination associated with Professor Comaroff. Furthermore, upon information and belief, Harvard's actions as alleged herein were performed in bad faith in that Harvard deliberately refused to investigate informal complaints of harassment against professors in the Anthropology Department, knowing full well that few, if

any, students would file formal complaints with ODR and that ODR investigations rarely result in sanctions against professors. Upon information and belief, ODR has published misleading statistics regarding the duration of its investigations, inducing participants to believe that ODR investigations are significantly shorter than they are.

266.    Plaintiffs have been damaged by Harvard's breach of the implied covenant of good faith and fair dealing.

### Count Ten

### Inducing Breach of Fiduciary Duty and Invasion of Privacy

### (Massachusetts Common Law and Mass. Gen. Laws ch. 214, § 1B)
### (On Behalf of Plaintiff Kilburn)

267.    Plaintiffs re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

268.    This count is brought on behalf of Plaintiff Kilburn.

269.    From 2018 to 2019, Plaintiff Kilburn received treatment from a licensed therapist.

270.    Under Massachusetts law, it is a breach of fiduciary duty for a healthcare provider to disclose medical information about the patient without the patient's consent.

271.    A healthcare provider's unauthorized disclosure of private medical information is also an invasion of privacy actionable under Mass. Gen. Laws ch. 214, § 1B.

272.    Federal regulation 45 C.F.R. § 164.508 at all relevant times prohibited the release of Ms. Kilburn's medical records to Harvard without her specific, written, and signed authorization.

273.    A third party who induces a healthcare provider to disclose information that the third party knew or should have known was confidential is liable to the patient for the damages that flow from that disclosure.

274. Plaintiff Kilburn's therapist possessed medical records that contain confidential information communicated during private therapy sessions for the purpose of therapeutic treatment. Plaintiff Kilburn reasonably expected that the information would be kept confidential.

275. Plaintiff Kilburn did not authorize Harvard to obtain her psychotherapy notes or to disclose them to others.

276. Harvard knew or should have known of the existence of the physician-patient relationship between Ms. Kilburn and her therapist.

277. Harvard intended to induce Ms. Kilburn's therapist to disclose Ms. Kilburn's psychotherapy notes or Harvard reasonably should have anticipated that its actions would induce Ms. Kilburn's therapist to disclose Ms. Kilburn's psychotherapy notes.

278. During its ODR investigation, Harvard obtained, used, discussed, and disclosed Plaintiff Kilburn's confidential psychotherapy records to multiple people, including, but not limited to, Professor Comaroff, his lawyers (one of whom is a Harvard faculty member), several faculty members on Harvard's appeal committee, members of the Office for Gender Equity, Title IX coordinators, and deans.

279. Harvard did not reasonably believe that Ms. Kilburn's therapist could disclose that information to Harvard without violating the duty of confidentiality that the therapist owed Ms. Kilburn.

280. By inducing Plaintiff Kilburn's therapist to disclose Plaintiff Kilburn's medical records without her consent, Harvard induced a breach of fiduciary duty and invasion of privacy under Massachusetts law.

281. Harvard persisted in this course despite a request from Ms. Kilburn that Harvard limit access to her confidential medical information. Specifically, on or about September 28, 2021,

Ms. Kilburn's counsel requested that Harvard not further disclose her medical records; inform her of individuals who have received a copy of her medical records; and instruct these individuals to turn over the records to Harvard's general counsel's office without retaining copies. Despite affirmative notice that Ms. Kilburn did not consent to Harvard's continued use and disclosure of her medical records, Harvard rejected these requests.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs request the following relief:

    a. A declaratory judgment that Harvard's policies, practices and/or procedures challenged herein are illegal and in violation of the rights of Plaintiffs under, inter alia, Title IX and the applicable Massachusetts state laws and doctrines set forth above;

    b. A permanent injunction against Harvard and its officers, owners, agents, successors, employees and/or representatives, and any and all persons acting in concert with them, from engaging in any further unlawful practices, policies, customs, and usages as set forth herein;

    c. An award of damages to Plaintiffs, including compensatory damages and punitive damages, in an amount to be determined at trial;

    d. An award of litigation costs and expenses, including reasonable attorneys' fees;

    e. An award of pre-judgment and post-judgment interest available under law; and

    f. Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of all issues triable of right to a jury.

Dated:  February 8, 2022                     Respectfully submitted,

                                            */s/ Sean Ouellette*
                                            Sean Ouellette (BBO# 697559)
                                            **SANFORD HEISLER SHARP, LLP**
                                            700 Pennsylvania Avenue SE, Suite 300
                                            Washington, DC 20003
                                            Telephone: (202) 499-5200
                                            souellette@sanfordheisler.com

                                            *-- and --*

                                            Russell Kornblith (*pro hac vice* forthcoming)
                                            Carolin Guentert (*pro hac vice* forthcoming)
                                            **SANFORD HEISLER SHARP, LLP**
                                            1350 Avenue of the Americas, 31st Floor
                                            New York, New York 10019
                                            Telephone: (646) 402-5650
                                            rkornblith@sanfordheisler.com
                                            cguentert@sanfordheisler.com

                                            *Attorneys for Plaintiffs*