UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **MARGARET CZERWIENSKI, LILIA KILBURN, and AMULYA MANDAVA** | |
| *Plaintiffs,* | CASE NO. 1:22-CV-10202-JGD |
| v. | |
| **HARVARD UNIVERSITY AND THE PRESIDENT AND FELLOWS OF HARVARD COLLEGE** | JURY TRIAL DEMANDED |
| *Defendant.* | |

## AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

1.      This is a case about Harvard's decade-long failure to protect students from sexual abuse and career-ending retaliation. Harvard Anthropology Professor John Comaroff[1] is a renowned scholar and a gatekeeper in his field. For years, he has used that power and his perch at Harvard to exploit aspiring scholars: he has kissed and groped students without their consent, made unwelcome sexual advances, and threatened to sabotage students' careers if they complained. When students reported him to Harvard and sought to warn their peers about him, Harvard watched as he retaliated by foreclosing career paths and ensuring that those students would have "trouble getting jobs." Harvard even allowed its investigatory process to be used in service of Professor Comaroff's campaign of professional blacklisting. The results have been devastating: Professor Comaroff and his enablers have destroyed the educational opportunities and careers of countless students. Among them are the plaintiffs in this case: Margaret Czerwienski, Lilia Kilburn, and

---

[1] Any reference to "Professor Comaroff" or "Professor John Comaroff" refers to Professor John Comaroff. Any reference to "Professor Jean Comaroff" refers to his wife, Professor Jean Comaroff.

Amulya Mandava, three graduate students in Harvard's Anthropology Department (the "Department").

2.      Harvard's deliberate indifference allowed Professor Comaroff to repeatedly and forcibly kiss Ms. Kilburn, grope her in public, imagine aloud her rape and murder, cut her off from other professors, and derail her academic trajectory. It also allowed Professor Comaroff to threaten Ms. Mandava and Ms. Czerwienski, poison their reputations in their fields of study, and upend their careers. All three Plaintiffs repeatedly complained to Harvard administrators. But the University brushed them aside and opted to protect its star professor over vulnerable students.

3.      Plaintiffs are far from alone. A 2019 survey revealed that one in five graduate student women at Harvard experience sexual harassment and that less than half of students are confident that Harvard would conduct a fair investigation of reported sexual misconduct.[2] And a recent investigation by *The Harvard Crimson* uncovered that dozens of Harvard graduate students have faced harassment, only to be met with "fear of retaliation by faculty and opaque and inadequate reporting mechanisms."[3]

4.      Such abuses of power are particularly widespread within Harvard's Anthropology Department. A Harvard committee tasked with examining the climate within the Department recently concluded that the Department is plagued by a "longstanding pattern of sexism, misogyny, and sexual and gender-based misconduct" that "has gone largely unchecked by a predominantly

---

[2] Harvard Univ. 2019 AAU Student Surv. on Sexual Assault & Misconduct at 10, 31 (noting that less than half of students believed it was "very" or "extremely" likely that campus officials would conduct a fair investigation into a report of sexual misconduct, *available at* https://hwpi.harvard.edu/files/oge/files/2019_harvard_aau_student_survey_on_sexual_assault_misconduct.pdf?m=1625077408.

[3] Ariel Kim and Meimei Xu, *'An Open Secret': Harvard Graduate Students Decry Harassment, Neglect from Faculty*, The Harvard Crimson (May 26, 2022), https://www.thecrimson.com/article/2022/5/26/graduate-students-power-dynamics/.

white, male faculty."[4] In a survey, about a third of the graduate students in the Department reported harassment.[5] Students rarely speak out about harassment or sexual misconduct, because when they do, they risk their education and their careers. In short, the report concluded, Harvard has condoned a "culture in which the abuse of power is normalized and accommodated."[6]

5.      This lawsuit targets that abuse of power. Plaintiffs Margaret Czerwienski, Lilia Kilburn, and Amulya Mandava ("Plaintiffs"), by and through their undersigned counsel, Sanford Heisler Sharp, LLP, bring this action against Defendant Harvard University and the President and Fellows of Harvard College ("Harvard" or the "University") under Title IX[7] and Massachusetts law to remedy the gender discrimination, sexual harassment, hostile environment, and retaliation that has defined their time at Harvard.

## I.      INTRODUCTION

6.      Harvard is one of the most prestigious academic institutions in the world. It has maintained that reputation by recruiting the world's foremost scholars.

7.      John Comaroff, Harvard Professor of Anthropology and of African and African American Studies, is one such scholar. He is one of the world's leading experts on Africa and the Global South, legal and political anthropology, crime and policing, the anthropology of colonialism and postcolonialism, and historical anthropology. He wields extraordinary power through a sprawling professional network, having mentored generations of tenured professors placed at nearly every major anthropology department and having held visiting professorships all

---

[4] Harvard University Anthropology Department, Standing Committee for a Supportive Departmental Community Final Report 10 (2021).

[5] *Id.* at 18.

[6] *Id.* at 10.

[7] Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* ("Title IX").

over the world.[8] To Harvard, Professor Comaroff's worldwide reputation and influence make him a valuable asset.

8.  Harvard has protected that asset despite a decades-long pattern of harassment and retaliation by Professor Comaroff—a pattern that was known to Harvard when it hired him in 2012. From 1979 to 2012, Professor Comaroff worked at the University of Chicago ("UChicago"). Graduate students and faculty there considered Professor Comaroff a "predator" and a "groomer." At least one of them warned Harvard about Professor Comaroff while the University was considering Professor Comaroff's candidacy. And the Harvard Anthropology Department's Graduate Program Coordinator specifically warned Harvard's Title IX Office—*indeed, **the same Title IX officer who would later receive Plaintiffs' complaints***—in or around 2012 about Professor Comaroff's sexual misconduct at UChicago. But Harvard ignored these warnings and welcomed him anyway.

9.  The result was predictable. Shortly after he arrived at Harvard, the University[9] received ***repeated*** complaints of sexual harassment, including forced kissing, groping, and offensive—even violent—sexual comments by Professor Comaroff.

10.  Plaintiffs were among those complainants. In spring 2017, Plaintiffs Margaret Czerwienski and Amulya Mandava learned that Professor Comaroff was making ongoing sexual advances on his advisee, a second-year graduate student: he forcibly kissed her, groped her buttocks, and, upon information and belief, sent her early-morning texts demanding to know with

---

[8] *See, e.g.*, Grant Jun Otsuki, *Academic Authority and Institutional Power in Anthropology*, (February 11, 2022), https://www.gjotsuki.net/academic-authority-and-institutional-power-in-anthropology/ (illustrating that "John Comaroff is among the most prolific of doctoral supervisors in the US.").

[9] "Harvard" or "the University" herein means Harvard and University officials with supervisory authority and the power to institute corrective measures on Harvard's behalf. Nonetheless, the use of "Harvard" or "the University" does not imply that individuals not referred to as such lacked such authority or responsibility.

whom she had slept. Ms. Czerwienski and Ms. Mandava reported this sexual harassment to faculty, including the soon-to-be Chair of the Anthropology Department. The advisee herself also reported the harassment to the University's Title IX Office.[10] Yet Harvard chose not to investigate these reports. The University instead stood by while the abuse continued unchecked.

11.     Harvard's deliberate indifference to these complaints enabled retaliation by Professor Comaroff. In October 2017, Professor Comaroff summoned Ms. Mandava to his office and told her that he knew she and Ms. Czerwienski were warning others of his sexual misconduct. He threatened that if they continued to do so, they would have "trouble getting jobs," as his detractors had in the past. Ms. Czerwienski reported this retaliation to Harvard's Title IX Office. But, still, Harvard took no apparent steps to stop Professor Comaroff from following through on his threats or targeting others.

12.     Because of Harvard's inaction, Professor Comaroff abused Lilia Kilburn. In 2017, before Ms. Kilburn even enrolled at Harvard, Professor Comaroff kissed her on the mouth without her consent during a campus visit. That fall, after she matriculated, he graphically described varying ways in which she "would" be raped, murdered, or "left for dead" in South Africa—a country thousands of miles away from the country she studied. Harvard allowed Professor Comaroff's behavior to continue for two years—subjecting Ms. Kilburn to a continuing nightmare that included more forced kissing, groping, persistent invitations to socialize alone off-campus, and coercive control. When Ms. Kilburn tried to avoid Professor Comaroff, he forbade her to work with her other advisor.

13.     Ms. Kilburn complained to Harvard's Title IX Office in May 2019. Again, however, the Title IX Office took no meaningful action—except to admit that Harvard had known

---

[10] Harvard's Title IX Office is located within its Office for Gender Equity.

about Professor Comaroff's behavior for years. In fact, a Harvard Title IX Resource Coordinator referred Ms. Kilburn to one of Professor Comaroff's other victims: the graduate student who had reported similar abuse two years earlier. Professor Comaroff, meanwhile, continued teaching and mentoring students.

14.     In 2020, *The Harvard Crimson* (the "*Crimson*") and *The Chronicle of Higher Education* (the "*Chronicle*") publicly exposed Professor Comaroff's misconduct. Only then, with its reputation to protect, did Harvard launch an investigation.

15.     But Harvard's investigation only exacerbated Plaintiffs' nightmare. Harvard dragged the process out for over a year, foisted inordinate burdens on Plaintiffs, then willfully ignored the overwhelming evidence they marshalled. During the process, Harvard obtained Ms. Kilburn's *private therapy records without her consent* and disclosed them to Professor Comaroff and others within its bureaucracy. The investigatory process that unfolded was neither "prompt" nor "equitable"; nor was it designed to "stop discrimination, remedy any harm," or "prevent its recurrence," as Harvard's written policies promise.[11] In the end, Harvard denied that Professor Comaroff engaged in repeated sexual harassment or retaliation and allowed him to continue teaching after a slap on the wrist.

16.     Harvard faculty moved swiftly to forestall further complaints. Hours after Harvard announced the investigation's results, Harvard Law Professor Janet Halley issued a statement calling Professor Comaroff's description of Ms. Kilburn's rape and his threats against Plaintiffs "*perfectly legitimate office-hours advice.*" She further blasted Plaintiffs' complaints as an "attack on academic freedom." Professor Comaroff's wife, Professor Jean Comaroff, promptly

---

[11]   Harvard University Sexual and Gender-Based Harassment Policy at 1, *available at* https://hwpi.harvard.edu/files/oge/files/sexual-and-gender-based-harassment-policy.pdf?m=1624890819.

disseminated the statement to Harvard faculty and others in her professional network. A few days later, 38 Harvard faculty members—including faculty currently supervising Plaintiffs' studies—wrote a letter publicly supporting Professor Comaroff and minimizing his abuse.

17.     Harvard's deliberate indifference to this pattern of retaliation has upended Plaintiffs' careers in anthropology. And Plaintiffs' ordeal is just one example of Harvard's broader pattern of deliberate indifference: sexual misconduct, abuse, and retaliation are endemic to the Anthropology Department. As the *Crimson* and *Chronicle* reports revealed, for over a decade, Harvard willfully ignored sexual harassment complaints against not just Professor Comaroff, but also against two Department Chairs, Gary Urton and Theodore Bestor. As a result, from 2007 to 2018—11 of the past 14 years—the Department was *chaired* by men who, according to these reports, leveraged their power to prey on women students and junior faculty.

18.     Harvard's continued failure to act on repeated reports of harassment against Professor Comaroff—until spurred to do so by the media—demonstrates an institutional policy of indifference: a system designed to protect the University, its reputation, and the faculty who sustain that reputation at the expense of its students. The University ignores the misconduct of star faculty for as long as possible, acting only when compelled by public outrage. When Harvard does investigate, it employs a process stacked against survivors— a process in which even University officials lack confidence. Instead of stopping abuse, Harvard perpetrates it, subjecting students to a second trauma that exacerbates the original abuse and leaves the students vulnerable to retaliation at the hands of faculty.

19.     Harvard's cycle of institutional betrayal violates Title IX and Massachusetts law.

## II.    PARTIES

20.    **PLAINTIFF MARGARET CZERWIENSKI** is a natural person, and, at all relevant times, has been domiciled in Massachusetts. She is a doctoral student in Harvard's Anthropology Department. She holds a B.A. in Women's Studies and a Master's of Public Health with a graduate certificate in Afroamerican and African Studies from the University of Michigan, and conducted research at the University of Michigan Medical School throughout her Master's program. She joined Harvard for her graduate studies in 2014, where she has worked as a Ph.D. student and teaching fellow. She is a highly credentialed member of the Department, and is the recipient of the National Science Foundation Doctoral Dissertation Research Improvement Grant.

21.    **PLAINTIFF LILIA KILBURN** is a natural person, and, at all relevant times, has been domiciled in Massachusetts. She is a doctoral student at Harvard. Ms. Kilburn holds a Master's degree in Comparative Media Practice from Massachusetts Institute of Technology and a B.A. in Anthropology from Amherst College. Her research has been supported by multiple prestigious grants in her field. Ms. Kilburn came to Harvard in 2017. She specifically applied to Harvard's Anthropology Department to work with the Comaroffs, and eventually accepted Harvard's offer—turning down opportunities from other universities—because Professor John Comaroff urged her to do so and promised her mentorship and pedagogic support.

22.    **PLAINTIFF AMULYA MANDAVA** is a natural person, and, at all relevant times, has been domiciled in Massachusetts and/or Maine. She is a doctoral student in Harvard's Anthropology Department. She holds a B.A. with Honors in Anthropology from the University of Chicago and a Master's degree from Harvard Divinity School. She enrolled in graduate studies at Harvard in 2012 and has worked as a Ph.D. student and teaching fellow. While at Harvard, Ms. Mandava has won multiple prestigious grants in her field, including the Wenner-Gren Dissertation Fieldwork Grant and the American Institute of Indian Studies Junior Fellowship.

23.     **DEFENDANT HARVARD UNIVERSITY AND THE PRESIDENT AND FELLOWS OF HARVARD COLLEGE** is a non-profit corporation organized and existing under the laws of Massachusetts that maintains its principal place of business at Massachusetts Hall, Cambridge, Massachusetts 02138.

## III.    JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, because Plaintiffs' statutory claims under Title IX present a federal question over which this Court has jurisdiction. Plaintiffs also assert state-law claims over which this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

25.     This Court has personal jurisdiction over Defendant pursuant to Federal Rule of Civil Procedure 4(k)(1)(A) because Defendant is domiciled in and conducts business within this Judicial District.

26.     This Court is the proper venue under 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f) because Harvard is headquartered in this District and many of the unlawful practices complained of herein occurred in this District, and the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## IV.    FACTUAL ALLEGATIONS

### A. <u>Professor Comaroff Harassed Students for Years Before Coming to Harvard</u>

27.     Harvard had good reason to be wary of Professor Comaroff. Before Harvard hired him, Professor Comaroff taught at UChicago, where he was surrounded by pervasive allegations of sexual misconduct. Indeed, multiple UChicago students and faculty complained to UChicago about his behavior—including sexual harassment and threats of retaliation strikingly similar to what Plaintiffs would experience at Harvard. This past is prologue to Plaintiffs' experience.

9

28.     In or around 1979, immediately after Professor Comaroff began teaching at UChicago, he lured an undergraduate student ("UChicago Student 1") to his home promising advice on her thesis. Alone with her, he forcibly hugged her, ran his hand down her back, and groped her buttocks without her consent. UChicago Student 1 contemporaneously recounted the incident to a graduate student, who replied that Professor Comaroff was well-known for his sexual behavior toward students, and that he was engaged in an affair with another student. UChicago Student 1—once a promising anthropology student—was so disturbed by her experience with Professor Comaroff that she abandoned her plans to pursue a Ph.D. in anthropology.

29.     This behavior continued for decades at UChicago. Between 1978 and 1982, Professor Comaroff mentored a female undergraduate student in UChicago's Anthropology department ("UChicago Student 2"), whom he eventually hired to work in his home as a live-in nanny. Upon information and belief, Professor Comaroff kissed UChicago Student 2 on the lips and subsequently initiated sexual contact that continued for several years.

30.     Between 1978 and 1991, upon information and belief, Professor Comaroff had sexual relationships with two graduate students in UChicago's Anthropology department, had sex with one of them in his office on UChicago's campus, and was observed repeatedly visiting one of UChicago's undergraduate dormitories.

31.     In 1991, Professor Comaroff sexually harassed a female first-year graduate student at Northwestern University at a conference, caressing her inner thigh inches from her pubic area.

32.     In 2001, a female graduate student at the University of Illinois was hired by UChicago's Social and Behavioral Finance Board, which worked closely with Professor Comaroff. Between the fall of 2001 until 2005, Professor Comaroff frequently asked the student to join him one-on-one for meals and other activities off campus, including at his home. Following one board

10

meeting, Professor Comaroff approached her to give her a hug and then forcibly kissed her on the lips without her consent. And on another occasion, Professor Comaroff forcibly kissed her on the lips without her consent outside of UChicago's Social Sciences center—in public view.

33.     In or around 2002, Professor Comaroff met with a female first-year graduate student at UChicago ("UChicago Student 3") to discuss her potential fieldwork in Senegal, thousands of miles from Professor Comaroff's academic focus, South Africa. Professor Comaroff told UChicago Student 3 during the meeting, "you can't work in Africa and be openly homosexual," but concluded "you might not have to worry. You have the right Senegalese body type, and the men there will love you." UChicago Student 3 also received unwanted kisses on the face from Professor Comaroff and witnessed the Comaroffs touching students' bodies in a way that made her uncomfortable. UChicago Student 3 expressed her discomfort at this behavior, but Professors John and Jean Comaroff instructed UChicago Student 3 that she would have to get used to such physical contact if she wished to conduct fieldwork in a Francophone country. UChicago Student 3 reported her concerns to her classmates, but her classmates warned her that she would have difficulty finding a job teaching anthropology if she continued to speak out. Fearing continued harassment and career-ending retaliation, UChicago Student 3 ended her advising relationship with the Comaroffs, ultimately damaging her career.

34.     Between 2005 and 2007, Professor Comaroff sexually harassed another female UChicago graduate student ("UChicago Student 4"). The harassment began in 2005 when UChicago Student 4 was conducting her field work. Professor Comaroff began sending her increasingly personal emails that he signed "Love, John" or "Much love, John." He also commented on her physical appearance, claimed that his colleague had "a major crush" on

UChicago Student 4, and declared that this "just proves that he has good taste. And he's not the only one of course."

35.     Upon UChicago Student 4's return from her fieldwork in 2006, Professor Comaroff's behavior turned physical and sexually violent. He directed UChicago Student 4 to meet him at his office at the American Bar Foundation. When she arrived, Professor Comaroff grabbed her arm and shoved the door closed. He forcibly kissed UChicago Student 4 on the mouth, groped her buttocks and legs, and put his hands up her skirt. Shortly thereafter, she discovered that Professor Comaroff had sent her violent pornography from his private email account. Throughout 2007, Professor Comaroff sent UChicago Student 4 sexual text messages and emails, winked at her during class, and commented on her choice of underwear.

