**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

<table>
<tr><td>

**MARGARET CZERWIENSKI,**
**LILIA KILBURN, and AMULYA**
**MANDAVA**

   *Plaintiffs,*

v.

**HARVARD UNIVERSITY AND THE**
**PRESIDENT AND FELLOWS OF**
**HARVARD COLLEGE**

  *Defendants.*

</td><td>

CASE NO. 1:22-cv-10202-JGD

</td></tr>
</table>

**AMENDED MEMORANDUM OF LAW IN SUPPORT OF HARVARD'S MOTION FOR**
**PARTIAL SUMMARY JUDGMENT AS TO COUNT TEN[1]**

## I. INTRODUCTION

  Count Ten of the Complaint in this action alleges that, during Harvard's investigation of

her sexual harassment allegations, Harvard obtained plaintiff Lilia Kilburn's private therapy rec-

ords from a mental health counselor and released them without her consent. This claim is patently

false. To the contrary, *Kilburn herself* (1) volunteered to the Harvard investigator reviewing her

---

[1] Harvard files this Amended Memorandum of Law in support of its Amended Motion for Partial Summary in light of Plaintiffs' recent Amended Complaint, (Dkt. No. 35). Harvard previously filed five exhibits to the Affidavit of Ilissa Povich (Dkt. No. 28) under seal. Plaintiff then moved to unseal those exhibits and to file redacted versions on the public docket (Dkt. No. 36). In light of that position, Harvard now files publicly redacted copies of those five exhibits (or selected pages of those exhibits): Povich Aff. Ex. 16 (ODR's notes relating to its interview with Kilburn's therapist); Ex. 17 (an October 22, 2020 email from the therapist to ODR); Ex. 19 (an October 30, 2020 email from ODR to Kilburn); Ex. 20 (an October 30, 2020 email from ODR to Comaroff); and Ex. 21 (ODR's notes concerning its Review of Evidence meeting with Kilburn). These redactions include the plaintiffs' proposed redactions from the pages Harvard has filed, and certain other redactions.

sexual harassment claims that she had spoken to a therapist about Professor John Comaroff's alleged harassment of her; (2) told the investigator that the therapist had a record of "specific memories" that would provide "contemporaneous corroboration" for her claims; (3) said the therapist stood "ready to attest" to her complaint; (4) gave the investigator the therapist's name and contact information; (5) urged the investigator to contact the therapist and to obtain her therapy records for use in Harvard's investigation; and (6) contacted her therapist to ask her to search for documentation supporting her allegations against Comaroff.

Moreover, before Kilburn gave the Harvard investigator her therapist's name and contact information, Harvard had notified Kilburn no fewer than *seven times* that Harvard's procedures for investigating harassment complaints required the investigator to disclose evidence the investigator obtained during the investigation, like the therapy records, to Comaroff.

When Harvard spoke to Kilburn's therapist, the therapist told Harvard that Kilburn had already contacted her to search for documentation relevant to Harvard's investigation. Before the therapist sent Harvard the two pages of notes she had located at Kilburn's request, Harvard's investigator told the therapist that Harvard's procedures required Harvard to disclose any records the therapist provided to Comaroff. Consistent with its policies, Harvard used the two pages of records the therapist sent solely in connection with its investigation of Kilburn's complaint and the internal appeals from, and the adjudication of, the investigation's findings. Despite Harvard's repeated reminders to Kilburn that its investigatory procedures required disclosure of the therapy records to Comaroff, Kilburn expressed no objection to Harvard's use of those records, or their disclosure to Comaroff, until after the investigation had ended and the internal appeals panel had convened.

FH10969682.2

These facts, which are beyond dispute, make clear that Count Ten, alleging that Harvard wrongfully induced Kilburn's therapist to disclose confidential information and invaded her privacy—is wholly without merit. Therefore, Harvard respectfully requests that the Court enter summary judgment in favor of President and Fellows of Harvard College on Count Ten.

## II. PROCEDURAL BACKGROUND AND PLAINTIFF KILBURN'S CLAIM IN COUNT TEN

On February 8, 2022, three Harvard graduate anthropology students, Margaret Czerwinski, Lilia Kilburn, and Amulya Mandava, filed a ten count, 65-page complaint against Harvard, alleging (among other things) that Harvard had discriminated against them by failing to prevent Professor John Comaroff, a professor in the Anthropology and African and African American Studies Departments, from engaging in a pattern of sexual harassment and retaliation against them. *See* Compl. (Dkt. No. 1), ¶ 181. On June 21, 2022, plaintiffs filed an 89-page amended complaint adding additional allegations to its ten counts. *See* Am. Compl. (Dkt. No. 35).

