UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **MARGARET CZERWIENSKI, LILIA KILBURN, and AMULYA MANDAVA**<br><br>*Plaintiffs,*<br><br>v.<br><br>**HARVARD UNIVERSITY AND THE PRESIDENT AND FELLOWS OF HARVARD COLLEGE**<br><br>*Defendant.* | Case No. 1:22-cv-10202-JGD |

### DECLARATION OF LILIA KILBURN IN OPPOSITION TO DEFENDANT'S AMENDED MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO COUNT TEN

I, Lilia Kilburn, hereby declare, under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. My name is Lilia Kilburn. I am a graduate student in Harvard University's Anthropology department and a Plaintiff in the above-captioned matter. I submit this declaration in opposition to Defendant's Motion for Partial Summary Judgment as to Count Ten (Dkts. 24–29) and Defendant's Amended Motion for Partial Summary Judgment as to Count Ten (Dkts. 47–52).

2. Professor Comaroff sexually harassed me for over two years, from before I matriculated at Harvard in 2017 through 2019. His behavior caused me extreme emotional distress, for which I sought therapy from a licensed mental health professional in 2018 and 2019.

3. In May 2019, I complained about Professor Comaroff's harassment of me to Dr. Seth Avakian, University Program Officer for Title IX and Professional Conduct and the Title IX

1

Resource Coordinator for graduate students and faculty in Harvard's Faculty of Arts and Sciences ("FAS").

4.      On approximately May 20, 2020, over a year after I had complained to Dr. Avakian, he informed me that, based on the complaints he received from me and three other graduate students (Margaret Czerwienski, Amulya Mandava, and Harvard Student 2), he had filed a formal complaint against Professor Comaroff with Harvard's Office For Dispute Resolution ("ODR").

5.      On approximately May 21, 2020, I learned that *The Harvard Crimson* (the "*Crimson*") would publish an article revealing a long pattern of sexual abuse perpetrated by senior male professors in Harvard's Anthropology Department, including Professor Comaroff. That article was published on May 29, 2020.

6.      On June 4, 2020, after the *Crimson* published its article, ODR investigator Ilissa Povich emailed me, notifying me that a formal complaint had been filed with ODR and requesting a two-hour interview with me on June 8 or June 9, 2020. **Ex. 1.**

7.      I did not respond immediately to Ms. Povich's email. I was unsure of what would be expected of me in a two-hour interview, and needed time to prepare myself. I was also enrolled in a time-intensive language class in preparation for my field study.

8.      Ms. Povich followed up via email on June 8, 2020, and told me that if I did not get back to her by June 10, 2020, she would "understand that [I] do not wish to participate in the ODR process as either a potential complainant or a witness," because an "initial review" of a complaint typically needed to be "concluded within one week of the date the complaint was received." **Ex. 1.**

9. I did wish to participate in the ODR process, but I did not understand why Ms. Povich was imposing this timeline on me; I had waited over a year for Dr. Avakian to investigate my complaint.

10. I responded to Ms. Povich on June 8, 2020 that I wished to participate in the ODR process, but that I was in a rural area with poor internet and would likely have trouble making a lengthy call. I asked to check in with her later that week. **Ex. 1.**

11. On June 9, 2020, Ms. Povich asked me when I would like to meet. **Ex. 1.** I did not respond immediately, because, among other reasons, I was busy with the language class and studying for my upcoming exams.

12. On June 12, 2020, Ms. Povich emailed me that if I did not get back to her by June 16, 2020, she would "understand that [I] do not wish to participate in the ODR investigation as a potential complainant or a witness." **Ex. 1.**

13. On June 17, 2020, Ms. Povich emailed me that because I had not yet responded, she "understand[s] that [I] do not wish to participate in the ODR process as either a potential complainant or a witness." **Ex. 1.**

