```
               UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS


_____

MARGARET CZERWIENSKI, et al.,

                    Plaintiffs,        Civil Action
                                       No. 22-10202-JGD
V.
                                       December 16, 2022
PRESIDENT AND FELLOWS OF
HARVARD COLLEGE, et al.,                10:36 a.m.

                    Defendants.
_____




          TRANSCRIPT OF AUDIO RECORDING OF MOTION HEARING

          BEFORE MAGISTRATE JUDGE JUDITH G. DEIN

              UNITED STATES DISTRICT COURT

            JOHN J. MOAKLEY U.S. COURTHOUSE

                 1 COURTHOUSE WAY

                BOSTON, MA  02210
```

DEBRA M. JOYCE, RMR, CRR, FCRR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way, Room 5204
Boston, MA  02210
joycedebra@gmail.com

```
 1     APPEARANCES:

 2     FOR THE PLAINTIFFS:

 3     RUSSELL L. KORNBLITH, ESQ.
       CAROLIN GUENTERT, ESQ.
 4     Sanford Heisler Kimpel, LLP
       1350 Avenue of the Americas
 5     31st Floor
       New York, NY 10019
 6     646-402-5646
       rkornblith@sanfordheisler.com
 7     cguentert@sanfordheisler.com

 8     SEAN R. OUELLETTE, ESQ.
       Sanford Heisler Sharp, LLP
 9     700 Pennsylvania Avenue SE
       Suite 300
10     Washington, DC 20003
       646-402-5644
11     souellette@sanfordheisler.com

12     FOR THE DEFENDANTS:

13     VICTORIA L. STEINBERG, ESQ.
       REBECCA M. O'BRIEN, ESQ.
14     Todd & Weld
       One Federal Street
15     27th Floor
       Boston, MA 02110
16     617-624-4714
       vsteinberg@toddweld.com
17     robrien@toddweld.com

18     MARTIN F. MURPHY, ESQ.
       MADELEINE K. RODRIGUEZ, ESQ.
19     Foley Hoag LLP
       155 Seaport Boulevard
20     Boston, MA 02210
       617-832-1213
21     mmurphy@foleyhoag.com
       mrodriguez@foleyhoag.com
22

23

24

25
```

1               P R O C E E D I N G S

2                    (The following proceedings were held in open

3        court before Magistrate Judge Judith G. Dein, United States

4        District Court, District of Massachusetts, at the John J.

5        Moakley United States Courthouse, 1 Courthouse Way, Boston,

6        Massachusetts, on December 16, 2022.)

7                    THE CLERK:  The United States District Court for the

8        District of Massachusetts is now in session on December 16, the

9        year 2022 in the matter of Czerwienski v. President and Fellows

10       of Harvard College, et al., Civil Action No. 22-10202.

11                   Could counsel please identify themselves for the

12       record.

13                   MR. KORNBLITH:  Good morning, your Honor.  My name is

14       Russell Kornblith, along with my colleagues, Carolin Guentert,

15       Sean Ouellette, we represent the plaintiffs.

16                   MS. STEINBERG:  Good morning, your Honor.  Victoria

17       Steinberg for Harvard and President and Fellows of Harvard

18       College.

19                   MS. O'BRIEN:  Good morning, your Honor.  Rebecca

20       O'Brien also on behalf of the plaintiffs.

21                   MR. MURPHY:  Good morning, your Honor.  Martin Murphy

22       also on behalf of Harvard.

23                   MS. RODRIGUEZ:  Good morning, your Honor.  Madeleine

24       Rodriguez also on behalf of Harvard.

25                   THE COURT:  Okay.  As an initial matter, I do want to

           1    thank all of you for accommodating my emergency last week.  I

           2    hope I didn't inconvenience you all terribly, but I brought you

           3    all here on a nice sunny day, so it doesn't get any better than

           4    this.

           5         All right.  Who's starting and -- I guess let's start

           6    with the summary judgment one first, okay?

           7         MR. MURPHY:  Thank you, your Honor.

           8         Your Honor, I think, as the Court is aware, Harvard

           9    has moved for summary judgment on Count Ten of the amended

11:05     10    complaint, and we do so because while that complaint makes a

          11    very serious allegation that Harvard obtained Ms. Kilburn's

          12    therapy record without her consent, the undisputed evidence

          13    shows that Harvard did not do so and that there is no basis for

          14    liability.

          15         The plaintiffs, your Honor, have suggested that we

          16    filed that motion prematurely, so if I could address the

          17    question of timing first.  And we would say, your Honor, that

          18    there are three reasons, three reasons why that motion is not

          19    premature.

11:05     20         The first is that the rule itself permits a defendant

          21    to file a motion for summary judgment at any time in the

          22    language of the rule until 30 days after the close of

          23    discovery.  So it certainly doesn't say that discovery is

          24    required first.

          25         Second, your Honor, we'd cite Judge Stearns' ruling

1    last year in the Cheung case, we which cited in our reply

2    brief, which was a Northeastern case, tuition refund case,

3    where Judge Stearns entered summary judgment before

4    Northeastern had filed an answer under circumstances very

5    similar to this where the plaintiff claimed that the reason why

6    summary judgment should not be granted is there was no

7    discovery and filed a 56(d) motion seeking discovery as a way

8    of averting summary judgment.  So the notion that the plaintiff

9    has asserted here that it is unprecedented in these

11:06 10    circumstances to award summary judgment prior to the defendant

11    answering or any discovery, that's wrong, and Judge Stearns'

12    decision shows that it is.

13         Finally, your Honor, we note that as the supplemental

14    filing we made yesterday shows, the 1st Circuit has reversed

15    Judge Talwani's decision in the principal case that plaintiff

16    relies on, Est. of Rahim, and said that summary judgment was

17    appropriate in those circumstances, again, despite the

18    plaintiff in that case's claim that they needed to conduct

19    discovery and that the affidavits that were filed by the

11:07 20    defendants and the defense witnesses in the case were not a

21    sufficient basis to conclude that summary judgment was

22    appropriate.

23         THE COURT:  I think you have two issues.  One is, can

24    you do it; and I think you can.  The question is should you

25    have done it and whether we have a factual dispute here that

1    needs to be developed.

2         The case that you sent yesterday, I mean, that's a

3    qualified immunity issue with Judge Talwani which sort of has a

4    whole lot more precedent of being decided on a more abbreviated

5    record and promptly in litigation.  So I'm not sure the policy

6    issues are the same, but I will agree that I have the authority

7    to issue summary judgment at any time.  So let's sort of focus

8    on should it be issued in this case.

9         MR. MURPHY:  And we say, your Honor, that it should

11:08 10   because, based on the affidavits that we presented, we say that

11   the genuine facts, the material facts that are relevant to this

12   dispute, are undisputed; or to put the matter in a finer way,

13   to make a finer dispute of it, are not disputed in any way the

14   law recognizes.

15        Most of the response to Harvard's statement of

16   material facts, to the extent that those facts are disputed,

17   they are disputed, your Honor, in a way that I think paragraph

18   50 of those statements reflects.  The plaintiff says that it's,

19   quote, disputed as unsupported by the cited affidavit, or notes

11:09 20   because plaintiffs have not had the opportunity to depose the

21   affiant.

22        And we say, your Honor, that, quite simply, that's not

23   the law, that in order to dispute a fact that is in a way that

24   creates a disputed issue of material fact, as we note in the

25   Theidon case, which we cited in our reply brief, the plaintiff

1    has to do simply -- something simply more than say we disagree

2    with that fact, we dispute the fact.  The plaintiff has to

3    offer some admissible evidence that that fact is incorrect.

4          And here we think that if the Court looks at the facts

5    which we have set forth, which the plaintiff has not disputed

6    in a way the law recognizes, it's clear that under the

7    governing law on the two claims that plaintiffs have advanced,

8    the claims of invasion of privacy and the claims for inducing

9    the breach of fiduciary duty, we should win.

11:10 10        So let me walk through, if I may, just what I think

11   are the critical undisputed facts.

12         So Statement of Fact No. 47.  Ms. Kilburn was the

13   first person to tell Harvard that she had met with a

14   psychotherapist about her dealings with Professor Comaroff, and

15   she did so in writing on August 12, 2022, telling Harvard that

16   there was evidence in the possession of that psychotherapist

17   that would provide, in her own words, contemporaneous

18   corroboration of her claims about Professor Comaroff's conduct;

19   and that, again, in her words, that the psychotherapist, quote,

11:11 20   stood ready to attest to what she had experienced.

21         Statement of Fact No. 50, Ms. Kilburn, in an interview

22   with Harvard on August 20, 2020, told Harvard that it had --

23   that the psychotherapist had, quote, some notes or memories for

24   you; that is, for Harvard.

25         In addition, your Honor, on September 25, 2020, and

1   this is Statement of Fact No. 55, which, again, plaintiffs have

2   not meaningfully disputed, Ms. Kilburn sent Harvard a list --

3   an email with a list of eight witnesses which she had described

4   as the people that Harvard should speak to first about her

5   claims.  And that list included the therapist's name and her

6   email address.

7           So it was -- it's clear from the undisputed facts or

8   facts which have not been disputed from -- in a way that the

9   law recognizes, that it was Ms. Kilburn who told Harvard about

11:12 10   the psychotherapist; it was Ms. Kilburn who urged Harvard to

11   speak to the psychotherapist; and it was Ms. Kilburn who said

12   that she, the psychotherapist, had notes, for Harvard.

13           So, again, we think that -- we take that as a baseline

14   of how Harvard learned about these notes.

15           Second, your Honor, it's absolutely clear, we say,

16   from the record, that Harvard told Ms. Kilburn that if a

17   witness provided documents to Harvard, Harvard was obligated

18   under its procedures to share those notes with Professor

19   Comaroff.

11:12 20           THE COURT:  Just go back a little.  I think part of

21   the issue is what was the scope of the information that the

22   plaintiff sort of authorized Harvard to get or to consider.  It

23   seemed the communications were pretty limited to corroborating

24   that she had complained about the harassment.  I mean,

25   that's -- if I remember correctly in the pile, that's what it

comes down to.  She says, Look, I've been complaining about
this, this is causing me stress, this is -- and I told my
therapist about this on a certain occasion.

In your view, is there any limitation on the kinds of
records that could be obtained or disseminated?

MR. MURPHY:  I think, your Honor, if Harvard had
sought records that were unrelated to Ms. Kilburn's dealings
with Professor Comaroff or unrelated to her experiences at
Harvard, that would be a different question, but that's not
what Harvard did here.

Harvard focused its interview of the psychotherapist
on the plaintiff's experiences with Professor Comaroff.  And,
your Honor, I think the legal question, which I'd respectfully
suggest ought to govern the Court's analysis here, is whether
or not there's a legitimate -- a genuine issue dispute about
facts relating to whether Harvard reasonably believed that the
therapist could provide information to Harvard about
Ms. Kilburn's dealings with Professor Comaroff.

And, your Honor, here we say that given the fact that
Ms. Kilburn was the one who raised her dealings with the
psychotherapist to Harvard in the first instance, gave Harvard
the email address and said she stood ready to attest and had
notes for her, that Harvard was completely -- notes for
Harvard -- Harvard was completely reasonable in believing that
it wouldn't be violating Ms. Kilburn's rights in any way by

1   obtaining the records which Ms. Kilburn suggested that Harvard

2   obtain.  That's fundamentally what's at issue here, we say,

3   your Honor.

4        The -- it's also clear, your Honor, that Harvard told

5   Ms. Kilburn on multiple occasions that it would share the

6   information that it obtained from witnesses, including

7   documents, with Professor Comaroff.

8        I think we've outlined in our papers eight times when

9   that happened, but let me focus just for a moment on two of

11:17 10   those occasions, because it's clear that those were occasions

11   when that happened in writing.

12        Statement of Fact No. 14.  In June of 2020, on June

13   4th of 2020, Harvard sent Ms. Kilburn written documents

14   explaining the Office of Dispute Resolution processes for

15   handling Title IX complaints.  That included a flowchart that

16   contained this language, quote, ODR collects additional

17   information, e.g., interview -- interviews witness, collects

18   documents, conducts site visits, and copies of these materials

19   will be given to the other party.