36.     UChicago Student 4 contemporaneously reported the assault to a male graduate student and a male professor at another university. The graduate student reported the misconduct to a UChicago faculty member. But Professor Comaroff soon learned of the complaint and, he would later boast, ensured that the student had "trouble" finding a job. The professor, on the other hand, refused to assist UChicago Student 4 and stopped communicating with her. The professor thereafter obtained a prestigious teaching position with help from Professor Comaroff.

37.     In or around 2008, Professor Comaroff initiated a sexual relationship with yet another female UChicago graduate student ("UChicago Student 5"). When UChicago Student 4 learned of this, she confronted Professor Comaroff and asked him to stop behaving inappropriately towards students. Professor Comaroff admitted to sexual contact with UChicago Student 5, but begged UChicago Student 4 not to tell anyone about it. Professor Comaroff then pressured UChicago Student 4 to delete the explicit emails he had sent her. When Professor Comaroff ended

his sexual contact with UChicago Student 5, he used his influence to damage her career and claimed that she was mentally ill.

38.     And in winter 2009, Professor Comaroff targeted Plaintiff Mandava, who was then an undergraduate at UChicago. Professor Comaroff took a focused interest in Ms. Mandava during a study-abroad trip in South Africa. He repeatedly invited her to sit next to him on long drives and commented on the neckline of her clothing, all of which made Ms. Mandava uncomfortable. Ms. Mandava told Professor David Bunn, who was also on the trip, about Professor Comaroff's bizarre actions in hopes that he would intervene. But Professor Bunn responded that Professor Comaroff's behavior was part of a pattern; he regularly crossed boundaries on study-abroad trips. During each trip, he developed a "crush" on a female student and "obsessively" focused on her throughout the program.

39.     Upon information and belief, in or around 2011, yet another UChicago student with whom Professor Comaroff had a sexual relationship was set to file a complaint against him, which prompted Professor Comaroff to leave UChicago.

40.     Upon information and belief, when Professor Comaroff received a job offer to leave UChicago, several UChicago faculty members appealed to their dean not to make Professor Comaroff a counteroffer, effectively pushing him out of the school.

### B. Harvard Knew That Professor Comaroff Had Harassed Students and Brought Him to Harvard Anyway

41.     Harvard knew of this pattern by the time it offered Professor Comaroff a position as a tenured professor and fellow to start in 2012. It hired him anyway.

42.     Upon information and belief, around the time Harvard hired Professor Comaroff, UChicago faculty warned the former Chair of Harvard's Department of African and African American Studies ("AAAS") and Director of the Hutchins Center for African and African

American Studies—who exercised meaningful influence in the decision to hire Professor Comaroff as a professor and fellow[12]—about Professor Comaroff's misconduct at UChicago.

43.     Around the same time, Harvard also received a warning through Seth Avakian, Ph.D., a Title IX Prevention Specialist who later became a University Program Officer for Title IX and Professional Conduct, that Professor Comaroff routinely engaged in inappropriate sexual conduct with his students. The warning came from the then-Graduate Program Coordinator of the Anthropology Department, who, before joining Harvard, had been a graduate student at Boston University ("BU"), where Professor Comaroff was affiliated with the BU African Studies Center. There, the Program Coordinator had been repeatedly warned that Professor Comaroff routinely had inappropriate sexual relationships with his students and that she needed to "be careful" around him. When she later learned that Harvard planned to hire Professor Comaroff into the Department, the Program Coordinator relayed these warnings to Dr. Avakian, to Professor Mary Steedly (then the Director of Graduate Studies for the Anthropology Department), and to the then-Department Administrator of the Anthropology Department. ***The Program Coordinator was so concerned that Harvard hired Professor Comaroff despite her warning that she would repeat her warning to Dr. Avakian approximately once or twice per year after Professor Comaroff was hired, urging Harvard to "keep an eye on" Professor Comaroff.***

44.     Professor George Meiu, who joined Harvard's faculty in or around 2014, was also aware of Professor Comaroff's sexual misconduct at UChicago. There, Professor Meiu had studied under the Comaroffs. After the *Crimson* exposed Professor Comaroff's misconduct in 2020,

---

[12] Professor Comaroff was hired as an Oppenheimer Research Fellow in African Studies, a fellowship overseen by the director of the Hutchins Center.

Professor Meiu apologized to more than 100 assembled members of the Department, including Plaintiffs, "for what I knew and what I didn't say anything about."

45.     Professor Nicholas Harkness, who joined Harvard's faculty in or around 2011, was likewise aware of complaints against Professor Comaroff. He, too, had learned of Professor Comaroff's history of sexual harassment and inappropriate sexual relationships with students at UChicago, where he had been a graduate student until 2010. Indeed, after Plaintiffs filed their Title IX complaints, he described Professor Comaroff to Ms. Kilburn as a "groomer" and "predator."

46.     Harvard could have heeded these warnings and passed on Professor Comaroff's candidacy or implemented safeguards—and protected Harvard's students. Instead, knowing his history of sexual misconduct, Harvard empowered Professor Comaroff and welcomed him to the faculty. In or around 2011, Harvard extended an offer to Professor Comaroff and his wife, Professor Jean Comaroff, to join the Department of Anthropology and the Department of AAAS. It implemented no safeguards on his contact with students.

**C. Professor Comaroff Sexually Harasses Students at Harvard**

47.     The results of Harvard's inaction were predictable.

48.     In 2015, Professor Comaroff made persistent unwanted sexual advances toward at least two Harvard graduate students. To the first ("Harvard Student 1"), he made repeated comments on her physical appearance—telling her "you're a very beautiful woman" during meetings—and kissed her on the cheek.

49.     To another, his advisee ("Harvard Student 2"), he commented on her appearance; shared his attraction to other students (describing one student as "beautiful" and another as "out of [his] league"); and recounted his sexual history and sexual preferences to her in detail. He also winked at her in class, drank out of her water bottle in the middle of a course he was teaching,

called her "my date," and kissed her on the forehead without her consent—all in view of other students. He told her that three students at UChicago would say he had sex with them, but he branded them as "liars."

50.     Professor Comaroff eventually escalated his harassment against Harvard Student 2 to physical assault. He cornered her in his office, brushed up against her, sat unnecessarily close to her in meetings, and touched her inappropriately. In fall 2016, during an annual brunch at his house, Professor Comaroff cornered her in his laundry room and forcibly kissed her on the mouth without her consent. His abuse continued throughout the semester: he kissed her, grabbed her buttocks, and, on information and belief, sent her messages late at night asking about her sexual partners.

51.     Finally, at a meeting in his office, Harvard Student 2 confronted Professor Comaroff about his behavior. He responded with more: he knelt in front of her, laid his head on her breasts, and told her he was impotent.

**D. Professor Comaroff Threatens Retaliation to Silence Warnings**

52.     Harvard Student 2 reported Professor Comaroff's harassment to a Harvard postdoctoral research fellow who had been an advisee of Professor Comaroff at UChicago ("Harvard Post-Doc 1"). Harvard Post-Doc 1 advised Harvard Student 2 to report the conduct to Harvard's Title IX Office.

53.     Professor Comaroff learned of this advice and swiftly retaliated: in fall 2017, Professor Comaroff called Harvard Post-Doc 1 to his office and threatened that if Harvard Post-Doc 1 continued "spreading gossip," he would "find it impossible" to get a permanent academic position.

54.     At the time, Harvard Post-Doc 1 was relying on letters of recommendation from Professors John and Jean Comaroff to find a teaching position. Professor John Comaroff's threat was thus clear and effective: if Harvard Post-Doc 1 did not stop engaging in oppositional activity, the Comaroffs would thwart his prospects of finding a permanent teaching position.

**E.   Professor Comaroff Retaliates Against Plaintiffs Czerwienski and Mandava**

### a.  Plaintiff Margaret Czerwienski Engages in Protected Activity

55.     Harvard Student 2 also reported Professor Comaroff's harassment to her classmate, Plaintiff Margaret Czerwienski. Around the same time, yet another student ("Harvard Student 3") told Ms. Czerwienski that Professor Comaroff was acting as though he had a "crush" on her, winking at her and flirting with her in class, which Ms. Czerwienski witnessed first-hand.

56.     In spring 2017, Ms. Czerwienski complained to her advisor, Professor Susan Greenhalgh, about Professor Comaroff's harassment of Harvard Student 2 and shared her concern that he was pursuing Harvard Student 3.

57.     Professor Greenhalgh was a mandatory reporter under Harvard's Title IX policies, and should therefore have reported Professor Comaroff, including to Harvard's Title IX Office. Professor Greenhalgh expressed concern, but, because Harvard had not properly trained her on her reporting obligations, she took no steps to intercede and neither did Harvard.

58.     Ms. Czerwienski also began warning other students of the dangers Professor Comaroff posed.

59.     Finally, Ms. Czerwienski urged Harvard Student 2 to report Professor Comaroff's harassment and assaults to Harvard's Title IX Office.

### b.  Harvard Receives and Ignores Harvard Student 2's Complaint

60.     Harvard Student 2 reported Professor Comaroff's harassment to multiple other

17

faculty members. In fall of 2016, she reported Professor Comaroff's conduct to Professor Alison Frank Johnson, who in turn conveyed her report to Dr. Avakian, who was now a University Program Officer for Title IX and Professional Conduct and the Title IX Resource Coordinator for graduate students and faculty in Harvard's Faculty of Arts and Sciences ("FAS"). In that role, Dr. Avakian was Harvard's designated representative to receive reports from mandatory reporters within FAS.

61.     In the 2016-2017 academic year, following Ms. Czerwienski's advice, Harvard Student 2 also reported Professor Comaroff's sexual harassment to Dr. Avakian, among others.

62.     Under Harvard's Sexual and Gender-Based Harassment Policy and the Sexual and Gender-Based Harassment Policy and Procedures for the Faculty of Arts and Sciences, Dr. Avakian was responsible for "identifying and responding to sexual harassment and its harm to equal educational opportunity" and "stopping or preventing sexual or gender-based harassment." Dr. Avakian also had the responsibility, under University policy, to convey complaints about Professor Comaroff to the University Title IX Coordinator and, "in consultation with [her]," to "assess the information and determine what action, if any" Harvard would take.[13]

63.     Dr. Avakian further had the power to "put in place any appropriate supportive measures to protect the educational and work environment," to warn Professor Comaroff to stop his harassing behavior, to take measures to prevent further harassment, and to initiate a formal investigation.[14] But he did none of these things.

64.     Instead of taking action to stop Professor Comaroff's harassment, Harvard enabled him to retaliate. In or before 2019, Harvard's Title IX Office leaked Harvard Student 2's

---

[13] Harvard University Sexual and Gender-Based Harassment Policy at 1, *supra* note 11.

[14] *Id.* at 10.

Complaint. Professor Comaroff, in turn, obtained a copy of Harvard Student 2's complaint *from someone at UChicago* and, in June 2019, read portions of her complaint back to Harvard Student 2 verbatim. This intimidation tactic worked. It dissuaded Harvard Student 2 from pursing her complaint or participating in the eventual investigation into Plaintiffs' 2020 complaints. As Harvard Student 2 once put it to Ms. Czerwienski, "I'll need his letter [of recommendation] for years to come."

### c.  Plaintiff Amulya Mandava Engages in Protected Activity

65.     By spring 2017, Ms. Mandava had also learned that Professor Comaroff had sexually harassed Harvard Student 2 and was pursuing Harvard Student 3. Ms. Mandava, like Ms. Czerwienski, warned other students about Professor Comaroff's sexual harassment.

66.     Also like Ms. Czerwienski, Ms. Mandava reported Professor Comaroff's sexual harassment to Harvard. Ms. Mandava informed Professor Ajantha Subramanian that Professor Comaroff had sexually harassed two graduate students at Harvard; that he had given Ms. Mandava herself unwanted sexual attention when she was an undergraduate at UChicago; and that he had had several sexual relationships with graduate students at UChicago.

67.     Professor Subramanian was a mandatory reporter under Harvard's Title IX policies, and should therefore have reported Professor Comaroff to Harvard's Title IX Office. But she did not. She expressed distress, but took no action. She informed Ms. Mandava that, under her understanding of Harvard policy, she could not elevate or act on Ms. Mandava's report unless the affected students (Harvard Students 2 and 3) made the reports to her directly.

### d. Professor Comaroff Threatens Plaintiffs Mandava and Czerwienski

68.     Harvard's indifference to the repeated reports received by its Title IX Office had a predictable result. By October 2017, Professor Comaroff had learned that Ms. Mandava and Ms. Czerwienski were warning others about his behavior. He swiftly sought to silence them.

69.     On or about September 22, 2017, Harvard Student 2 told Ms. Czerwienski that Professor Comaroff had been texting Harvard Student 2 about Ms. Czerwienski's whereabouts and activities on campus, that he had discussed Ms. Czerwienski's knowledge of his sexual harassment and her opposition to it, and that he viewed Ms. Czerwienski as a threat to him. He also texted Harvard Student 2 about the grants for which Ms. Czerwienski was applying and the classes she was taking—including that she had dropped his class—alarming Ms. Czerwienski and suggesting that Professor Comaroff intended to interfere with her academic progress.

70.     On or about October 13, 2017, Ms. Mandava met Professor Comaroff alone in his office to discuss a grant application. During the meeting, Professor Comaroff told Ms. Mandava that graduate students, including Ms. Czerwienski, were spreading "nasty rumors" about his sexual misconduct with students, and that he knew Ms. Mandava had participated in those conversations. Ms. Mandava responded by confirming that she had warned others in the Department about his sexual encounters with students. In reply, Professor Comaroff first sought to dispel the "nasty rumors" by claiming that he had "been sexually inactive for seven years" because he was impotent—an admission that caused Ms. Mandava great discomfort.

71.     Next, Professor Comaroff threatened Ms. Mandava and Ms. Czerwienski. He told Ms. Mandava that there had been "rumors" about him at UChicago, too. He referenced three specific UChicago graduate students—including Harvard Post-Doc 1—who perpetuated these

"rumors" about him, and he told her that those students had later experienced "trouble getting jobs." He warned that he would not want the same to happen to Ms. Mandava.

72.     Professor Comaroff further threatened that if Ms. Mandava continued to speak out, she would lose her relationship with her recommender, Professor Jean Comaroff. He reminded Ms. Mandava that he and his wife were responsible for her admission to Harvard and reiterated multiple times how much "support" they had given her over the years. He cautioned that Professor Jean Comaroff would be "furious" at anyone who told her about his conduct.

73.     Finally, Professor Comaroff warned that if Ms. Mandava and Ms. Czerwienski continued their "gossip," he and his wife would find out, because "our students will always tell us."

74.     Professor Comaroff's threats were serious and credible. As Dean for Faculty Affairs and Planning Nina Zipser acknowledges, academics "rely on narrow networks of individuals."[15] Harvard Professor Stephen Blyth affirms that "[t]he influence a senior professor holds over a PhD student's career . . . is immense: a poor letter of recommendation torpedoes job prospects."[16] Anthropology is a small and tight-knit field. There are seldom more than a handful of tenure-track positions available to graduating doctoral students. Each position receives hundreds of applications. And Professor Comaroff's influence permeates the field. His former students and acolytes sit on hiring committees in almost every major anthropology department across the globe. A down-vote from Professor Comaroff is thus the death knell of an anthropologist's career.

---

[15] Letter from Stephen Blyth, Professor, Harvard Univ., to Drew G. Faust, President, Harvard Univ. (May 7, 2018), https://www.bostonglobe.com/2019/05/24/read-letter/h2qAM6WfEOWiRHQVmu0N2M/story.html?camp=bg%3Abrief%3Arss%3Afeedly&rss_id=feedly_rss_brief&s_campaign=bostonglobe%3Asocialflow%3Atwitter.

[16] *Id.*

75.     The Comaroffs' manifest retaliatory animus similarly threatened Plaintiffs' primary means of professional advancement: conducting their research and securing prestigious publications. Academia's mantra of "publish or perish" means that scholars failing to obtain sufficient grant funding to conduct their research and regularly publish their work in their field's academic journals will find their careers stalled or ended prematurely. Professor Comaroff and his wife, as current or former members of the editorial or advisory board of dozens of prestigious journals and grant sources, were and remain perfectly placed to sabotage Plaintiffs' publication and grant prospects, and thus their careers.

76.     Ms. Mandava shared Professor Comaroff's threats with Ms. Czerwienski. Both began fearing for their academic futures at Harvard and their career plans.

### F.   **Ms. Czerwienski Reports Professor Comaroff's Threats**

77.     Ms. Czerwienski nonetheless reported Professor Comaroff's threats to Harvard Title IX Resource Coordinator Seth Avakian three days later, on or about October 16, 2017. She also told Dr. Avakian (as others had before) that Professor Comaroff had been sexually harassing students.

78.      In response, Dr. Avakian discouraged Ms. Czerwienski from filing a formal report with Harvard's Office for Dispute Resolution ("ODR") because, he said, doing so would be futile since he believed her complaint would not survive the initial stages of the ODR process. Deterred from filing a formal complaint, Ms. Czerwienski asked Dr. Avakian to keep a record of her complaint because, she said, she feared that Professor Comaroff would follow through on his threat of retaliation.

79.     Ms. Czerwienski and Ms. Mandava trusted that Harvard, informed of Professor Comaroff's repeated sexual harassment of other students and retaliation against them, would take

action to stop his pattern of misconduct—even if only behind the scenes. But, they later learned, Harvard did not.

### G. Professor Comaroff's Threat Derails Ms. Czerwienski and Ms. Mandava's Careers

80.     Meanwhile, Professor Comaroff's threats had their intended chilling effect on Ms. Mandava and Ms. Czerwienski. Ms. Czerwienski did not file a formal complaint, and, after the October 13, 2017 meeting, Ms. Czerwienski and Ms. Mandava both stopped warning other students about Professor Comaroff's sexual misconduct. Indeed, later in the fall of 2017, when Plaintiff Kilburn approached Ms. Mandava seeking guidance regarding Professor Comaroff's harassment, Ms. Mandava, fearful of retaliation, refused to assist Ms. Kilburn.

81.     Professor Comaroff, meanwhile, spoke openly about his inappropriate behavior, with his wife's support. At an October 2017 dinner with faculty and graduate students, Professor Comaroff compared himself to Harvey Weinstein, and remarked, "They're coming for me next!" Professor Jean Comaroff, also in attendance, disparaged women who confront or report sexual violence, commenting, "Whatever happened to rolling with the punches?"