Count Ten of the Complaint is brought on behalf of only one of the three plaintiffs, Lilia Kilburn. *See* Am. Compl., ¶¶ 322-37. Kilburn has been a graduate student in Harvard's Anthropology Department since 2017. *Id.* ¶ 21. Kilburn alleges that on May 18, 2020, Dr. Seth Avakian, Program Officer for Title IX and Professional Conduct in Harvard's Faculty of Arts and Sciences ("FAS") filed a formal complaint against Comaroff with Harvard's Office for Dispute Resolution ("ODR") the Harvard administrative office charged with investigating complaints of sexual harassment. *Id.* ¶¶ 119. Kilburn alleges that, as part of that investigation, "ODR contacted Ms. Kilburn's psychotherapist, a private therapist unaffiliated with Harvard, and obtained the psychotherapy notes from two of her sessions with Kilburn. ODR did not obtain Kilburn's consent for the release of those records." *Id.* ¶ 164. Kilburn alleges that Harvard wrongfully induced her

therapist to breach the therapist's fiduciary duty to hold Kilburn's medical records in confidence and violated the Massachusetts invasion of privacy statute, M.G.L c. 214 § 1B.

## III. ARGUMENT

### A. Summary Judgment is Appropriate Here.

Summary judgment is appropriate when "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Sanchez-Rodriguez v. AT&T Mobility Puerto Rico, Inc.*, 673 F.3d 1, 9 (1st Cir. 2012). "When a plaintiff opposes summary judgment, she bears 'the burden of producing specific facts sufficient to deflect the swing of the summary judgment scythe.'" *Theidon v. Harvard Univ.* 948 F.3d 477, 494 (1st Cir. 2020) (quoting *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003)). "For this purpose, she cannot rely on 'conclusory allegations, improbable inferences, acrimonious invective, or rank speculation.'" *Theidon,* 948 F.3d at 494 (quoting *Ahern v. Shinseki*, 629 F.3d 49, 54 (1st Cir. 2010). "To be genuine, a factual dispute must be built on a solid foundation—a foundation constructed from materials of evidentiary quality." *Nieves-Romero v. United States*, 715 F.3d 375, 378 (1st Cir. 2013).

Under Fed. R. Civ. P. 56(b), "a party may file a motion for summary judgment at any time until 30 days after the close of all discovery." *See Chan Wing Cheung v. Hamilton*, 298 F.2d 459, 460 n.1 (1st Cir. 1962); *Hubicki v. ACF Indus., Inc*., 484 F.2d 519, 522 (3d Cir. 1973); 6 Moore's Federal Practice par. 56.08 n.19 (2d ed. 1982). As the First Circuit said in *Chan Wing Cheung,* 298 F.2d at 460 n.1: "[i]f a defendant, through affidavits or otherwise, shows that a plaintiff has no case, the absence of a formal answer cannot be material."

FH10969682.2

**B. Facts Kilburn Cannot Dispute Show that Kilburn <u>Urged</u> ODR to Speak to Her Therapist and Obtain her Therapist's Notes After Having Been Repeatedly Told that ODR's Policies Required ODR to Share Those Notes with Comaroff.**

Harvard did not obtain Kilburn's therapy records without her consent. To the contrary, Kilburn *volunteered* to ODR that she had seen a therapist who had information she believed would corroborate her claims; told Harvard the therapist would "attest" to what Kilburn said in therapy; urged Harvard to contact the therapist to obtain her records for corroboration; provided the therapist's contact information to Harvard; and communicated with the therapist about Harvard's investigation—all with the knowledge that Harvard's investigatory procedures required that any relevant documents or information Harvard received from the therapist be shared with Comaroff. The facts that follow cannot genuinely be disputed:

1. *ODR Begins Its Investigation and Informs Kilburn That its Policies Require Sharing Information with Both Parties.*

ODR is responsible for investigating formal complaints of sexual harassment at Harvard. Harvard's Statement of Material Facts ("SF"), (Dkt. No. 26) ¶ 1. ODR's investigation of Kilburn's allegations about Comaroff began on May 18, 2020 when ODR received an email from Title IX program officer Seth Avakian, attaching a complaint based on information that Kilburn, among others, provided to him. *Id.* ¶¶ 7-8. Avakian's complaint raised questions about whether Comaroff's conduct had violated Harvard policies, including the Sexual and Gender-Based Harassment Policy and Procedures for the Faculty of Arts and Sciences at Harvard University ("the Policy and Procedures"). *Id.* ¶¶ 5, 8-9.

ODR assigned Senior Investigator Ilissa Povich to investigate Kilburn's allegations against Comaroff. *Id.* ¶ 4. On June 4, 2020, Povich emailed Kilburn informing Kilburn of her role as an Investigator, and further informing Kilburn to:

Please find the following documents linked for your review: 1) **the Sexual and Gender-Based Harassment Policy and Procedures for the Faculty of Arts and Sciences Harvard University;** 2) **Harvard University's Procedures for Handling Complaints Involving Students** Pursuant to **the Sexual and Gender-Based Harassment Policy;** 3) **Frequently Asked Questions Concerning the Policy and Procedures;** 4) **Frequently Asked Questions Concerning the FAS Policy and Procedures;** 5) the **ODR Flowchart for Investigative Process;** and 6) the **Personal Advisor Role Frequently Asked Questions**. As outlined in these documents, your participation is entirely voluntary, and ODR respects and protects privacy to the greatest extent possible, sharing information only on a need-to-know basis.