14. On June 17, 2020, I emailed Ms. Povich that I had returned to an area with better service and could speak to her the following day. However, I still felt that I did not sufficiently understand the ODR process and what would be expected of me, and I was busy working on an intensive language course as required by my graduate program and studying for exams. I wrote Ms. Povich, "I would like to hear more about the process, as I don't feel that I have a strong understanding of what it entails. I would like to participate, but am somewhat perplexed by all of the references to a timeline which was not explained to me, especially given that it is June and many of us have other obligations at this time." **Ex. 1.**

15. Ms. Povich responded by suggesting I could "withdraw[ ] [my] complaint" or, because someone had filed a complaint on my behalf, "withdraw [my] participation" from that complaint. **Ex. 1.** I felt pressured by Ms. Povich's email, and emailed her on June 17,

> It feels as though you are pressuring me to withdraw my complaint, although I am making clear I have no intention of doing so and simply need more time. I trust you will understand my concern about this sudden emphasis on an immediate turnaround, given that I filed my complaint over a year ago. Another complainant filed 3 years ago. This is the first response we have had, and is occurring during a time when I have limited access to communications, and a time of considerable turmoil overall. I am also in the midst of an intensive language course through the FLAS program. I am concerned about the sudden emphasis on "prompt methods of investigation," when this has not appeared to be a concern of the university until now. I, too, want a prompt process. But I am also concerned with the fact that a timeline that has not been transparently communicated with me, and which you are representing as rigid and inflexible, is being imposed in such a way that does not allow me to "equitably" present a case regarding my experiences of sexual violence on the part of a Harvard faculty member.

16. On June 18, 2020, I spoke with Ms. Povich on the phone. I told Ms. Povich that I feared that Professor Comaroff would retaliate against me for participating in the ODR process.

17. Dr. Avakian's complaint contained several errors. So I also agreed to send Ms. Povich a statement in which I would correct errors in the present complaint filed by Dr. Avakian and to help the investigation, because I wanted to prevent future harm to other students.

18. Ms. Povich also told me during the June 18, 2020 meeting that I could appoint a personal advisor to help me through the ODR process, but that I was on a tight deadline to find one. I told Ms. Povich that it was very difficult for me to secure an advisor in such a short timeframe, whereas Professor Comaroff had already secured a personal advisor and legal representation. I ultimately secured a personal advisor in early July 2020.

19. In the days following the June 18, 2020 meeting with Ms. Povich, I began to realize that Ms. Czerwienski, Ms. Mandava, and I would have to invest significant time and resources into the ODR process and that we would have to do so on ODR's imposed deadlines.

20. I sent my written statement to ODR on July 13, 2020. In it, I described Professor Comaroff's harassment of me and the impact it had on me. I did not mention that I had seen therapists while Professor Comaroff was harassing me. I submitted minor amendments to that statement on approximately July 16, 2020.

21. Throughout the ODR process, I never fully understood what information I provided to ODR would be shared with Professor Comaroff and vice versa. ODR gave me vague—and at times conflicting—explanations of what information would be shared with the other party, and refused to clarify further even when I asked.

22. For example, on July 1, 2020, I emailed ODR and asked, "I would have concerns about sharing electronic copies of things, given how easily they can be copied. How are you all approaching this?" **Ex. 2.** On July 2, 2020, ODR Fellow Jessica Shaffer explained via email that, "[d]uring the course of the investigation, both the complainant and the respondent will have the opportunity to respond to all information used by the Investigative Team in reaching its conclusions. They will also have the opportunity to provide the Investigative Team with any additional information that they have. This information, *like other information received from the complainant and respondent during the investigatory process*, will be shared with the other," which mirrors the Frequently Asked Questions Concerning the Harvard's Sexual and Gender-Based Harassment Policy and Procedures document I previously received. **Ex. 3.**

23. However, in the same email, Ms. Shaffer qualified that "[b]oth parties have the right to review and respond *to all information that ODR may rely on in the investigation*." **Ex. 3.** Throughout the ODR process, ODR repeated variations of that explanation; they would share with Professor Comaroff *only* information on which ODR "*may rely*" or "*might rely*." No one

5

explained to me how ODR would determine whether it "may rely" or "might rely" on information I shared with them, and thus pass it on to Professor Comaroff.