11:18 20        A second occasion, again, when this disclosure was

21   made clearly in writing was on July 2, 2020, when ODR Fellow

22   Shaffer wrote to Ms. Kilburn in an email, quote, Both parties

23   have the right to review and respond to all information that

24   ODR may rely on in the investigation, including the complaint,

25   the response, and written information provided by a witness or

1    other documents submitted.

2         So, quote-unquote, two occasions when Harvard

3    explained clearly in writing to Ms. Kilburn that any documents

4    that a witness provided would be shared with Professor

5    Comaroff.

6         And it's also clear, your Honor, that under the rest

7    of the evidence we provided, there were other occasions, at

8    least six other occasions, when Harvard did that either in

9    writing or orally.  I just highlight those, too, because they

11:19 10   are so clear.

11         So all of those, all the evidence I've described so

12   far, your Honor, relates directly to Harvard's interactions

13   with Ms. Kilburn personally.  She's in a position, I would

14   respectfully suggest, to say, I dispute that, that none of that

15   happened, that things like that didn't happen, that didn't

16   happen.  She has not done so.  So I think the Court has to take

17   all of those facts as undisputed whether or not the plaintiff

18   has had the opportunity to depose Ms. Povich or Ms. Shaffer in

19   or any other reasons the plaintiff advances why summary

11:20 20   judgment is not appropriate.

21         Then, your Honor, there are additional facts which are

22   undisputed based on the record about Harvard's dealing with the

23   therapist.  It's clear, based on the record, that Harvard spoke

24   to the therapist on a single occasion on October 22, 2020.

25         Statement of Fact No. 59, the therapist explained that

1    she had been a licensed therapist for more than 25 years and

2    had received a request from Ms. Kilburn over the summer to look

3    for documents.  Harvard asked the therapist -- and this is in

4    Statement of Fact No. 62 -- for documents relating to

5    Ms. Kilburn's dealings with Professor Comaroff because and only

6    because it was Ms. Kilburn who had said that the therapist had,

7    quote, notes or memories for you.

8           Harvard told the therapist -- and this is in Statement

9    of Fact No. 63 -- as it had repeatedly told Ms. Kilburn, that

11:23 10   if she provided documents, they would be shared with Professor

11   Comaroff.

12          Statement of Fact No. 64, the therapist told Harvard

13   that, quote, confidentiality is my bread and butter,

14   quote-unquote, and made a specific reference to HIPAA in the

15   communication that she made to Harvard about the documents that

16   they sent.

17          So, your Honor, when you look at these facts, and

18   there are plenty of others, but when you look at the core facts

19   that I've identified, it's Harvard's view that plaintiff has

11:23 20   not done what is required under the law to raise a genuine

21   issue of dispute with respect to these facts, and on these

22   facts alone, that -- under the case which we say governs this

23   analysis, the Court's analysis here, the Alberts v. Devine

24   case, the SJC case from 1985, that there's no basis for anyone

25   to conclude that the defendant, Harvard here, did not

1    reasonably believe that the psychotherapist could disclose the

2    information that she disclosed without violating a duty of

3    confidentiality that she owed to Ms. Kilburn.  That's

4    fundamentally what we say that is the basis for our motion for

5    summary judgment.

6            If I can raise a couple of points that the plaintiffs

7    made in their opposition briefly, your Honor.

8            Number one, Ms. Kilburn's affidavit, and it's a

9    lengthy affidavit, 18 pages long, never disputes the fact that

11:24 10   any of the things which I've described that Harvard had told

11   her were said to her.  She describes, instead, undisclosed

12   reservations that she had about this process.

13           And to be direct, your Honor, the law does not require

14   that Harvard in these circumstances, the Alberts case doesn't

15   require Harvard in these circumstances to be a mind reader and

16   to know that she harbored those undisclosed reservations about

17   this process.  What counts is what Harvard reasonably believed

18   under the circumstances.

19           The second point, your Honor, is that the plaintiff

11:25 20   cites Department of Education OCR regulations that took place

21   on August 14, 2020.  But, as we say, and we pointed this out in

22   our reply brief, it's clear that the conduct that the plaintiff

23   complains about, as alleged in paragraph 85 of her complaint,

24   took place between 2017 and 2020.  And as the DOE itself says,

25   quote, If the conduct at issue in the complaint took place

1    prior to August 14, 2020, the 2020 amendments do not apply,

2    even if the complaint was filed with a school on or after

3    August 14, 2020.

4         So the <u>Marsh</u> case, the North Carolina case that we

5    provided yesterday, confirms this.

6         And, your Honor, as a practical matter, those

7    amendments to the Title IX process didn't simply have the one

8    provision that plaintiff has cited.  They were very broad

9    amendments that made a number of changes to the Title IX

11:26 10   process that schools had to apply, including, for example,

11   requirements of adversary hearings and cross-examination.

12        It would not be practically possible if you think

13   about -- I'm sure the Court has had other Title IX cases -- if

14   all of a sudden the new rules that were put in effect in 2020

15   were supposed to apply to all of the cases before, it would

16   really have consequences that even the Department of Education

17   did not intend.

18        So, essentially, your Honor, we say that this is a

19   case in which the plaintiff has said Harvard obtained her

11:27 20   medical records, essentially, if one were to read the

21   complaint, without her having any idea that this was -- this

22   was happening, through some kind of back door.  That's the

23   impression that the complaint creates.

24        In fact, the undisputed facts show that plaintiff

25   obtained those records solely because she said that they would

1    provide contemporaneous corroboration for her claims.  And so

2    the notion that Harvard could have suspected that she did not

3    authorize the disclosure of records that she told Harvard to

4    get, simply, we say, does not pass the kind of the test that's

5    required to avoid summary judgment here.

6              THE COURT:  Thank you.

7              Who's arguing?

8              MS. GUENTERT:  If I may respond, your Honor.

9              If I first may begin with a brief recitation of the

11:31 10   facts which show that there is a genuine dispute of material

11    fact here, and then I'll move into the issues and respond

12    quickly to opposing counsel's argument.

13             THE COURT:  For the record, just state your name

14    again.

15             MS. GUENTERT:  Of course.  Carolin Guentert from the

16    law firm Sanford Heisler Sharp representing the plaintiffs.

17    Thank you.

18             Your Honor, the motion boils down to whether Harvard

19    acted reasonably when it obtained Ms. Kilburn's medical records

11:31 20   without her written consent and without confirming with her

21    therapist whether she had obtained written consent and what the

22    scope of that consent was.  So the motion should be denied on

23    that basis alone.

24             Here's what the current incomplete prediscovery record

25    shows.

1      Professor Comaroff harassed Ms. Kilburn for over two
2  years, and to deal with the impact that it had on her she saw a
3  therapist.
4      In August 2020, during the ODR investigation,
5  Professor Comaroff claimed that Ms. Kilburn's distress was
6  unrelated to him.  And so to respond to that, Ms. Kilburn
7  wanted to prove that her distress was because of Professor
8  Comaroff and that she had spoken to a therapist.
9      So she reached out to her former therapist to see if
11:32 10  that therapist had any notes which she wanted to review, and
11  she specifically asked for notes from two sessions that she
12  remembers being relevant.
13      The therapist said that she couldn't find the notes
14  but that she would check her files when she returned from
15  vacation; and she also offered to write a statement.
16      Ms. Kilburn agreed.  She wrote in an email, quote, I
17  would greatly appreciate it if you could check your notes back
18  in Boston and if you could write up a statement, end quote.
19      She did not give permission for that statement to be
11:32 20  released.  She didn't give permission for notes to be released.
21  She just wanted a summary of the therapist's relevant records.
22      On August 28th, the ODR investigator asked whether
23  Ms. Kilburn had confided in a therapist about Professor
24  Comaroff, and Ms. Kilburn said she had.
25      Right then, Harvard could have asked for consent or a

1    scope of consent or a written waiver, but it didn't.

2         Next, ODR told Ms. Kilburn that the therapist should

3    be a witness and asked for her contact information.  So

4    Ms. Kilburn agreed, she provided the contact information.

5         Again, right then, Harvard could have asked for a

6    written waiver or explained to Ms. Kilburn what they were doing

7    and what they would do with the notes, but it didn't.

8         Next, ODR conducted a substantive interview with the

9    therapist where they did actually ask about issues that were

11:33 10   completely unrelated to Ms. Kilburn's harassment -- to the

11   harassment Ms. Kilburn experienced at the hands of Professor

12   Comaroff.

13        The therapist disclosed issues that were unrelated,

14   that were about Ms. Kilburn's medical history and family.  And

15   ODR pressed the therapist and asked for details about those

16   issues.  So they were completely unrelated to the harassment.

17        And again, in that interview, Harvard could have asked

18   Ms. Kilburn for consent or they could have, at a minimum, asked

19   the therapist explicitly whether they had the necessary consent

11:33 20   and, if so, what the scope of what that consent was, but it

21   didn't do that.

22        At any point during that process Harvard could have

23   easily clarified what notes they were seeking, why they were

24   relevant, and whether they had permission to get them.  But

25   they didn't, and instead, they released those notes to

1    Professor Comaroff without telling Ms. Kilburn.

2              And Harvard is now claiming that based on this record,

3    it should get summary judgment, that there are no disputed

4    issues of facts.

5              But Harvard can't meet that burden, and I'll move into

6    the legal arguments as to why that is now, your Honor.

7              First, this is a prediscovery motion for summary

8    judgment.

9              THE COURT:  So let me just ask, though --

11:34 10            MS. GUENTERT:  Sure.

11             THE COURT:  -- is it your contention that Harvard

12    shouldn't have spoken to the therapist at all without written

13    consent?

14             MS. GUENTERT:  No, your Honor, our contention is not

15    that Harvard shouldn't have spoken with the therapist.

16             We agree that Ms. Kilburn provided the contact

17    information for the therapist and was anticipating that there

18    would be some outreach.  But what she believed -- what she

19    wanted was to review the notes herself to determine whether or

11:34 20   not to put them into the record.  And that's pretty much what

21    ODR told her.  ODR told her that they would ask witnesses

22    whether they had relevant documents.  She did not anticipate

23    that Harvard would conduct a substantive interview, ask for

24    notes, and pretty much take that choice away from her.

25             In fact, your Honor, it just goes to show that -- she

1    had another therapist.  Actually, Ms. Kilburn saw first a

2    Harvard therapist and then a private therapist.  And with the

3    Harvard therapist, this all went very differently.  She reached

4    out to the therapist to ask whether that therapist had notes;

5    he did.  He sent them to her.  Ms. Kilburn reviewed them,

6    decided not to enter them into the ODR process, and they

7    weren't entered into the ODR process.

8         The same thing should have happened with her private

9    therapist.  But it didn't because ODR imparted on Ms. Kilburn

11:35 10   that she couldn't talk to witnesses because that would be

11   tampering with evidence and influencing the ODR process.

12        So after initially reaching out to her therapist to

13   ask for notes, Ms. Kilburn never spoke to her therapist again,

14   because she was afraid to unfairly influence the proceedings.

15   She thought that would be tampering with witnesses, based on

16   what ODR had told her.

17        And so to return to the prediscovery argument, your

18   Honor, Harvard hasn't been required to produce any of the

19   evidence that it has that may run contrary to the narrative

11:36 20   that it's asking to -- the Court to adopt today.  And the

21   plaintiffs have the right under Rule 56 to depose the employees

22   who submitted affidavits to Harvard's motion; to probe the

23   record; to probe the veracity of the notes, frankly, your

24   Honor.

25        What Harvard is relying on in this case are notes that

1    were written by the ODR investigators who were involved in this

2    case.  But those notes do not read like a transcript.  It's

3    quite clear that those notes were written by one or two

4    investigators and that they're based -- they're a summary of

5    what happened, rather than a faithful transcript of what

6    exactly occurred.

7            And so, your Honor, plaintiffs have the right to

8    depose those note-takers to determine whether there are drafts

9    of those notes, whether there are recordings of these

11:37 10  interviews, and to depose the individuals, including the

11   therapists who were involved in this to see whether they

12   reasonably believe that they had consent and what exactly they

13   told the therapist.

14           And, your Honor, Harvard is basing its statement that

15   Ms. Kilburn gave oral consent.  I believe she said, I think --

16   quote, I think she should have a bunch of notes or memories for

17   you, end quote.