82.     These remarks further rattled Ms. Mandava and Ms. Czerwienski. To mitigate the risk of retaliation from the Comaroffs, Ms. Czerwienski ended her advising relationship with Professor Jean Comaroff; dropped a required course then taught only by the Comaroffs (thereby delaying her completion of that requirement); and shifted her academic focus away from Africa, a region studied in Harvard's Social Anthropology program exclusively by the Comaroffs and a former student of theirs. Ms. Czerwienski also actively sought to avoid Professor Comaroff. Professor John Comaroff's tentacular influence in the field, however, made it impossible to avoid him, and Ms. Czerwienski continued to encounter him on campus.

83.     Ms. Mandava, too, ultimately ended her mentoring relationship with both Professor Jean Comaroff and Professor John Comaroff, changed the focus of her dissertation, and did not apply for a grant in their area of expertise to avoid them. Ms. Mandava had previously relied on the Comaroffs for letters of recommendation for nearly every major application since college. Ms. Mandava also felt persistent anxiety resulting from Professor Comaroff's threat.

84.     Harvard's inaction thus upended the academic careers of Ms. Mandava and Ms. Czerwienski. It would soon do the same to Ms. Kilburn.

## H.  Professor Comaroff Subjects Plaintiff Kilburn to Repeated Sexual Harassment

85.     From the day Ms. Kilburn first visited Harvard as a prospective student in 2017 through April of 2019, Professor Comaroff subjected her to pervasive sexual harassment, including unwanted kissing and touching as well as a graphic description of her imagined rape and murder.

### a.  Professor Comaroff Kisses Ms. Kilburn When She Was an Admitted Student

86.     Professor Comaroff began making unwanted sexual advances on Ms. Kilburn before she even matriculated at Harvard. On or about February 27, 2017, Ms. Kilburn met with Professors John and Jean Comaroff to discuss her acceptance to the program. Professor John Comaroff offered to walk Ms. Kilburn back to Harvard's campus. As they approached the building in which his office is located, Professor Comaroff stepped in front of Ms. Kilburn, hugged her tightly—pressing the length of his body against hers—and kissed her on the lips without her consent. Continuing to hug her tightly, he whispered in her ear that she should "go visit Columbia [University], but then come back here."

87.     Ms. Kilburn was distressed by Professor Comaroff's assault. She feared for her future at Harvard, in a program she had dreamed of attending. But, not knowing of Professor Comaroff's history, she sought to forget the incident and move on.

**b.   Ms. Kilburn's First Day of Grad School: "You Would Be Raped and Killed"**

88.     Ms. Kilburn's fears, however, proved well founded. On the first day of Ms. Kilburn's doctoral program, on or about August 27, 2017, she met with Professor Comaroff, now her advisor, in his office to discuss her planned study of a country in Central Africa.

89.     During the meeting, Professor Comaroff repeatedly described various ways in which Ms. Kilburn would be raped and killed in South Africa—approximately 3,000 miles away from Central Africa—because she is in a same-sex relationship. He told her, "there are many places where you would go where you would be raped," "you would certainly be raped," and "you would be raped and killed." He then identified specific places where so-called "corrective rapes" had been carried out, and stated over and over that Ms. Kilburn, too, "would be raped," "would be killed," would be "left for dead," and that "they would finish you off." Ms. Kilburn sat frozen in shock, while Professor Comaroff continued for approximately five minutes.

90.     As he had with Ms. Mandava, Professor Comaroff ended the meeting by reminding Ms. Kilburn of the power he now wielded over her career. He told her that he had "fought very hard for [her]" in the admissions process and that Ms. Kilburn needed to trust him because he had been advising students for fifty years.

**c.   Professor Comaroff Kisses Ms. Kilburn Again at His Home Without Consent**

91.     Professor Comaroff's harassment again turned physical.

92.     On or about September 24, 2017, Ms. Kilburn attended an annual brunch held at the Comaroffs' house. Professor John Comaroff greeted Ms. Kilburn with a hug and a kiss on the cheek and began singling her out for unwanted attention; he placed his hand uncomfortably low on her back to guide her through the room, expressed disappointment that she was not drinking alcohol, and touched her lower back again when he returned with coffee.

93.     When Ms. Kilburn went to leave the brunch, Professor Comaroff followed her. Ms. Kilburn bent to retrieve her bag, and when she stood, Professor Comaroff had moved close to her. He again hugged her forcibly and kissed her on the mouth without her consent. Ms. Kilburn pushed him away and wiped her mouth, only to find Professor Comaroff smiling at her.

94.     Ms. Kilburn was disturbed. Over the remainder of the fall semester of 2017, she avoided Professor Comaroff. She did not attend the regular meetings with Professor Comaroff that were customary for first-year graduate students, and she began dressing more conservatively. She also stopped attending the weekly African Studies Workshop led by Professors John and Jean Comaroff, even though the workshop was crucial to expanding her network in her field and one of the reasons she had decided to matriculate at Harvard over other institutions.

### d. Harvard's Program Administrator Rebuffs Ms. Kilburn's Attempted Disclosure: "Those Are Just Nasty Rumors"

95.     Throughout the fall of 2017, Ms. Kilburn sought assistance from classmates and staff. None offered aid because of Professor Comaroff's threats and Harvard's indifference.

96.     First, in or around October 2017, Ms. Kilburn approached the Graduate Program Administrator in the Anthropology Department. She asked whether the Graduate Program Administrator was aware of Professor Comaroff ever having made students uncomfortable. But before she could finish, the Graduate Program Administrator cut her off and responded, "Those are just nasty rumors!"—mimicking the language used by Professor Comaroff.

97.     Then, in late fall 2017, Ms. Kilburn approached Ms. Mandava to share her experience with Professor Comaroff. Chilled by Professor Comaroff's threat to damage her career if she spoke about his conduct, however, Ms. Mandava demurred.

98.     Professor Comaroff's threatened retaliation and Harvard's inaction thus had their predictable effect: Ms. Kilburn continued to believe that she needed to remain quiet about Professor Comaroff's abuse and that she was alone in her experience.

**e.   Professor Comaroff Harasses Ms. Kilburn and Squeezes Her Thigh in Public**

99.     Professor Comaroff took advantage of the University's indifference to continue harassing Ms. Kilburn.

100.    In late 2017, Professor Comaroff saw Ms. Kilburn in the atrium of the Anthropology Department's building. Despite Ms. Kilburn's noticeable attempts to avoid him that semester, he approached her, touched her back again, and insisted that she meet with him.

101.    During a required meeting on or about January 23, 2018, Professor Comaroff criticized Ms. Kilburn for avoiding meetings with him. He then told her that if she ever needed to "talk to a woman," she could approach his wife, Professor Jean Comaroff.

102.    In or around February 2018, Ms. Kilburn was attending a departmental colloquium. As Professor Comaroff was leaving the colloquium, he passed by Ms. Kilburn's seat in the back row and forcibly squeezed her thigh several inches above her knee in view of faculty and students.

103.    And throughout the fall 2018 semester, Professor Comaroff repeatedly asked Ms. Kilburn to meet him alone off-campus for reasons unrelated to her work. These unwelcome proposals made Ms. Kilburn fearful and uncomfortable and continued into November or December 2018.

**f.   Professor Comaroff Continues His Harassment Through April 2019**

104.    By the spring 2019 semester, Professor Comaroff apparently recognized Ms. Kilburn's efforts to avoid him. He responded by becoming increasingly possessive over her.

105.     In April 2019, Professor Comaroff repeatedly pressured Ms. Kilburn to direct her forthcoming project to a topic in which he (rather than her other advisor, Professor Harkness) specialized—a topic that had never been Ms. Kilburn's area of focus, would be dangerous to undertake, and was not tenable given the political situation in her country of study. Ms. Kilburn expressed these concerns to Professor Comaroff during a meeting on the topic, but Professor Comaroff exploded in response, with no apparent explanation. Shortly thereafter, he forbade Ms. Kilburn from working with Professor Harkness at all, making her entirely beholden to him and more vulnerable to his sexual advances.

### g. Ms. Kilburn Reports Professor Comaroff's Harassment to Harvard and Discovers Harvard's Past Indifference to Harvard Student 2's Complaint

106.     The situation soon got worse. On or about April 26, 2019, Ms. Kilburn was in the glassed-in waiting area of the Graduate Program Administrator's office. Professor Comaroff saw her and tried to open the door and enter the waiting area. Ms. Kilburn, seeking to avoid contact with him, and perceiving his approach as another potential sexual advance, told him that she had a meeting and held the door shut. Against Ms. Kilburn's physical resistance, Professor Comaroff continued to try to force his way inside.[17]

107.     This moment was a breaking point for Ms. Kilburn. Before the events in April 2019, she had believed she could manage Professor Comaroff's behavior by avoiding him and seeking joint meetings with Professor Jean Comaroff. But her avoidance had made him more possessive. She now feared that she would have to leave the program if Professor Comaroff did not stop harassing her.

---

[17] Professor Comaroff did not engage in such possessive behavior—repeatedly inviting a student to meet off-campus alone, isolating them from their other advisors, and following them into small spaces—to his male students who did not engage in protected activity.

108.     This fear drove Ms. Kilburn to report Professor Comaroff's conduct, his threats notwithstanding. On or about April 26, 2019, the same day as the door incident, Ms. Kilburn complained to Professors Joana Pimenta and Lucien Castaing-Taylor that Professor Comaroff had twice kissed her without her consent, told her on her first day of school that she would be raped and killed, and repeatedly harassed her throughout her graduate career. Both professors were mandatory reporters and shared Ms. Kilburn's complaint with the Title IX Office.

109.     On or about May 2, May 6, and May 29, 2019, Ms. Kilburn met with Title IX Officer Avakian, Anthropology Department Chair Ajantha Subramanian, and Professor Nicholas Harkness, respectively, to report Professor Comaroff's sexual harassment of her. All three of these employees were mandatory reporters under Harvard's Title IX policies.[18]

110.     Ms. Kilburn's May 2, 2019 complaint to Dr. Avakian was met with predictable indifference.[19] Ms. Kilburn began describing her complaint, but before she even named her harasser, Dr. Avakian guessed that her complaint concerned Professor Comaroff. Dr. Avakian's notes record, "Seth [said] to [Ms. Kilburn:] I should let you know that you don't have to mention the faculty member's name, but I know who you are talking about"—a tacit admission that Harvard's administration was well aware of Professor Comaroff's history of harassment.[20] Then, in an *explicit* admission (also recorded in his notes), Dr. Avakian acknowledged to Ms. Kilburn

---

[18] *See* Sexual and Gender-Based Harassment Policy and Procedures for the Faculty of Arts And Sciences, *available* *at* https://www.fas.harvard.edu/files/fas/files/fas_p_and_p_combined_2014_2020.pdf?m=1600459885.

[19] Dr. Avakian even acknowledged that he has "found that it is very common for students to express concerns about retaliation that damages their reputation, educational or career opportunities" when they report professors, yet offered Ms. Kilburn no solutions to prevent such retaliation.

[20] In 2020, in a meeting about Plaintiffs' Title IX complaints, the Assistant Dean of Student Affairs also admitted that Harvard's administration had known about Professor Comaroff's behavior for years.

that "there was another student w[ith] a similar issue w[ith] the same person" who had previously filed a complaint.

111.    Again, however—just like he had done in 2017 with Harvard Student 2—Dr. Avakian did not stop or remedy Professor Comaroff's harassment or initiate an investigation. Dr. Avakian instead put Ms. Kilburn in contact with Harvard Student 2.

112.    Ms. Kilburn met with Harvard Student 2, who shared with Ms. Kilburn that (as alleged above) Professor Comaroff had engaged in a similar pattern of harassment against her: kissing her, groping her, and isolating her from others.

113.    The meeting showed Ms. Kilburn that Harvard would not protect students who complained about Professor Comaroff, and that his misconduct would therefore continue to go unchecked. Before she learned of Harvard Student 2, Ms. Kilburn had not known that Professor Comaroff had sexually harassed other students, nor that other students had reported his behavior to Harvard. Nor had she suspected that Harvard would ignore repeated complaints that a professor subjected students to serial sexual harassment. These revelations shocked Ms. Kilburn.

114.    Ms. Kilburn shared her experience of harassment with Ms. Mandava in June 2019. Ms. Mandava, disturbed to learn that Professor Comaroff had continued his abuse, sought out Professor Subramanian (now the Chair of the Anthropology Department) to complain of Professor Comaroff's 2017 retaliation and also complained to Professor Harkness about the same.

115.    Both Professor Subramanian and Professor Harkness eventually reported those complaints to the Title IX Office, but Dr. Avakian and Harvard did not act on them.

116.    On November 20, 2019, Dr. Avakian even *confirmed* to Ms. Czerwienski via email, "I spoke with someone earlier this week about the concerns we've discussed and they told me that you have been talking with a few students in AAAS who share similar concerns." And still,

*knowing* that more students had complaints about Professor Comaroff, Harvard's Title IX Office failed to investigate Professor Comaroff.

117.    Because the Title IX Office failed to act, Professor Comaroff remained unrestricted in his teaching and supervising of students throughout the spring and fall 2019 semesters. Harvard even allowed him to take undergraduate students on a study-abroad trip in the summer of 2019. Harvard waited even though its Title IX Office had received at least *eight* separate complaints about Professor Comaroff and at least *four* such complaints in 2019 alone. In the interim, it left Plaintiffs vulnerable to further harassment and retaliation by Professor Comaroff.

## I.   Harvard Fails to Act Until the Media Exposes Professor Comaroff's Misconduct

118.    Harvard apparently did not investigate Professor Comaroff's misconduct until a year later, in May 2020—when *The Harvard Crimson* contacted the Title IX Office seeking comment on an article it was set to publish in the coming days. The article concerned sexual harassment by multiple professors in the Anthropology Department, including Professor Comaroff.

119.    On May 18, 2020, Dr. Avakian filed a formal complaint against Professor Comaroff with ODR on behalf of Ms. Czerwienski, Ms. Kilburn, Ms. Mandava, and Harvard Student 2, finally setting in motion a formal investigation. This investigation came more than two and a half years after Ms. Czerwienski had first reported Professor Comaroff's threat, more than one year after Ms. Kilburn had reported her own harassment to Harvard's Title IX Office, and eleven months after Ms. Mandava had reported Professor Comaroff's threat to the Department Chair. But, upon information and belief, it came just days after the Title IX Office learned of the *Crimson*'s impending article. Approximately two days later, on or about May 20, 2020, Dr. Avakian told Plaintiffs about the filing of his complaint and hinted that the timing might appear suspect. And

31

just a day after Dr. Avakian's hint, on or around May 21, 2020, Plaintiffs learned that the *Crimson* was set to publish an article concerning harassment by Professor Comaroff.

120.    Harvard officials openly disparaged the ODR process; none expected it to remedy the harms experienced by Plaintiff. Dr. Avakian expressly told Ms. Kilburn that reporting to the press would be more impactful than participating in the ODR process. He cited Professor Jorge Dominguez, a Harvard professor who, on information and belief, had serially abused women students for over 40 years, telling Ms. Kilburn that Professor Dominguez's victims found speaking to the press more effective than Harvard's ODR process and encouraged Ms. Kilburn to do the same. Department Chair Subramanian, too, urged all three Plaintiffs to speak to the *Crimson* and subsequently with *The Chronicle of Higher Education*, because, she said, *that* would give Harvard a reason to act. And Dean Zipser pressed Plaintiffs to speak to the *Chronicle*, because, she said, only a public article would give her cover to take action against Professor Comaroff.

121.    Ms. Kilburn, Ms. Czerwienski, and Ms. Mandava had been reluctant to go public with their stories. But, because Harvard's faculty, Title IX Resource Coordinator, and top-level decision-making officials now disparaged the ODR process and urged them to go to the press, they did so.

### J.   The *Crimson* and *Chronicle* Reports Bring Other Survivors Forward and Reveal Harvard's Deliberate Indifference to Rampant Harassment in the Department

122.    On May 29, 2020, the *Crimson* published an article revealing a decades-long pattern of sexual abuse perpetrated by senior male professors in Harvard's Anthropology Department. The *Chronicle* followed suit on August 25, 2020, publishing an article detailing Professor Comaroff's sexual harassment and retaliation against Plaintiffs, sexual misconduct by two other professors, and Harvard's longstanding indifference thereto. Those reports spurred other survivors to come forward.

123.    Before those articles were published, Ms. Czerwienski, Ms. Mandava, and Ms. Kilburn were aware only of the harm Professor Comaroff had caused them and two other students—Harvard Students 2 and 3. Plaintiffs did not suspect that Harvard had failed to respond to prior reports of sexual harassment. Only through the articles and the resulting fallout did Plaintiffs begin to suspect Harvard's longstanding complicity in his abuse.

### a. More Students Speak Up About Professor Comaroff's Longstanding Abuse

124.    After the *Crimson* article's publication, multiple students contacted Plaintiffs to share their experiences of sexual harassment by Professor Comaroff and other professors in the Department. These included UChicago Student 2, Harvard Student 1, and a faculty member at another institution who shared that Professor Comaroff harassed her at a 2018 conference. In addition, another current female Harvard Anthropology graduate student ("Harvard Student 4") reported that, in 2018, Professor Comaroff had made an inappropriate sexualized remark to her. They also learned that Professor Comaroff had harassed yet another student at a conference.

125.    Following the publication of the *Chronicle* article, Plaintiffs also learned that Professor Comaroff had retaliated against Harvard Post-Doc 1 in 2017 when Harvard Post-Doc 1 had encouraged Harvard Student 2 to file her complaint of sexual harassment against Professor Comaroff.

126.    UChicago Student 4, Harvard Post-Doc 1, Harvard Student 1, and Harvard Student 4 all complained to Harvard about Professor Comaroff's misconduct towards them, but Harvard did not meaningfully act on their complaints. Harvard Post-Doc 1 even wrote to Dean Zipser about the ongoing retaliation he was experiencing. Nonetheless, as it had done to Plaintiffs, Harvard sent the students elsewhere. Dr. Avakian informed Harvard Post-Doc 1 that no investigation would be conducted unless Harvard Post-Doc 1 filed a formal complaint. Because Harvard Post-Doc 1 did

33

not have a tenured position and feared retaliation, he did not file a formal complaint, and Harvard did not investigate his allegations. Similarly, Dean Zipser told UChicago Student 4 that she was a mandatory reporter and would have to share UChicago Student 4's complaint with the Title IX Office. But when UChicago Student 4 expressed that she wished to file a Title IX complaint herself, Dean Zipser told her she could not do so because she was not affiliated with Harvard. Instead, Dean Zipser advised UChicago Student 4 to go to the press because otherwise, she said, Harvard would not consider her complaint.[21]

### b. The *Crimson* Reveals Harassment by Other Professors in the Department

127.  The *Crimson* article also revealed that since at least 2013, Harvard had been willfully ignoring complaints not just against Professor Comaroff, but also against two other professors who served as *chairs* of the Department.