*Id*. ¶ 14. ODR's June 4, 2020 email to Kilburn contained hyperlinks (set out in bold in above) to documents describing ODR's investigative process. *Id*. ¶ 15. The document entitled "Frequently Asked Questions Concerning the Policy and Procedures" included the following language:

Will both parties have access to the materials that ODR uses in reaching its conclusions?

Yes. During the course of the investigation, both the complainant and the respondent will have the opportunity to respond to all information used by the Investigative Team in reaching its conclusions. ***They will also have the opportunity to provide the Investigative Team with any additional information that they have. This information, like other information received from the complainant and respondent during the investigatory process, will be shared with the other***.

*Id*. ¶ 19 (emphasis added). Another hyperlinked document, the "ODR Flowchart for Investigative Process," also contained a detailed description of ODR's process. It too explained that:

ODR collects additional information (e.g., interview witnesses, collect documents, conduct site visits). The parties may submit additional materials they believe may be relevant. ***Copies of these materials will be given to the other party and, at that party's discretion, their personal advisor (if applicable) . . . .***

*Id*. ¶ 20 (emphasis added). On July 2, 2020, ODR again reminded Kilburn that information ODR gathered from Kilburn or witnesses Kilburn identified would be shared with Comaroff. In response

to a question from Kilburn, ODR Fellow Jessica Shaffer, who was working with Povich on the investigation, wrote Kilburn:

> Both parties have the right to review and respond to all information that ODR may rely on in the investigation, including the complaint, the response, **any written information provided by a witness, or other documents submitted.**

*Id.* ¶ 23 (emphasis added). Kilburn acknowledged receipt of ODR Fellow Shaffer's email, stating: "Hi Jessica and Ilissa, Thank you for this information—it is helpful . . . ." *Id.* ¶ 24.

On July 13, 2020, Povich and Shaffer interviewed Kilburn by Zoom. Kilburn's personal advisor, Jacqueline Yun, was also present.[2] *Id.* ¶ 25. At the outset of the meeting, Povich explained ODR's role and gave Kilburn an overview of the investigative process. *Id.* ¶¶ 26-27. As Povich's affidavit states, Povich told Kilburn that ODR approached the investigation as a neutral and that Kilburn's participation was voluntary. *Id.* ¶ 28. She also explained that ODR's procedures required ODR to share information she provided—and information provided by witnesses she identified— with Comaroff. *Id.* ¶ 29. Later in ODR's July 13 interview of Kilburn, Povich again reminded Kilburn that ODR's procedures required ODR to share with Comaroff information Kilburn provided to ODR. *Id.* ODR Fellow Shaffer's contemporaneous notes quote Povich saying (about the survey): "You're welcome to provide that to us. As a reminder that would be shared with [Comaroff]." *Id.* ¶ 37.

ODR's interview of Kilburn continued on July 20, 2020 where Povich again reminded Kilburn that information she provided to ODR would be shared with Comaroff. *Id.* Accordingly, by the end of the July 20, 2020 interview, ODR had informed and reminded Kilburn no fewer than

---

[2] Under the Policy and Procedures, each party may select a personal advisor to support them during ODR's investigation. Kilburn selected Yun.  SF ¶¶ 20, 25.

seven times—at least three times in writing, at least three times on July 13, 2020, and at least once on July 20, 2020—that ODR's procedures required it to share information it received in its investigation with Comaroff.

2. *Kilburn Urges ODR to Obtain Her Therapist's Notes and Provides Her Therapist's Contact Information.*

Comaroff submitted his Response to Kilburn's complaint on August 12, 2020. *Id.* ¶ 42. On August 13, 2020, consistent with ODR's policy, Povich sent Kilburn a copy of Comaroff's Response. *Id.* ¶ 43. Kilburn, in turn, submitted on August 24, 2020 a 36-page document responding to Comaroff's Response *Id.* ¶ 45. Kilburn's August 24, 2020 submission stated that, during the summer of 2018, while speaking to a counselor at Harvard University Health Services ("HUHS") she was seeing about matters unrelated to Comaroff, "I also began to speak to a counselor about Comaroff himself . . . [and] his repeated sexual harassment of me . . . ."*Id.* ¶ 46. Kilburn's submission said that she became concerned that her HUHS counselor might be a "mandatory reporter" and that Kilburn "might be forced into reporting Comaroff before I was ready." *Id.* ¶ 47. Kilburn's August 24 submission continued:

> Because of my fear that discussing my experiences frankly with a Harvard employee would remove my agency over how that information was shared, I sought out a new licensed mental health professional with whom to discuss these issues.. . . She is currently on vacation, but I believe **she has specific memories of our conversations about misconduct in my department, my concerns about the damage Professor Comaroff could do to my career, and my repeated and unfruitful attempts to get assistance. She is ready to attest to this when she returns from vacation.**
>
> **Thank you to Professor Comaroff for jogging my memory on this additional incident of contemporaneous corroboration** and disclosure of his misconduct and its effects on me.