24. I continued to ask questions about what information would be shared, but did not get a straightforward answer. In a July 16, 2020 interview with ODR, Ms. Povich said words to the effect that Professor Comaroff would see everything I submit, but that this didn't apply to procedural questions. She said that ODR doesn't share interviews in their entirety, only portions that ODR might rely on. In October 2020, when I asked Ms. Povich further clarifying questions about the information sharing process, she wrote: "ODR shares *any substantive information provided by one party with the other party,*" but does not share information that "raise[s] only procedural questions." She did not explain what ODR considers "substantive" or "procedural questions." I found these answers inconsistent and unclear. But usually when I asked for more clarification, ODR investigators told me that they are "neutrals" and referred me to the procedures I had already reviewed.

25. ODR also treated different types of evidence in different ways that were never clearly explained to me. For example, Ms. Czerwienski, Ms. Mandava, and I attempted to submit evidence in the form of text messages to ODR. ODR asked both the sender and the recipient of each text message conversation *whether each consented to the text messages being used as evidence in the ODR process*. When a sender or recipient withheld consent, ODR did not rely on those text messages, and as I understand it, did not share them with Professor Comaroff.

26. At one point, I was told that parties would not receive copies of evidence, but rather have the right to review evidence gathered by the ODR in a conference room.

27. Yet ODR did not specifically tell me how it would treat medical records. ODR did not explain to me whether medical records would be shared with Professor Comaroff

6

automatically, or if they would only be shared if they were documents on which ODR "may rely" and how that would be determined. ODR also did not ask me for my explicit consent to release them. Nor did ODR tell me that Professor Comaroff would be receiving a copy of my medical records by email, his to keep forever.

28. Usually when I asked for clarification on how information would be shared, ODR insisted that they were a "neutral", and that beyond providing me with the ODR policies, they could not give further guidance. My personal advisor could give me only limited advice on how information would be shared.

29. Professor Comaroff responded to my complaint on August 12, 2020. ODR shared a copy of his response with me. **Ex. 4.**

30. In his August 12, 2020 response, Professor Comaroff wrote that he knew I was experiencing "substantial emotional distress" but claimed it was "for reasons unrelated to [him]." He also wrote that he and his wife Jean Comaroff had considered "alert[ing] others in the department, or even at the university's health services." I found Professor Comaroff's claim very upsetting; I felt he was implying to ODR that my allegations were not credible and my memory unreliable due to distress I was suffering. I *did* experience emotional distress while being Professor Comaroff's advisee, but it was largely due to his harassment of me, and I wondered how I could prove that to ODR.

31. I recalled that I had seen a therapist at Harvard University Health Services ("HUHS") in the summer of 2018, and that I confided in him about Professor Comaroff's harassment of me. In one of our sessions, he implied that he was a mandatory reporter as a Harvard employee, which I understood to mean that he had a duty to report harassment to Harvard. Because I was not yet ready to make a complaint to Harvard, I sought out a private

therapist who was unaffiliated with Harvard. I saw a private therapist in 2018 and 2019, and I also confided in her about Professor Comaroff's harassment of me and the impact it had on me.

32. I decided to reach out to both therapists to determine whether they recalled my descriptions of Professor Comaroff's harassment or whether they had any notes of our sessions. If they did have any notes of our sessions, I planned to review them before deciding whether to submit them as evidence to ODR.

33. On August 19, 2020, I messaged the HUHS therapist to ask if he had relevant notes from our conversations in August 2018. **Ex. 5.** I reviewed the records and unfortunately, they were cursory and did not specifically mention the harassment I had discussed with the therapist. I decided not to share the medical records with ODR.