18           Your Honor, that's the alleged oral statement that

19   Harvard is basing its argument for reasonable consent on.  That

11:38 20  statement is only recorded in one place -- not in writing, as

21   they contended in their reply, which is inaccurate -- it was an

22   oral statement, allegedly.  And the only place that statement

23   is recorded is in ODR's notes.

24           Ms. Kilburn does not recall making that statement.

25           Those notes are, again, written by an untested affiant

1    who is not here today, whom plaintiffs have not had an

2    opportunity to depose.

3             And again, your Honor, those notes, we've not been

4    able to probe, we've not been able to ask the writer of those

5    notes what exactly was said during that interview.

6             And so even if Harvard's exhibits were taken as true,

7    which, again, your Honor, we believe is not appropriate at this

8    stage, a jury could still find that Harvard acted unreasonably

9    here.

11:39 10          Therapy records are among the most private documents

11   in existence, and the law recognizes that in spades.  Numerous

12   federal and state statutes show that and impose safeguards on

13   handling medical records.  And Harvard knows about those

14   safeguards because they're written into their own trainings

15   that were in place in October 2020 when it got these notes.

16   But Harvard blew past these safeguards here for reasons we

17   don't know yet.  Harvard had so many chances to ask Ms. Kilburn

18   for a written release, but it never did.

19          And, your Honor, the argument that Ms. Kilburn -- we

11:39 20   don't dispute that Ms. Kilburn was repeatedly told by ODR what

21   would happen with documents that she entered into the record.

22   What we do dispute, your Honor, is that those warnings were

23   consistent and clear.  Ms. Kilburn repeatedly asked for

24   clarification and never got it.

25          ODR also treated different kinds of evidence quite

1    differently.

2            ODR also did not pass all information that Ms. Kilburn

3    entered into the ODR case on to Professor Comaroff.  For

4    example, Ms. Kilburn and her co-complainants tried to enter

5    text messages into the ODR that ODR never passed on to

6    Professor Comaroff.

7            So it wasn't clear at all which documents would and

8    wouldn't go to Professor Comaroff, which documents would be

9    read out loud in a review of evidence interview, and which

11:40 10   documents would be physically handed over.  That was never made

11   clear to Ms. Kilburn.

12           And again, at minimum, it shows that there's a dispute

13   of fact here about what exactly would happen with these

14   documents and what Harvard reasonably believed.

15           And, your Honor, under Massachusetts law, an intrusion

16   on medical privacy is reasonable only if the scope of consent

17   was unambiguous.  And an oral statement that's only recorded in

18   one place that said she should have some notes or memories for

19   you, where "notes" or "memories" are ambiguous, "for you" is

11:41 20   ambiguous, and "should have" is also ambiguous.  It's just not

21   reasonable to interpret that as -- that off-hand statement as

22   consent to obtain medical records in a prediscovery posture.

23           And, your Honor, the federal regulation that opposing

24   counsel was referring to, we're not asking for a retroactive

25   application.  That Title IX regulation was enacted on August

1    14, 2020.  These medical records were obtained in October of

2    2020.  We're not asking for a retroactive application.  The

3    conduct at issue, which is illegally obtaining medical records,

4    occurred three months after the regulation was already in

5    place.

6            And, your Honor, we're not alleging in the complaint

7    that Harvard necessarily violated the Title IX regulations.

8    What we're alleging is that they violated Massachusetts law and

9    common law in Massachusetts.  And courts in Massachusetts

11:42 10  regularly look to other statutes, like Title IX, like HIPAA, to

11   determine whether the conduct was reasonable.  And we're simply

12   arguing that in light of the safeguards imposed by HIPAA, in

13   light of the safeguards imposed by the Title IX regulation, in

14   light of the trainings that Harvard had and all other

15   circumstances in this context, the behavior wasn't reasonable

16   and that a jury could easily find there are disputed issues of

17   material fact here.

18           And finally, your Honor, even if Harvard had met the

19   summary judgment standard, circuit law makes very clear that

11:43 20  the motion should be denied under Rule 56(d) because plaintiffs

21   haven't had discovery.

22           As I wrote in the declaration that we appended to our

23   opposition, your Honor, discovery in this case could uncover a

24   lot.  We would want to depose the ODR employees involved in

25   this and ask them whether they believed they had reasonable

1    consent and what informed that consent.

2           We would want to talk to the therapist and ask her

3    what exactly ODR told her and whether she believed she had

4    consent and whether they ever had a conversation about that.

5           We'd ask for all emails that ODR staff exchanged about

6    the therapy records.

7           And we'd ask for a list of recipients of the therapy

8    records, because, your Honor, Ms. Kilburn still doesn't know

9    who at Harvard has received those records to this day.

11:43 10          So before plaintiffs get discovery on these issues,

11   summary judgment is completely inappropriate.

12           And I'd just like to respond to one or two points that

13   opposing counsel makes.

14           We agree that the Alberts case governs here, but the

15   Alberts case governs the common law claims, not the

16   Massachusetts law.  And under the Massachusetts law, which is

17   214 Section 1B, the question is:  Was this reasonable behavior?

18   And that's from objective -- that's the view from an objective

19   fact finder, like a jury.  But under Alberts, the common law

11:44 20   claim, that's correct, that the question is:  Did Harvard

21   believe that it acted reasonably?  So those are two slightly

22   different inquiries, so I just wanted to put that on the

23   record.

24           And, your Honor, the Cheung case, as you already

25   mentioned -- no, I take that back.

1          The Cheung case, that was based on a contract claim,

2    your Honor.  There was no additional discovery needed in that

3    case.  The question was whether the issue could be decided in a

4    contract, and that contract was appended to the motion for

5    summary judgment.  So there was no additional discovery needed

6    in that case, which is very different than this situation.

7          And with that, your Honor, unless you have any

8    questions, we rest on our papers.

9          THE COURT:  Thank you.

11:45 10          MR. MURPHY:  May I respond briefly, your Honor, very

11    briefly?

12          Let me just make just a few points.

13          First, your Honor, with respect to the Cheung case, in

14    that case, the plaintiff sought to avoid summary judgment by

15    saying that discovery was required because the contract at

16    issue was the -- was a computerized form, and the question was

17    sort of very similar, what did the plaintiffs understand about

18    what that computerized form meant.  The plaintiffs said

19    discovery was necessary, the court said, No, it's not, that

11:45 20    saying it's necessary under those circumstances isn't enough to

21    avoid summary judgment.

22          Just to respond to a couple of other claims.

23          First, the undisputed facts make clear that

24    Ms. Kilburn told Harvard in writing that there was a therapist

25    who could provide contemporaneous corroboration for her claims.

1    That was a written claim.  That statement --

2         THE COURT:  So my concern here -- I'll be -- my

3    concern, and where I really have to examine the record, is any

4    scope of the conversation and whether that needs to be explored

5    or not.

6         You had communications -- as counsel said, the

7    plaintiff is not arguing that any contact was inappropriate.  I

8    question the therapist's limitations, but that's a different

9    case.

11:46 10        I'm not sure how clear the record is on what she was

11   authorizing Harvard to get and what Harvard actually got as

12   part of these conversations.

13        MR. MURPHY:  And, your Honor, we would urge the Court,

14   again, to look at Ms. Povich's affidavit and the statement of

15   undisputed facts.  And we say it's very clear that she said --

16   and this is not disputed -- that the therapist should have

17   notes for you relating to the -- her interactions with

18   Professor Comaroff.  Notes or memories for you.  And then

19   provided the therapist's email and urged the -- urged Harvard

11:48 20   to speak to the therapist.

21        So it was Ms. Comaroff -- pardon me, it was

22   Ms. Kilburn who asked Harvard to obtain these records.

23        THE COURT:  When Ms. Kilburn says she doesn't know how

24   widespread the dissemination was and what the dissemination

25   was, I guess.

1          MR. MURPHY:  Your Honor, I think the answer to that is

2     that our affidavits in this case list precisely who received

3     those notes, and the ODR process explains who's going to

4     receive evidence.  It's going to be received by the Title IX

5     coordinator for the school; he received it.  It's going to be

6     received by the appellate panel once the -- once an appeal is

7     taken, and the appellate panel took it.

8          And then, because the question of discipline went to

9     Dean Gay.  As the affidavits we filed show, the only other

11:49 10     people who received these records were Dean Gay as the decision

11     maker, two deans who provided advice to Dean Gay, and a member

12     of the Harvard Office of General Counsel, who also provided

13     advice to Dean Gay.

14          So the circle was limited to those people who had a

15     responsibility for doing what it was that Ms. Kilburn wanted

16     all along, which was to have sanctions imposed against

17     Professor Comaroff as a result of her complaints about his

18     dealings with her, and those sanctions were ultimately imposed.

19          THE COURT:  All right, thank you.

11:50 20          MR. MURPHY:  Thank you, your Honor.

21          MS. GUENTERT:  I'll just respond to the last point,

22     your Honor.

23          Ms. Kilburn still doesn't know the identity of the

24     individuals who received these notes, because -- and I'm

25     referring now to the affidavit of Alexandria Masud, it says

1    that the panelists on the appeal panel received the notes.

2    Ms. Kilburn didn't know the identity of all of those panelists.

3           And as it says in the affidavit itself, the panel is

4    drawn from a pool of trained standing committee faculty and

5    senior administrators.  Your Honor, those are individuals who

6    might be teaching Ms. Kilburn, who might be in charge of

7    determining her academic future.  And she didn't initially know

8    who those individuals are.

9           And, your Honor, early on in this matter we had asked

11:51 10   opposing counsel for a list of individuals who had received the

11   notes so that Ms. Kilburn may have some information about that,

12   and we were refused.

13          So Ms. Kilburn still doesn't know the identity of all

14   the individuals who have seen extremely private records about

15   her.

16          Thank you.

17          THE COURT:  Okay.  Thank you.  I'll take the matter

18   under advisement.

19          MR. MURPHY:  Thank you, your Honor.

11:51 20         THE COURT:  Okay.  The motion to dismiss.

21          MS. STEINBERG:  Thank you, your Honor.  Victoria

22   Steinberg arguing the motion to dismiss.

23          Your Honor, Harvard has moved to dismiss Counts One

24   through Nine in this matter.  The first three, as I believe you

25   likely know, are the Title IX claims, and I propose to address

1    those first, unless your Honor would like to hear about

2    different ones.

3         Those three, your Honor, must be dismissed for two

4    different reasons at least.  The first is that they are outside

5    of the statute of limitations; and the second is that they

6    failed to state a claim, in any event.

7         In short, your Honor --

8         THE COURT:  I'm sorry, I missed the second sentence.

9         MS. STEINBERG:  The second reason is that they failed

11:52 10   to state a claim in any event.

11        Over the course of the 88-plus page complaint here,

12   what becomes clear is that plaintiffs very much would like

13   Harvard to have a different process for its Title IX complaints

14   than Harvard has.  That is not the function of a Title IX

15   claim, and it is not what this lawsuit ought to be about.

16        Title IX, as the cases hold, is not a mechanism for

17   judicial review of the wisdom or the prudence of the

18   institution's response, and it's not an avenue to make

19   particular remedial demands.

11:53 20        Instead, the question under Title IX primarily is:

21   Was the institution deliberately indifferent to complaints?

22   And Count One here of the -- Count One of the amended complaint

23   is a Title IX claim alleging that Harvard was deliberately

24   indifferent.

25        Before I turn to the specific allegations here, I want

1   to note that the application of exactly this ODR policy and ODR

2   procedure has been found not deliberately indifferent in

3   another case in this court, which is the Leader matter.

4        In that case, they were exactly the same policies and

5   procedures, and there were many of the same allegations made.

6   For example, there, as here, the plaintiff argued that there

7   was a timing issue, that Harvard didn't act quickly enough.

8   And the court rejected that and found that under those policies

9   and procedures, the complainant did not file an ODR report, as

11:55 10  here, and that Harvard's failure to initiate that investigation

11   was not deliberately indifferent because the complainant had

12   not filed a report; that's true here as well.

13        In addition, in almost exactly the same language, in

14   the Leader complaint it is alleged that Harvard maintained a,

15   quote, policy of indifference toward sexual misconduct on

16   campus.  Again, in the Leader case, the court rejected that and

17   found that there is no such policy at Harvard, and in fact,

18   that the application of the ODR policies and procedures in that

19   case, as is the case here, was not deliberately indifferent.