#### i. *Professor Theodore Bestor*

128.  Through the *Crimson* article, Plaintiffs learned that Harvard administrators and the Title IX Office had known about multiple complaints of sexual harassment against Professor Theodore Bestor[22] since at least 2013. Harvard enabled Professor Bestor's longstanding pattern of harassment through its deliberate inaction, according to the *Crimson*.

129.  The *Crimson* revealed that, in 2013, a graduate student complained to then-Department Chair Gary Urton that Professor Bestor had subjected her to a pattern of sexual harassment over the course of seven years. Around the same time, the student also complained to then-Director of Graduate Studies Mary Steedly, Professor Subramanian, Professor Greenhalgh,

---

[21] UChicago Student 4, wanting Harvard to consider her allegations, reported her experience to the *Chronicle*. But because she did not wish to publicize her name for fear of retaliation from Professor Comaroff, the *Chronicle* did not publish her story, and Harvard did not investigate her allegations.

[22] Professor Bestor was Chair of the Anthropology Department from 2007 to 2012.

and Professor Steve Caton about Professor Bestor's harassment. Her complaints detailed unwanted kissing on the lips (including in front of other Harvard faculty members) and inappropriate late-night emails. Although Professor Urton told the student that he had relayed the complaint to Harvard's ombudsman, Harvard evidently took no action on her complaint. And Professor Bestor told the *Crimson* that Harvard never informed him of the student's complaints.

130.    Professor Bestor similarly harassed one of his graduate advisees, repeatedly kissing her on her face and commenting on her body. She reported his behavior to Harvard's Dean for Graduate Student Affairs Garth McCavana in 2012, to which Dean McCavana advised her *to speak with Professor Bestor directly to resolve the issue*. She also complained to the Graduate Program Administrator, who responded that the behavior described did not qualify as harassment because Professor Bestor "treats everyone like that." The graduate student also repeatedly sought assistance from the Title IX Office—a process that was especially difficult for her to navigate as an international student—to no avail. She was eventually forced to change advisors, which resulted in retaliation and significant harm to her career prospects.

131.    By July 2017, the *Crimson* revealed, Harvard's Title IX Office had received reports that Professor Bestor had sexually harassed multiple women, but that, because of his power and influence in the tight-knit field of anthropology, the women feared reprisal should they file formal complaints.[23] Dr. Avakian did little to allay these fears: He told these women that ***Harvard could not protect them from professional retaliation if they filed formal complaints***. So none did.

132.    Nor did Harvard. In July 2017, Dr. Avakian told a witness that he had "not considered" filing a formal complaint against Professor Bestor. In the same conversation, he

---

[23] James S. Bikales, *Protected by Decades-Old Power Structures, Three Renowned Harvard Anthropologists Face Allegations of Sexual Harassment*, The Harvard Crimson (May 29, 2020), https://www.thecrimson.com/article/2020/5/29/harvard-anthropology-gender-issues/.

admitted that he had already received several prior complaints about professors in the Anthropology Department.[24]

133.    Among the complaints that did make their way to Harvard's Title IX office, the *Crimson* reported, was a complaint made in May 2017 by a professor at another institution. The professor told Harvard's Title IX Office that, at an academic conference, Professor Bestor made unwelcomed sexual comments to her—stating that that he "loved" her, asking her if she had "ever been raped," and stating "I won't ply you with wine, I'll ply you with me"—then attempted to hug her and kiss her. Harvard's Title IX Office, however, initially refused to investigate the outside professor's complaint, telling her that the conduct she described was not serious enough to investigate and that Harvard did not believe that Professor Bestor posed a risk to Harvard students.

134.    Harvard reversed this decision only after the outside professor wrote a letter to Harvard's President. Only then, in November 2017, did Harvard investigate her complaint. It eventually found that Professor Bestor committed only two counts of sexual misconduct against the professor—out of six to which she testified—because it found that the professor did not support the other allegations with independent corroboration. Harvard allowed Professor Bestor to return to work before completing his required sanctions.

### ii. Professor Gary Urton

135.    The *Crimson* also described years of sexual harassment by Professor Urton.

---

[24] Dr. Avakian has repeatedly admitted to complainants that he was aware of prior allegations against the same professor. *See supra* ¶ 110 (admitting to Ms. Kilburn that at least one other student had complained about Professor Comaroff engaging in the same conduct). In or around 2008, an untenured faculty member received unwelcome physical advances from Professor Jorge Dominguez, and learned that Professor Dominguez repeatedly asked graduate students in the Government Department to come to his house "for ice cream" when his wife was out of town. The untenured professor reported this conduct to Dr. Avakian, who responded that he had "heard about the ice cream calls many times" and that the professor needed to file a formal complaint if she wanted Harvard to investigate.

136.     The *Crimson* revealed that, in 2011, Professor Urton pressured a student into unwelcome sex by propositioning her in exchange for a letter of recommendation and a high grade in his class. Fearing professional reprisals if she did not assent, the student remained silent for years, the *Crimson* said. The student eventually complained in 2016 to then-University President Drew Faust and Harvard's sexual harassment officer, yet the University took no steps to investigate or protect other students, according to the *Crimson*.[25]

137.     In a subsequent article, the *Crimson* further reported that Professor Urton had propositioned a female graduate student on a research trip in 2003, and for the following nine years, made her professional development at Harvard contingent on a sexual relationship with him.[26] According to the *Crimson*, she complained to Harvard's Dean for Graduate Student Affairs Garth McCavana, but, echoing Dr. Avakian, Dean McCavana responded that complaints rarely worked out in the victim's favor, which discouraged her from contacting the Title IX office. "***I was essentially told that I could file a complaint or get a degree, but not both***," the former student told the *Crimson*.[27]

138.     The same *Crimson* article revealed that, in 2012, Professor Urton propositioned another female graduate student via email. He wrote, "I wonder if we should just plan a time to have a tete-a-tete, daytime or nighttime, rather than leaving it to chance? . . . I would find it most enjoyable." He followed up shortly thereafter, affirming that he "would be interested in something more intimate" and propositioned, "what if I got a hotel room and then we got a bottle of wine and

---

[25] *Id.*

[26] James S. Bikales, *Anthropology Faculty Call for Urton's Resignation as More Former Students Accuse Him of Sexual Misconduct*, The Harvard Crimson (June 5, 2020), https://www.thecrimson.com/article/2020/6/5/urton-more-allegations-anthropology-faculty-demand-resignation/.

[27] *Id.*

spent an afternoon in conversation and exploration?"[28] The student reported Professor Urton's behavior to Professor Rowan Flad immediately. She also reported it to the Anthropology Graduate Program Administrator. The Administrator instructed the graduate student to be "a good Harvard girl" and "never speak of it again." Neither conveyed the complaints to Harvard's Title IX office, and Harvard did not conduct an investigation. When the student learned from the May 2020 *Crimson* article that she was not the only student harassed by Professor Urton, she filed a complaint with Harvard's Title IX Office, but the Title IX office pressured her to drop her complaint. And, perversely, when the student publicized Harvard's finding that Professor Urton had violated FAS policy, Professor Urton filed a retaliation claim against the student with the ODR. Unlike the student's complaint, Harvard promptly pursued Professor Urton's complaint, effectively punishing the student for having sought to warn the Harvard community (and the world) about Professor Urton.

139. The *Crimson* article's publication brought forward further survivors. Following the publication, a faculty member who was repeatedly sexually harassed by Professor Urton over email between 2008 and 2010 filed two complaints with ODR. And a former Harvard undergraduate student publicly shared, "Gary Urton groomed me since I was 18 to sexually harass me and used my favorite Spanish author to sexually proposition me my senior year. [H]e was one of the first people I told I was undocumented. I believe my status is why he propositioned me."

140. For his part, Professor Urton reminded the University in 2020 that the allegations against him were "well known" and that "***Harvard has had at its disposal (and has discounted) [the allegations] for three years***."[29] He also acknowledged that Harvard knew "these are issues

---

[28] *Id.*

[29] Letter from Gary Urton, Professor, Harvard Univ., to Claudine Gay, Edgerley Fam. Dean of the Fac. of

that do not affect the Department of Anthropology alone, but are pervasive within the University."[30]

### iii.  Harvard's Complicity

141.    The articles, Professor Urton's response, and the resulting fallout laid bare Harvard's complicity in the abuse that, upon information and belief, Anthropology Department professors had been committing against women students for over a decade. Before the *Crimson*'s reporting, Plaintiffs were aware only of the misconduct to which they and a few others had been subjected. The *Crimson*, however, exposed both a broader pattern of abuse and that, for years, ODR, the Title IX Office, faculty, and administrators systematically refused to act on students' complaints. This inaction, in turn, facilitated new abuses (including Plaintiffs'), all perpetrated under threats to the careers of additional female students.[31] As Ms. Czerwienski wrote to Harvard Student 2 on May 29, 2020—the day the *Crimson* published its investigation: "Did you see the [C]rimson article? . . . no one I knew knew of all 3 [professors] . . . ."

142.    The *Crimson*'s reporting also laid bare a power structure that functioned to protect powerful male faculty at the expense of their female graduate students. Not only, it now appeared,

---

Arts and Scis., Harvard Univ., and Lawrence Bobo, Dean of the Div. of Soc. Scis., Harvard Univ. 1-2 (May 31, 2020).

[30] *Id.*

[31] Studies show that graduate students are particularly vulnerable to sexual misconduct by faculty, and that faculty who abuse students often do so serially and over long periods of time. *See, e.g.*,  Nancy C. Cantalupo & William C. Kidder, *Mapping the Title IX Iceberg: Sexual Harassment (Mostly) in Graduate School by College Faculty,* 66 J. Legal Educ. 850, 869 (2016) (analyzing 68 cases in which students brought sexual harassment claims against a member of their University's faculty and concluding that "the alleged harasser has a standard method for targeting victims" and that "in several of these cases, the faculty member's reported tendencies to harass appear to be 'open secret'"); Nancy C. Cantalupo & William C. Kidder, *A Systematic Look at a Serial Problem: Sexual Harassment of Students by University Faculty,* Utah L. Rev. 671, 672 (2017) (analyzing over 300 cases of investigations/lawsuits against graduate school professors and concluding that "more than half (53%) of cases involved professors allegedly engaged in serial sexual harassment. Thus, this study adds to our understanding of sexual harassment in the university setting and informs [among other things] prevention, sanctions, and the so-called 'pass-the-harasser' phenomenon of serial sexual harassers relocating to new university positions.").

had Harvard known of rampant sexual abuse within its Anthropology Department, but the powerful male faculty who should have been disciplined knew that Harvard knew about their sexual abuse and took Harvard's ongoing indifference as license to continue such conduct. Indeed, the repeated actions of Harvard administrators and Harvard faculty to discourage complainants from filing formal complaints—and thus forestall investigations—appears designed to protect powerful male faculty at the expense of their female graduate students.[32]

143.    These new revelations—that Professor Comaroff had continued to sexually harass multiple students after Harvard received multiple complaints about him, and of Harvard's pattern of deliberate indifference to reports against faculty—also alerted Plaintiffs that Harvard had likely not responded adequately to prior complaints against Professor Comaroff. Professor Comaroff confirmed this himself on February 8, 2022: in response to the lawsuit, he announced through counsel that Harvard had *never* notified him of any complaint aside from the Plaintiffs'.

### K.  **More Harvard Faculty Learn About Professor Comaroff's Misconduct but Fail to Act**

144.    Following the publication of the *Crimson* article, graduate students in the AAAS Department met with AAAS Department Chair Tommie Shelby, then-Dean of Graduate Studies Alejandro de la Fuente, and Professor Emmanuel Akyeampong and "informed them of a substantial 'whisper network' about Comaroff's decades of alleged abuse and [their] own inappropriate interactions with him."[33] Still, upon information and belief, none of the three faculty

---

[32] In 2015, for example, almost half of all female graduate students (49.6%) surveyed said they had experienced sexual harassment at Harvard (compared with 34% of men), and 21% of those women identified that the offender was faculty. Harvard Univ. 2015 AAU Student Surv. on Sexual Assault & Misconduct at 9. Only 26.5 percent believe that Harvard would take action against the offender if they reported. *See id.*

[33] Crimson News Staff, *AAAS Grad Students' Response*, The Harvard Crimson (March 9, 2022), https://www.thecrimson.com/PDF/2022/3/9/aaas-grad-students-response/.

brought these complaints to the Title IX Office or ODR upon learning them.

**L. Professor Comaroff Retaliates Against Plaintiffs for Participating in the *Crimson*'s Investigation**

145.    Meanwhile, upon information and belief, Professor Comaroff swiftly mobilized his network. In June 2020, a former student of his circulated a letter to dozens of individuals in the Comaroffs' network, including Post-Doc 1, Harvard Student 2, a Harvard Law School teaching fellow, and a Harvard faculty member who also serves as the Director of Undergraduate Studies. The letter, addressed to Dean Gay, defended the "beloved professor" against the "unsubstantiated" "accusations of sexual harassment made against him" and threatened that its signatories would not "shy away from any further actions or collaborations necessary to defend his reputation and standing within the university and the academic community at large." The letter's proponents exhorted students and faculty to pick a side: either sign the letter or *request not to be a signatory*. The message to Plaintiffs and those who refused to sign was thus clear: We know who you are, and you are on the wrong side.

**M. Harvard Conducts an Inadequate Title IX Investigation that Exposes Plaintiffs to Further Retaliation**

146.    With the *Crimson* and *Chronicle* articles in May and August, 2020, respectively, Harvard finally began to investigate Plaintiffs' longstanding allegations against Professor Comaroff. This investigation, however, was limited in scope, placed inordinate burdens on Plaintiffs, and proved woefully inadequate. It has left Plaintiffs vulnerable to further harassment and retaliation and perpetuated the hostile environment they face in the Department.

147.    On June 3, 2020, Dr. Avakian revised and resubmitted his May 18, 2020 formal complaint to ODR. He removed the allegations of Harvard Student 2, keeping only the allegations of Ms. Czerwienski, Ms. Kilburn, and Ms. Mandava. He did so because (as explained *supra* at ¶

64) Professor Comaroff had bullied Harvard Student 2 into silence, such that she was no longer willing to support her own complaint. As a result, Harvard never formally investigated the allegations brought forth by Harvard Student 2, and refused to consider her allegations and the substantial evidence of her abuse in Plaintiffs' ODR cases. Harvard pursued this course even though Professor Comaroff's harassment of Harvard Student 2 was the reason Professor Comaroff threatened Ms. Czerwienski and Ms. Mandava in the first place.

148.    Worse, shortly thereafter, Plaintiffs learned that Dr. Avakian's complaint had been dropped. And, despite at least two requests that it do so, ODR refused to revive the complaint or pursue it. **ODR thus made clear that it would not pursue the matter unless Plaintiffs filed their own formal complaints or convinced FAS to do so on their behalf.**

### a.   Harvard Limits the Scope of Its Investigation

149.    In summer 2020, Plaintiffs filed their own formal complaints with ODR. They did so to ensure that their complaints would be investigated and to correct inaccuracies in Dr. Avakian's complaint. They also did so because Harvard administrators involved in the investigation suggested that serving as complainants would both create a greater possibility of success and ensure that Plaintiffs learned the investigation's results.

150.    Ms. Kilburn, Ms. Czerwienski, and Ms. Mandava thus filed formal ODR complaints against Professor Comaroff on July 13, July 28, and July 31, 2020, respectively— fearing that, if they did not, Harvard would continue to ignore Professor Comaroff's pattern of sexual harassment and future students would remain vulnerable to him.

151.    But Harvard did not explain to Plaintiffs that by filing their own complaints, they had constrained the scope of the investigation. It belatedly did so only *after* Plaintiffs filed their own formal complaints. The result was that Harvard's investigation would be driven by Plaintiffs'

knowledge. But had Dr. Avakian's complaint remained operative, ODR could have considered evidence and complaints submitted to Dr. Avakian by others, thus establishing Professor Comaroff's pattern of harassment and retaliation. Instead, Harvard left Harvard Student 2's complaint uninvestigated.[34]

### b. Harvard Allows Professor Comaroff to Tamper with Evidence

152.    Things soon got worse. Professor Comaroff quickly poisoned the ODR process. Harvard allowed him to do so.

153.    On or about August 6, 2020, Professor Comaroff received a copy of Ms. Czerwienski's ODR complaint. The complaint relied, among other sources of proof, on messages Harvard Student 2 had sent to Ms. Czerwienski in 2017 detailing Professor Comaroff's ongoing abuse. Upon information and belief, that same day, Professor Comaroff pressured Harvard Student 2—over whose dissertation defense he would soon be presiding—to delete those messages.

154.    Ms. Czerwienski sought ODR's assistance in protecting the integrity of the investigation. She told ODR on August 17, 2020 that she was concerned Professor Comaroff was "intimidat[ing] witnesses" and "destroy[ing] evidence." But ODR merely foisted responsibility back onto Ms. Czerwienski, telling her, "[y]ou are free to let [Harvard Student 2] know, as you see fit, that she would be welcome to, for example, file a complaint with ODR as appropriate and as she saw fit. Otherwise, besides asking [Professor Comaroff] about this matter in due course, ODR would logically reach out to [Harvard Student 2] as a prospective witness, including about this specific matter, but whether she participated or not would be entirely up to her." Ms. Czerwienski

---

[34]    *Lawyers Respond to Civ. Suit*, JohnComaroff.com (February 8, 2022), https://www.johncomaroff.com/harvard-case/comaroffs-lawyers-respond-to-civil-suit/ (statement by Professor Comaroff's attorneys that "[t]he only students whose complaints Harvard has notified him of are the plaintiffs.").

raised the same complaint to Dean Zipser, who simply responded that Ms. Czerwienski had done "the right thing" by raising the complaint, but took no additional action.

155.    ODR sent Ms. Czerwienski's August 17, 2020 complaint of spoliation to Professor Comaroff on August 19, 2020. Two days later, on August 21, 2020, Harvard Student 2 deleted *additional* messages in which she had described Professor Comaroff's abuse of her to Ms. Czerwienski.

156.     Because of ODR's inaction, throughout summer 2020, Professor Comaroff and his allies tampered with more witnesses: they contacted Harvard Post-Doc 1 and two female UChicago graduate students, threatening repercussions if they did not remain silent about their knowledge of his misconduct. These threats had their intended effect.

157.    This tampering violated Harvard's policies and procedures. Plaintiffs reported these issues to ODR's investigator (Ilissa Povich) and to Harvard deans. But Harvard refused to act.