*Id.* (emphasis added).

On August 28, 2020, ODR conducted a follow-up interview of Kilburn. *Id*. ¶ 48. Kilburn's personal advisor, Yun, asked ODR whether Kilburn could list a therapist as a potential witness. *Id*. As ODR's notes reflect:

> [Yun]: Procedural question about witnesses: If you confide in a confidential resource, a therapist, can you list them as a potential witness and they'll have the option to participate?
>
> ODR: [Explains ODR will speak to confidential resources, but that such witnesses often will not participate without a waiver from the party.]
>
> [Yun]: It's okay to do that?
>
> ODR: Absolutely. If you give them that waiver, they will generally talk to us.

*Id.* ¶ 49. Later in the interview, ODR followed up with Kilburn about the therapist she had mentioned in her August 24, 2020 submission as having "corroboration" for her allegations. *Id*. ¶¶ 47, 50. Kilburn volunteered that the therapist "***should have a bunch of notes or memories for you.***" *Id.*¶ 50 (emphasis added). ODR's contemporaneous notes record the exchange:

> ODR: You also referred to a licensed mental health professional and a UHS counselor. I understood you went outside the University because you were concerned about Title IX reporting requirements. Those people are confidential.
>
> [Kilburn]: I didn't realize that--only through this process. I was worried about losing control of the information at the time.
>
> ODR: Are there people outside the University or in the University who you feel like you provided information to that was not provided to other people?
>
> [Kilburn] I can't say it wasn't provided to other people, ***but I'm sure I spoke in great detail on impact a lot about worries in my career and what I said and what it would mean to say something about this.*** [The therapist] ***who I worked with all through fall 2018 and also spring 2019, and I think she should have a bunch of notes or memories for you.***

*Id.* (emphasis added). Later in the interview, as ODR's notes reflect, Povich told Kilburn: "We ask every single witness if they have documents that are relevant, which we share with you." *Id.* ¶ 51.

9

On September 25, 2020, Kilburn sent ODR an email containing names and contact information for eight witnesses. Kilburn wrote: "I think the following would make sense as a first set of people for you to speak to; I'll attach email addresses for non-Harvard people, but please let me know if you'd like phone numbers also." *Id.* ¶ 55. The list of eight names included the name and email address of the therapist Kilburn identified as a witness during ODR's August 28, 2020 interview. *Id.* ¶ 56. In response, ODR reminded Kilburn that her email would be "redacted to remove personally identifying information and will be provided to Respondent." *Id.*

3. *ODR Contacts Kilburn's Therapist, as Kilburn Requested.*

On October 19, 2020, ODR wrote to Kilburn's therapist at the email address Kilburn had provided, informing the therapist ODR was reaching out to her "as a potential witness because ODR has received notice that you may have information about a matter that our office is investigating." *Id*. ¶ 57. The therapist wrote back, offering to speak with ODR, and ODR interviewed the therapist on October 22, 2020. *Id*. ¶ 58. At the beginning of the interview, ODR confirmed that the therapist knew why ODR wished to speak with her. *Id*. ¶ 59. The therapist told ODR that Kilburn had sent her an email over the summer about the investigation. *Id*. As recorded in ODR's detailed notes, the therapist said: "I did get an email from [Kilburn] over the summer asking if I had documentation about what we talked about . . . related to her position as a Ph.D. candidate at Harvard and what the atmosphere is like." *Id*. ¶ 60.

ODR explained to the therapist that ODR would share information ODR it might rely on with all the parties to the investigation. *Id*. ¶ 59. The therapist stated that she had been a licensed mental health counselor for more than 25 years. *Id.* ODR followed up on Kilburn's August 28, 2020 statement that therapist "should have a bunch of notes or memories for [ODR]" by asking whether the therapist was willing to provide any documents related to her discussion with Kilburn

to ODR. *Id.* ¶ 62. The therapist said she had gone through her notes and identified two notes she believed "might be helpful." *Id.* ¶ 64. ODR then informed the therapist, as ODR's contemporaneous notes state: "Understand if you provide [information] and we think we might rely on it, we would send it to both parties." *Id.* ¶ 63. ODR further explained that, under the Family Educational Rights and Privacy Act ("FERPA"), ODR would redact student identifying information from any records it disclosed. *Id.* ¶ 64. The therapist told ODR that she would provide notes from her therapy sessions on two dates in March 2019. *Id.* She added: "In transmitting via email I need to comply with HIPAA." *Id.* She also told ODR, "confidentiality is my bread and butter." *Id.* Later on October 22, 2020, Kilburn's therapist sent ODR those two days of therapy notes. *Id.* ¶ 65.