34. On August 20, 2020, I emailed the private therapist. I wrote, "[i]n one of our last sessions in May 2019, I believe I told you about some misconduct I had experienced from a faculty member, John Comaroff, early in my graduate studies, and that I was thinking of approaching the Title IX office." I explained that I had now filed a complaint against him, and asked, "[s]o I'm writing on that front *to see if you might have notes from our sessions that mention any of this. Probable dates when we talked about this would be May 3rd 2019 and May 15th 2019*. I would also be happy to set up a time to talk about this if that would be easier." I wanted to see whether my therapist had any notes, which, just like my HUHS medical records, I wanted to review. **Ex. 6.**

35. On the same day, my therapist responded via email that she was on vacation and that her internet access was "tenuous." She wrote, "I don't find notes for you for May 2019. They end in April.  I have to figure out if there's another way to get them. . . . When I get back to Boston I can see if I can find my notebook from that time where there may be more specific

information I can also look to see if there is a way to recover what's still missing." Then she offered, "I would be glad to write up a brief statement acknowledging that we talked about sexual harassment by professors in your department on a number of occasions and that you also discussed the damage these people could do to your academic career. I can attest to your deep unhappiness in the department related to sexual harassment on various levels throughout the department and how ineffective your repeated efforts to report this proved. I'll let you know whether I can find anything more specific when I get home." **Ex. 6.**

36. On the same day, I responded to my therapist via email, "I would greatly appreciate *if you could check your notes back in Boston, and if you could write up a statement*. Would it be helpful if I checked in when you are back from vacation? If so, when would that be?" **Ex. 6.** If my therapist had any notes from May 2019, or if she were to write up a statement regarding Professor Comaroff's harassment and the impact it had on me, I planned to review them before deciding whether to submit them to ODR.

37. At no point in these August 20, 2020 communications did my therapist mention a waiver that would give Harvard permission to review these documents, nor did I sign one.

38. On August 24, 2020, I submitted my reply to Professor Comaroff's August 12, 2020 response to ODR. In order to rebut Professor Comaroff's argument and to show ODR that my emotional distress stemmed from his harassment of me, I described in my reply that I had confided in two therapists about his harassment. I had not heard back from my private therapist about whether she had session notes from May 2019 or whether she had written a statement for me, both of which I would want to review. So I wrote in my reply to ODR, "She is currently on vacation, but *I believe she has specific memories* of our conversations about misconduct in my department, my concerns about the damage Professor Comaroff could do to my career, and my

repeated and unfruitful attempts to get assistance. *She is ready to attest to this when she returns from vacation*." I was communicating to ODR that my therapist might have relevant evidence and might serve as a witness.

39. Had Professor Comaroff not put my mental state and credibility at issue in his August 12, 2020 response to my complaint, I would never have reached out to my therapists and considered them as potential witnesses.

40. On or about August 28, 2020, I was interviewed by ODR. During that interview, we discussed the process of selecting witnesses. Ms. Povich stressed that ODR would like to interview witnesses who observed or heard about the harassment when it was happening. Ms. Povich also stressed that the ODR process is confidential, that disclosing information about my case could compromise the integrity of the investigation and could even be viewed as retaliatory, and that to avoid compromising the case, I should limit the number of people in whom I confide.

41. During this meeting, and as the ODR process progressed, I came to understand that I would need evidence and witnesses to back up each aspect of my allegations against Professor Comaroff, and that ODR would not consider my description of the incidents as sufficient to prove any part of my allegations. I also came to understand that I was not permitted to contact my potential witnesses and discuss the ODR process with them. ODR repeatedly told me—including in this August 28, 2020 meeting—that speaking with my witnesses could damage the credibility of those witnesses, which would in turn damage my case. ODR did not explain whether there were *any* interactions I could have with my witnesses that were appropriate.

42. During the August 28, 2020 meeting with ODR. Ms. Povich specifically asked me about the therapists I had mentioned in my August 24, 2020 reply, and asked whether I had confided in the private therapist about the harassment. I answered that I had. Ms. Povich said that

she needed the therapist's contact information and that she wanted me to put the therapist on my witness list. Ms. Povich then told me that I had too many witnesses and that I needed to narrow down my list, but that she definitely wanted my therapist on the list because she was one of the individuals with information she deemed was not redundant from that of other witnesses. At the conclusion of the meeting, I expressed my understanding that I could not contact my witnesses to ask them whether they had any relevant documents. Ms. Povich did not correct me and said that *ODR* would ask each witness whether they had relevant documents. I understood this to mean that ODR might contact my therapist and ask her whether she had relevant documents, just as I had done. I did *not* understand this to mean that ODR would interview my therapist about her treatment of me and ask her for my medical records.