11:56 20        So turning now to the allegations in this complaint.

21        Under Count One for deliberate indifference,

22   plaintiffs allege that there are three distinct theories.

23   Their opposition makes clear there are three theories they are

24   looking to to support Count One:  First, that Harvard had a

25   so-called custom and practice of deliberate indifference; two,

1    their principal -- what they call their principal theory, that
2    Harvard was deliberately indifferent to reports of Professor
3    Comaroff's misconduct prior to any of the plaintiffs'
4    experiences with him; and then, third, that Harvard's response
5    to plaintiffs' complaints about Professor Comaroff were
6    deliberately indifferent.
7             So I'll take those each in turn.
8             First, as to custom and practice, that can and should
9    be dispensed with quickly.  There is no custom and practice
11:56 10   Title IX doctrine in the 1st Circuit and in this jurisdiction.
11   In order to create one, plaintiffs take a creative approach
12   combining various practices that they feel are in place and
13   calling them a policy of Harvard.  For example, they allege
14   that Harvard fails to investigate faculty misconduct unless a
15   student initiates a formal ODR complaint.  That is actually not
16   just not true in the abstract, it's not true in this case.
17   None of the plaintiffs filed their own complaint initially.
18   Harvard filed the initial complaints against Professor
19   Comaroff, after which each complainants filed their own
11:57 20   complaint.  So -- but, in any event, even if that were the
21   case, and it is not, there is no custom and practice claim
22   recognized or analyzed in the 1st Circuit.
23            As to the allegation that plaintiff has -- the
24   plaintiffs have stated a Title IX claim based on conduct prior
25   to their own experiences with Professor Comaroff, those cannot

1    move forward, again, for two reasons.  One is they are clearly

2    untimely.  The first allegations pertaining to plaintiffs -- I

3    should say all of the allegations that they allege are the,

4    quote-unquote, pre-harassment conduct occur prior to 2017.  And

5    those consist of things like rumors about his experiences at

6    University of Chicago, exactly the kinds of things that

7    don't -- that don't comprise actual knowledge of other

8    misconduct prior to their own experiences.  So those cannot

9    move forward.  Even if they had pled actual knowledge, again,

11:58 10   they are untimely.

11           And finally, what I think is actually the crux of this

12   matter is whether or not Harvard's response to plaintiffs' own

13   complaints was deliberately indifferent.  Again, ODR's

14   application of its policies has already been found not to be so

15   and that could and should be the end of the story.  But, just

16   as importantly, plaintiffs don't point to -- they don't allege

17   anything in Harvard's procedures that Harvard did not do.

18   Rather, they point to policies and procedures that they would

19   like Harvard to have that it does not have and that there is --

11:59 20          THE COURT:  But don't they point to a delay between

21   the complaints and the initiation of the process?  I think

22   that's part of the deliberate indifference argument.

23          MS. STEINBERG:  So, your Honor, again, that is part of

24   the deliberate indifference argument.  First of all, there is

25   no set amount of time in the caselaw that is found --

1          THE COURT:  Here they're saying years, right?

2          MS. STEINBERG:  They say a single year at most.  So to

3     give them the benefit of the doubt, there is a complaint to

4     Title IX in 2019 by -- I just want to make sure that I have the

5     correct person -- by Ms. Kilburn.  And it is true that no

6     complaint was filed with ODR until approximately a year

7     afterwards.  However, again, they did not file those

8     complaints.  Harvard went ahead and filed a complaint despite

9     the plaintiffs not filing any complaint formally.

12:49 10         As you can imagine, there are many things that go into

11    a decision whether an institution is going to file a complaint

12    without the complainants being willing to come forward.  In

13    those circumstances, there is no case finding that that amount

14    of time is somehow deliberately indifferent.

15         Furthermore, there is no harassment alleged after the

16    point at which they complained.  In other words, there is no

17    even alleged damage or misconduct or treatment of them or

18    anything that goes wrong after that fact, which distinguishes

19    this case from some that find that a delay was harmful because

12:50 20    of deliberate indifference.

21         So -- and, your Honor -- so that is the response on

22    the timing front.

23         It also -- so -- and for a separate reason, again, the

24    statute of limitations bars the Count One under Title IX.

25         It's important to note, your Honor, under all of the

1    Title IX counts, One through Three, that the three plaintiffs

2    are not similarly situated in all respects.  And this Court

3    should and needs to analyze whether a claim has been stated for

4    each of them.

5         So, for example, under the deliberate indifference

6    standard or really any of the Title IX standards, Ms. Mandava

7    never complained to Harvard's Title IX office and alleges a

8    single comment made in her presence in October of 2017.  That's

9    the allegation, essentially.  There's no physical conduct,

12:51 10   there's nothing else between them.

11        Ms. Czerwienski primarily complains about text

12   messages to a third party and that the comment to Ms. Mandava,

13   which she claims was about her, but she actually alleges no

14   interaction between herself and Professor Comaroff whatsoever.

15   Again, that comment was made not to her but supposedly about

16   her in October of 2017 outside of the statute of limitations.

17   So those two plaintiffs, your Honor, do not state a claim for

18   those reasons independently.

19        The question, your Honor, under Title IX, Count One is

12:52 20   not whether Harvard could have done something different, but,

21   rather, whether what it did was deliberately indifferent.  And

22   even taking everything that the plaintiffs' claim as true in

23   the complaint, there really is no way to find under deliberate

24   indifference caselaw that what Harvard did was deliberately

25   indifferent.

```
 1              As to Count Two, retaliation, first we want to clarify
 2     that notwithstanding that the government's brief kind of takes
 3     a little bit of an adversarial approach to what Harvard had
 4     claimed, we actually don't disagree very much, I think.
 5              For example, the government appears to agree with
 6     Harvard that this is not a strict liability standard.  Like all
 7     Title IX claims, really, this retaliation claim is a deliberate
 8     indifference standard:  Was Harvard aware of retaliation and
 9     was it deliberately indifferent to that conduct?
12:53 10         And the question or what we'd like to note here is
11     that there is no allegation whatsoever that Harvard itself
12     retaliated against the plaintiffs, none.
13              There is an allegation that Professor Comaroff
14     retaliated against Ms. Mandava and Ms. Czerwienski, again, in
15     October of 2017, and those claims are time-barred.
16              And then there's a third category of retaliation
17     that's alleged; that is, retaliation by everybody else --
18     faculty members who wrote letters pro Professor Comaroff,
19     anti-Professor Comaroff.  Some of them changed their mind and
12:53 20   they rescinded their -- you know, their agreement to those
21     letters.
22              There is simply no basis to hold Harvard responsible
23     for the, you know, free expression of our professors' ideas
24     about what they think they know about the case.  In fact, all
25     that Harvard ever said officially about those letters is you
```

1    don't have -- you, professors, don't have all the information,

2    both sides.

3         So there is no basis under Title IX caselaw, and it

4    would really be a problem in terms of academic freedom to begin

5    to use Title IX to hold Harvard responsible for the opinions of

6    its faculty, unaffiliated -- faculty members who have nothing

7    to do with the case at hand whatsoever.  They're simply

8    expressing an opinion about it.

9         Finally, as to --

12:55 10       THE COURT:  Well, just clarify for me, though,

11   Harvard's position on its liability for the actions of the

12   players.

13        MS. STEINBERG:  Sure.

14        THE COURT:  That middle category.

15        MS. STEINBERG:  Yep.  The question under Gebser and

16   the other cases that discuss retaliation in particular, if that

17   is what your Honor is asking, is whether an official of the

18   school had notice -- an official who could institute corrective

19   action had notice of retaliation and failed to act such that it

12:55 20   was deliberate indifference to that retaliation.  That's the

21   standard.

22        It's not strict liability in the sense that if a

23   faculty member unbeknownst to Harvard engages in retaliation,

24   Harvard doesn't know but that's later proven, Harvard is not

25   strictly liable for that.

1          And that is really what the plaintiffs have alleged

2     here, that Harvard is somehow strictly liable for Professor

3     Comaroff's retaliation.  That is not the standard.  The

4     standard is whether Harvard, once it was made aware of any

5     retaliation, was deliberately indifferent to it.

6          THE COURT:  Thank you.

7          MS. STEINBERG:  Your Honor, as to Count Three, which

8     is gender bias, we are unaware of any claim such as this where

9     there's an outcome against the respondent and complainants

12:56 10     claim that there was gender bias against them.  In other words,

11     gender bias claims under Title IX do not exist in a vacuum,

12     they have to be tied to the outcome.  The standard is whether

13     or not the outcome in the Title IX was infected by gender bias

14     in some way.  And there is nothing alleged here that really

15     supports any claim that gender bias was at issue.  There's

16     nothing other than conclusory allegations of gender

17     discrimination.

18          For example, plaintiffs don't allege that similarly

19     situated individuals who are male complainants are treated

12:57 20     better than they were as female complainants.  And there are

21     many cases in this jurisdiction dismissing gender bias claims

22     that make almost identical claims to the ones here, including

23     there's the Western New England case, there's a Wentworth case.

24     They're all cited in our brief.  But there is no basis for them

25     to move forward with a gender bias claim here.

1          Your Honor, as to the statute of limitations as to all

2     three of those, there's obviously disagreement between the

3     parties about what -- when the statute begins to run.  Does it

4     begin to run when the act of harassment occurred or does it

5     begin to run, for example, when knowledge of the deliberate

6     indifference occurred.

7          As to both Ms. Mandava and Ms. Czerwienski, it

8     actually makes no difference to the outcome here.  In other

9     words, both the harassment and the knowledge of supposed

12:58 10   deliberate indifference occurred far before, long before this

11    case was filed.  The statute ran long before the case was

12    filed.

13          In October of 2017, it is alleged that -- and I want

14    to give you the reference to the paragraphs -- paragraphs 55 to

15    76 you'll find allegations that show that the plaintiffs were

16    not only aware of what had happened to them in 2017, meaning

17    the comment about people not getting jobs or such, they were

18    also aware of the rumors that they claim they heard, his

19    treatment of other people.  And they allege that they were

12:58 20   unhappy with Harvard's action or inaction following them

21    telling people about those things.  In other words, they were

22    aware of deliberate indifference as of 2017, and they did not

23    take action in terms of filing a suit at that time.  There is

24    no basis to move those -- that claim forward in time,

25    especially as to Ms. Mandava and Ms. Czerwienski.

1          And I would move on from the Title IX claims, unless

2     you have questions.

3          THE COURT:  No, that's fine.

4          MS. STEINBERG:  So as to the statutory claims, your

5     Honor, I didn't plan to spend very much time on them because

6     our argument is set out.  Those are untimely without question;

7     and the 214 1C, in any event, governs, and the other two can't

8     move forward.

9          Negligent hiring, retention, and supervision.

01:00 10   Professor Comaroff was hired in 2012.  Again, plaintiffs were

11    allegedly aware of Harvard, quote, mishandling the supervision

12    of him at the latest 2017.  And again, that's paragraphs 56 to

13    about 77, and also paragraph 96.

14         Some examples.  Ms. Kilburn alleges that she was

15    distressed by his harassment as of February of 2017.  These

16    claims have a three-year statute of limitations and also must

17    be dismissed.

18         Finally, your Honor, as to the breach of contract

19    claim, that appears to be essentially an end run around the

01:01 20   fact that the Title IX claims can't be brought and don't

21    survive under the deliberate indifference standard.  The breach

22    of contract claims really don't allege any promise apart from

23    the generalized types of terms that all Title IX policies have,

24    for example, Title IX is intended to keep this community safe.

25    Those are the kinds of non-actionable terms that courts have

found cannot be the basis of breach of contract claims in many
a Title IX case.

So, your Honor, unless you have additional
questions --

THE COURT:  No.  Unless you wanted to address the
continuing violation theory.

MS. STEINBERG:  I'd be happy to, your Honor.

Continuing violations does not -- in this situation
does not save their claims for a few reasons.  I just want to
make sure that I'm giving you the right information.

(Pause.)