### c.   Harvard Allows Professor Comaroff to Retaliate Against Ms. Kilburn

158.    Harvard also allowed Professor Comaroff to weaponize the ODR process to retaliate against Ms. Kilburn.

159.    Professor Comaroff named three of the most prominent scholars in Ms. Kilburn's field—Peter Geschiere, Caroline Elkins, and Sue Cook—as witnesses in his defense. These scholars had no firsthand knowledge of the relevant events and *did not even know* Ms. Kilburn. But, by drawing them into the process, Professor Comaroff ensured that they would know about Ms. Kilburn's formal complaint against him and his animus towards her.

160.    All three of these professors are preeminent scholars in Ms. Kilburn's field and would have been potential advisors and mentors who could have replaced Professor Comaroff. But because ODR allowed Professor Comaroff to needlessly involve them in Ms. Kilburn's case,

Ms. Kilburn can no longer turn to them as advisors or mentors, nor can she count on them as impartial reviewers. Through this action, among many others, Professor Comaroff flatlined Ms. Kilburn's nascent career.

161.    But Professor Comaroff did not stop there: he also named Professor George Meiu—one of Ms. Kilburn's *current* dissertation committee members—as a witness to testify about *the layout of a well-known seminar room*. Professor Meiu had no relevant testimony to provide in Professor Comaroff's defense. He was, however, set to preside over Ms. Kilburn's qualifying exams and charged with determining whether Ms. Kilburn would be awarded a doctorate at the end of her studies. He was also working closely with the Comaroffs. Although Professor Meiu refused to give testimony, he made it clear to Ms. Kilburn that he did not support her complaint. Ms. Kilburn was thus forced to delay her qualifying exams for months.

162.    ODR played along with Professor Comaroff and approached the witnesses for interviews. It, predictably, found that they did not have information material to Ms. Kilburn's complaint. Nonetheless, ODR took no steps to investigate or forestall Professor Comaroff's efforts to use the ODR process to poison Ms. Kilburn's career.

163.    Ms. Kilburn therefore complained to Dr. Avakian and Kwok Yu, the Harvard Associate Dean who was overseeing Plaintiffs' complaints, that Professor Comaroff was calling witnesses for the purpose of derailing her career. But, still, the Title IX Office took no discernable action.

### d.  Harvard Obtains Ms. Kilburn's Confidential Medical Records Without Her Consent and Discloses them to Professor Comaroff and Others

164.    The investigation only got worse. In 2020, ODR contacted Ms. Kilburn's psychotherapist, a private therapist unaffiliated with Harvard, and obtained the psychotherapy notes from two of her sessions with Ms. Kilburn. ODR did not obtain Ms. Kilburn's consent for

the release of those records. Nor did ODR ask Ms. Kilburn's therapist if she had Ms. Kilburn's authorization to release her medical records to Harvard or share any other information with ODR.

165.    ODR's failure to obtain a signed authorization from Ms. Kilburn for the release of her therapy records was plainly unreasonable. According to Brett Sokolow, president of the Association of Title IX Administrators, "that's something almost always orchestrated by the institution and its investigators." He explains that "We [Title IX investigators] then take that [authorization] form to the therapist and ask for the records to be released . . . . We usually clarify with the complainant whether we are asking for full release or a redacted range. And we say, please understand that if these records are released to us and are relevant, they'll be incorporated in the investigation file, which is shared among everyone involved." Harvard's actions in seeking records without such a clear, precise, and signed authorization are thus "probably not in line with the practices of other schools," he said.[35] Indeed, Harvard did not even confirm that Ms. Kilburn's therapist had received a properly executed request for release of records and in fact proceeded to seek them despite evidence that Ms. Kilburn's therapist had not received such a signed authorization.

166.    ODR also interviewed Ms. Kilburn's therapist. In the interview, ODR asked the therapist to share information about other issues that Ms. Kilburn discussed during her sessions— issues that were entirely unrelated to experiences with Professor Comaroff. Ms. Kilburn had not given her consent for Harvard to acquire such information either.[36]

---

[35] Anemona Hartocollis, *After Sexual Harassment Lawsuit, Critics Attack Harvard's Release of Therapy Records*, N.Y. Times (Feb. 15, 2022), https://www.nytimes.com/2022/02/15/us/harvard-kilburn-therapy-records.html.

[36] Harvard was well aware of its obligations with respect to Ms. Kilburn's therapy notes: Around the time ODR obtained these notes, the ODR Investigator assigned to Plaintiffs' cases was giving trainings at Harvard about how to obtain medical records in compliance with federal regulations. *See* Office for Dispute Resolution, *Our Professional Training*, https://odr.harvard.edu/our-professional-training.

167.    After obtaining the notes without Ms. Kilburn's consent, ODR then withheld the full notes from Ms. Kilburn, redacting swaths of the notes and refusing to disclose the redacted portions even as ODR's investigator grilled her about the redacted contents during an interview.

168.    ODR then provided the notes to Professor Comaroff as part of its draft report. Professor Comaroff, in turn, deployed the notes to gaslight Ms. Kilburn, claiming that she must have imagined that he sexually harassed her because she was experiencing post-traumatic stress disorder—a condition that she developed *as a direct result* of his conduct.

169.    Finally, ODR disclosed the notes to others at the University without telling Ms. Kilburn the identities of those individuals, published the notes in its Final Report concerning Ms. Kilburn's complaint against Professor Comaroff, and appended them as exhibits, making Ms. Kilburn's medical records available to anyone with access to the Final Report.[37]

### e.    Harvard Refuses to Hold Professor Comaroff Responsible for his Pattern of Sexual Harassment and Retaliation

170.    ODR's findings were issued in August 2021, over *a year* after Plaintiffs had filed their complaints. Despite a process stacked against Plaintiffs, ODR made one finding in Ms. Kilburn's favor: it determined that Professor Comaroff had "over the course of approximately five minutes" repeatedly described how Ms. Kilburn "would be raped" in certain parts of Africa. ODR found that these unprompted and graphic descriptions constituted "severe" sexual harassment against Ms. Kilburn.

171.    As to Professor Comaroff's other, repeated sexual harassment and assaults against

---

[37] Harvard persisted in this course despite a request from Ms. Kilburn that Harvard limit access to her confidential medical information. On or about September 28, 2021, Ms. Kilburn's counsel requested that Harvard not further disclose her medical records; inform her of individuals who have received a copy of her medical records; and instruct these individuals to turn over the records to Harvard's general counsel's office without retaining copies. Harvard rejected these requests.

Ms. Kilburn (including his forced kissing and groping) and his retaliation against Ms. Mandava and Ms. Czerwienski, however, ODR found that Professor Comaroff had not violated Harvard's Sexual and Gender-Based Harassment Policy.

172.     ODR's reports—portraying Professor Comaroff's misconduct as a one-off verbal incident—reveal willful blindness to the overwhelming evidence that he engaged in a *pattern* of serial sexual harassment and retaliation that Harvard knew about but failed to stop.

### i.   *Ms. Kilburn's ODR Report*

173.     In Ms. Kilburn's case, ODR refused to interview *two thirds* of the witnesses Ms. Kilburn identified (even as it interviewed or attempted to interview all of the witnesses Professor Comaroff named). ODR also ignored the testimony of witnesses it did interview: throughout the investigation, Ms. Kilburn gave consistent, specific testimony detailing each of the repeated instances when Professor Comaroff kissed and touched her without consent. At least three separate witnesses confirmed that she had been reporting his pattern of abuse to them since 2017, while the harassment was ongoing, and long before she filed her complaint with ODR.

174.     ODR, however, cited "inconsistencies" in Ms. Kilburn's statements and used them to discount her testimony. These "inconsistencies" are, in reality, a pretext to avoid a finding of serial harassment and insulate Harvard from liability. To cite but a few examples:

> a.   Ms. Kilburn told ODR that Professor Comaroff kissed her in front of the Barker Center with force. Yet ODR rejected this live, corroborated testimony because ODR found it "inconsistent" with a sentence fragment from Dr. Avakian's notes. In fact, ODR did not even interview Dr. Avakian about this reference, but had it done so, ODR would have discovered that the reference did *not* contradict Ms. Kilburn's testimony.
>
> b.   Ms. Kilburn testified that Professor Comaroff kissed her at his home after a brunch. Another witness corroborated Ms. Kilburn's testimony, and ODR admitted that the witness's account was "credible" and "contemporaneous," because Ms. Kilburn had told her about the kiss "on the same day" it occurred. Nonetheless, ODR rejected this corroborated testimony because Ms. Kilburn

could not recall against precisely *which wall* in the room Professor Comaroff had assaulted her.

c.  Ms. Kilburn and three other witnesses testified that Professor Comaroff groped her thigh, but ODR rejected Ms. Kilburn's testimony based primarily on a non-existent "inconsistency" in her consistent statements about where Professor Comaroff was sitting before he groped her.

d.  Professor Harkness testified at Ms. Kilburn's ODR proceeding that Ms. Kilburn had complained to him and that Professor Comaroff had sexually harassed students at UChicago. ODR ignored his testimony entirely.

175.    In addition, ODR entirely failed to consider multiple incidents of harassment against Ms. Kilburn, including Professor Comaroff's repeated invitations to meet off campus, his forbidding her from working with her advisor, and his efforts (after Ms. Kilburn's clear and repeated efforts to avoid him) to forcibly enter an enclosed space with her over her resistance.

### *ii*. *Ms. Mandava and Ms. Czerwienski's ODR Reports*

176.    ODR made no finding against Professor Comaroff on the central issue in Ms. Mandava and Ms. Czerwienski's cases: whether Professor Comaroff threatened them and other students in retaliation for discussing his sexual misconduct. Instead, ODR's finding in Ms. Mandava's case rested on its conclusion that Ms. Mandava had not engaged in protected activity. To reach that conclusion, ODR disregarded Ms. Mandava's testimony (corroborated by contemporaneous messages referencing the conversations at issue) that she had complained of Professor Comaroff's harassment to Professor Subramanian and to multiple students because it found that Ms. Mandava offered insufficient independent corroboration. It also ignored her testimony that Professor Comaroff had *told* her he *knew* she had engaged in such conversations, and that she confirmed his belief before he threatened her.

177.    With respect to Ms. Czerwienski, ODR concluded that she "engaged in a protected activity by 'sharing with other students her knowledge of [Professor Comaroff's] purported . . .

sexual harassment of" [Harvard Student 2]." Still, ODR determined that Professor Comaroff did not have "notice" that Ms. Czerwienski had engaged in protected activity. In doing so, ODR ignored Ms. Czerwienski's testimony that weeks before Professor Comaroff's October 13, 2017 threat, Harvard Student 2 *told* Professor Comaroff that Ms. Czerwienski was discussing his misconduct with other students. And ODR further ignored the testimony of three separate students who (in ODR's own words) "each understood the last student referenced by [Professor Comaroff] in the October 13 conversation . . . was [Ms. Czerwienski]."

178.     Moreover, ODR refused to consider any of Ms. Czerwienski's written communications with Harvard Student 2. These communications show Harvard Student 2 detailing Professor Comaroff's sexual harassment and reference Ms. Czerwienski's discussions with other students about his harassment. They further reflect that Harvard Student 2 told Professor Comaroff about those discussions and notified him that Ms. Czerwienski engaged in protected activity. After refusing to consider this corroborating evidence, ODR then disregarded much of Ms. Czerwienski's relevant testimony for lack of independent corroboration.

### iv.   ODR Recommends No Discipline

179.     Based on these and other inequities that permeated its blinkered investigation, ODR only found one instance of misconduct against Ms. Kilburn and shut its eyes to his broader pattern of harassment and retaliation against all three Plaintiffs. It did not recommend discipline for Professor Comaroff. Indeed, ODR proposed no action that would prevent further harassment or retaliation against Plaintiffs, much less remedy the harm they had suffered.

180.     Ms. Mandava, Ms. Czerwienski, and Ms. Kilburn therefore appealed ODR's decisions. The University's appellate panel, however, held to ODR's determination and summarily concluded that no "procedural violation occurred." The Title IX Office subsequently informed

Plaintiffs that "[t]he findings and determinations reached in the course of [ODR's] investigation are . . . final and cannot be re-visited."

181.   Harvard's position is therefore clear: it views ODR's determination that Professor Comaroff is not responsible for most of his sexual harassment against Ms. Kilburn and for his retaliation against Ms. Mandava and Ms. Czerwienski as final and sound.

### N.  An External Review Confirms Ms. Mandava's Claims

182.   After ODR issued its Final Reports, the Faculty of Arts and Sciences ("FAS") (the division of Harvard to which the Department belongs) conducted a review to determine whether Professor Comaroff's "corrective rape" comments to Ms. Kilburn or his October 2017 threat to Ms. Mandava and Ms. Czerwienski violated its Professional Conduct Policy. It appointed an external factfinder to review ODR's Final Report and record of investigation concerning Ms. Mandava's case (i.e., the same evidence that ODR reviewed).

183.   In December 2021, the external factfinder concluded, based on this evidence, that, on October 13, 2017, Professor Comaroff threatened Ms. Mandava to stop her from participating in discussions about his sexual misconduct. The investigator found that his statements were "coercive" and violated the FAS Professional Conduct Policy.

### O.  Harvard Announces Inadequate and Temporary Sanctions for Professor Comaroff

184.   On January 20, 2022—nearly five years after Ms. Mandava, Ms. Czerwienski, and Harvard Student 2 began reporting Professor Comaroff's sexual harassment, and over a decade after Harvard first learned of the risk he posed to students—Dean of FAS Claudine Gay announced limited findings and discipline against Professor Comaroff. Dean Gay wrote in a statement that after an investigation by ODR and FAS, Professor Comaroff "was found to have engaged in verbal conduct that violated the FAS Sexual and Gender-Based Harassment Policy and the FAS

Professional Conduct Policy." She provided no further detail about his underlying conduct.

185.     Harvard imposed limited, temporary sanctions on Professor Comaroff in response: the FAS placed Professor Comaroff on leave for the spring 2022 semester and relieved him of teaching required courses (but evidently not elective courses), from serving on dissertation committees, and from advising graduate students who do not have at least one other co-advisor for the 2022-2023 academic year.

186.     Harvard did not take any measures to prevent Professor Comaroff or those in his network from engaging in further harassment or retaliation against Plaintiffs or other students, even after Plaintiffs' counsel urged Harvard to do so.[38]

187.     ***Because of Harvard's ineffective sanction, Professor Comaroff is now scheduled to return to campus for the Fall 2022 semester***, teaching an elective course cross-listed between Harvard Law School and the AAAS Department. His influence, it appears, remains unfettered.

## P. "Perfectly Legitimate Office-Hours Advice": Harvard Exposes Plaintiffs to Further Retaliation from the Comaroffs and Their Allies

188.     By obfuscating Professor Comaroff's pattern of misconduct and failing to take measures to head off retaliation, Harvard's inadequate response enabled yet further reprisals.

189.      Professor Comaroff and his wife resumed their campaign of retaliation just hours after Dean Gay released her statement. On January 20, 2022, Professor Jean Comaroff disseminated a press release from Professor John Comaroff's lawyers disparaging Plaintiffs. She sent the message to a broad segment of the Comaroffs' professional network, including former students, Harvard faculty, and other Anthropology scholars with the power to influence Plaintiffs'

---

[38] Dean Gay's statement further referred victims of harassment to Harvard's Office of Sexual Assault Prevention and Response, a Harvard program that has been defunct for over a year.

careers. One of the recipients of Professor Jean Comaroff's email was *Ms. Czerwienski's current advisor*, whom Ms. Czerwienski selected after she was forced to drop Jean Comaroff as an advisor, and who is charged with determining whether Ms. Czerwienski will be awarded a Ph.D.

190. In her email, Professor Jean Comaroff thanked the recipients for their "support and affirmation" during the ODR investigation and wrote that she was sharing the press release to provide "the full context" behind Harvard's findings, as she believed this case "speaks to social and political conditions in the contemporary academy" with "serious professional implications for the future."

191. The statement Professor Jean Comaroff appended to her email—authored by Professor John Comaroff's lawyers—panned Plaintiffs' opposition to sexual harassment, characterizing it as an "attack on academic freedom."

192. Harvard Law Professor Janet Halley joined in the press release's attack. She commented, "What this case boils down to: two students took offense at *perfectly legitimate office-hours advice*" (emphasis added). She exhorted "[e]veryone who advises at Harvard" to "note this attack on academic freedom."

193. The press release and Professor Halley's comment not only grossly mischaracterized Professor Comaroff's conduct—including his insistence to Ms. Kilburn that she would be raped and murdered in a country irrelevant to her studies, his unwanted physical advances, and his threats against Ms. Mandava and Ms. Czerwienski for speaking out about his sexual harassment—it also evinced a clear intent to discredit Plaintiffs and to dissuade students from making complaints about similar harassment.

194. The Comaroffs' efforts paid off. Within days, they convinced *38 faculty members* to sign a public letter that minimized Professor Comaroff's abuse and misrepresented the few

factual findings ODR made. The letter falsely stated that Professor Comaroff had simply given Ms. Kilburn "advice intended to protect an advisee from sexual violence"—even though (as ODR credited) he had repeatedly described how Ms. Kilburn "would be raped" in a country far away from the one she planned to study. The Harvard faculty members further dismissed the external factfinder's conclusions, questioning why the review was "justif[ied]." And they bemoaned that Harvard would "sanction" a "committed university citizen" by investigating such complaints against a faculty member they "know . . . to be an excellent colleague." By signing the letter, Harvard faculty further curtailed Plaintiffs' narrowing universe of potential advisors: amongst the signatories were Professor Greenhalgh, Professor Elkins, and dozens of other faculty members.

195.    The retaliation against Plaintiffs pervaded beyond Harvard's campus. One day before the letter by the 38 Harvard faculty was published, on February 3, 2022, the *Chronicle* published an open letter signed by 54 academic dignitaries from top universities across the United States, Europe, Asia, and South Africa.[39] Like the faculty letter, the open letter in the *Chronicle* either minimized or disregarded ODR's factual findings, including by proclaiming that "the advice he gave purely concerned her personal security" and that Comaroff had merely "warn[ed] a student about gossiping about the department." And the *Chronicle* signatories bemoaned Professor Comaroff's "stiff penalties"—he was, after all, "found responsible *solely* for verbal sexual harassment."[40]

196.    All three communications, distributed to academics with the power to influence Plaintiffs' careers, constitute textbook retaliation. Their message is clear: students who experience

---

[39] One of the letter's signatories is the professor who refused to assist UChicago Student 4 when she reported to him that Professor Comaroff had assaulted her.

[40] *Open Letter Against Harvard's Treatment of John Comaroff*, Chron. of Higher Educ. (February 3, 2022), https://www.chronicle.com/blogs/letters/open-letter-against-harvards-treatment-of-john-comaroff (emphasis added).

harassment should shut up. It is the price to pay for entry into academia.