ODR interviewed Kilburn's therapist and received the two notes the therapist identified solely because Kilburn (i) identified her as a witness, (ii) provided the therapist's email address to ODR, and told ODR that the therapist "should have a bunch of notes or memories for [ODR]." *Id.* ¶¶ 67, 68. Had Kilburn not identified her therapist as a witness and directed ODR to the therapist and her notes, ODR would not have taken steps to interview the therapist or receive her notes. *Id.* ¶ 69. ODR does not seek information about or from a complainant's mental health counseling unless, as here, a complainant volunteers that information and identifies the mental health counselor as a witness. *Id.* Indeed, ODR did not—and has not—sought to obtain any information about Kilburn from the counselor Kilburn told ODR she had seen at Harvard University Health Services. *Id.* ¶ 52. As Povich informed Kilburn on August 24, 2020, "[t]hose people are confidential." *Id.* ¶ 50. When ODR does speak to a mental health counselor a party has identified, ODR informs that mental health counselor, consistent with its procedures and as was done here,

that it will share any information the counselor provides with both parties to the investigation. *Id.* ¶ 70.

On October 30, 2020, and consistent with the written notices and oral explanations of ODR's information-sharing procedures ODR had given Kilburn since the outset of the investigation, ODR sent redacted copies of the two pages of therapist's notes (as well as other, non-therapy-related documents) it had received from Kilburn, Comaroff, and their witnesses to Kilburn, Comaroff, and each of their personal advisors. *Id.* ¶ 72. ODR redacted from the therapy notes personally identifying information and certain information not pertinent to the investigation from one of the notes. *Id.* ¶¶ 72-73. Kilburn did not object.

4. *ODR Reminds Kilburn That ODR Was Following its Information Sharing Procedures; Kilburn Expresses No Objection to ODR Disclosing the Therapy Notes to Comaroff.*

As the investigation proceeded, ODR frequently reminded Kilburn it was following its procedures by sharing the information it gathered with both parties. For example, ODR repeatedly sent Kilburn copies of documents provided by Comaroff or witnesses Comaroff identified. *Id.* ¶ 44. In three separate sessions on January 5, 6, and 7, 2021, ODR met with Kilburn and her personal advisor to hold a "review of evidence meeting" —a standard part of the ODR process in which ODR reviews with the parties the evidence it has gathered in the course of its investigation and asks follow-up questions. *Id.* ¶ 75. In those sessions, ODR read to Kilburn verbatim from its detailed notes of interviews of witnesses Kilburn identified, including the therapist; from interviews of witnesses Comaroff identified; and from ODR's interview of Comaroff. *Id.* ¶ 77-78.

At the beginning of the January 6, 2021 session, Kilburn again suggested her communications with her therapist contained information relevant to ODR's investigation. As ODR's contemporaneous notes state, Kilburn said: "I also realize I did have some emails with [the

therapist] that maybe I'll send you that I think could potentially be helpful, conversations I explicitly remembered having about [Comaroff] and I think she did lose some records, so I can send you that.[3] *Id.* ¶ 77. At the end of ODR's January 7, 2021 meeting with Kilburn, ODR advised Kilburn that ODR's next step was to hold a similar review of evidence meeting with Comaroff. *Id.* ¶ 79. Kilburn expressed no concerns about ODR conducting such a meeting with Comaroff or sharing the therapy notes with Comaroff at that meeting. *Id.* ¶ 80.

On May 10, 2021, ODR sent Kilburn a Draft Report of ODR's investigation of her complaint against Comaroff. *Id.* ¶ 91. ODR's cover email stated: "Under the *FAS Procedures,* the Investigator provides Complainant and Respondent with a written draft of the findings of fact and analysis . . . the documents referenced in the Draft Report were already provided by you or to you during the investigation, and will be attached as exhibits to the Final Report." *Id.* (emphasis in original). The Draft Report referred specifically to ODR having conducted an interview of Kilburn's counselor and having received the therapist's notes. *Id.* ¶ 93. On June 14, 2021, Kilburn provided a 61-page, single-spaced response to ODR's Draft Report. *Id.* ¶ 94. Although Kilburn's response criticized ODR's investigation in many respects, Kilburn's response did not express concerns about—or, indeed, even mention—ODR's disclosure of information provided by witnesses Kilburn identified, like her therapist, to Comaroff. *Id.* ¶ 95.

ODR issued its Final Report (with exhibits, including the two pages of redacted therapy notes) to Kilburn and Comaroff on August 27, 2021. *Id.* ¶ 96.[4] On September 3, 2021, Kilburn

---

[3] Kilburn did not in fact send such emails to ODR. SF ¶ 77.