43. I wanted to ask my therapist whether she had found notes from May 2019 or had written a statement. But because I was afraid that ODR would not credit any potential recollections from my therapist, I stopped communicating with my therapist following this August 28, 2020 meeting with ODR. I never communicated with my therapist again following our August 20, 2020 email exchange.

44. On September 18, 2020, Ms. Shaffer emailed me, "I am writing to remind you of ODR's expectation that both you and Respondent will provide us with any additional witness names and documentation (including text messages, email messages, and social media messages) that may be relevant to the investigation within one week. If there are any witnesses you feel we should speak to or documentation that you feel would be helpful to the investigation that you have not already provided, please provide us this information by the close of business on Friday, September 25."

45. Complying with the request, on September 25, 2020, I sent ODR a list of eight witnesses. I put each of these individuals—including my private therapist—on the witness list because Ms. Povich had identified them as individuals who had relevant information during our August 28, 2020 meeting.

46. Based on my August 28, 2020 interview with ODR, I expected that ODR would reach out to my therapist and ask her *whether* she had any relevant notes. I wanted to reach out to my therapist myself, but because I believed that ODR would consider this an improper communication and discredit my therapist's account, I did not reach out to her.

47. My understanding that I could not contact witnesses without risking the integrity of the investigation was confirmed by another student who had recently served as a complainant in an ODR process.

48. Dr. Avakian also confirmed my understanding that I could not speak with my witnesses.

49. Based on this, and the warnings ODR had given me, I was very afraid to accidentally compromise the investigation. I repeatedly explained to ODR that *all three* of my dissertation committee members (Professor Nicholas Harkness, Professor George Meiu, and Professor Ajantha Subramanian) had been called as witnesses, and that without having substantial contact with them I could not progress in my degree. ODR offered no solutions. I therefore had limited formal academic guidance for the entire year during which ODR conducted its investigation and had to delay my exams, all because ODR had imparted on me that contacting witnesses would infect their process. I felt helpless and isolated.

50. Throughout the summer of 2020, I had developed symptoms of what would later be diagnosed as a serious health condition requiring significant medical attention.

51. On October 30, 2020, I received an email from Ms. Shaffer, who informed me that ODR had "held three witness interviews" that week and attached "four documents that were submitted in this matter." Two of the documents she attached to her email were progress notes from my sessions with my private therapist; one note was dated March 6, 2019 and the other was dated March 20, 2019. In both notes, my name and birthday were redacted. The March 20, 2019 note contained additional redactions within the body of the note, denoted with "[…]". I did not know what was within that omitted text; all Ms. Shaffer indicated was the documents were redacted for "privacy reasons." **Ex. 7.**

52. I was surprised and upset to be receiving these two progress notes. I had asked my therapist whether she had notes from *May* 2019, and to write a statement for me. I did not complain to ODR because I did not know at the time that Ms. Shaffer had also sent these two progress notes to Professor Comaroff, and because I was very busy working on a grant application, a necessary part of making progress towards my degree.

53. On January 5, 6, and 7, 2021, I met with ODR for "review of evidence" meetings, in which ODR orally described to me some of the evidence it had gathered in the course of investigating my complaint.

54. In these meetings, I learned that ODR had interviewed my therapist extensively in October 2020, not only about what documentation she might have, but also what I had discussed with her in therapy. ODR had also asked my therapist about issues *unrelated* to Professor Comaroff's harassment of me. During the review of evidence meetings, ODR questioned me about the highly personal issues I had discussed in therapy, and admitted that these issues were unrelated to my case. I was confused at the time why ODR would question me about sensitive personal topics unrelated to my case. But when I was read aloud portions of ODR's interview

with my therapist, I understood that ODR's questions to me must have been grounded in the portions of the March 20, 2019 progress note that been redacted, the full contents of which I had not seen. **Ex. 8.**

55. I also understood that ODR was sharing only *excerpts* of their interview with my therapist in my evidence review meetings. I wondered what else ODR and my therapist had discussed in the interview and whether I would ever know.