MS. STEINBERG:  So, your Honor, first of all, the
continuing violation doctrine does not apply in Title IX
claims.  There is no case in the 1st Circuit or the Supreme
Court that has addressed whether or not to apply continuing
violation to Title IX claims.  And we've cited, as you know in
our brief, an Eastern District of New York case that explains
why the continuing violation doctrine is not, quote, a good fit
with the goals of Title IX.  And the reason for that appears to
be that really these claims are grounded in the relationship
between the institution and an individual, and that it is very
difficult to apply a continuing violation doctrine in that
setting.

Even if it did apply, your Honor, plaintiffs do not
have sufficient allegations within the time period to anchor

1    their claims.  And again, particularly as to Ms. Mandava and

2    Ms. Czerwienski, they -- the only timely claims are things

3    like, for example, an allegation at paragraph 236 that Harvard,

4    quote, maintained an official policy, custom, and/or practice

5    of deliberate indifference.  And then they put that in time

6    within the statute of limitations.  But that is not an

7    allegation of a fact pertaining to them within the relevant

8    time period.

9          And for similar reasons, the statutory claims are

01:03 10   barred and could not be brought forward because there simply

11   are not facts alleged that could be anchoring acts similar

12   enough to the untimely acts that would save them.

13         THE COURT:  Okay, thank you.

14         MS. STEINBERG:  Thank you.

15         MR. KORNBLITH:  Good morning, your Honor.  My name is

16   Russell Kornblith, and I represent the plaintiffs in this

17   action.

18         We've actually divided the argument on the motion to

19   dismiss such that I'm going to address the sufficiency of our

01:04 20   pleadings, and Mr. Ouellette is going to address the statute of

21   limitations argument.

22         THE COURT:  Okay.

23         MR. KORNBLITH:  Your Honor, this is a case about

24   whether a university must do something when it learns about

25   sexual harassment and retaliation being committed by one of its

star professors against its graduate students or whether they
can wait years until the press picks up the story.

Harvard did nothing to protect the plaintiffs from
Professor Comaroff despite at least four complaints, did
nothing for more than two years after our plaintiffs complained
of career-ending retaliation, conducted a deficient
investigation only when shamed into doing so by the press, and
sat by while Professor Comaroff spoliated evidence and his
allies retaliated.

01:05      Harvard would recast this case as about one comment
made by one professor to one student one time.  But it's
anything but.

Plaintiffs bring three groups of claims that are the
subject of this motion to dismiss.  The first group of claims
target harassment, retaliation, and gender discrimination in
violation of Title IX.

The second group of claims arise under Massachusetts
law and likewise target gender discrimination and retaliation.

And the third group of claims are negligence claims
01:06 and contract claims under Massachusetts law.

The Title IX claims themselves break down into three
distinct theories of liability.  First, plaintiffs allege a
pre-harassment deliberate indifference claim based on Harvard's
failure to act on prior complaints against Professor Comaroff
before he harassed them.

1          Second, plaintiffs bring post-harassment deliberate

2     indifference claims based on Harvard's deficient response to

3     their complaints.  And both of these Title IX complaints or

4     claims include a retaliation component because retaliation is

5     another form of gender discrimination in violation of Title IX.

6          Finally, plaintiffs bring a gender discrimination

7     claim in violation of Title IX based on Harvard's archaic

8     independent corroboration requirement that persists in

9     practice.

01:06 10          Plaintiffs' Title IX complaints begin with the

11    pre-harassment claims.  By 2017, Harvard had received at least

12    four warnings that Professor Comaroff posed a danger to female

13    students, including an account from one of his victims.  And

14    Harvard had received at least five other accounts of sexual

15    harassment being committed by other professors in the

16    anthropology department, but Harvard did nothing to protect the

17    plaintiffs from them.  Harvard's deliberate indifference had

18    predictable consequences.  Ms. Czerwienski and Ms. Mandava

19    learned that Professor Comaroff was sexually harassing their

01:07 20    colleague identified in our papers as Harvard Student 2.  They

21    sought to warn others about him, but Professor Comaroff learned

22    of their protected activity and first sent a series of

23    harassing text messages to Harvard Student 2 with the

24    ostensible purpose of intimidating Ms. Czerwienski.

25          Things soon got worse.  In October of that year,

1    Professor Comaroff summoned Ms. Mandava to his office, told her

2    that he knew that she and Ms. Czerwienski were spreading,

3    quote, nasty rumors, unquote, about him, and threatened that if

4    they continued to do so, they would have, quote, trouble

5    getting jobs.

6          Ms. Czerwienski contemporaneously reported this threat

7    to Harvard's Title IX officer, Seth Avakian, but Harvard did

8    not act; it did nothing.

9          Harvard still did nothing despite five warnings, and,

01:08 10   as a result, Professor Comaroff groped and harassed

11   Ms. Kilburn.  He kissed her without consent.  He graphically

12   imagined her rape out loud, and he sought unwanted contact with

13   her.

14         Ms. Kilburn told several Harvard faculty members, at

15   least one of whom conveyed her complaints to Harvard.  But

16   still, Harvard did nothing.

17         Harvard was such well aware of Professor Comaroff's

18   harassment by this time.  When Ms. Kilburn approached

19   Dr. Avakian in 2019, he preempted her and he told her that he

01:08 20   knew that her complaint pertained to Professor Comaroff, even

21   before Ms. Kilburn named him.

22         Harvard's deliberate indifference in the face of these

23   repeated complaints had severe effects on the educational

24   environment of all three plaintiffs.

25         Ms. Czerwienski and Ms. Mandava both shifted their

1    fields of study and altered their advising arrangements in an

2    attempt to avoid Professor Comaroff's pervasive reach.  And

3    Ms. Kilburn, likewise, altered her course of study and stopped

4    attending meetings with Professor Comaroff and altered her

5    dress.

6          All three plaintiffs were denied the educational

7    environment for which they matriculated at Harvard, but Harvard

8    did nothing.

9          By 2019, now, Harvard had received at least eight

01:09  10   warnings about Professor Comaroff's sexual harassment and

11   retaliation, but Harvard still did nothing.

12         Harvard, in fact, took no meaningful action until the

13   summer of 2020, when the Harvard Crimson, that's the

14   university's student newspaper, was poised to publish an exposé

15   on sexual misconduct in Harvard's anthropology department.

16   Only then did Harvard initiate an investigation into Professor

17   Comaroff, preempting the article by days, and only then because

18   the Crimson sought comment from Dr. Avakian's office.  This

19   yearslong delay was plainly unreasonable and itself gives rise

01:10  20   to a deliberate indifference claim.  And this year-plus delay

21   is not the plaintiffs' only post-harassment Title IX

22   indifference claim.

23         Harvard's 2020 investigation was so unartful that it

24   was plainly unreasonable.  It turned a blind eye to

25   overwhelming evidence in a contorted effort to minimize

1    Comaroff's responsibility.

2         Among the deficiencies:  Harvard shut its eyes to what

3    was by then a pattern of conduct against multiple students

4    spanning multiple years.

5         It did nothing while Comaroff encouraged Harvard

6    Student 2 to spoliate evidence.

7         It ignored a Comaroff statement that he knew that

8    Mandava and Czerwienski were engaged in protected activity for

9    supposed lack of corroboration.

01:11 10      It allowed Comaroff to call irrelevant witnesses,

11   damaging Ms. Kilburn's career.

12        It manufactured non-existent inconsistencies in

13   Ms. Kilburn's testimony.

14        It ignored text messages that Ms. Czerwienski received

15   from Harvard Student 2.

16        And finally, Harvard obtained Ms. Kilburn's medical

17   records without her consent.

18        These decisions in the context of Harvard's

19   investigation were plainly unreasonable.

01:11 20      In addition, one particular practice of Harvard's

21   investigation warrants special mention because it forms the

22   basis of Count Three, which is Harvard's -- excuse me, the

23   plaintiffs' gender discrimination claim under Title IX.

24        Harvard required independent corroboration of the

25   plaintiffs' gender discrimination allegations and dismissed

1    Mandava's and Czerwienski's complaints for failure to offer it.

2    This archaic requirement, we allege, rests on biases against

3    the credibility of women and affected the outcome of these

4    investigations.

5         Collectively, Harvard's investigations and failures

6    resulted in a botched investigation and unreasonable findings

7    of fact that allowed Professor Comaroff to return to teaching

8    with a mere slap on the wrist.  And Harvard did nothing to

9    prevent retaliation.  The retaliation that followed was swift

01:12 10   and pervasive.

11        Law Professor Janet Halley issued a statement blasting

12   the plaintiffs for filing Title IX complaints based on, quote,

13   perfectly legitimate office hours advice.

14        And 38 Harvard faculty, including a faculty member who

15   is currently supervising one of the plaintiffs' studies, issued

16   a statement downplaying Comaroff's harassment and plainly

17   hostile toward future such complaints.

18        Harvard never condemned these statements in an

19   official statement.  In fact, worse, on February 10th of this

01:13 20   year, Harvard accused the plaintiffs of chilling Title IX

21   complaints by virtue of filing this lawsuit.

22        Under Karasek v. The University of California, our

23   plaintiffs can also state a Title IX deliberate indifference

24   claim by identifying a policy or practice that expose students

25   to a hostile environment.

1          The complaint in this case identifies at least three

2     of those:  First, Harvard's practice of requiring students to

3     file formal complaints before it will initiate an

4     investigation; second, Harvard's express refusal to prevent

5     professional retaliation exemplified by the statements we've

6     just identified; and its policy of discouraging students from

7     filing formal complaints even if they have an intention or a

8     thought to do so.  Plaintiffs, thus, also state a deliberate

9     indifference claim based on this custom and practice theory.

01:13 10          So to recap, we have Title IX complaints based on,

11     first, Harvard's pre-harassment failure to prevent harm;

12     second, its unreasonable post-reporting delay in even launching

13     an investigation; third, its botched investigation; fourth, its

14     customs and practices that resulted in a discriminatory

15     environment; and fifth, its practice of requiring independent

16     corroboration for allegations of gender discrimination.

17          In addition to these Title IX complaints, plaintiffs

18     bring seven claims under state law, six of which are the

19     subject of this motion.

01:14 20          So briefly I want to review --

21          THE COURT:  Before you go there --

22          MR. KORNBLITH:  Yes, your Honor.

23          THE COURT:  -- deal with the statute of limitations.

24     Oh, I'm sorry, never mind.

25          MR. OUELLETTE:  I can go ahead.

1          MR. KORNBLITH:  As the Court prefers.

2          THE COURT:  Actually, I do want to hear the statute of

3     limitations.

4          MR. OUELLETTE:  Your Honor, as to statute of

5     limitations, this case asks whether plaintiffs' Title IX claims

6     accrued before any reasonable student would have known they

7     existed, and I'm asked whether their federal and state civil

8     rights claims expired even though Harvard continued to subject

9     them to a hostile environment well into the limitations period.

01:14 10   And the answer is no on both counts.

11         To show that the claims should be dismissed on the

12    statue of limitations, Harvard has to remove any doubt that on

13    the face of the complaint the claims are time-barred, and

14    Harvard hasn't met that burden because the claims are timely

15    under both the discovery rule and the continuing violation

16    doctrine.

17         I want to discuss the discovery rule first, and that

18    rule in this circuit is clear.  The claim for deliberate

19    indifference accrues when the plaintiff has the facts necessary

01:15 20   to file suit against the institutional defendant, not when the

21    plaintiff is first abused.  That's the holding of the 1st

22    Circuit in Ouellette, and it's the rule in every circuit to

23    address this question under Title IX.

24         And those cases tell us the plaintiffs' claims didn't

25    accrue when Comaroff harassed or threatened them.  They accrue

1    when plaintiffs had enough facts to state a claim against

2    Harvard under Title IX, and that means the plaintiffs had to

3    know both that an appropriate person at Harvard knew about

4    sexual harassment or retaliation and that Harvard was

5    deliberately indifferent to those reports.

6         And I want to address something that opposing counsel

7    said in her argument.  She said we allege -- I think they also

8    argue this in their reply brief -- that we allege that

9    Ms. Czerwienski and Ms. Mandava allege they were happy with

01:24 10   Harvard's response to complaints in 2017.  And that's just not

11   true.  Nothing in the complaint alleges that in 2017

12   Ms. Czerwienski and Ms. Mandava were disappointed or unhappy

13   with the way Harvard responded to their complaints.  To the

14   contrary, the complaint explicitly alleges in paragraph 79 that

15   Ms. Czerwienski and Ms. Mandava trusted that Harvard would take

16   action to stop Professor Comaroff's pattern of misconduct in

17   2017, and it was not until later that they learned that Harvard

18   did not take those actions.