197.    The chilling effect of these communications was no secret. Indeed, after Plaintiffs filed their Complaint on February 8, 2022, several of the 38 faculty members explicitly acknowledged the retaliatory impact of their letter:

a.  35 faculty signed a retraction letter admitting that "the impact" of their original letter could be "to intimidate students and inhibit them from divulging experiences of harm."

b.  Professor Greenhalgh recognized that "by signing that letter [she] appeared to support the professor over the students."

c.  Professor Evelynn Hammonds admitted that "[t]he letter . . . has been read as supporting the accused and questioning the veracity of the students who brought forth the charges."

d.  Professor Michael Herzfeld stated that by signing the letter he "undermin[ed] the search for truth and transparency."

e.  Professor Henry Louis Gates Jr. acknowledged that "it's a failure of scholarship to agree to be a signatory when you don't know all the facts" and suggested that the letter, which "gave an extremely selective account of the charges," impedes students' ability to "safely and comfortably speak out and file a complaint and be taken seriously."

f.  Professor Mariano Siskind wrote that he had previously failed to "consider[ ] more carefully the letter's potential effect on those who had experienced sexual-based misconduct."

g.  Professor Maya Jasanoff wrote that signing the letter was a "serious lapse of judgment" because of "the signal it would send to our students."

h.  And 73 Harvard faculty members wrote in a February 9, 2022 response letter to the 38 signatories, "*In lauding Professor Comaroff's reputation while failing to consider the complainants' perspectives, the signatories imply that the students have fabricated their accounts of harassment and retaliation*."[41]

198.    Nonetheless, even as the signatories of February 3, 2022 faculty letter condemned

---

[41] Ariel H. Kim and Meimei Xu, *Harvard Professors Retract Support for Letter Questioning Results of Comaroff Investigations*, The Harvard Crimson (Feb. 10, 2022), https://www.thecrimson.com/article/2022/2/10/comaroff-faculty-letter-retraction/.

their own actions, the University declined to punish them, apparently viewing the initial communications condemning Plaintiffs' complaints as an exercise of "academic freedom." Nor did Harvard take effective action to assure students that they would not face similar public retaliation if they too spoke up about faculty misconduct.

199.    Instead, on February 10, 2022, Harvard accused *Plaintiffs* of creating "a potential chilling effect on our community members' confidence in the investigatory process and their ability to access counseling and other resources." It further sought to publicly cast doubt on Plaintiffs' credibility, ostensibly branding them liars. In other words, Harvard chastised *Plaintiffs* for bringing to light abuses within the institution and claimed that this *lawsuit*—as opposed to the University's own mishandling of sexual misconduct—would prevent future students from coming forward. When students condemned the retaliatory nature of the statement, Harvard eventually *admitted* that the "statement has contributed to further concerns around trust."

200.    Harvard sought to quiet this ongoing discontent in official town hall meetings held by several Harvard departments in February and March 2022. These meetings, however, bred further chill: Harvard faculty told students that the meetings were "off the record," beseeching students not to discuss their contents with others, and thus sent the signal, yet again, that discussion of sexual misconduct at Harvard is taboo, not encouraged by the University, and may be punished.

201.    Meanwhile, beyond the University, the vast majority of academics who signed the letter published in the *Chronicle* stand by their support of Professor Comaroff. To date, only *eleven* of the 55 original signatories have retracted their signatures.

202.    These public repudiations of Plaintiffs' experiences will create countless roadblocks for Ms. Czerwienski, Ms. Kilburn, and Ms. Mandava when they apply for grants, funding, publications, and jobs at the institutions on which the signatories serve. The damage will

likely never be repaired.

### Q. **Harvard's Unlawful Policies and Practices Underpin Its Deliberate Indifference**

203.    Plaintiffs' odyssey of abuse was not accidental. It was, instead, the product of at least seven ongoing practices and customs, the effects of which are now well known: to protect powerful faculty, even at the expense of students.

204.    First, Harvard customarily does not investigate or otherwise act on credible reports of sexual harassment unless the survivor proceeds with a formal ODR complaint, even if Harvard has received prior complaints against the same professor.[42] Harvard maintains this custom and practice despite a December 30, 2014 warning from the U.S. Department of Education that "if a recipient knows . . . about sexual harassment that creates a hostile environment, a recipient must take immediate and appropriate action to investigate or otherwise determine what occurred . . . regardless of whether a student has complained, asked the recipient to take action, or identified the harassment as a form of discrimination."[43] Harvard could respond to student complaints by investigating their allegations or bringing its own formal complaint; but Harvard has repeatedly chosen not to do so. And even when students choose to file formal reports, faculty, the Title IX Office, and Harvard administrators routinely discourage them from doing so, leaving complaints to go unaddressed. It is, of course, no secret that most victims of sexual harassment are women.

205.    Second, Harvard forces its students to publicize their complaints through the media, at great personal and professional risk. The Title IX Office and Harvard administrators repeatedly

---

[42] Harvard appears to make an exception to this practice when media attention threatens to publicize allegations against a faculty member, as occurred in this case in 2020.

[43] Letter from Joel J. Berner, Reg'l Dir., U.S. Dep't of Educ., Off. for C.R., to Martha C. Minow, Dean, Harvard L. Sch. 3-4 (Dec. 30, 2014); *see also* Dear Colleague Letter from Russlynn Ali, Assistant Sec'y for C.R., U.S. Dep't of Educ., Off. for C.R., to Title IX Coordinators 4 (Apr. 4, 2011) (same).

told Plaintiffs and other graduate students who experienced abuse that if they wanted Harvard to consider their complaints, they needed to share their stories with the press. In September 2020, twelve female Harvard students who had experienced abuse over the course of nearly 50 years, including at the hands of Professors Comaroff, Urton, and Bestor wrote a letter to Dean Gay, complaining, "our experience with the ODR and FAS Title IX procedures has caused us considerable alarm and distress. Many of us were forced to resort to the media to pressure Harvard to take concrete steps, even after reporting to Harvard directly; sometimes we were even encouraged to do so by Harvard employees. Only when the media attention became too intense were we asked to participate in a flawed and unsatisfactory process." Despite this complaint, Harvard did not change its practices.[44] As the *Crimson*'s Editorial Board summed up this issue shortly after Plaintiffs filed this lawsuit:

> That paradigm is beyond shameful. For one, it forces complainants going through scarring events to publicly reopen their wounds for the press, exposing them to public scrutiny. More egregiously, it subcontracts a crucial university duty to nearby newsrooms . . . . Our reporters are not professional sexual harassment investigators or mediators. We are not, and we cannot be, a replacement for Title IX or other institutional complaint processes. And yet, according to one of Harvard's own Title IX Coordinators, that's exactly what we've become.[45]

206.   Third, ODR ordinarily does not credit women's complaints unless they are corroborated by independent evidence, no matter how credible the complainant's testimony. Several survivors have publicly and privately attested that Harvard has "ignored some of the most egregious cases of harm and sexual harassment that were brought to their office because of lack of

---

[44] As Harvard Student 2 pointed out on May 31, 2020—two days after the *Crimson* published its investigation—"It seems like the Crimson has overtaken ODR as the bringer of retributive justice."

[45] Crimson Editorial Board, *We Are Not a Title IX Substitute*, The Harvard Crimson (Feb. 17, 2022), https://www.thecrimson.com/article/2022/2/17/editorial-we-are-not-a-title-ix-replacement/#:~:text=Harvard%20is%20getting%20sued.,consequences%20for%20its%20alleged%20negligence.

documentary evidence."[46] ODR rejected many allegations against Professors Comaroff and Bestor, including four allegations against Professor Bestor by the outside professor, because it found the complainants' testimony was not sufficiently corroborated by other witnesses. At one time, Harvard's written procedures concerning complaints of sexual assault explicitly provided that Harvard ordinarily would not consider a case unless allegations were supported by "independent corroborating evidence." Harvard has since removed that requirement from its *published* procedures, but it has persisted in practice. There is a consensus among scholars that the archaic historical requirement of independent corroboration in cases of gender violence (and sexual assault in particular) rests on biases against women as lacking credibility.

207.    Fourth, even as Harvard requires corroboration, its rules sharply restrict the written corroboration that complainants may offer. Even when a complainant *has* corroborating communications, Harvard will not admit them unless both parties to the communication participate in the proceeding and make themselves available for cross-examination. This rule arbitrarily excludes (among other things) statements by witnesses who are dissuaded from participating in the ODR process by well-grounded fears of repercussions—even direct threats by the accused himself. For example, Professor Comaroff's intimidation and threats of retaliation (including reading her complaint aloud to her) deterred Harvard Student 2 from participating in the ODR process. As a result, Harvard ignored Harvard Student 2's contemporaneous written accounts of her abuse.

208.    Fifth, Harvard does not take measures to protect students from professional retaliation. A 2015 survey found that over **two thirds** (69.6%) of female graduate students believed

---

[46] Ann Gibbons, *Harvard Bans Former Anthropology Chair After Finding Persistent Sexual Harassment*, Science (June 10, 2021), https://www.science.org/content/article/harvard-bans-former-anthropology-chair-after-finding-persistent-sexual-harassment.

that they would face retaliation by the offender or his associates if they reported sexual misconduct, and over a quarter believed that retaliation was either "very" or "somewhat" likely.[47] Yet, despite these statistics and Plaintiffs' and other students' repeatedly-expressed concerns to the Title IX Office that Professor Comaroff and other faculty would damage their careers through contact with colleagues and former students at other institutions, and despite reports that Professor Comaroff did so, Harvard has done nothing to prevent him from disparaging Plaintiffs to prospective employers. Indeed, Harvard has professed that it will do nothing to prevent or punish such actions.

209.    Sixth, Harvard failed to adequately train faculty in the Department to report sexual harassment by faculty against students. Despite knowing that some faculty would be reluctant to report misconduct committed by powerful senior faculty, and despite reports of sexual harassment by faculty in the Department (including Professor Comaroff), Harvard took no known steps to train or encourage faculty in the Department to make reports. As a result, faculty who knew of the danger Professor Comaroff posed dating back to his time at UChicago did not timely report this knowledge to Harvard's Title IX Office, exposing Plaintiffs to abuse. As a result, Professor Comaroff continued to sexually harass women.

210.    Seventh, in the rare instances that Harvard does intervene in sexual abuse and abuse of power by faculty, the sanctions the school metes out are woefully inadequate, fail to further protect students, and, in many instances, punish women as well. As detailed *infra*, Harvard has failed to complete the recommendations by an external review committee formed in the wake of the public allegations against Professor Jorge Dominguez, and Harvard permitted Professor Bestor to return to work before completing his required sanctions.

---

[47] Harvard Univ. 2015 AAU Student Surv. on Sexual Assault & Misconduct, Table 1.1.

**R.** **Harvard Has Long Known that its Practices Punish Survivors and Protect Perpetrators, Yet it Persists in Them**

211.    These shortcomings were not public and were not known to Plaintiffs as their ordeal unfolded, but they were no mystery to Harvard. Credible sources have repeatedly warned Harvard that its practices are failing survivors of sexual harassment and retaliation, thereby discouraging students from coming forward, and thereby victimizing yet more students.

212.    Harvard Professor Stephen Blyth wrote in a May 2018 letter to then-President Drew Faust that Harvard's "current institutional structure may actively discourage victims from pursuing complaints."[48] He explained that Harvard fails to instill "confidence that perpetrators will, when appropriate, be removed from the University," and concluded, "***Harvard has been an institution that does not act***" (emphasis added).[49]

213.    A February 2021 letter to Provost Alan Garber and Dean Gay from the faculty member who filed ODR complaints against Professor Urton in July 2020 reported the traumatizing and incompetent manner in which the ODR was investigating Professor Urton. The faculty complainant explained that although she had emails that proved the harassment, ODR forced her to spend "over 200 hours of [her] personal time on these complaints while working a full-time job during COVID." She continued, "Why so much time? Because the burden is on the complainant to lead the actual investigation. Indeed, ODR spends most of its time investigating the credibility of [ ] witnesses and trying to determine whether collusion has occurred among his multiple victims rather than actually *investigating* the allegations against Gary [Urton]." She went on to say that

---

[48] Letter from Stephen Blyth, Professor, Harvard Univ., to Drew G. Faust, President, Harvard Univ. (May 7, 2018), https://www.bostonglobe.com/2019/05/24/read-letter/h2qAM6WfEOWiRHQVmu0N2M/story.html?camp=bg%3Abrief%3Arss%3Afeedly&rss_id=feedly_rss_brief&s_campaign=bostonglobe%3Asocialflow%3Atwitter.

[49] *Id.*

she had "often considered pulling out [of the ODR proceedings]--not because of Gary--but because of the ODR process itself."

214.     In the same letter, the faculty complainant explained that two of the students who had also filed formal complaints against Professor Urton were forced to retract their complaints because ODR traumatized one with "over 9 hours of interviews" and the other with "intrusive, inappropriate, and unnecessary questions far beyond the scope of [the] narrow complaint." Both students had previously complained about Professor Urton to other Harvard administrators to no avail, but "[w]hen both women finally had the courage to engage in the current ODR process, the interviews were so traumatizing, they both withdrew, thereby depriving Harvard of crucial evidence" and ending *any* inquiry into their allegations. Worse, one of the students had been serving as a witness for the faculty complainant, and when the student was forced to withdraw her complaint, ODR claimed that the faculty complainant *could no longer rely on the student complainant's corroborating evidence*, even though Harvard was well aware of the damning evidence against Professor Urton. As the faculty complainant summarized to Provost Garber and Dean Gay:

> How convenient. If it weren't bad enough that Harvard refuses to provide evidence in its own possession about Gary, the ODR process actually obstructs the truth and the collection of external evidence by traumatizing the victims to the point where they can't engage at all. I now understand why these alarming abuses of power by faculty members like Gary persist for years, if not decades--despite knowledge within the community about these abuses. . . . [The process is] ruinous . . . obstructive and damaging . . . . ***Until this deeply flawed process is finally fixed, no woman should ever engage***.

The faculty complainant thus recognized what is now abundantly clear to Plaintiffs: Harvard's ODR process disproportionately harms women, who have made up three quarters of complainants since 2014.

215.     Similarly, also in 2021, Harvard faculty sent a letter to Harvard complaining about

the pervasive deficiencies in ODR's process.

216.    The drumbeat of warnings has continued in 2022. On February 9, 2022, 73 Harvard faculty pointed to "ample evidence that the available institutional procedures for investigating complaints of sexual and gender-based harassment and professional misconduct are [ ] far from adequate for the effective adjudication of such abuses of power."[50]

217.    In a February 14, 2022 speech, Professor Subramanian referred to Plaintiffs' experiences as a "total institutional failure" and noted, "[i]t is no secret that Harvard has a long and sordid history of failing survivors of sexual and gender-based misconduct. The Title IX system was supposed to be the solution. It has instead become part of the problem."

218.    On March 13, 2022, the *Crimson* reported that Harvard had failed to complete the recommendations published over a year earlier by an external review committee formed in the wake of the public allegations against Professor Jorge Dominguez.[51] According to the *Crimson*, this external review committee "found that a 'permissive culture regarding sexual harassment' at Harvard allowed [Professor Dominguez] to rise through the school's rank despite repeatedly sexually harassing students and colleagues." In tandem with this report, President Bacow issued an apology to Terry Karl, a survivor of Professor Dominguez's abuse, and acknowledged that "Harvard failed her." And yet Harvard has continued to fail the survivors in its community. While the external report committee outlined nine recommendations to reform Harvard's processes for handling complaints of sexual harassment, as of March 2022, the *Crimson* reported, Harvard had

---

[50] Vincent A. Brown et al., *Harvard Professors Retract Support for Letter Questioning Results of Comaroff Investigations*, The Harvard Crimson (Feb. 9, 2022), https://www.thecrimson.com/article/2022/2/9/letter-73-faculty-response/.

[51] Cara J. Chang and Isabella B. Cho, *One Year After an External Review into Sexual Harassment at Harvard, Three Recommendations Remain Unfulfilled*, The Harvard Crimson (March 11, 2022), https://www.thecrimson.com/article/2022/3/11/dominguez-nine-recommendations-update/.

failed to adopt three of the recommendations.

219.   On May 16, 2022, the *Crimson* further reported that in its annual survey of the Harvard Faculty of Arts and Sciences, more than a quarter of faculty respondents "said they know someone else in their department who has experienced sexual harassment in a Harvard workplace setting."[52] Among the surveyed faculty, experiences of sexual harassment turned heavily on gender: "About 14 percent of female respondents reported that they have experienced sexual harassment in a Harvard workplace setting, compared to 2 percent of male respondents." (While a 2019 survey revealed that roughly 21.9% of female graduate students, compared with 8.8% of males, experienced harassment at Harvard.)[53] Nearly a fifth of the surveyed faculty "indicated that they do not 'believe their department promotes an environment where students, faculty, and staff feel comfortable coming forward about instances of sexual harassment.'" And 41 percent of surveyed faculty "indicated that they either somewhat or strongly disagree with the assessment that Harvard's Title IX Office and Office for Dispute Resolution are adequately equipped to deal with issues of sex and gender-based discrimination on campus." Elaborating on this sentiment, one faculty respondent even wrote, "[t]he Title IX office and ODR seem more invested in protecting the university from liability than in protecting members of our community from harm."

220.   In a May 27, 2022 article, the *Crimson* interviewed nearly 30 Harvard graduate students who "reported a culture in which senior faculty wield power over their students with little accountability." These graduate students additionally reported "difficulty in seeking recourse for

---

[52] Ariel H. Kim and Meimei Xu, *'An Open Secret': Harvard Graduate Students Decry Harassment, Neglect From Faculty*, The Harvard Crimson (May 26, 2022), https://www.thecrimson.com/article/2022/5/26/graduate-students-power-dynamics/.

[53] Harvard Univ. 2019 AAU Student Surv. on Sexual Assault & Misconduct at 31, *available at* https://hwpi.harvard.edu/files/oge/files/2019_harvard_aau_student_survey_on_sexual_assault_misconduct.pdf?m=1625077408.

complaints of harassment, faced with a fear of retaliation by faculty and opaque and inadequate reporting mechanisms."[54]

221.    Nor is it any secret that the failure to correct the failings identified by the foregoing sources affected Plaintiffs. Deputy Provost Peggy Newell and Dean of the Graduate School of Arts and Sciences Emma Dench admitted flaws in Harvard's ODR process to Plaintiffs. Dean Dench acknowledged to Plaintiffs that the ODR process made students "go mad" because it left them "in limbo forever," and Deputy Provost Newell affirmed that Dr. Avakian has mishandled Plaintiffs' complaints.