[4] The Report concluded that Comaroff had violated the Sexual and Gender-Based Harassment Policy by engaging in an inappropriate discussion with Kilburn in a meeting in August 2017 but concluded that a preponderance of the evidence did not support Kilburn's other allegations. SF ¶ 97.

submitted an appeal of ODR's Final Report to Harvard's Office for Gender Equity. *Id.* ¶ 100. Kilburn's appeal did not complain about ODR having received the therapy notes from her counselor or ODR having provided those notes in redacted form to Professor Comaroff. *Id.*

**C. On These Facts Count Ten Fails as a Matter of Law; Consequently, the Court Should Enter Summary Judgment.**

    1. *Because Harvard Reasonably Believed the Therapist Provided the Notes Without Violating Any Duty to Kilburn, the Court Should Enter Summary Judgment in Harvard's Favor on Count Ten.*

Kilburn alleges that Harvard violated her right to privacy under M.G.L. c. 214, § 1B by inducing her therapist to give Harvard her psychotherapy records without her consent, then disclosing those records. Kilburn's claim is wholly without merit. To prevail, Kilburn must demonstrate that Harvard did not reasonably believe that the therapist could send Harvard the notes without breaching her duty to Kilburn. Because Kilburn cannot make that showing here, she cannot meet the "the burden of producing specific facts sufficient to deflect the swing of the summary judgment scythe." *Theidon*, 948 F.3d at 494 (citation omitted).

G.L. c. 214, § 1B provides that "a person shall have a right against unreasonable, substantial or serious interference with his privacy." The Supreme Judicial Court has recognized that medical professionals may violate c. 214, § 1B by "disclosure without the consent of the patient, of confidential medical information." *Towers v. Hirschorn*, 397 Mass. 581, 586-87 (1986) (plaintiff's claim that her neurologist disclosed information about her condition without her knowledge or consent, sufficient to create liability *against her neurologist* for invasion of privacy under c. 214, §1B).

But a plaintiff must meet a much higher burden when claiming that a third party (here, Harvard), not a treatment provider, violated M.G.L. c. 214, § 1B. To recover against Harvard,

Kilburn must show that Harvard did not reasonably believe, under the circumstances, that the therapist could send Kilburn's therapy notes to Harvard without violating the therapist's obligations to Kilburn. *See Alberts v. Devine*, 395 Mass. 59 (1985). In *Alberts*, the Supreme Judicial Court addressed the question whether, and under what circumstances, a third party may be held liable for inducing a medical professional to violate the patient's confidentiality. Alberts, a minister, sued two of his clerical superiors and his psychiatrist, alleging that his superiors "intentionally induced" the psychiatrist to disclose confidential information concerning his treatment, then disseminated that information widely. *Id*. at 61. The Court held that the minister could seek damages against a physician if the physician, without the patient's consent, makes an out-of-court disclosure of confidential information obtained in the course of the physician-patient relationship." *Id*. at 65. The SJC then addressed whether the plaintiff's clerical supervisors could be held liable for inducing the psychiatrist to disclose information about the minister's treatment. The Court ruled as follows:

> We hold that one who, **with the state of mind we describe below**, induces a physician **wrongfully** to disclose information about a patient, may be held liable to the patient for the damages that flow from that disclosure . . . . To establish liability the plaintiff must prove that: (1) the defendant knew or reasonably should have known of the existence of the physician-patient relationship; (2) the defendant intended to induce the physician to disclose information about the patient or the defendant reasonably should have anticipated that his actions would induce the physician to disclose such information; and (3) **the defendant did not reasonably believe that the physician could disclose that information to the defendant without violating the duty of confidentiality that the physician owed the patient**.

*Id*. at 70-71 (emphasis added). The Court held that summary judgment would be appropriate where there was no dispute of material fact as to whether the third party accused of inducing the

physician's breach of duty "reasonably believed" the medical professional could "give them the information they sought without violating [the] duty of confidentiality . . . ." *Id*. at 73.[5]

Here, as the Affidavit of ODR Senior Investigator Povich and the discussion above makes clear, Harvard did in fact believe—and believed reasonably—that the therapist could provide the two pages of records at issue without violating any duty of confidentiality to Kilburn. SF ¶ 71. Kilburn cannot produce "specific facts," *see Theidon*, 948 F.3d at 494, sufficient to establish that Harvard's belief was not reasonable. Indeed, all the facts point to the conclusion that Harvard's belief was reasonable. Kilburn did far more than merely *consent* to ODR obtaining the therapy records. Kilburn expressly urged ODR to speak to her therapist because the therapist "should have a bunch of notes or memories" that would corroborate Kilburn's claims. SF ¶ 50. Kilburn included the therapist's name and contact information on the first witness list she sent ODR. *Id.* ¶ 55. Harvard investigators were informed that Kilburn emailed the therapist, to ask the therapist to review records for helpful information. *Id.* ¶ 60. When ODR contacted the therapist (at Kilburn's insistence), ODR informed the therapist that its procedures required it to share any information the therapist provided to all parties, and confirmed that the therapist had communicated with Kilburn about ODR's request for information. *Id.* ¶¶ 59-60. The therapist told ODR that Kilburn had emailed her asking her to search for documents that might be helpful to Kilburn in the investigation. *Id.* The therapist selected the two therapy notes which she provided to ODR. *Id.* ¶ 65. The therapist also told ODR, "confidentiality is my bread and butter." *Id.* ¶¶ 60, 64.