56. After hearing about ODR's interview with my therapist, I felt very upset. I had not anticipated that ODR would interview my therapist about the *contents* of what I shared with her during our sessions. I was extremely overwhelmed, and did not know how to communicate to ODR that I was not comfortable with the extent to which they had interviewed my therapist.

57. At this point, I did not know that ODR had shared my therapy records with Professor Comaroff. At the end of our review of evidence meetings, ODR simply said they would have a similar meeting with Professor Comaroff to review evidence. **Ex. 8**. I believed that ODR would read Professor Comaroff select excerpts of their interview with my therapist, as they had done in my review of evidence meeting.

58. On May 10, 2021, ODR sent me the Draft Report of its findings regarding its investigation into my complaint. In the cover email attaching the Draft Report, ODR had written, "The documents referenced in the draft Report were already provided by you or to you during the investigation, and will be attached as exhibits to the Final Report." When I read the Draft Report, I saw that the report listed my therapist as one of the witnesses interviewed and noted that she had provided two progress notes to ODR. But the remainder of the Draft Report contained no discussion of the content of her interview or the progress notes, so I concluded that

ODR must not have relied on her progress notes or interview to draft the report and that they would therefore not be exhibits to the Final Report.

59. In its Draft Report, ODR found that Professor Comaroff had "over the course of approximately five minutes" repeatedly described how I "would be raped", but as to his repeated physical harassment of me, including kissing and groping me, ODR found no violation of Harvard policy. I was very upset by the conclusions ODR reached in the Draft Report.

60. ODR invited both parties to write a response to the Draft Report within one week. That wasn't nearly enough time to digest and respond to the 55-page Draft Report; I was working full-time, teaching at two universities and trying to make progress on my degree, which was very difficult because I could not rely on the only three professors at Harvard who studied my subject area, Professors John and Jean Comaroff, and their advisee George Meiu, who had made it clear to me that his close relationship with Professor Jean Comaroff would prevent him from being able to support me.

61. I submitted my response on June 14, 2021. I tried to focus my response on the reasons I thought ODR had erred by reaching the conclusion that Professor Comaroff had not physically harassed me.

62. On August 27, 2021, ODR sent me a copy of its Final Report. There were only minor differences between the Draft Report and Final Report and the overall conclusions were unchanged.

63. Professor Comaroff's response to the Draft Report was attached as one of the exhibits to the Final Report. At the time, I did not read it closely; my health had started to further deteriorate. I was doing my best to get the care I needed, while keeping up with my work at Harvard and the demands of the ODR process.

64. The Final Report indicated that the parties had one week to appeal ODR's findings to the Office for Gender Equity ("OGE"). As I received the report at the beginning of the fall 2021 semester, I was very busy preparing for my fieldwork and trying to make progress on my degree. I was also busy managing my symptoms and attempting to get a diagnosis from medical specialists. One week was not nearly enough time to review the Final Report and the hundreds of pages of exhibits appended to the Final Report.

65. On August 28, 2021, one day after I received the report, my wife and I had to move apartments to better accommodate the symptoms I was experiencing.

66. On August 30, 2021, I was admitted to the ER for symptoms related to my health condition.

67. While working and studying full-time, and dealing with a move and debilitating health issues, I did my best to draft an appeal that focused on the overall errors ODR had made in its process and conclusions. I submitted the appeal to Nicole Merhill on September 3, 2021. **Ex. 9.**

68. At this point, I did not realize that ODR had appended the March 6 and 20, 2019 progress notes as Exhibits to the Final Report. Like the Draft Report, the Final Report did not rely on the interview and notes from my therapist.