19        And I think, as Harvard would agree, it wouldn't have

01:25 20   been enough if the plaintiffs were subjectively unhappy with

21   Harvard's response.  Title IX requires that Harvard be

22   deliberately indifferent to reports of sexual harassment or

23   retaliation.

24        THE COURT:  So when -- is there a trigger for that in

25   your analysis or is it --

1          MR. OUELLETTE:  Yes, your Honor.  So the plaintiffs

2     didn't have any reason to know that Harvard was deliberately

3     indifferent to prior reports of harassment until 2020, because

4     that's when public reports revealed for the first time that

5     Harvard failed to respond to reports of sexual harassment in

6     the anthropology department.

7          Back in 2017, plaintiffs did know -- Ms. Mandava and

8     Ms. Czerwienski did know that they had complained to various

9     faculty, but I think everyone here agrees that those faculty

01:26 10     were not individuals with authority to take corrective action

11     under Title IX; they weren't appropriate people.  The

12     appropriate person here is Dr. Avakian with the Title IX

13     office.  And until 2020, none of the plaintiffs knew that the

14     Title IX office, that an appropriate person at Harvard, had

15     failed to take adequate steps in response to a complaint of

16     sexual harassment or retaliation.

17          And those reports, those public reports by the Crimson

18     newspaper and The Chronicle in 2020 reveal facts that were

19     critical to state plaintiffs' Title IX claims.

01:26 20          First, the Crimson revealed that Harvard had a pattern

21     of failing to respond to complaints against professors within

22     the department, including by Professor Comaroff.  And that was

23     the first time that it was revealed that Harvard had that

24     pattern and that Harvard -- that an appropriate person at

25     Harvard had failed to respond to prior complaints of sexual

1    harassment in the department.

2         And specifically, second, the press revealed that

3    Harvard had apparently not approached Professor Comaroff to

4    investigate the complaint by Harvard Student 2, the prior

5    complaint that happened before Ms. Czerwienski and Ms. Mandava

6    were threatened.  The Crimson revealed that Harvard had

7    apparently not approached Professor Comaroff to investigate

8    prior complaints, and we know that now because Professor

9    Comaroff disclosed to the press that Harvard had not informed

01:27 10   him of any formal charge or prior complaint against him other

11   than the plaintiffs.  He confirmed that in 2020 and 2022, but

12   plaintiffs had no reason to know that back in 2017.

13        And third, the articles and their aftermath revealed

14   that the customs and practices that we rely on that gave rise

15   to plaintiffs' complaints under Title IX, they reveal that the

16   Title IX office did not initiate investigations on its own but

17   relied on individual students who might not have all the

18   information about the pattern of misconduct to go to the ODR

19   and initiate formal complaints themselves.  And they revealed

01:28 20   that the Title IX officer believed that he couldn't protect

21   students from retaliation in their field, which, of course, is

22   directly relevant to Harvard's deliberate indifference and the

23   failure to protect Ms. Mandava and Ms. Czerwienski against the

24   retaliation in 2017.  And none of those facts were public until

25   2020.

1          In fact, before 2019, which is still well within the
2     limitations period, Ms. Kilburn didn't even know that Comaroff
3     had harassed any other student and didn't know that Harvard had
4     received any prior report against him.

5          And in fact, it appears that Harvard agrees that if
6     the rule in Ouellette applies, if the discovery rule applies as
7     we articulated it, that Ms. Kilburn's claims would be timely;
8     and I think it's clear that it does.

9          So until plaintiffs knew all of those facts, the
01:29 10   bottom line is they couldn't have stated a Title IX claim
11    against Harvard and their claims did not accrue until then.
12    Until 2020, they trusted Harvard to address claims of sexual
13    harassment and take steps to prevent retaliation because
14    Harvard's policies promise students that it would do so.  So
15    it's at least plausible that their trust was reasonable until
16    2020.

17         And you know, the caselaw bears that out.  In
18    Ouellette, a case by the 1st Circuit, the plaintiff knew that
19    he was abused by the defendant's employee back in the 1980s.
01:29 20   And the court still held, the 1st Circuit still held, that the
21    claim did not accrue until 20 years later when it came out that
22    the defendant, the city, was deliberately indifferent to past
23    reports of misconduct by employees.

24         And it's the same situation here.  That case is really
25    on point.  Just as in Ouellette, plaintiffs were not aware of

 1    Harvard's deliberate indifference to any complaint of sexual

 2    harassment or retaliation until 2020.

 3          And in the Karasek and Lozano cases, in fact, the

 4    plaintiffs each knew that the school had received prior reports

 5    of sexual harassment before they were abused, and including

 6    complaints against the same perpetrator; and those courts still

 7    held that those claims under the discovery rule did not accrue

 8    until many years later when public reports, just as in this

 9    case, revealed the broader pattern of deliberate indifference

01:37 10   by the university.  That's the Lozano and Karasek cases cited

11    in our opposition.

12          There's one more point -- and by the way, Harvard

13    doesn't even address those cases in its papers, so it doesn't

14    give the Court any reason not to follow them.

15          Remember, it is Harvard's burden here at the motion to

16    dismiss stage, as the Court explains in the Snyder-Hill case in

17    the 6th Circuit, as Judge Gorton explained in the Maffeo case

18    to show the complaint on its face shows the claims are

19    untimely, and Harvard hasn't met that burden here.

01:38 20         One more point I'd like to stress on the discovery

21    rule, and that's that to show the Title IX claims are untimely,

22    Harvard has to show both that a reasonable student would have

23    investigated her claim before the limitations period, and that

24    such an investigation would have necessarily on the face of the

25    complaint, removing any doubt and drawing all inferences in the

1    plaintiffs' favor, that an investigation that was diligent

2    necessarily would have had revealed Harvard's complicity in

3    abuse before October 2018, which is when the limitations window

4    begins here.

5         But even if the plaintiffs had investigated, there's

6    nothing in the complaint that states they would have learned

7    how Harvard had responded to prior complaints because Harvard

8    keeps that information confidential, as they reminded the Court

9    in September, as their procedures make very clear.

01:39 10         So, unless the Court has any questions right now on

11   the discovery rule, I could move to the continuing violation

12   doctrine.

13         THE COURT:  I'm good.

14         MR. OUELLETTE:  And on the continuing violations

15   doctrine, both the plaintiffs' federal and state civil rights

16   claims, to be clear, Counts One through Six, are all timely for

17   the independent reason that the plaintiffs allege continuing

18   violations of Title IX in the Massachusetts civil rights

19   statute.

01:39 20         Under the continuing violation, a claim is timely if

21   it's based on an unlawful policy or pattern of discrimination

22   that continues and injures the plaintiff within the limitations

23   period.  And every circuit to address this question has applied

24   that doctrine, that claims for deliberate indifference under

25   both Section 1983 and Title IX, and that includes cases within

1    the 4th Circuit.  It's not true that no case in this circuit

2    has addressed this question.  The 1st Circuit has not with

3    respect to Title IX, but there are two cases within this

4    circuit, that's the LeGoff case, Harvard actually cites it in

5    their opening brief, by Judge Gertner, and Doe v. Brown by

6    Judge McConnell in the District of Rhode Island, both of which

7    apply the continuing violation doctrine.

8         The Title IX claims -- and Judge McConnell actually

9    has a good in-depth analysis of why the doctrine applies to

01:40 10   Title IX claims and rejects Harvard's argument that somehow the

11   distinctions between Title VII and Title IX mean that the court

12   shouldn't apply the continuing violation doctrine to Title IX

13   claims.

14        One more thing to note on this is the 1st Circuit has

15   applied the continuing violation doctrine to claims under

16   Section 1983, and that's significant because every circuit to

17   address the question has treated Section 1983 and Title IX as

18   the same for statute of limitations purposes.  You'll find that

19   in the 6th Circuit's decision in Snyder-Hill which makes that

01:41 20   point, and the 5th Circuit's decision in King-White,

21   reiterating that circuits have treated those two statutes the

22   same.  And that makes a lot of sense because in the Gebser

23   case, the Supreme Court actually took the deliberate

24   indifferent standard from Section 1983 to adapt it to Title IX.

25   So those two statutes are analogous, and the 1st Circuit has

1    applied the continuing violation doctrine to claims under

2    Section 1983.  So there's really no material distinction here

3    that indicates the court should not apply it to Title IX

4    claims.

5            And as in all those cases that have applied the

6    continuing violation doctrine to deliberately indifferent

7    cases, you know -- actually, one more point on why the doctrine

8    applies.  I think Ms. Steinberg said she -- they're citing this

9    case in I believe EDNY or SDNY, it's the <u>Folkes</u> case, that's

01:42 10   the one case in their papers that they cite to argue that the

11   continuing violation doctrine doesn't apply to Title IX, that

12   case did not decide the issue, it's *dicta*, it's district court

13   *dicta*.  And Harvard actually hasn't cited any case that decided

14   the doctrine doesn't apply to Title IX claims.

15           The rationale I believe Ms. Steinberg gave was I

16   believe that Title IX is grounded in the relationship between

17   the institution and the individual.  Well, as the Court may

18   know from claims for deliberate indifference under Section

19   1983, like the claim the court addressed in the <u>Ouellette</u> case,

01:44 20   that's -- the same is true for claims of deliberate

21   indifference under Section 1983.  It's about the relationship

22   between the institution, the municipality or the supervisor,

23   and the individual, employee or someone else that might have

24   violated the Constitution; and the plaintiff is arguing that

25   the city or a supervisor was deliberately indifferent in that,

1    and, therefore, is liable.  It's the same framework -- as I

2    mentioned, the Supreme Court actually adopted the same

3    framework for Title IX.  And in those cases, as we explain in

4    our opposition brief, every circuit to address claims for

5    deliberate indifference under Section 1983 has applied the

6    continuing violation doctrine in those circumstances.  So

7    that's not a distinction that I think is persuasive here.

8         And, as in those cases, we allege an ongoing practice

9    of deliberate indifference.  Harvard received and ignored

01:45 10   complaints about the same professor almost every year from 2016

11   through 2020.  And Harvard's ongoing inaction subjected

12   plaintiffs to a hostile environment that continued well into

13   the limitations period.

14        Harvard left the plaintiffs to work on the same campus

15   in the same department as a professor that harassed and

16   threatened them, and they avoided taking classes, avoided

17   applying for grants, asking for letters of recommendation, they

18   lost advisors and mentors, and they live with the continuing

19   emotional distress that's interfered with the work that they

01:46 20   came to Harvard to do.

21        Here I think there are specific acts by Harvard and

22   employees that anchor plaintiffs' claims within the limitations

23   period.

24        And as to Ms. Kilburn, there's no question that she

25   alleges a continuing violation.  Harvard does not dispute that

1    Professor Comaroff subjected her to a pattern of sexual

2    harassment.  And in fact, in their papers they twice concede

3    that that pattern included actionable harassment, I am quoting,

4    in fall 2018.

5         And there's really no serious question that that

6    occurred during the limitations period.  Title IX adopts state

7    law statutes of limitations, which is why everyone here agrees

8    that we're dealing with the Massachusetts statutes of

9    limitation because Title IX adopts those and uses those as its

01:46 10   own.  And that means that it also adopts state law tolling

11   rules, because under state law the tolling rules sort of -- the

12   soil comes with the plant.  The tolling rules are inextricably

13   related to the statute of limitations.

14        You know, the Supreme Court -- that's really black

15   letter law under the Supreme Court caselaw in the Heimeshoff

16   case, which we cite in our papers, and Judge Young also

17   explains this point in the Silva case.

18        And the SJC tolled all civil statutes of limitations

19   in Massachusetts during the COVID-19 pandemic, so the

01:47 20   limitations window for both the state and federal claims starts

21   in October 2018, which is three years plus 105 days before the

22   suit was filed, because the SJC --

23        THE COURT:  But the tolling for the state claim from

24   the court was due to the conditions in the state court.  Does

25   that necessarily -- it didn't deal with -- it wasn't enacted

1    because of the underlying claims, right?  It was enacted

2    because of the access to the courts.  Is that applied in the

3    federal court, the state claims?