222.    Yet Harvard has failed to correct these failures despite repeated opportunities to do so. It has, to the contrary, repeatedly resisted programmatic changes to the ODR process. Harvard's Graduate Student Union has suggested such changes. So have Plaintiffs. But Harvard persists in its archaic practices and customs, turning a blind eye to faculty abusers, placing the burden of recourse on survivors, and failing to protect those who do speak up. Through these practices, Harvard has fostered a "culture in which the abuse of power is normalized and accommodated."[55] And its victims are female students and those who speak up on their behalf.

**S.  <u>Harvard's Deliberate Indifference Has Harmed and Continues to Harm Plaintiffs</u>**

223.    Harvard's failure to prevent and redress Professor Comaroff's abuse and retaliation has profoundly altered the academic trajectories and career prospects of Ms. Czerwienski, Ms. Kilburn, and Ms. Mandava. It has also caused them significant emotional distress—emotional distress that will continue for the foreseeable future.

---

[54] Ariel Kim and Meimei Xu, *'An Open Secret': Harvard Graduate Students Decry Harassment, Neglect from Faculty*, The Harvard Crimson (May 26, 2022), https://www.thecrimson.com/article/2022/5/26/graduate-students-power-dynamics/.

[55] Maya Yang, *Harvard Students Sue, Claiming School Ignored Professor's Sexual Harassment*, The Guardian (February 9, 2022), https://www.theguardian.com/education/2022/feb/09/harvard-students-file-lawsuit-claiming-school-ignored-professor-sexual-harassment-for-years.

224.    All three Plaintiffs have been forced to delay their degree progress to participate in ODR's lengthy—and ultimately futile—process. They spent hundreds of hours marshalling evidence, preparing submissions, and struggling to understand ODR's arcane evidentiary rules, taking valuable time from their studies, writing, and other academic work—only for Harvard to refuse to meaningfully acknowledge Professor Comaroff's serial harassment and threats against students, just as it has done for years. Learning and living with the reality that Harvard is, and has for years been, willing to protect a serial harasser at the expense of their careers has taken a significant toll on Plaintiffs.

225.    This ordeal has made it impossible for Ms. Kilburn to proceed with her doctorate as planned. As a fifth-year graduate student, she must form a dissertation committee consisting of advisors and faculty with expertise in her area of study, but her geographical region is studied by only three Harvard professors in her field: the Comaroffs and their former advisee, Professor Meiu, who recently announced that he would be leaving Harvard for a different university beginning July 1, 2022. Nor can Ms. Kilburn look outside the Department to Professor Geschiere, Professor Elkins, or Dr. Cook, whom Professor Comaroff needlessly involved in her case, nor to any of the professors who signed the letter in support of Professor Comaroff published in the *Chronicle*.[56] Harvard has repeatedly expressed to Ms. Kilburn that she will have difficulty advancing her Ph.D. candidacy if she does not have advisors in her area of specialization, but has not assisted Ms. Kilburn in finding new advisors. Ms. Kilburn must instead change her course of study and build an entirely new professional network, which requires funding she has been unable to obtain. These limitations are profoundly damaging to Ms. Kilburn's academic progress; it will be virtually

---

[56] *Open Letter Against Harvard's Treatment of John Comaroff,* Chron. of Higher Educ. (February 3, 2022), https://www.chronicle.com/blogs/letters/open-letter-against-harvards-treatment-of-john-comaroff (emphasis added).

impossible for her to finish her doctorate within the planned seven-year timespan. If Ms. Kilburn is unable to find new advisors and successfully develop a new field of expertise, she may be forced to leave academia entirely, having wasted years of her life and vast financial and personal resources.

226.    Ms. Czerwienski had to direct her course of study away from Professor Comaroff's regional expertise and sever her advising relationship with Professor Jean Comaroff. The effects are far-reaching: two of Ms. Czerwienski's current advisors were recipients of Professor Jean Comaroff's retaliatory email, and one signed the Harvard letter. Two other professors Ms. Czerwienski was planning to add to her dissertation committee also signed the Harvard letter supporting Professor Comaroff. When Ms. Czerwienski asked Harvard for assistance finding advisors who had not been tainted by Professor Comaroff's retaliatory campaign, Dean Dench and the Assistant Dean of Student Affairs refused and told Ms. Czerwienski that she would have to do so on her own. And a prominent anthropologist in Ms. Czerwienski's subspeciality derided Ms. Czerwienski and her co-complainants for their "Titld [sic] IX uptightness."

227.    Ms. Mandava had to change the focus of her dissertation away from Professor John Comaroff's subject matter expertise and has been unable to receive crucial letters of recommendation from Professors Jean and John Comaroff. She also had to end her mentoring relationship with a professor who signed the retaliatory letter in support of Professor Comaroff.

228.    Professor Comaroff's efforts to poison the well will have untold harm on Plaintiffs' nascent careers. Knowing that 92 faculty worldwide discounted Plaintiffs' allegations and sided with their harasser makes it nearly impossible for Plaintiffs to find the trusted advisors and collaborators that are the foundation of any academic's career.

229.    And even if Plaintiffs do complete their doctorates, Harvard's actions will continue

to harm Plaintiffs. All three Plaintiffs face dismal job prospects upon completion of their degrees—prospects significantly hampered by Harvard's response to their complaints—which will cause irreparable damage to their earnings potential.

230.     Plaintiffs will also have difficulty finding funding for their research, which is critical for anthropologists. Many of the faculty members who signed the Harvard letter in support of Professor Comaroff are involved in funding decisions, including the head of the African Language Program and the head of the Weatherhead Center. Since the publication of the letter, Plaintiffs have been forced to forgo grant opportunities, knowing that some of the individuals making the funding decisions publicly supported Professor Comaroff and cast doubt on their complaints. Thus even if Plaintiffs are able to finish their degrees, they may never be able to practice the discipline to which they sought to dedicate their lives.

231.     In short, Harvard utterly failed Ms. Czerwienski, Ms. Kilburn, and Ms. Mandava, just as it has failed Professor Comaroff's many other victims.

## V.     COUNTS

### Count One

**Violation of Title IX of the Education Amendments of 1972**

**Deliberate Indifference to Gender Discrimination and Hostile Educational Environment**

**(20 U.S.C. § 1681)**
**(On Behalf of All Plaintiffs)**

232.     Plaintiffs re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

233.     This count is brought on behalf of all Plaintiffs.

2.     Plaintiffs are enrolled at Harvard as graduate students.

234.     At all times relevant to this action, Harvard has received, and continues to receive,

68

federal financial assistance.

235.     Harvard has discriminated against Plaintiffs Czerwienski, Kilburn, and Mandava by subjecting them, through deliberate indifference, to discrimination based on their gender, including disparate treatment, retaliation, and a hostile environment that was sufficiently severe, pervasive, and objectively offensive to interfere with their educational opportunities and deprive them of the benefits of their educational programs. Relevant actions include, but are not limited to:

     a.  In October 2017, Professor Comaroff retaliated against Ms. Mandava and Ms. Czerwienski by threatening their careers because he believed they had reported and would report his sexual harassment to other students and faculty, which is a protected activity under Title IX.

     b.  From 2017 through 2022, Professors John and Jean Comaroff created a hostile educational environment for Ms. Mandava and Ms. Czerwienski because of the Comaroffs' belief that Ms. Mandava and Ms. Czerwienski had reported Professor Comaroff's sexual harassment and later his retaliation to other students, to faculty, and to Harvard. The Comaroffs' retaliatory actions at this time included, but are not limited to, threatening Ms. Mandava and Ms. Czerwienski's careers and disseminating disparaging and misleading statements about Plaintiffs.

     c.  From 2017 through 2021, Professor John Comaroff engaged in a pattern of sexual harassment and retaliation against Ms. Kilburn, which created a hostile educational environment.

     d.  In 2021, Professor Comaroff perpetuated the hostile environment by retaliating against Ms. Kilburn for complaining about his harassment. His acts of retaliation included, but are not limited to, baselessly naming prominent scholars in her field as witnesses in Harvard's ODR process.

     e.  In 2020, Professor Comaroff also retaliated against Plaintiffs by pressuring Harvard Student 2 not to participate in the investigation into their complaints.

     f.  In January 2022, Professors John and Jean Comaroff disseminated disparaging and misleading statements about Plaintiffs in retaliation for Plaintiffs' filing of complaints of discrimination with Harvard's ODR.

     g.  In February 2022, Professors John and Jean Comaroff and other Harvard faculty retaliated against Plaintiffs by publishing a false or misleading statement that would reasonably dissuade students from making complaints against faculty.

236.    Before Professor Comaroff took these actions, appropriate persons at Harvard with authority to implement corrective measures were on actual notice of the risk he posed to students. Harvard knew that Professor Comaroff had sexually harassed and otherwise discriminated against other students before he retaliated against Ms. Mandava and Ms. Czerwienski and before he sexually harassed and retaliated against Ms. Kilburn, but it failed to take adequate measures to prevent harm to Plaintiffs. In addition, since 2017, Harvard has been on actual notice of the hostile academic environment that Plaintiffs themselves have endured at Harvard. Harvard has shown continued deliberate indifference to Professor Comaroff's sexual harassment and retaliation by tolerating, condoning, ratifying, and failing to take remedial action to correct it.

237.    Harvard has also maintained an official policy, custom, and/or practice of deliberate indifference to a known overall risk of sexual harassment, retaliation, and gender-based disparate treatment against graduate students in the Anthropology Department. Specifically, Harvard has (among other things) failed to adequately train its employees to prevent, report, and correct sexual harassment and retaliation and to address its effects; failed to adequately act on multiple reports of sexual harassment and retaliation by multiple professors; maintained and enforced dispute resolution policies and processes that cause Harvard officials to fail to act on reports of sexual harassment and fail to deter systemic sexual harassment; and otherwise failed to implement adequate procedures to prevent, detect, monitor, and correct sexual harassment and retaliation. Harvard's official policy of deliberate indifference to gender discrimination has systemically deprived women and non-binary graduate students in the Department of benefits, privileges, and placement services relative to men.

238.    Harvard's deliberate indifference to the known risk of sexual harassment and retaliation that Professor Comaroff posed, its inadequate response to Plaintiffs' complaints, and its

failure to correct pervasive issues of sexual harassment and discrimination in the Department have themselves exacerbated the hostile environment that Plaintiffs experienced in the Department.

239.    Through its deliberate indifference, Harvard has denied all three Plaintiffs their rights to work and learn in an environment free of gender discrimination and associated retaliation. Plaintiffs have suffered and will continue to suffer harm, including loss of future educational and employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish, and other economic and non-economic damages.

240.    Because of the continuous nature of Harvard's unlawful conduct, Plaintiffs are entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

241.    Because a reasonable person in each Plaintiff's position would have first discovered that Harvard's unlawful practices and handling of prior complaints against professors in the Anthropology Department were the probable cause of her injury within the applicable limitations period, Plaintiffs are entitled to the application of the discovery rule to the unlawful acts alleged herein.

242.    Because Professor Comaroff threatened their careers if they spoke out about his misconduct, because Harvard ratified that threat by failing to act on it, and because Professor Comaroff's threat induced Plaintiffs Mandava and Czerwienski to keep silent about his misconduct until May 2019, equity estops Harvard from relying on the statute of limitations.

243.    Plaintiffs are entitled to all legal and equitable remedies available for violations of Title IX, including compensatory damages, injunctive relief, attorneys' fees and costs, and other appropriate relief.

**Count Two**

**Violation of Title IX of the Education Amendments of 1972**

**Retaliation**

**(20 U.S.C. § 1681)**
**(On Behalf of All Plaintiffs)**

244.    Plaintiffs re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

245.    This count is brought on behalf of all Plaintiffs.

246.    Plaintiffs are enrolled at Harvard as graduate students.

247.    At all times relevant to this action, Harvard has received, and continues to receive, federal financial assistance.

248.    In addition to discriminating against Plaintiffs through deliberate indifference to the risk and reality of a sex-based hostile environment, Harvard discriminated against Plaintiffs through its deliberate indifference to the retaliatory acts of its employees,[57] including:

  a.   In October 2017, Professor Comaroff retaliated against Ms. Mandava and Ms. Czerwienski by threatening their careers because he believed they had reported and would report his sexual harassment to other students and faculty, which is a protected activity under Title IX.

  b.   In 2020, Professor Comaroff retaliated against Plaintiffs by pressuring Harvard Student 2 not to participate in the investigation into their complaints.

  c.   In 2021, Professor Comaroff perpetuated the hostile environment by retaliating against Ms. Kilburn for complaining about his harassment (a protected activity), including by baselessly naming prominent scholars in her field as witnesses in the ODR proceedings in retaliation for her formal complaint.

  d.   In 2022, Professors John and Jean Comaroff and Professor Janet Halley retaliated against Plaintiffs by disseminating a false or misleading statement that would reasonably dissuade students from making complaints against faculty.

---

[57] Plaintiffs assert Count Two (along with their other claims) in addition to and in the alternative to Count One and maintain that retaliation for complaints of sexual harassment is a form of gender discrimination.

e. In 2022, 38 Harvard faculty members retaliated against Plaintiffs by publishing a false or misleading statement that would reasonably dissuade students from making complaints against faculty (a protected activity).

249.     Before Professor Comaroff and his allies took these actions, appropriate persons at Harvard with authority to implement corrective measures were on actual notice of the risk they posed to students but showed deliberate indifference to past acts of discrimination and failed to take adequate measures to prevent retaliation against Plaintiffs. Harvard also knew that its policies, customs, and practices unreasonably exposed students (including Plaintiffs) to retaliation. Harvard was further aware that from 2017 through 2020, the above retaliation continued to chill Plaintiffs' opposition to Professor Comaroff's discrimination and continued to harm their education and careers. Nonetheless, Harvard maintained a policy, custom, and practice of deliberate indifference to retaliation in its educational programs leaving Plaintiffs vulnerable to it.

250.     The foregoing actions of Harvard and its faculty would dissuade a reasonable student from making or supporting a charge of discrimination.

251.     Because of the continuous nature of Harvard's unlawful conduct, Plaintiffs are entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

252.     Because a reasonable person in each Plaintiff's position would have first discovered that Harvard's unlawful polices were the probable cause of her injury within the applicable limitations period, Plaintiffs are entitled to the application of the discovery rule.

253.     Plaintiffs are entitled to all legal and equitable remedies available under Title IX, including compensatory damages, injunctive relief, attorneys' fees and costs, and other appropriate relief.

**Count Three**

**Violation of Title IX of the Education Amendments of 1972**

**Gender Discrimination**

**(20 U.S.C. § 1681)**
**(On Behalf of All Plaintiffs)**

254.    Plaintiffs re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

255.    This count is brought on behalf of all Plaintiffs.

256.    Plaintiffs are enrolled at Harvard as graduate students.

257.    At all times relevant to this action, Harvard has received, and continues to receive, federal financial assistance.

258.    In addition to discriminating against Plaintiffs through deliberate indifference to discrimination (including sexual harassment and retaliation) by its employees, Harvard has also discriminated against all three Plaintiffs by subjecting them to disparate treatment based on gender and gender-based bias or animus. Specifically, Harvard maintains official practices, policies, procedures, and customs applicable to cases of sexual and gender-based harassment and retaliation based on bias against women, against students who complain about gender-based harassment and retaliation, and/or in favor of men. As a result, Harvard deprived Plaintiffs of the benefits of its educational programs and subjected them to discrimination based on their gender.

259.    Harvard's differential treatment of Plaintiffs is a direct and proximate result of gender discrimination.

260.    Harvard has failed to prevent, respond to, adequately investigate, and/or appropriately resolve instances of gender discrimination.

261.    Because of Harvard's continuous unlawful conduct, Plaintiffs have suffered and

will continue to suffer harm, including, but not limited to, loss of future educational and employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish, and other economic damages and non-economic damages.

262.    Because of the continuous nature of Harvard's unlawful conduct, Plaintiffs are entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

263.    Because a reasonable person in each Plaintiff's position would have first discovered that Harvard's unlawful polices were the probable cause of her injury within the applicable limitations period, Plaintiffs are entitled to the application of the discovery rule.

264.    Plaintiffs are entitled to all legal and equitable remedies available for violations of Title IX, including compensatory damages, injunctive relief, attorneys' fees and costs, and other appropriate relief.

<u>**Count Four**</u>

**Violation of the Massachusetts Civil Rights Act**

**(Mass. Gen. Laws Chapter 12, § 11I)**
**(On Behalf of All Plaintiffs)**

265.    Plaintiffs re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

266.    This count is brought on behalf of all Plaintiffs.

267.    Plaintiffs are enrolled at Harvard as graduate students.

268.    At all times relevant to this action, Harvard was an educational institution.

269.    Harvard interfered or attempt to interfere by threats, intimidation or coercion with Plaintiffs' exercise or enjoyment of "rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth" of Massachusetts, in violation of Mass. Gen. Laws ch. 12, § 11H(a)(1), including through the following acts:

a. In October 2017, Professor Comaroff threatened the careers of Ms. Mandava and Ms. Czerwienski because he believed they had reported and would report his sexual harassment to other students and faculty, which is a protected activity under Title IX.

b. Professor Comaroff subjected Ms. Kilburn to a pattern of gender-based harassment and assault continuing from 2017 until at least April 2019 using threats, intimidation, and coercion.

c. From 2020 to 2022, Professor Comaroff disclosed Ms. Kilburn's allegations to faculty members in her field and enlisted them as witnesses.

d. In 2020, Professor Comaroff intimidated, threatened, or coerced Harvard Student 2 not to participate in the investigation into Plaintiffs' complaints.

e. In 2022, Professors John and Jean Comaroff and Professor Janet Halley disseminated an email disparaging Plaintiffs to other faculty with the power to influence Plaintiffs' careers.

f. In 2022, 38 Harvard faculty members published a false or misleading statement that would reasonably dissuade students from making complaints against faculty.

g. Harvard enabled and ratified the foregoing actions by failing to prevent them despite its knowledge of a substantial risk that they would occur, and by failing to remedy them despite its knowledge that they had occurred.

270.    In doing so, Professor John Comaroff, Professor Jean Comaroff, Professor Halley, and other Harvard employees interfered and/or attempted to interfere by threats, intimidation, or coercion with Plaintiffs' rights under federal and Massachusetts law, including:

a. The right to be free of actions by an educational institution that "discriminate [on the basis of sex] against any student admitted to" a graduate "program or course of study in providing benefits, privileges and placement services," Mass. Gen. Laws ch. 151C § 2(d);

b. The right not to "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance" under Title IX, 20 U.S.C. § 1681(a); and

c. The right to "equality under the law" and freedom from discrimination on the grounds of sex, guaranteed by Article 1 of the Massachusetts Constitution.

271.    Harvard is vicariously liable for the actions of its faculty in violation of the MCRA

76

because Harvard employees took those actions within the scope of their employment.