---

[5] The conduct at issue in *Alberts* occurred before the enactment of c. 214, § 1B; therefore, that statute did not explicitly apply. Under the circumstances, however, this is a distinction without a difference. *Albert's* holding that a physician owes a common law duty to maintain patient confidences is the functional equivalent of c. 214, § 1B's recognition of "a patient's valid interest in preserving the confidentiality of medical facts relayed to a physician." *Towers,* 397 Mass. at 586 (quoting *Bratt v. Int'l Bus. Machs. Corp*., 392 Mass. at 522).

FH10969682.2

Moreover, Kilburn knew that her therapist provided two pages of therapy notes to ODR, and likewise knew that ODR's procedures required it to share them with Comaroff. *Id.* ¶ 23. Harvard also informed Kilburn at the outset of the investigation that ODR's procedures required it to share information she or her witnesses provided with Comaroff and repeatedly reminded Kilburn of that procedural requirement—doing so explicitly at least *eight times* throughout the investigation. *Id.* ¶¶ 18-24 19, 20, 23, 29, 37-38, 40, 51, 56, 72. (This includes the seven occasions referred to *supra,* at 7-8.) ODR also routinely shared information Comaroff provided with Kilburn, also doing so on at least eight occasions. *Id.* ¶¶ 43-44, 77. Kilburn's 61-page response to ODR's Draft Report did not complain about ODR's reference to her therapist's. Nor did Kilburn complain about the ODR referencing the notes when she appealed the findings of the Final Report. *Id.* ¶¶ 94-95, 100.

2. *Harvard's Limited Disclosures of Kilburn's Therapist's Records In Compliance with Its Policies Were Not an Unreasonable, Substantial or, Serious Interference with Kilburn's Privacy Rights, Particularly Where Kilburn was Informed of Harvard's Policies and Nonetheless Directed Harvard to These Records*

As discussed above, ODR repeatedly informed and reminded Kilburn that ODR's policies required that all evidence be provided to both parties and members of the adjudicatory process, *see e.g.* SF ¶¶ 15, 19, 20, 23, 40. Knowing this, Kilburn urged ODR to obtain her therapists notes multiple times. *See id.* ¶¶ 47, 50. Plaintiff can present no facts supporting the claim that Kilburn had any reasonable expectation that Harvard would treat the information provided by Kilburn's therapist differently, in contravention of ODR policy. *See Schlesinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 409 Mass. 514, 521 (1991) ("person may relinquish a privacy right by engaging in certain activities, or by placing himself in certain contexts where his legitimate expectation of privacy is reduced").

In addition, Kilburn can offer no evidence demonstrating that Harvard disseminated her therapist's notes more widely than its policies required. *See* Am. Compl., ¶ 333. Here, Harvard limited dissemination of the records to those who played a formal role in the investigation of Kilburn's complaint. In the first instance, the notes were distributed only to the parties and their personal advisors. SF ¶ 72. ODR repeatedly reminded the parties and their advisors of the expectation of confidentiality stated in the Policy and Procedures. *Id*. ¶¶ 21, 41, 54, 85, 92. When ODR completed its investigation, ODR sent the Final Report, which included redacted copies of the therapist's notes, to Kilburn, Comaroff, their personal advisors and, consistent with the Policy and Procedures, to Kwok Yu, Senior Associate Dean for Faculty Affairs, "as the Title IX Resource Coordinator and Liaison for FAS." *Id*. ¶ 96. Thereafter, facts Kilburn cannot dispute show that Harvard limited its distribution of the full Final Report (and, in particular, the Report's discussion of Kilburn's therapist and the two pages of notes the therapist provided) to the faculty panel who decided the appeals of Kilburn and Comaroff and the individuals whom advised Faculty of Arts and Sciences Dean Claudine Gay in connection with her decision to impose sanctions. *Id*. ¶¶ 102-109.

3.  *Federal Statutes and Related Regulations Provide No Basis for Relief Against Harvard.*

Plaintiffs' Amended Complaint cites two regulations:45 C.F.R. § 164.508, which does not apply to Harvard here; and 34 CFR § 106.45(b)(5), which did not apply to Harvard's consideration of Kilburn's Title IX complaint. Putting aside the fact that these federal regulations are not relevant to Massachusetts state privacy rights, the attempt to rely on these regulations fails on their substantive terms. 45 C.F.R. § 164.508—issued by the Department of Health and Human Services under HIPAA, *see* 67 Fed. Reg. 53181 (Aug. 14, 2002)—does not, by its terms, apply to Harvard in this situation. It states: "Except as otherwise permitted or required by this subchapter, a ***covered***

*entity* may not use or disclose protected health information without an authorization that is valid under this section." 45 C.F.R. § 164.508(a)(1) (emphasis added). The regulations define a "covered entity" as "[a] health plan; (2) [a] health care clearinghouse; [or] (3) [a] health care provider who transmits any health information in electronic form in connection with a transaction covered by this subchapter." Plaintiff does not allege that Harvard was her health care provider or fits within any of these other categories. Second, even if HIPAA regulations applied to Harvard here (and they do not), those regulations do not create a private right of action entitling a private plaintiff, like Kilburn, to seek damages. *See Miller v. Nichols*, 586 F.3d 53, 59-60 (1st Cir. 2009); *Willitts v. Engie N. Am., Inc*., Civil Action No. 20-cv-11255-ADB, 2021 U.S. Dist. LEXIS 106539, at *11 (D. Mass. June 7, 2021) ("it is well established that HIPAA does not create a private right of action").