69. On September 22, 2021, I finally had an opportunity to read more closely the response Professor Comaroff had written to the Draft Report. **Ex. 10**. I was extremely disturbed by it. He argued that my PTSD diagnosis—*which I received as a result of his harassment*—made my memory unreliable and my report of harassment incredible. Even though he is not a medical doctor, he described the symptoms of PTSD at length, concluding,

> PTSD can have long-term effects including causing people to interpret innocuous stimuli as threatening. When it comes to memory, it is characteristic of people

16

>with PTSD that they may over-remember traumatic events, adding details that did not, in fact, take place. . . . [Ms. Kilburn's] therapist's notes suggest strongly that, in fact, her history may have profoundly affected the accuracy of her perceptions of her encounters and interactions not only with me, but with the anthropology department and with Harvard generally. . . . It seems highly likely, in short, that [Complainant]'s PTSD and history of trauma affected the accuracy of her perceptions of my behavior during our interactions as well as her memories of it after the fact. The draft report does not address this issue; it omits any mention of her therapist's testimony and records. I understand that addressing issues related to [Complainant]'s mental health is delicate and difficult for an investigator, as indeed it is for me. But [Complainant] has put questions about her mental health and perceptual accuracy into the record. It is impossible to meaningfully evaluate her credibility, or my responsibility, without addressing this major issue.

70. He went on to say that it would not be "rational" to believe my account, and that certain passages of my therapist's notes could indicate I was simply "misinterpreting innocuous conduct." **Ex. 10.**

71. I was stunned reading Professor Comaroff's response to the Draft Report. This is when I learned that ODR had given Professor Comaroff the two progress notes, and shared with him excerpts of ODR's interview with my therapist. And Professor Comaroff was using those notes and the interview to argue that I had invented his harassment and that my mental state made me unreliable—even though I had begun seeing my therapist and received a PTSD diagnosis precisely *because* of his harassment.

72. I wanted to alert the appeals committee immediately. The following day, on September 23, I emailed OGE to ask whether I could submit further information to the appeals panel. OGE denied my request, writing, "The *FAS Procedures* provide, 'Appeals must be received by the Office for Gender Equity (University Title IX Coordinator Nicole Merhill. . . ) within one week of the date of this Final Report.' As this deadline has now passed, we are unable to accept further appeal documents or information from either party in this matter." **Ex. 9.** On September 29, 2021, OGE denied my appeal. **Ex. 11.**

73. By this time, I had retained the law firm Sanford Heisler Sharp, LLP to represent me in my claims against Harvard.

74. On September 28, 2021, my counsel wrote a letter to Eileen Finan, a lawyer in Harvard's Office of the General Counsel. In the letter, my counsel explained that "The unlawful receipt, use, and disclosure of Ms. Kilburn's medical records give rise to additional claims of retaliation under Title IX and Massachusetts law as well as liability for breach of therapist-patient confidentiality and the right of privacy under Massachusetts law. . . . Further, the fact that anyone who has received the Final Report – including Harvard professors, deans, and administrators who supervise Ms. Kilburn and have significant influence over her career trajectory – is now aware of Ms. Kilburn's private medical information has caused Ms. Kilburn additional emotional and reputational harm." My counsel requested that Harvard not further disclose my medical records; inform my counsel of individuals who have received a copy of my medical records; instruct these individuals to turn over the records to Harvard's general counsel's office without retaining copies; and provide me with an unredacted copy of my medical records.

75. On October 7, 2021, Harvard rejected these requests in a letter to my counsel.

76. At this point, I did not know how many Harvard faculty and administrators had received the Final Report and attached exhibits.

77. On February 8, 2021, Ms. Czerwienski, Ms. Mandava, and I initiated the above-captioned lawsuit. Count Ten alleges that Harvard illegally obtained and disseminated my medical records.

78. The first time I saw an unredacted version of my therapy notes is when Harvard attached them to its May 31, 2022 Motion for Partial Summary Judgment as to Count Ten.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 22, 2022

*Lilia Kilburn*