4              MR. OUELLETTE:  Yes, your Honor.  Judge Young's

5    decision in Silva addresses just this point, that it's a

6    substantive tolling rule that applies to federal claims that

7    borrow Massachusetts statutes of limitations because under

8    Supreme Court caselaw, when you borrow the state statutes of

9    limitations, you also borrow the tolling rules.  And Judge

01:48 10   Young explains this in depth in the Silva opinion, which I'd

11   commend to the Court, that he found -- the same argument was

12   made there, that this was sort of procedural rule that just had

13   to do with conditions in the Massachusetts court, and he

14   rejected that argument.  He found that there was no distinction

15   under 1st Circuit caselaw between tolling by a court that has

16   to do with -- that might be argued to have to do with

17   procedures in the state courts and the kind of more familiar

18   tolling doctrines passed -- well, because, for example, a lot

19   of the tolling doctrines that we're familiar with are judge

01:49 20   made.  They're equity tolling, those sort of judge-made

21   doctrines that aren't passed by the legislature.  Those are the

22   sort of tolling doctrines that do come with the soil.  And

23   Judge Young found that this tolling order was no different.

24              In the Doe v. SUNY case in SDNY that we cite in our

25   sur-reply brief, that also applied to a similar tolling order,

1    a New York City tolling order that also dealt with the

2    conditions of the pandemic.  The court applied that to Title

3    IX.

4         And Harvard hasn't cited any cases to the contrary.

5    In fact, I don't think Harvard has really made any substantive

6    argument to the contrary.  They just say, Well, Silva doesn't

7    apply because Silva dealt with Section 1983 and not Title IX,

8    but they don't explain why that distinction is material.  As

9    I've already explained, Section 1983 and Title IX are treated

01:50 10   as of a piece for statute of limitations purposes.

11         So I think they've waived any argument that this

12   doesn't apply, but even if they haven't waived it for various

13   reasons, it does.

14         And so assuming that applies, and it does,

15   Ms. Kilburn's claims are timely for the reason alone that

16   Harvard concedes there was actionable harassment in fall 2018.

17   We allege that harassment continued after October, November,

18   and December when Professor Comaroff continued to invite

19   Ms. Kilburn to meet him alone off campus, even though he knew

01:50 20   that she was trying to avoid meeting him alone.

21         And we also allege, as we discuss in the briefs,

22   various actions in 2019 that were also part of the pattern of

23   sexual harassment, gender-based harassment against Ms. Kilburn.

24         As to plaintiffs Czerwienski and Mandava, they also

25   allege a continuing violation for three reasons.

1          First, Harvard failed to respond to complaints in

2     2016, 2017.

3          That, you know, the complaint by Harvard Student 2

4     that led to Ms. Czerwienski and Ms. Mandava being retaliated

5     against, Harvard failed to respond to their complaints in 2017.

6          And again, Harvard failed to respond to Ms. Mandava's

7     complaint in 2019 and the plaintiffs' complaints again in 2020

8     after the formal investigation initiated.

9          And the law is clear on this, too.  And that's that

01:51 10   when an institution fails to adequately respond to a

11    plaintiff's complaint of discrimination, that's itself an act

12    of discrimination that contributes to the hostile environment

13    and anchors the claim.  That's Judge Gorton's holding in the in

14    Cook case that we cite in our opposition; and several courts

15    have applied the same rule under Title IX, including the

16    district of Delaware in the Keel case that explained that the

17    school's inactions and the perpetrator's actions are all part

18    of the Title IX, the continuing violation, and that the

19    school's inaction anchored the claim in the Keel case.

01:52 20         And you know, that's also consistent with the 1st

21    Circuit's decision in Fitzgerald, which recognizes that the

22    school's deliberate indifference, its unreasonable response can

23    itself contribute to the hostile environment under Title IX.

24    And here we allege it did, that plaintiff suffered severe

25    emotional distress from living and learning with the fact that

1    an institution they trusted did not care that they were

2    harassed and threatened by a professor.

3         And second, the plaintiffs learned during the

4    limitations period that Professor Comaroff had harassed other

5    students, including Ms. Kilburn, whom he harassed well into the

6    limitations period.  And Harvard failed to adequately respond

7    to those complaints.

8         And there is caselaw on this, too.  Harassment against

9    others known to the plaintiff and the institution's failure to

01:53 10  adequately respond also contributes to the hostile environment

11   and anchors the claim, as the SJC held in the Cuddyer case.

12        And I think also analogous on this is the 2nd

13   Circuit's decision in Lucente, cited in our papers, where the

14   Court's analysis found a continuing violation under Section

15   1983, deliberate indifference claim to sexual abuse based on

16   harassment against a non-plaintiff, someone who had been a

17   plaintiff but settled the claims and wasn't at issue in the

18   appeal.  The harassment against that other inmate continued the

19   violation under the 2nd Circuit's analysis.  So it's true under

01:54 20  both state and federal law.

21        And finally, the pattern of retaliation itself

22   continued into the limitations period.  In 2020, Professor

23   Comaroff intimidated witnesses and pressured them to destroy

24   evidence.  Ms. Czerwienski reported that as retaliation to

25   Harvard, and Harvard didn't respond.

1          And in 2022, Comaroff and his allies published

2    retaliatory letters all without meaningful responses from

3    Harvard.  And faculty recognized that that letter by the 38

4    faculty at Harvard could reasonably intimidate students and

5    inhibit them from making complaints.  And we allege that

6    Professor Comaroff and Jean Comaroff did have a hand in causing

7    that letter to be published.

8          So it's all part of the same pattern of sexual

9    harassment by the same individual and a pattern of intimidation

01:55 10   to perpetuate that pattern of sexual harassment and Harvard's

11   pattern of deliberate indifference to that misconduct, all of

12   which continued into the limitations period, all of which

13   caused a hostile environment the plaintiffs are still dealing

14   with to this day.

15         So, in short, both the deliberate indifference and the

16   injury continue into the limitations period, and that's a

17   continuing violation under state and federal law.  So we

18   believe that plaintiffs do state timely claims under both state

19   and federal law that continued into the limitations period.

01:56 20        So, unless the Court has any questions, I can hand it

21   back over to my colleague to discuss the merits or however your

22   Honor would like to --

23         THE COURT:  I think there's a lot more merits, so

24   Harvard will have a chance when we're done.

25         MR. KORNBLITH:  I promise to be brief on the state

1  claims, your Honor, but I do want to address them briefly.

2          So, as the Court knows, Counts Four, Five, and Six

3  raise civil rights claims under Massachusetts law.  And I think

4  the most helpful way to think about those is to start with

5  Count Five which seeks to hold Harvard strictly liable for

6  sexual harassment committed against Ms. Kilburn.  That claim is

7  brought only on behalf of Ms. Kilburn.

8          Count Four alleges a hostile environment and

9  retaliation on behalf of all three plaintiffs under the

01:56  10  Massachusetts Civil Rights Act.  It seeks to enforce three

11  rights, which is the right to be free from sex discrimination,

12  the right to be free from discrimination under Title IX, and

13  the right to equality under Article 1 of the Massachusetts

14  Constitution.

15          So it's broader than Count Five, which makes it not

16  duplicative of Count Five, counter the caselaw that the other

17  side would cite on that.

18          Count Six is a claim that the plaintiffs were denied

19  contractual rights based on their gender and that they were

01:57  20  denied equal benefits under law in violation of the

21  Massachusetts Equal Rights Act.  So, again, that's not the same

22  as sexual harassment, which is the sole target of Count Five.

23          The second group of claims that we have are these

24  common law claims.  Count Seven states claim for negligence.

25  And as we've discussed, by 2017, Harvard had received at least

four warnings that Comaroff had a proclivity to commit sexual

harassment and retaliation, yet, it did nothing.  That's

negligent supervision.

Count Eight states a claim for breach of contract

because Harvard's policies promise to prevent retaliation and

discrimination and harassment, provide prompt remediation, and

put students back in the position of having the education that

they were promised and were the conditions of their

matriculation.  Harvard described these promises as an

obligation.  These specific promises constitute a contract

under Massachusetts law, and I would point the Court to the Doe

v. Wentworth case where the promises made in that case are very

similar to the promises made here.

Finally, Count Nine states a claim for the breach of

the covenant of good faith and fair dealing.  This claim goes

beyond the contract claim and alleges that the school failed to

fulfill the students' reasonable expectations to an education.

So with that, I would rest on our papers, unless the

Court has further questions at this time.

THE COURT:  I'm good, thank you.

MS. STEINBERG:  Your Honor, if I may respond to a few

points.

On the statute of limitations, you asked plaintiffs'

counsel is there a trigger, is there a time when these claims

accrue?  And I believe that the answer that you heard is when

1    they say it does.  And in their papers and today you've heard
2    many different answers about when the claim accrued, one of
3    which is in 2020 when there was an article by the Crimson.
4    However, we would urge you, your Honor, to look at the
5    allegations as they are pled in the complaint, because this is
6    what governs here, not what is said today, some of which is
7    contrary to what is in the complaint itself.
8            What is in the complaint itself is that, among other
9    things, by 2017, Ms. Mandava and Ms. Czerwienski knew of not
01:59 10   only their own experiences with Professor Comaroff but knew of
11   others' supposed experiences and were unsatisfied with
12   Harvard's response to that.
13           All of those mean that the claim had accrued by 2017,
14   whether you look at the running of the statute of limitations
15   to start when the conduct occurs or when knowledge of the
16   deliberate indifference occurs.
17           And I would point, among other paragraphs, to
18   paragraph 57 and 58, which state that in 2017, Ms. Czerwienski
19   complained to a certain individual, that individual took no
02:00 20   steps, and neither did Harvard; therefore, Ms. Czerwienski
21   began warning other students of the dangers that he posed.
22   They took -- in other words, they took matters, supposedly,
23   into their own hands.
24           And that continues through, for example, to paragraph
25   65.  Ms. Mandava learned that Professor Comaroff had harassed

```
 1   somebody else and was pursuing, yet, a third person; and like
 2   Ms. Czerwienski, warned other students.
 3          And there are indications throughout the complaint
 4   that they are unsatisfied.  In fact, I believe you heard it
 5   today, that by 2017, they knew of their own and others'
 6   supposed experiences with Professor Comaroff and that Harvard
 7   did nothing; and, therefore, they did a variety of things.
 8   They changed their studies, they changed the way that they
 9   dressed, they warned other people.  All of these indicate that
10   they were taking matters into their own hands and they were
11   well aware of what Harvard was or was not doing, and they
12   weren't filing complaints.
13          So, your Honor, respectfully, it appears that
14   plaintiffs are attempting to have this both ways.  They would
15   like to use earlier knowledge and knowledge of Harvard's
16   actions or inactions to prop up their later case where they
17   don't have sufficient allegations, but they do not want
18   those -- that earlier knowledge to be the basis for the running
19   of the statute of limitations; and that's just not the correct
20   application of the law here, particularly, your Honor, as to
21   the continuing violation doctrine.
22          And I apologize, if I said that no case in the 1st
23   Circuit has applied continuing violations to Title IX, that is
24   incorrect.  It has not been applied here in this -- in this
25   court.  However, even if you were to apply continuing violation
```

1    doctrine, the supposed anchoring acts that you heard today are

2    not sufficient anchoring acts, particularly as to Ms. Mandava

3    and Ms. Czerwienski.

4         What you heard today from plaintiffs' counsel is that

5    in 2020, there was a complaint of a report of intimidation of

6    others, that Professor Comaroff was intimidating others.  That

7    was one supposed anchoring act which is insufficient to anchor

8    an entire claim of sexual harassment of plaintiff herself.

9         And secondly, again, the letter by 38 faculty members

02:02 10   is being pointed to as an anchoring act.  It's not actionable,

11   whether timely or untimely; and it certainly is not sufficient

12   to be an anchoring act for an untimely claim of sexual

13   harassment of a plaintiff.

14        Your Honor, if the COVID tolling rule applied, which

15   we do not believe it does, that was a case that did not decide

16   this as a matter of law that all federal claims are somehow

17   tolled by this.  But even if you were to use the COVID tolling

18   order, neither Ms. Mandava nor Ms. Czerwienski's claims would

19   become timely.  They are still untimely for all of the reasons

02:03 20   that we've set forth today and in our brief.