272.    In taking the above actions, Harvard acted knowingly and with reckless indifference to Plaintiffs' rights and the risk that they would suffer serious harm.

273.    The above-alleged threats, intimidation, and coercion in violation of the MCRA upended Plaintiffs' academic careers and caused and continue to cause them emotional, reputational, and economic harm, for which they are entitled to damages, including punitive damages, and equitable relief.

## Count Five

### Sexual Harassment Under Massachusetts Law

### (Violation of Mass. Gen. Laws Chapters 214 § 1C)
### (On Behalf of Plaintiff Kilburn)

274.    Plaintiffs re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

275.    This count is brought on behalf of Plaintiff Kilburn.

276.    Plaintiff Kilburn is enrolled at Harvard as a graduate student.

277.    At all times relevant to this action, Harvard was an educational institution.

278.    Mass. Gen. Laws ch. 151C § 2(g) prohibits an educational institution from sexually harassing students in any program or course of study.

279.    From 2017 to 2019, Professor Comaroff made sexual advances on Ms. Kilburn and engaged in verbal and physical conduct of a sexual nature.

280.    Harvard enabled and ratified Professor Comaroff's sexual harassment by failing to prevent it despite knowledge of a substantial risk that it would occur, and by failing to remedy it despite knowledge of the hostile environment in produced.

281.    Ms. Kilburn understood that Professor Comaroff's conduct was a term or condition

of the benefits, privileges, or placement services of her program and influenced the evaluation of academic achievement.

282.    Professor Comaroff's sexual harassment unreasonably interfered with Ms. Kilburn's education by creating an intimidating, hostile, humiliating or sexually offensive educational environment.

283.    Harvard is strictly liable for Professor Comaroff's sexual harassment of Ms. Kilburn.

284.    In taking the above actions, Harvard acted knowingly and with reckless indifference to Ms. Kilburn's rights and the risk that she would suffer serious harm.

285.    Professor Comaroff's harassment inflicted injuries and threatens future injuries for which Harvard is liable for damages, including punitive damages, and appropriate equitable relief under Massachusetts law.

## Count Six

### Violation of the Massachusetts Equal Rights Act

### (Mass. Gen. Laws Chapter 93, § 102)
### (On Behalf of All Plaintiffs)

286.    Plaintiffs re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

287.    This count is brought on behalf of all Plaintiffs.

288.    The Massachusetts Equal Rights Act ("MERA") guarantees "[a]ll persons within the commonwealth" the "same rights enjoyed by white male citizens" to "make and enforce contracts" and "to the full and equal benefit of all laws and proceedings for the security of persons and property." Mass. Gen. Laws ch. 93, § 102.

289.    As alleged in Count Eight, Plaintiffs made a contract with Harvard to provide them

with graduate education free from gender discrimination and retaliation, in exchange for their matriculation, labor, tuition payments, and fees, among other things.

290.     By subjecting Ms. Kilburn to a pattern of gender discrimination, including gender-based harassment, by subjecting all Plaintiffs to retaliation (a form of gender discrimination) in their graduate program, and by creating an unequal and hostile educational environment, Harvard, Professor Comaroff (acting within the scope of his employment), and other Harvard faculty members deprived Plaintiffs of the benefits of their contracts with Harvard and the full and equal benefit of state and federal law, including Mass. Gen. Laws ch. 151C § 2(d), Title IX, 20 U.S.C. § 1681(a), and the Massachusetts Constitution, based on their gender. Relevant acts include:

a.  In October 2017, Professor Comaroff retaliated against Ms. Mandava and Ms. Czerwienski by threatening their careers because he believed they had reported and would report his sexual harassment to other students and faculty, which is a protected activity under Title IX.

b.  From 2017 through 2021, Professor John Comaroff engaged in a pattern of sexual harassment and retaliation against Ms. Kilburn, which created a hostile educational environment.

c.  In 2021, Professor Comaroff perpetuated the hostile environment by retaliating against Ms. Kilburn for complaining about his harassment. His acts of retaliation included, but are not limited to, baselessly naming prominent scholars in her field as witnesses in Harvard's ODR process.

d.  In 2020, Professor Comaroff also retaliated against Plaintiffs by pressuring Harvard Student 2 not to participate in the investigation into their complaints.

e.  In January 2022, Professors John and Jean Comaroff disseminated disparaging and misleading statements about Plaintiffs in retaliation for Plaintiffs' filing of complaints of discrimination with Harvard's ODR.

f.  In February 2022, Professors John and Jean Comaroff and other Harvard faculty retaliated against Plaintiffs by publishing a false or misleading statement that would reasonably dissuade students from making complaints against faculty.

h.  Harvard enabled and ratified the foregoing discriminatory actions by failing to prevent them despite its knowledge of a substantial risk that they would occur, and by failing to remedy them despites its knowledge that they had occurred.

291.   Harvard is vicariously liable for the actions of its faculty in violation of the MERA because Harvard faculty took those actions within the scope of their employment.

292.   In taking the above actions, Harvard acted knowingly and with reckless indifference to Plaintiffs' rights and the risk that they would suffer serious harm.

293.   Plaintiffs are therefore entitled to all legal and equitable remedies available under the MERA, including compensatory and punitive damages, injunctive relief, attorneys' fees and costs, and other appropriate relief.

## Count Seven

### Negligent Hiring, Retention, and Supervision

#### (Massachusetts Common Law)
#### (On Behalf of All Plaintiffs)

294.   Plaintiffs re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

295.   This count is brought on behalf of all Plaintiffs.

296.   Upon information and belief, at all times relevant to this action, Professor Comaroff was an agent of and employed by Harvard.

297.   Harvard owed Plaintiffs a duty of care to avoid selecting or retaining a professor it knew or had reason to know posed a significant risk of harm to students and to take reasonable measures to protect Plaintiffs from sexual harassment and retaliation by its employees.

298.   From 2012 through the present, Harvard knew or should have known that Professor Comaroff posed a risk to and was unfit to work with, exercise influence over, or supervise women students. Harvard, however, has failed to exercise due care in hiring Professor Comaroff and in retaining him in a position of access, influence, and authority over women students without

80

adequate training or supervision.

299.    As a direct and proximate result of Harvard's breach of its duty of care, Plaintiffs
were subjected to sexual harassment and retaliation by Professor Comaroff.

300.    Plaintiffs suffered damages and injuries for which Harvard is liable under state law.

## Count Eight

### Breach of Contract

### (Massachusetts Common Law)
### (On Behalf of All Plaintiffs)

301.    Plaintiffs re-allege and incorporate by reference each and every allegation in each
and every aforementioned paragraph as if fully set forth herein.

302.    This count is brought on behalf of all Plaintiffs.

303.    Harvard represents that it has a broad sexual misconduct policy and that it takes
active measures to prevent and punish sexual harassment, sexual assault, and retaliation. For
example, Harvard's Sexual and Gender-Based Harassment Policy, applicable to conduct occurring
between September 1, 2014 and August 14, 2020, states:

> Harvard University is committed to maintaining a safe and healthy educational and
> work environment in which no member of the University community is, on the
> basis of sex, sexual orientation, or gender identity, excluded from participation in,
> denied the benefits of, or subjected to discrimination in any University program or
> activity. Gender-based and sexual harassment, including sexual violence, are forms
> of sex discrimination in that they deny or limit an individual's ability to participate
> in or benefit from University programs or activities.
>
> . . .
>
> Retaliation against an individual for raising an allegation of sexual or gender-based
> harassment, for cooperating in an investigation of such a complaint, or for opposing
> discriminatory practices is prohibited.

304.    Harvard's Sexual and Gender-Based Harassment Policy also promises that Harvard
will "prevent incidents of sexual and gender-based harassment from denying or limiting an

individual's ability to participate in or benefit from the University's programs." It commits that Harvard will "provide prompt and equitable methods of investigation and resolution to stop discrimination, remedy any harm, and prevent its recurrence."

305.   Harvard's Sexual and Gender-Based Harassment Policy also gives Harvard "an obligation to keep the community safe and to address incidents of alleged harassment that it knows about or reasonably should know about." Harvard's FAQs Concerning the Harvard University Sexual and Gender-Based Harassment Policy and Procedures No. 12.

306.   Similarly, Harvard's Interim Title IX Sexual Harassment Policy, applicable to conduct occurring on or after August 14, 2020, promises that the University will "respond promptly and equitably to sexual harassment in a manner that is not deliberately indifferent" and "prevent incidents of sexual harassment from denying or limiting an individual's ability to participate in or benefit from the University's programs or activities."

307.   Further, under Harvard's Interim Other Sexual Misconduct Policy, applicable to conduct occurring on or after August 14, 2020, the University will "respond promptly and equitably to allegations of other sexual misconduct."

308.   Harvard's Sexual and Gender-Based Harassment Policy and Procedures for the Faculty of Arts and Sciences, applicable to conduct occurring between September 1, 2014 and August 14, 2020, specifically charges the FAS with "maintaining a safe and healthy educational and work environment in which no member of the community is excluded from participation in, denied the benefits of, or subjected to discrimination in any University program or activity on the basis of sex, sexual orientation, or gender identity." And Harvard's Interim Policies and Procedures Addressing Title IX Sexual and Gender-Based Harassment and Other Sexual Misconduct for the Faculty of Arts and Sciences, applicable to conduct occurring on or after

August 14, 2020, similarly charge the FAS with "maintaining a safe and healthy educational and work environment in which no member of the community is, on the basis of sex, including sexual orientation or gender identity, excluded from participation in, denied the benefits of, or subjected to discrimination in any University program or activity." Harvard's FAS Professional Conduct Policy also provides that "[f]aculty must comply with all applicable laws, rules, regulations, and professional standards including FAS policies and practices; this includes, but is not limited to, policies regarding discrimination and sexual and gender-based harassment" and that "[n]on-compliance . . . could result in varying sanctions."

309.    Harvard's Whistleblowing Policy further provides that "[t]he University will protect from retaliation members of the Harvard community who make good faith reports of suspected violations of the law or University policy."

310.    Similarly, Harvard's Non-Retaliation Policy provides that "[t]he University expressly forbids anyone to take any form of retaliatory action against any member of the Harvard community who in good faith voices concerns, seeks advice, files a complaint or grievance, seeks the aid of Human Resources, testifies or participates in investigations, compliance reviews, proceedings or hearings, or opposes actual or perceived violations of Harvard University's policy or unlawful acts" and further promises that "retaliation will not be tolerated."

311.    Harvard holds these policies out as compulsory, mandatory, and enforced. These promises are part of the contract that Harvard makes with its students in exchange for their matriculation, labor, tuition payments, and fees.

312.    Plaintiffs performed under this contract. Harvard did not. Harvard permitted Professor Comaroff to sexually harass Ms. Kilburn and to retaliate against all three Plaintiffs. Harvard failed to take effective measures to "prevent incidents of sexual and gender-based

harassment" and to "protect" Plaintiffs from retaliation. Indeed, contrary to Harvard's policy, Harvard has tolerated a sexually hostile environment within its Anthropology Department and failed to provide Plaintiffs with methods of investigation that were prompt and equitable or designed to stop discrimination, remedy any harm, and prevent its recurrence. Harvard thus failed to meet Plaintiffs' reasonable expectations of the equal educational benefits to which they are entitled under Harvard's policies.

313.    Harvard's breaches of contract have caused Plaintiffs substantial economic damages, including lost future earnings, among other injuries, for which Plaintiffs are entitled to monetary damages and appropriate equitable relief.

## Count Nine

## Breach of the Implied Covenant of Good Faith and Fair Dealing

### (Massachusetts Common Law)
### (On Behalf of All Plaintiffs)

314.    Plaintiffs re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

315.    This count is brought on behalf of all Plaintiffs.

316.    All contracts in the Commonwealth of Massachusetts contain an implied covenant of good faith and fair dealing, including the contract between Harvard and Plaintiffs. This implied covenant prohibits actions that will have the effect of destroying or injuring the rights of the other party to receive the fruits of the contract.

317.    Harvard's multiple Sexual and Gender-Based Harassment Policies, FAS Professional Conduct Policy, Whistleblowing Policy, Non-Retaliation Policy, and other materials applicable to students all contain promises to Plaintiffs that are part of binding contracts between Harvard and Plaintiffs Czerwienski, Kilburn, and Mandava.

318.    Harvard violated the reasonable expectations of Plaintiffs under these contracts.

319.    Harvard breached the implied covenant of good faith and fair dealing by maintaining an investigatory and dispute resolution process that is inadequate to effectively remedy sexual harassment and retaliation against students, by failing to take the steps necessary to prevent and correct the rampant sexual misconduct and retaliation committed by Professor Comaroff, by failing to provide Plaintiffs with a complaint process that comports with basic fairness, and by turning a blind eye to the hostile environment and unequal access to education afforded to Plaintiffs based on their gender. These acts and omissions have injured the rights of Plaintiffs to receive the benefits of their contracts with Harvard.

320.    Upon information and belief, Harvard's actions as alleged herein were performed in bad faith in that the purpose behind Harvard's practices and policies was to facilitate the evasion of Harvard's obligations to address sexual misconduct and discrimination associated with Professor Comaroff. Furthermore, upon information and belief, Harvard's actions as alleged herein were performed in bad faith in that Harvard deliberately refused to investigate informal complaints of harassment against professors in the Anthropology Department, knowing full well that few, if any, students would file formal complaints with ODR and that ODR investigations rarely result in sanctions against professors. Upon information and belief, ODR has published misleading statistics regarding the duration of its investigations, inducing participants to believe that ODR investigations are significantly shorter than they are.

321.    Plaintiffs have been damaged by Harvard's breach of the implied covenant of good faith and fair dealing.

<u>**Count Ten**</u>

**Inducing Breach of Fiduciary Duty and Invasion of Privacy**

**(Massachusetts Common Law and Mass. Gen. Laws ch. 214, § 1B)**
**(On Behalf of Plaintiff Kilburn)**

322.    Plaintiffs re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

323.    This count is brought on behalf of Plaintiff Kilburn.

324.    From 2018 to 2019, Plaintiff Kilburn received treatment from a licensed therapist.

325.    Under Massachusetts law, it is a breach of fiduciary duty for a healthcare provider to disclose medical information about the patient without the patient's consent. A third party who induces a healthcare provider to disclose information that the third party knew or should have known was confidential is liable to the patient for the damages that flow from that disclosure.

326.    Under Mass. Gen. Laws ch. 214, § 1B, it is an actionable violation of one's right to privacy to procure, retain, or disclose private medical information without consent or in an otherwise unreasonable manner.

327.    45 C.F.R. § 164.508 at all relevant times prohibited the release of Ms. Kilburn's medical records to Harvard without her specific, written, and signed authorization.

328.    34 CFR § 106.45(b)(5) at all relevant times prohibited Harvard from accessing, using, or disclosing Ms. Kilburn's medical records without her "voluntary, written consent."

329.    Plaintiff Kilburn's therapist possessed confidential information and records of information communicated during private therapy sessions for the purpose of therapeutic treatment. Plaintiff Kilburn reasonably expected that the information and records would be kept confidential.

330.    Plaintiff Kilburn did not authorize Harvard to obtain her psychotherapy notes nor

to disclose them to others.

331.    Harvard knew or should have known of the existence of the physician-patient relationship between Ms. Kilburn and her therapist.

332.    Harvard intended to induce Ms. Kilburn's therapist to disclose Ms. Kilburn's psychotherapy notes and Harvard reasonably should have anticipated that its actions would induce Ms. Kilburn's therapist to disclose Ms. Kilburn's psychotherapy notes.

333.    During its ODR investigation, Harvard obtained, used, discussed, and disclosed Plaintiff Kilburn's confidential psychotherapy records to multiple people, including, but not limited to, Professor Comaroff, his lawyers (one of whom is a Harvard faculty member), several faculty members on Harvard's appeal committee, members of the Office for Gender Equity, Title IX coordinators, and deans.

334.    Harvard did not reasonably believe that Ms. Kilburn authorized Harvard to procure these confidential facts and records or to disclose them to those individuals, nor did Harvard take reasonable steps to determine whether Ms. Kilburn had granted such authorization, or even if it believed that it had some such authorization, to ascertain the extent of such authorization.

335.    By inducing Plaintiff Kilburn's therapist to disclose Plaintiff Kilburn's medical information and records without Ms. Kilburn's written authorization and without her consent, and also by disclosing such information and records to others without such permission, Harvard induced a breach of fiduciary duty and invaded Ms. Kilburn's privacy under Massachusetts law.

336.    And by distributing Ms. Kilburn's records not only to Professor Comaroff and his lawyers (one of whom is a Harvard faculty member), but also to members of the Office for Gender Equity, Title IX coordinators, deans, and several faculty members on Harvard's appeal committee, Harvard further invaded Ms. Kilburn's privacy under Massachusetts law.

337.     Harvard persisted in this course despite a request from Ms. Kilburn that Harvard limit access to her confidential medical information. Specifically, on or about September 28, 2021, Ms. Kilburn's counsel requested that Harvard not further disclose her medical records, inform her of individuals who have received a copy of her medical records, and instruct these individuals to turn over the records to Harvard's general counsel's office without retaining copies. Despite affirmative notice that Ms. Kilburn did not consent to Harvard's continued use and disclosure of her medical records, Harvard rejected these requests.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs request the following relief:

a. A declaratory judgment that Harvard's policies, practices, and/or procedures challenged herein are illegal and in violation of the rights of Plaintiffs under, inter alia, Title IX and the applicable Massachusetts state laws and doctrines set forth above;

b. A permanent injunction against Harvard and its officers, owners, agents, successors, employees, and/or representatives, and any and all persons acting in concert with them, from engaging in any further unlawful practices, policies, customs, and usages as set forth herein;

c. An award of damages to Plaintiffs, including compensatory damages and punitive damages, in an amount to be determined at trial;

d. An award of litigation costs and expenses, including reasonable attorneys' fees;

e. An award of pre-judgment and post-judgment interest available under law; and

f. Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of all issues triable of right to a jury.

Dated:  June 21, 2022                    Respectfully submitted,

                                        /s/ Russell Kornblith
                                        Russell Kornblith (*pro hac vice*)
                                        Carolin Guentert (*pro hac vice*)
                                        **SANFORD HEISLER SHARP, LLP**
                                        1350 Avenue of the Americas, 31st Floor
                                        New York, New York 10019
                                        Telephone: (646) 402-5650
                                        rkornblith@sanfordheisler.com
                                        cguentert@sanfordheisler.com


                                        Sean Ouellette (BBO# 697559)
                                        **SANFORD HEISLER SHARP, LLP**
                                        700 Pennsylvania Avenue SE, Suite 300
                                        Washington, DC 20003
                                        Telephone: (202) 499-5200
                                        souellette@sanfordheisler.com

                                        *Attorneys for Plaintiffs*