Similarly, 34 CFR § 106.45(b)(5)—issued by the Department of Education under Title IX, *see* 85 Fed. Reg. 30026 (May 19, 2020)—does not apply to the conduct at issue. That regulation, which now requires written consent if treatment records will be used in Title IX proceedings, became effective on August 14, 2020. 45 C.F.R. § 164.508, but it was ***not*** retroactive, *see* 85 Fed. Reg. 30026, 30061, 30072 (May 19, 2020) and U.S. Dep't Educ., Questions and Answers on the Title IX Regulations on Sexual Harassment (July 2021) (Updated June 28, 2022) (available at: https://www2.ed.gov/about/offices/list/ocr/docs/202107-qa-titleix.pdf) ("[I]f the conduct at issue in the complaint took place prior to August 14, 2020, the 2020 amendments do not apply even if the complaint was filed with a school on or after August 14, 2020"). Kilburn complained that Comaroff committed a Title IX offense against her in 2017 and 2018, but in any event, long before August 14, 2020, and therefore the then new regulation's requirements did not apply to actions taken by Harvard to investigate and address Kilburn's complaint. SF ¶ 7. *See Doe v. Univ.-*

*Chicago*, No. 20 CV 7293, 2021 U.S. Dist. LEXIS 116182, at *22 n.8 (N.D. Ill. June 22, 2021) ("These regulations [34 C.F.R. § 106.45] became effective after Loyola's proceedings against Doe and have no retroactive effect."). Nor does 45 C.F.R. 164.508 provide a private right of action.

## IV. CONCLUSION

For these reasons, Harvard respectfully requests that the Court enter summary judgment in Harvard's favor on Count Ten. Count Ten's allegations are not only indisputably false, they are irresponsible. Left unchecked, Count Ten's false allegations—which have been widely publicized[6]—will continue to create the risk that Harvard students will be discouraged from availing themselves of the Title IX process because of a baseless fear that Harvard investigators will obtain their therapy records without their consent. The allegations in Count Ten cannot defeat the clear evidentiary record Harvard has presented, a record that makes summary judgment on that Count appropriate here.

---

[6] *See, e.g.*, Anemona Hatocollis, *After Sexual Harassment Lawsuit, Critics Attack Harvard's Release of Therapy Records*, N.Y. TIMES, (Feb. 15, 2022) *https://www.nytimes.com/2022/02/15/us/harvard-kilburn-therapy-records.html;* Katy Rose Guest Pryal, *When Universities Raid Student Therapy Records*, CHRON. HIGHER EDUCATION (Feb. 11, 2022), https://www.chronicle.com/article/when-universities-raid-student-therapy-records; Coleen Flaherty, *'Without Her Consent'*, INSIDE HIGHER ED, (Feb. 10, 2022), https://www.insidehighered.com/news/2022/02/10/harvard-allegedly-obtained-students-outside-therapy-records; Tarpley Hitt, *So How Did Harvard Get Private Therapy Records Without Consent*, GAWKER (Feb. 9. 2022), https://www.gawker.com/news/so-how-did-harvard-get-private-therapy-records-without-consent.

Respectfully submitted,

Victoria L. Steinberg, BBO #666482
Julien M. Mundele, BBO #694001
Rachel C. Hutchinson, BBO #696739
TODD & WELD LLP
One Federal Street
Boston, MA 02110
Telephone:    (617) 624-4714
Facsimile:    (617) 624-4814
vsteinberg@toddweld.com
jmundele@toddweld.com
rhutchinson@toddweld.com

*Martin F. Murphy*
Martin F. Murphy, BBO #363250
Madeleine K. Rodriguez, BBO #684394
FOLEY HOAG LLP
155 Seaport Boulevard, Suite 1600
Boston, MA 02210
Telephone: (617) 832-1000
Facsimile: (617) 832-7000
mmurphy@foleyhoag.com
mrodriguez@foleyhoag.com

*Attorneys for Defendants,*
*Harvard University and President and*
*Fellows of Harvard College*

## CERTIFICATE OF SERVICE

I, Martin F. Murphy, hereby certify that a copy of the foregoing was sent via the Court's electronic filing system and served to all counsel of record on July 19, 2022.

*/s/ Martin F. Murphy*
Martin F. Murphy

FH10969682.2