21        Finally, your Honor, I would just, again, urge you to

22   look at the statute of limitations issues to look at the

23   allegations themselves, because they show that the plaintiffs

24   knew of their -- their own experiences and they knew of

25   Harvard's response or non-response, alleged non-response to

1   those allegations as of October of 2017, and all of the Title

2   IX claims are, therefore, untimely.

3          On the statutory claims, your Honor, if I may briefly

4   address those.  It appears that plaintiffs concede that the

5   214C statute, if this alleges -- if the -- that that governs,

6   not the other two statutes that are alleged in those counts,

7   but that they would like to keep all three alive, in any event,

8   because the other two are, quote-unquote, broader.

9          Your Honor, as we explain in our brief, the plaintiffs

02:04 10  simply use different words to describe those causes of action.

11  The question is whether the underlying facts, the facts that

12  give rise to those three statutory counts, are the same; and

13  they are here, and therefore, they cannot all proceed.  And in

14  any event, they are all untimely for the same reasons that we

15  have stated.

16         Finally, your Honor, again, on the breach of contract

17  claim, I think I'll rest on my prior statements.

18         And on the negligence claims, you heard plaintiffs'

19  counsel say that by 2017 they were aware of Harvard's negligent

02:05 20  actions toward having failed to supervise and failed to oversee

21  Professor Comaroff because the plaintiffs knew of their own

22  experiences and others, and that plainly makes all of their

23  claims, both under their negligence counts and under Title IX,

24  untimely.

25         Thank you.

1          THE COURT:  Okay.  Unless you're going to give me

2     something new --

3          MR. OUELLETTE:  Yes, your Honor.  Just in response, I

4     want to direct the Court to some specific allegations in the

5     complaint in response --

6          THE COURT:  Okay.

7          MR. OUELLETTE:  -- to the argument that we alleged

8     that the plaintiffs are unsatisfied with Harvard's response to

9     complaints in 2017.

02:06 10          First, paragraph 123 of the complaint alleges exactly

11     the opposite explicitly.  It says, Before those articles were

12     published in 2020, plaintiffs did not suspect that Harvard had

13     failed to respond to prior reports of sexual harassment.

14          Paragraph 143.  These new revelations -- again,

15     referring to revelations in 2020 that Professor Comaroff had

16     continued to sexually harass multiple students after Harvard

17     received multiple complaints about him and of Harvard's pattern

18     of deliberate indifference to reports against faculty -- also

19     alerted plaintiff that Harvard had likely not responded

02:06 20     adequately to prior complaints against Comaroff; and Comaroff

21     confirmed this himself in the press.

22          The allegations that Harvard cite, I believe 56

23     through 58, allege that Ms. Czerwienski complained to her

24     advisor about Professor Comaroff and that her advisor expressed

25     concern that Harvard had not properly trained her in her

1   reporting obligations, so she took no steps to intercede, and

2   Ms. Czerwienski began warning other students about the dangers

3   that he posed.

4        None of those allegations allege that Ms. Czerwienski

5   knew or give any reason for the Court to conclude that

6   Ms. Czerwienski should have known that an appropriate official

7   at Harvard knew about sexual harassment and failed to

8   adequately respond to it.

9        Professor Greenhow, Ms. Czerwienski's advisor -- and

02:07 10   that's the professor that these allegations discuss -- everyone

11   here agrees not an appropriate person under Title IX, so she

12   couldn't trigger Title IX liability.

13        And so the fact that Ms. Czerwienski knew that a

14   complaint was made to her doesn't tell us anything under Title

15   IX and doesn't put Ms. Czerwienski on notice of her claim under

16   Title IX.

17        As a case the Court can look to confirm that, the 6th

18   Circuit decision in Snyder-Hill makes it very clear.  In that

19   case there were lots of students that were abused by an

02:08 20   athletic trainer many years before the complaint was filed, and

21   some of them had told the coaches about the abuse, just like

22   Ms. Czerwienski told an average professor about the abuse.  And

23   the court held that didn't trigger accrual because those

24   coaches were not appropriate people under Title IX, they

25   weren't people who could take -- had authority to take

1    corrective action, like Dr. Avakian with the Title IX office.

2    And plaintiffs didn't know that there were complaints to

3    Dr. Avakian by prior students and that Harvard had failed to

4    respond to those complaints until 2020 when the Crimson and The

5    Chronicle came out with their reports.

6         And I think -- so opposing counsel also addressed a

7    couple of the anchoring acts that we allege during the

8    limitations period, the intimidation against Harvard Student 2

9    for plaintiffs' investigation and the retaliatory letter, and

02:09 10   so, quickly, if my colleague could address why those constitute

11   retaliation.

12        MS. STEINBERG:  Your Honor, can I just respond to one,

13   the statute of limitations question?

14        Because that paragraph, I just need to point out, says

15   she, Professor Greenhow, took no steps to intercede and neither

16   did Harvard.

17        So clearly it shows that there was an allegation that

18   Harvard took no steps at that time in 2017 to -- supposedly, to

19   address the things that plaintiffs knew.  So I think the

02:09 20   allegations need to be read as they are pled.

21        THE COURT:  But they're not alleging that anybody else

22   from Harvard knew, right?

23        MS. STEINBERG:  Well, they are, in fact.  They had

24   made a complaint -- within days of the 2017 comments being

25   made, they had made a complaint to Title IX Harvard knew.

```
 1              THE COURT:  Okay.
 2              MR. OUELLETTE:  Would you like to me to just clarify
 3     factually?
 4              THE COURT:  I'm a little confused at the moment.
 5              MR. OUELLETTE:  So plaintiffs allege -- so what
 6     happened is Harvard Student 2 makes a complaint, a prior
 7     complaint, to the Title IX office in 2017.  That's before
 8     Professor Comaroff threatened the plaintiffs.  And then,
 9     Ms. Czerwienski complains about the threat to the same person,
02:10 10    the same Title IX officer.
11              So those are the two complaints to an appropriate
12     person that occurred in 2017, so those are the ground for our
13     Title IX liability on the theory that Harvard -- that the
14     Harvard Student 2 complaint is the grounds for the
15     pre-retaliation liability, so our theory that Harvard had that
16     complaint from Harvard Student 2, failed to respond, and
17     therefore, the plaintiffs were harassed and threatened.
18              So we do allege that Harvard knew about sexual
19     harassment and retaliation, in fact, in 2017 before plaintiffs
02:11 20    were threatened.  What we do not allege is that plaintiffs knew
21     or should have known about those prior complaints to Harvard
22     and that plaintiffs should or should have known --
23              THE COURT:  But she's arguing that they knew about
24     their own complaint.
25              MR. OUELLETTE:  And I can address that, too.
```

1           So as far as Ms. Czerwienski' complaints to

2   Dr. Avakian after the retaliation in 2017, nothing in the

3   complaint alleges the second part, that Ms. Czerwienski knew or

4   should have known about Harvard -- how Harvard responded to

5   that complaint.  Remember, the burden is on Harvard to remove

6   any doubt that she should have known about that.

7           But even if -- and the caselaw is clear on this --

8   even if Ms. Czerwienski had a reason to know that her own

9   complaint was mishandled prior to the limitations period -- and

02:12 10   again, we argue she didn't -- but even if Ms. Czerwienski had a

11   reason to know that her own complaint was mishandled, that's

12   not enough for her claim to accrue for the pre-retaliation

13   claim.  So it's not enough for her to be on notice that she had

14   a claim that Harvard was deliberately indifferent to prior

15   complaints that caused her harassment.  And the 6th Circuit

16   reaches that conclusion in the Snyder-Hill case very clearly,

17   that says even if the plaintiff knows that her own complaint

18   was mishandled, she still has -- she can still have a timely

19   claim for pre-harassment or pre-retaliation deliberate

02:12 20   indifference based on the institution's failure to respond to

21   prior complaints when she didn't know how the institution

22   responded to prior complaints.

23           THE COURT:  Would you just address for me -- you said

24   that there's in the record information that a dean, one of the

25   deans was involved in getting the faculty letters.

1          MR. OUELLETTE:  Professor Comaroff was involved.

2          MR. KORNBLITH:  Yes, your Honor.  That I believe is at

3     paragraph 194.

4          MR. OUELLETTE:  Yes.

5          MR. KORNBLITH:  Your Honor, paragraph 194 says that it

6     was the efforts of the Comaroffs that resulted in the faculty

7     statements.

8          And I believe also at paragraph 191, we have Professor

9     Jean Comaroff disseminating a statement authored by Professor

02:13 10   Comaroff's lawyers panning the plaintiffs' opposition to sexual

11    harassment.

12         We have Professor Halley joining in on that attack,

13    and I think that does go, in fact, to the second point I was

14    going to address, which is this retaliatory.

15         Well, after we filed this lawsuit, which we filed the

16    initial complaint just days after those 38 faculty members --

17    34 retracted it, and that's true, but they only retracted it

18    because we filed this lawsuit, and it's only because of this

19    lawsuit that they recognized that what they had said could, in

02:14 20   fact, have a chilling effect on future complainants, which is

21    the standard for retaliation under Title VII and, thus, under

22    Title IX because Title IX adopts Title VII here.

23         So I don't think based on the pleadings -- I think

24    it's a very reasonable inference this was a retaliatory act and

25    Harvard to this day has not issued an official statement

condemning it.  It's got one statement by one dean that said

people should be more reflective, but I don't think Harvard

gets to own that statement without also owning the statements

of the 38 faculty members.

THE COURT:  Okay.  Thank you.

MS. STEINBERG:  Your Honor, that's exactly the case as

a matter of fact.  There is no strict liability for

retaliation, as the government agrees, and as the plaintiffs

seem to concede.  We are not responsible, Harvard is not

responsible for every statement of opinion about every case

that it has by every faculty member --

THE COURT:  I think that's -- let's keep this within

the bounds of what's really being argued.

I mean, what they're saying is there's 38 letters that

come out.  It's a very public statement, and the issue is

should Harvard have taken a position on it or was it obligated

to.

MS. STEINBERG:  Well, Harvard did take a position on

it, as you just heard, which was, Please be more reflective,

you don't have all of the facts.

And what counsel has said is Harvard can't own that

and not own the statements of the 38 faculty members, or four

after the retraction, however many it is.  And the cases --

actually, yes, as the dean she was speaking for the university.

As the 38 or 34 or four faculty members, they are stating their

1    opinion, and there is no basis to hold Harvard strictly liable

2    for what those folks have done.  The response was, in fact --

3    is not alleged to have been retaliatory in any way.  The

4    response was from Harvard.  And so there is no basis to find

5    retaliation anywhere there, and to do otherwise would chill the

6    ability of academics to state their opinion even about -- many

7    of those statements were critical of Harvard in -- you know,

8    there were dueling letters, and it would chill academic freedom

9    to hold Harvard responsible for the opinions of each of its

02:17 10   letter writers in this case.

11              MR. KORNBLITH:  Your Honor, if I could correct just

12   one statement there, which is, the next paragraph in our

13   complaint, paragraph 199, points out that Harvard did issue one

14   official statement in this case, and that's on February 10th

15   that accused the plaintiffs of creating a potential chilling

16   effect on our community members' confidence in the

17   investigatory process and their ability to access counseling

18   and other resources.

19              So Harvard was perfectly capable of putting out an

02:17 20   official statement, it just chose to do that to condemn our

21   plaintiffs' efforts, not the faculty signers.

22              MS. STEINBERG:  Those two are unrelated, your Honor.

23   That has to do with false and -- false information in the claim

24   regarding the disclosure of personal health information.

25   That's what that statement had to do with.

1          Plaintiffs decided not to include the university's

2      statement about those letters in their complaint.

3              THE COURT:  Okay.  Thank you.

4              I'll take the matter under advisements.  This has been

5      helpful.  Thank you all.

6              THE CLERK:  Court is in recess.

7              (Court adjourned at 12:32 p.m.)

8                      - - - - - - - - - - - -

9                            CERTIFICATION

10         I certify that the foregoing is a correct transcript

11     of the record of proceedings in the above-entitled matter to

12     the best of my skill and ability.

13

14

15

16     /s/Debra M. Joyce_____          January 10, 2023_____
       Debra M. Joyce, RMR, CRR, FCRR     Date
17     Official Court Reporter

18

19

20

21

22

23

24

25