UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MARGARET CZERWIENSKI, | ) | |
| LILIA KILBURN and | ) | |
| AMULYA MANDAVA, | ) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION NO. 22-10202-JGD |
| v. | ) | |
| | ) | |
| HARVARD UNIVERSITY and | ) | |
| THE PRESIDENT AND FELLOWS | ) | |
| OF HARVARD COLLEGE, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF DECISION AND ORDER ON
## HARVARD'S AMENDED MOTION FOR PARTIAL
## <u>SUMMARY JUDGMENT AS TO COUNT TEN</u>

March 27, 2023

DEIN, U.S.M.J.

### I.      <u>INTRODUCTION</u>

The plaintiffs are all graduate students in Anthropology at Harvard University.  They

have brought an action against Harvard[1] alleging that they were sexually harassed by Professor

John Comaroff, a professor in the Anthropology and African and African American Studies

Departments, and that Harvard's inadequate response to their complaints subjected them to

gender discrimination, sexual harassment, a hostile environment and retaliation.  In Count Ten

of the Amended Complaint, plaintiff Lilia Kilburn ("Ms. Kilburn") alleges that in connection with

---

[1] Defendants contend that Harvard University is not properly named as a defendant as it is not a corporate entity independent of the President and Fellows of Harvard College.  The Defendants refer to themselves collectively as "Harvard" and the court will do the same.

Harvard's investigation of her complaint by its Office of Dispute Resolution ("ODR") it obtained and disseminated her therapy records without her consent, thereby inducing her therapist to breach her fiduciary duty and invade Ms. Kilburn's privacy, in violation of common law and Mass. Gen. Laws ch. 214, § 1B.

This matter is presently before the court on "Harvard's Amended Motion for Partial Summary Judgment as to Count Ten" (Docket No. 47).  By its motion, which was filed before the onset of any discovery, Harvard contends that the undisputed facts establish that Ms. Kilburn initiated Harvard's interactions with her therapist, was fully informed that information obtained from the therapist would be disseminated to Professor Comaroff and others, and that she consented thereto.  Ms. Kilburn opposes the motion both as being premature and on the basis that the facts are in dispute.

For the reasons detailed herein, this court concludes that the extent of Ms. Kilburn's consent is unclear and in dispute, and that this issue must await further development of the record.  Harvard is relying on ambiguous documents and disputed oral conversations that have been untested by discovery.  There are cases where the facts are so clear cut that summary judgment is appropriate before discovery begins.  See Nieves-Romero v. United States, 715 F.3d 375, 380 (1st Cir. 2013).  This is not such a case.  Rather, the plaintiff is entitled to have "sufficient time and opportunity for discovery" before Harvard can prevail on a claim that the plaintiff cannot prove her case.  See Carmona v. Toledo, 215 F.3d 124, 132-33 (1st Cir. 2000).  Therefore, Harvard's motion for summary judgment as to Count Ten is DENIED without prejudice.

II.     **STATEMENT OF FACTS**[2]

The facts herein are limited to those relevant to the Motion for Partial Summary

Judgment as to Count Ten.  As a general statement, it is Harvard's position that two written

policy documents informed Ms. Kilburn that any information she provided during the course of

the investigation would be provided to Professor Comaroff, and that this was confirmed in

emails and oral communications with Ms. Kilburn.  It is Ms. Kilburn's contention that the

information provided to her was inconsistent, that it was never made clear either that Harvard

was going to obtain any written documents from her therapist, or that Harvard would

disseminate such information without her consent, and that oral statements were made

contradicting Harvard's present position.  This court agrees that the record is not sufficient to

support Harvard's motion for summary judgment at this time.

**Events Leading Up to the Investigation**

Ms. Kilburn is a graduate student in the Anthropology Department at Harvard.  She

alleges that beginning in 2017, she was subjected to "forced kissing, groping, persistent

---

[2] The facts are derived from the Amended Complaint (Docket No. 35) ("AC"); Harvard's Amended Statement of Material Facts (Docket No. 49) ("HSF"); the Affidavit of Alexandria Masud, Associate Director for Administrative Operations at Harvard University (Docket No. 50) ("Masud Aff."); the Affidavit of Ilissa Povich, Senior Investigator with Harvard University's Office for Dispute Resolution (Docket No. 51) ("Povich Aff.") and Exhibits attached thereto ("Harvard Ex. ___"); the Affidavit of Kwok W. Yu, Senior Associate Dean for Faculty Affairs for the Faculty of Arts and Sciences at Harvard University (Docket No. 52) ("Yu Aff."); Plaintiffs' Response to Defendant's Amended Statement of Material Facts (Docket No. 63) ("PR"); the Declaration of Carolin Guentert, counsel for Plaintiffs (Docket No. 64) ("Guentert Decl.") and Exhibits attached thereto ("Pls. Ex. ___"); and the Declaration of Lilia Kilburn (Docket No. 65) ("Kilburn Decl.") and Exhibits attached thereto ("Kilburn Ex. ___").  Citations to the Statement of Facts and Response thereto incorporate the underlying exhibits.  Relevant pleadings are cited as follows: Amended Memorandum of Law in Support of Harvard's Motion for Partial Summary Judgment as to Count Ten (Docket No. 48) ("Harvard Mem."); Plaintiffs' Memorandum of Law in Opposition to Defendant's Amended Motion for Partial Summary Judgment as to Count Ten (Docket No. 62) ("Kilburn Opp."); and Harvard's Reply Memorandum in Support of its Amended Motion for Partial Summary Judgment as to Count Ten (Docket No. 73) ("Harvard Reply").

invitations to socialize alone off-campus, and coercive control" by Professor Comaroff, who "forbade her to work with her other advisor."  AC ¶ 12.  See generally AC ¶¶ 88-107.  She complained to Harvard's Title IX[3] Office in May 2019.  Id. ¶ 13.  According to the plaintiffs, Harvard took no meaningful action at that time, and did not act until *The Harvard Crimson* newspaper and *The Chronicle of Higher Education* published articles in 2020 reporting on the complaints against Professor Comaroff and others.  Id. ¶¶ 14, 17.

Specifically, as alleged in the Amended Complaint, on or about April 26, 2019, after a particularly stressful encounter with Professor Comaroff, Ms. Kilburn complained to two professors who were mandatory Title IX reporters and they, in turn, shared her complaint with the Title IX Office.  Id. ¶ 108.  On May 2, 6 and 29, 2019, Ms. Kilburn met with a Title IX Officer, Dr. Seth Avakian, and two other professors in connection with her Title IX complaint.  Id. ¶ 109.  However, no investigation was undertaken, and her complaint was met with "indifference," albeit with an acknowledgement that there had been at least one other complaint made against Professor Comaroff.  Id. ¶¶ 110, 111.

According to the plaintiffs, Harvard did not investigate either Ms. Kilburn's or other students' complaints against Dr. Comaroff until May 2020, when *The Harvard Crimson* contacted the Title IX Office seeking comment on an article about sexual harassment complaints that it was preparing to publish.  Id. ¶ 118.  On May 18, 2020, Dr. Avakian filed a formal complaint against Professor Comaroff with Harvard's ODR, the office tasked with investigating Title IX complaints, on behalf of all the plaintiffs and another Harvard student.  Id.

---

[3] Title IX bars universities that receive federal funds from discriminating against students on the basis of sex.  See 20 U.S.C. § 1681(a).

¶ 119.  The *Crimson* published its article on May 29, 2020, and the *Chronicle* followed suit on August 25, 2020.  Id. ¶ 122.  According to the plaintiffs, the unnamed student was fearful of reprisals, and on June 3, 2020, Dr. Avakian revised and resubmitted his May 18, 2020 complaint to ODR limited to the three plaintiffs.  Id. ¶ 147.

### Events Leading Up To Harvard's Communications With Ms. Kilburn's Therapist

Ilissa Povich, a Senior Investigator with ODR, was assigned to Ms. Kilburn's matter.  HSF ¶ 4.  She was assisted by a Fellow working in the office, Jessica Shaffer.  Id. ¶ 6.  Ms. Povich contacted Ms. Kilburn by email on June 4, 2020, and asked if she was available to meet in the next few days.  Id. ¶ 14.  As attachments to this email, Ms. Povich provided Ms. Kilburn with access to a number of documents.  As she wrote:

> Please find the following documents linked for your review: 1) **the Sexual and Gender-Based Harassment Policy and Procedures for the Faculty of Arts and Sciences Harvard University**; 2) **Harvard University's Procedures for Handling Complaints Involving Students** Pursuant to **the Sexual and Gender-Based Harassment Policy**; 3) **Frequently Asked Questions Concerning the Policy and Procedures**; 4) **Frequently Asked Questions Concerning the FAS Policy and Procedures**; 5) the **ODR Flowchart for Investigative Process**; and 6) the **Personal Advisor Role Frequently Asked Questions**.  As outlined in these documents, your participation is entirely voluntary, and *ODR respects and protects privacy to the greatest extent possible, sharing information only on a need-to-know basis.*

Id. ¶ 14 (bold documents were hyperlinked; italicized emphasis added).  Despite the assurance of protecting the participants' privacy "to the greatest extent possible," and "sharing information only on a need to-know basis," Harvard relies on the language included in two of the attached documents in support of its summary judgment argument that "that ODR's procedures *required* it to share information it received in its investigation with Comaroff." Harvard Mem. at 7-8 (emphasis added).  Those documents and the relevant language include the following materials.

[5]

The document entitled "Frequently Asked Questions Concerning the Policy and

Procedures" included the following language:

> Will both parties have access to the *materials that ODR uses in reaching its conclusions*?
>
> Yes.   During the course of the investigation, both the complainant and the respondent will have the opportunity *to respond to all information used by the Investigative Team in reaching its conclusions.  They will also have the opportunity to provide the Investigative Team with any additional information that they have. This information, like other information received from the complainant and respondent during the investigatory process, will be shared with the other.   In addition, each party will have the opportunity to review and comment on the draft investigative report, and the Investigative Team will evaluate the comments before issuing a final report.*
>
> For the past six years, ODR has routinely emailed the parties such documents with redactions removing any personally identifying information of students in accordance with the Family Educational Rights and Privacy Act ("FERPA").  *Likewise, ODR shares other information gathered upon which ODR may rely, as information gathered in interviews, with the parties orally.*

HSF ¶¶ 19, 23 (emphasis added).  The "ODR Flowchart for Investigative Process" contained the

following language:

> ODR collects additional information (e.g., interview witnesses, collect documents, conduct site visits).  *The parties may submit additional materials they believe may be relevant.  Copies of these materials will be given to the other party and, at that party's discretion, their Personal Advisor (if applicable). . . .*

Id. ¶ 20 (emphasis added).

While the plaintiffs do not dispute that this language was included in the documents,

they stress that in the absence of discovery, they have no information as to whether the

procedures described in these documents were actually, or customarily, followed.  See PR ¶¶

19, 20.  They further argue that the language is unclear as to what information will actually be

shared, and there is no reference to personal medical or psychiatric information.  Harvard does

[6]

not dispute that Ms. Kilburn never initialed these provisions or otherwise specifically consented in writing to the dissemination of any of her personal medical information.  It also appears to be undisputed at this juncture that Harvard never explained what limitation, if any, was meant by the reference "to the materials that ODR uses *in reaching its conclusions.*" (emphasis added).  There also is no explanation as to whether ODR would share information about which a party was unaware or which a party had not submitted.  Furthermore, the record does not contain an explanation as to what information would be shared orally, as opposed to in writing.

Despite the fact that Ms. Kilburn's complaint of May 2019 and Dr. Avakian's original complaint of May 18, 2020 had not generated any response from ODR, Ms. Povich stressed the need for prompt action in her communications with Ms. Kilburn in June 2020.  See Kilburn Decl. ¶¶ 8-9, 12-13, 15.  This appears to have been challenging for Ms. Kilburn, as she was in a rural area with poor internet access and it was a very busy period for her.  See id. ¶ 10.  In the communications following the initial contact from Ms. Povich there is evidence that Ms. Kilburn was feeling pressured to either withdraw her complaint or ignore her other obligations to respond to what she perceived to be an artificial timeline.  See id. ¶¶ 6-16.  She was also concerned because Professor Comaroff had a personal advisor and legal representation before she had the opportunity even to obtain an advisor, and she was worried that Professor Comaroff would retaliate against her for participating in the ODR process.  Id. ¶¶ 16, 18.  Nevertheless, Ms. Povich was insistent that the matter either move forward or be dropped.  See id. ¶ 15.  Despite her concerns, Ms. Kilburn did agree to participate.  She spoke with Ms. Povich by phone on June 18, 2020.  Id. ¶ 16.  She also agreed to file a complaint to correct

[7]

errors in Dr. Avakian's complaint, which she did on July 13, 2020, with minor amendments on

July 16, 2020.  PR ¶¶ 26, 39.

As detailed more fully below, Ms. Kilburn met on Zoom with Ms. Povich and others on

July 13, 2020.  Before then, there was an exchange of emails relating to scheduling.  See HSF ¶

22.  On July 1, 2020, Ms. Kilburn sent an email to Ms. Shaffer, the ODR Fellow, asking a series of

questions, including questions which indicated that she was unsure about what information, if

any, was going to be disseminated.  Therein, Ms. Kilburn wrote:

> I am also wondering about how COVID affects the process -- I think either Illissa or
> Seth had mentioned a process where printed copies of documents were consulted.
> But this can't be the system currently, right?  I would have concerns about sharing
> electronic copies of things, given how easily they can be copied.  How are you all
> approaching this?

Id. ¶ 23.  Ms. Shaffer responded by repeating the excerpts from the Frequently Asked

Questions ("FAQ") quoted above, and stating as follows:

> ODR's investigative process continues remotely during the response to the novel
> coronavirus.  As a reminder, the Policy and Procedures grants rights to parties that
> do not extend to witnesses.  Both parties have the right *to review and respond to*
> all information *that ODR may rely on in the investigation*, including the complaint,
> the response, any written information provided by a witness, or other documents
> submitted.

PR ¶ 23 (emphasis added).  As quoted above, the FAQ information also indicated that "ODR

shares other information gathered upon which ODR may rely, such as information gathered in

interviews, with the parties orally."  PR ¶ 23.  Harvard contends that this email, along with the

FAQ Bulletin and the ODR Flowchart, constitute three written notices to Ms. Kilburn that her

personal information, which she had not seen, would be shared with Professor Comaroff.

Harvard Mem. at 7-8.

Ms. Kilburn was interviewed on Zoom by Ms. Povich and Ms. Shaffer on July 13, 2020.

Ms. Kilburn's personal advisor, Jacqueline Yun, Executive Director of the Graduate School of

Arts and Sciences Student Center, was also present.  HSF ¶ 25.  The interview continued on July

20, 2020.  HSF ¶ 40.  There is no recording of either of the interviews.  Harvard asserts that at

various times through these interviews, Ms. Kilburn was advised that information obtained

during the investigation would be shared with Professor Comaroff, and that Ms. Shaffer's notes

of the interviews reflect the same.[4]  HSF ¶¶ 29-30, 32-33, 36.  Even under Harvard's version of

events, however, there was no specific reference to medical or psychological records, or to any

other types of highly confidential information.  The following is typical of Harvard's statement

of facts and the plaintiffs' responses relating to these issues:

> In the course of ODR's July 13 interview of Kilburn, Povich reminded Kilburn a
> number of times that if ODR proceeded with its investigation it would share
> information that she provided with Comaroff.  Povich Aff. ¶ 18.
>
> Response: Disputed as unsupported by the cited affidavit or notes because Plaintiffs
> have not had the opportunity to depose the affiant or Shaffer.  *See* Pls.' Resp. to ¶
> 1.  Further disputed to the extent Defendant implies that *all* information Ms. Kilburn
> provided to ODR would be shared with Professor Comaroff.  Indeed, ODR only told
> Ms. Kilburn that information she shared and on which ODR "may rely" would be
> shared with Professor Comaroff without explaining to Ms. Kilburn how ODR
> determined whether it would "rely" on evidence.  *See* Kilburn Decl. ¶¶ 23-24.
> Throughout the ODR process, ODR chose not to "rely" on certain evidence Plaintiffs
> submitted, and did not share all evidence submitted in the case with both sides.  *Id.*
> ¶ 25.  Further disputed because Defendant has not produced full notes of ODR's
> interviews with Ms. Kilburn to Plaintiffs and have not established that the notes
> were not edited following the interview such that they would not qualify as a
> recorded recollection.

HSF ¶ 36; PR ¶ 36.

---

[4] The parties dispute whether Ms. Shaffer's notes are properly considered on summary judgment or are
inadmissible hearsay.  In light of this Court's conclusion that summary judgment is not warranted, the
Court will not resolve this dispute at this time.

According to Ms. Kilburn:

Throughout the ODR process, I never fully understood what information I provided to ODR would be shared with Professor Comaroff and vice versa. ODR gave me vague – and at times conflicting – explanations of what information would be shared with the other party, and refused to clarify further even when I asked.

Kilburn Decl. ¶ 21. Thus, while ODR informed her that "they would share with Professor Comaroff only information on which ODR 'may rely' or 'might rely'," no one explained to her "how ODR would determine whether it 'may rely' or 'might rely' on information [she] shared with them, and thus pass it on to Professor Comaroff." Id. ¶ 23.[5] Similarly, Kilburn was informed that "ODR doesn't share interviews in their entirety" and does not share "procedural questions" but when she asked for further clarification she did not receive an answer. Id. ¶ 24. On another occasion she was told that parties would not receive copies of evidence to keep but would only have the right to review the evidence in a conference room. Id. ¶ 26. On one occasion, when the plaintiffs attempted to submit text messages as evidence, "ODR asked both the sender and the recipient of each text message conversation whether each consented to the text messages being used as evidence in the ODR process" and if one party withheld consent, ODR did not "rely" on the text messages and thus did not share them. Id. ¶ 25. Significantly, both Harvard and the plaintiffs seem to agree that there were no specific conversations about medical records and that ODR never asked for or obtained Ms. Kilburn's explicit written consent to release her therapy records. Id. ¶ 27. Moreover, there is no evidence that Ms. Kilburn was advised that Harvard would disseminate records before having them reviewed by Ms. Kilburn,

---

[5] According to Harvard, Ms. Kilburn and her advisor were expressly told on July 20, 2020 that ODR shared "what was provided by the parties" and that it did not "share everything in the interview" with the parties. HSF ¶ 40. They were allegedly told further that "[w]e share anything we might rely on, but we don't share the interviews in their entirety." Id.

or before Mis. Kilburn submitted them as evidence on her own behalf.  Finally, it seems to be

undisputed that ODR did not tell Ms. Kilburn "that Professor Comaroff would be receiving a

copy of [her] medical records by email, his to keep forever."  Id.

### Harvard's Receipt of Ms. Kilburn's Therapy Records

Professor Comaroff responded to Ms. Kilburn's ODR complaint on August 12, 2020.  HSF

¶ 42.  Therein, he questioned Ms. Kilburn's mental stability for "reasons unrelated" to his

conduct.  See Kilburn Decl. ¶ 30.  This upset Ms. Kilburn because she believed the emotional

distress she suffered while being Professor Comaroff's advisee was largely due to his behavior.

Id.  Ms. Kilburn had no intention of referencing any therapist in the ODR proceeding.  PR ¶ 46.

Upon reading Professor Comaroff's response, however, Ms. Kilburn recalled that she had seen a

therapist at Harvard University Health Services in the summer of 2018 and discussed Professor

Comaroff's harassment of her, but once the therapist implied that he had a duty to report

harassment to Harvard, she sought out a private therapist as she was not yet ready to make a

complaint to Harvard.  Kilburn Decl. ¶ 31.  Ms. Kilburn contacted both therapists to determine if

they had any notes of her sessions, which she planned on reviewing before deciding whether to

submit them to ODR.  Id. ¶¶ 33-34.  The Harvard therapist's notes were cursory and Ms. Kilburn

did not share them with ODR.  Id. ¶ 33.  With respect to the private therapist, Ms. Kilburn wrote

to her on August 20, 2020, and asked if she had any notes from May 2019 and/or if she had

time to talk.  Id. ¶ 34.  It was clear from this communication that Ms. Kilburn expected any

communication to go through her, and not directly to Harvard.  The therapist responded that

she was on vacation and would look for notes when she got back to Boston.  Id. ¶ 35.  She

further wrote as follows:

> I would be glad to write up a brief statement acknowledging that we talked about
> sexual harassment by professors in your department on a number of occasions and
> that you also discussed the damage these people could do to your academic career.
> I can attest to your deep unhappiness in the department related to sexual
> harassment on various levels throughout the department and how ineffective your
> repeated efforts to report this proved.  I'll let you know whether I can find anything
> more specific when I get home.

Id.  In response, Ms. Kilburn wrote:

> I would greatly appreciate if you could check your notes back in Boston, and if you
> could write up a statement.  Would it be helpful if I checked in when you are back
> from vacation?  If so, when would that be?

Id. ¶ 36.  According to Ms. Kilburn, she intended to review any information from her therapist

before it was sent to ODR.  Id.

Ms. Kilburn submitted her reply to Professor Comaroff's August 12, 2020 response to

ODR on August 24, 2020.  Id. ¶ 38.  Therein, she confirmed that she had spoken to a counselor

at Harvard about Professor Comaroff's "repeated sexual harassment" and to a private therapist

thereafter.  As she wrote:

> Because of my fear that discussing my experiences frankly with a Harvard employee
> would remove my agency over how that information was shared, I sought out a new
> licensed mental health professional with whom to discuss these issues. . . .  She is
> currently on vacation, but I believe she has specific memories of our conversations
> about misconduct in my department, my concerns about the damage Professor
> Comaroff could do to my career, and my repeated and unfruitful attempts to get
> assistance.  She is ready to attest to this when she returns from vacation.

> Thank you to Professor Comaroff for jogging my memory on this additional incident
> of contemporaneous corroboration and disclosure of his misconduct and its effects
> on me.

HSF ¶ 47.  Ms. Kilburn did not intend this to be authorization for ODR to obtain information directly from the therapist.  PR ¶ 47; Kilburn Decl. ¶ 38.

Ms. Kilburn was interviewed by Ms. Povich and Ms. Shaffer on August 28, 2020.  HSF ¶ 48.  Her personal advisor, Ms. Yun, was also present.  Id.  Harvard relies on statements allegedly made at this meeting to support its contention that Ms. Kilburn consented to having ODR contact her therapist, obtain her records, and disseminate them to Professor Comaroff. Harvard Mem. at 9-10.   Again, Ms. Kilburn objects to the fact that she has not had the opportunity to depose any of the witnesses, including Ms. Shaffer who allegedly took notes, and does not agree with Harvard's interpretation of events.  See, e.g., PR ¶ 52.

According to Harvard, Ms. Kilburn was informed at that time that therapists could be listed as witnesses, "but that such witnesses often will not participate without a waiver from the party" and "[i]f you give them a waiver, they will generally talk to [ODR]."  HSF ¶ 49.  Ms. Shaffer's notes state that Ms. Kilburn said that her therapist "should have a bunch of notes or memories for you."  Id. ¶ 50.  According to Ms. Kilburn, Ms. Povich encouraged her to list her therapist as a witness, since she would have contemporaneous information, and further advised her that she should not be in communication with any witness as it could compromise the integrity of the investigation.  See Kilburn Decl. ¶¶ 40-43.  As a result, Ms. Kilburn did not contact her therapist again.  Id. ¶ 43.  Harvard never asked Ms. Kilburn to sign a waiver. According to Ms. Kilburn, at most she understood "that ODR might contact my therapist and ask her whether she had relevant documents, just as I had done.  I did *not* understand this to mean that ODR would interview my therapist about her treatment of me and ask her for my

medical records." Id. ¶ 42 (emphasis in original).[6]  See also id. ¶ 46.  At Ms. Shaffer's request,

Ms. Kilburn sent a list of eight witnesses and their contact information to Ms. Shaffer on

September 25, 2020.  HSF ¶¶ 55, 56.  Ms. Shaffer confirmed that she would send the witness

list to Professor Comaroff, with students' personal identifying information redacted.  Id. ¶ 56.

On October 22, 2020, Ms. Shaffer and Ms. Povich met with Ms. Kilburn's therapist over

Zoom.  Povich Aff. ¶ 32.  According to ODR, but untested by the plaintiffs, the therapist was

informed "that if she provided information to ODR, and ODR concluded that it might rely on it,

ODR would share that information with both parties."  Id. ¶ 34.  Other than the fact that the

therapist indicated that she understood her obligation of confidentiality, and "that she received

an email over the summer from Ms. Kilburn asking whether the therapist had documentation

about what she and Ms. Kilburn had 'talked about'. . . ." ODR apparently took no steps to verify

that the therapist had Ms. Kilburn's consent to speak about any specific topics or to provide any

written information.  See id. ¶¶ 33-34.  Nor did ODR apparently clarify that it did not have such

written consent either.  See id.  Remarkably, the therapist "agreed to keep her conversations

with ODR confidential[.]"  Id. ¶ 34.  Later that day the therapist sent Ms. Shaffer therapy notes

from March 6, 2019 and March 20, 2019 (not the May 2019 dates Ms. Kilburn had previously

identified), which contained information concerning matters outside the scope of the ODR

investigation.  See PR ¶ 71.  According to Ms. Povich, "ODR obtained the therapist's notes of

her March 6, 2019 and March 20, 2019 sessions solely because Ms. Kilburn told ODR [at the

meeting on August 28, 2020] that the therapist 'should have a bunch of notes or memories for

---

[6] Ms. Kilburn's understanding seems to be supported by Ms. Shaffer's notes, which state that Ms. Povich told Ms. Kilburn that "[w]e ask every single witness if they have documents that are relevant, which we share with *you*."  HSF ¶ 51 (emphasis added).

[ODR].'"  Povich Aff. ¶ 37; Harvard Ex. 10 at 26.  No one notified Ms. Kilburn that this was

happening or confirmed that she approved.

On October 30, 2020, without prior notice, ODR sent the two therapist notes to Ms.

Kilburn and Professor Comaroff.  HSF ¶ 72; PR ¶ 72.  They were redacted, and Ms. Kilburn never

received an unredacted version prior to Harvard's filing of the instant motion.  Kilburn Decl. ¶¶

51, 54, 78.  Ms. Kilburn met with ODR for "review of evidence" meetings on January 5, 6 and 7,

2021, during which time Ms. Kilburn learned that ODR had interviewed her therapist

"extensively," including about matters unrelated to her case, and ODR proceeded to question

Ms. Kilburn about the same.  Kilburn Decl. ¶ 53-54.  Because ODR shared only "excerpts of their

interview with [her] therapist in [the] evidence review meetings," Ms. Kilburn was left to

wonder what ODR and her therapist had discussed.  Id. ¶ 55.

ODR issued its Draft Report on May 10, 2021.  Although the Report acknowledged that

Ms. Kilburn's therapist had been interviewed and provided two progress notes, ODR did not

rely on the notes or the therapist at all in concluding that Dr. Comaroff had "over the course of

approximately five minutes" repeatedly described how Ms. Kilburn "would be raped" but

rejecting Ms. Kilburn's report that he physically harassed her.  Id. ¶¶ 58-59.  Since ODR did not

rely on the therapist's notes, Ms. Kilburn assumed that they would not be attached to the

Report even under ODR's stated criteria.  See id. ¶ 58.  The Draft Report did not have exhibits

attached as they had already been provided during the investigation.  HSF ¶ 91.

The parties were invited to respond to the Draft Report.  In his response, Professor

Comaroff, who is not a medical doctor, commented on and offered a diagnosis relating to Ms.

Kilburn's emotional state, and objected strenuously to the fact that the Draft Report "omits any

[15]

mention of [Ms. Kilburn's] therapist's testimony and records" and ignores the "major issue" of her mental health.  Kilburn Decl. ¶ 69.  It is apparent from Professor Comaroff's comments that ODR shared both the progress notes and excerpts from its interview with the therapist with him, despite the fact that it was not relying on this information in its investigation.  See id. ¶ 71.  ODR sent Ms. Kilburn a copy of the Final Report on August 27, 2021.  Id. ¶ 62.  There were only minor differences between the Draft and Final Reports, and the overall conclusions were unchanged.  Id.  Both Ms.Kilburn and Professor Comaroff appealed.  HSF ¶¶ 99-100.

The Final Report and exhibits, including the redacted therapy notes, were sent to Ms. Kilburn; Professor Comaroff; the parties' personal advisors; the Senior Associate Dean of Faculty Affairs, Kowk Yu; the faculty panel who decided the appeals of both Ms. Kilburn and Professor Comaroff; and the individuals who advised the then-existing Faculty of Arts and Sciences Dean, Claudine Gay, who determined whether to sanction Professor Comaroff.  Id. ¶¶ 96, 102-07.  Prior to this litigation, Ms. Kilburn did not know the identity of all the individuals who received these materials.  See Kilburn Decl. ¶ 76.

Additional facts will be provided below as appropriate.

### III.   ANALYSIS

#### A.  Standard of Review

"A party moving for summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law." Carmona, 215 F.3d at 132.  Pursuant to Fed. R. Civ. P. 56(b), the motion may be filed "at any time until 30 days after the close of all discovery."  Nevertheless, it is not "either necessary or desirable for a court to attempt to probe sophisticated issues on an undeveloped record."

Resol. Tr. Corp. v. N. Bridge Assocs., Inc., 22 F.3d 1198, 1208 (1st Cir. 1994) (ruling that District Court abused its discretion in denying request for discovery to respond to summary judgment motion). Thus, while summary judgment prior to any discovery may be appropriate where the facts truly are not in dispute, and the case presents a pure issue of law, "an evidentiary record generally is necessary for a summary judgment decision, [and] a motion for summary judgment is rarely considered before discovery." Collision Commc'ns, Inc. v. Nokia Sols. & Networks OY, No. 20-cv-949-JD, 2021 WL 1124725, at *3 (D.N.H. Mar. 24, 2021) (and cases cited). "While [the moving party] may prefer to make its arguments based on its selection of documents and communications while avoiding all discovery from [the plaintiff], that procedure would be unfairly prejudicial to [the plaintiff]." Id.

> As the Carmona court explained:
>
> Where the moving party lacks the ultimate burden of persuasion at trial, its initial burden of production is conventionally satisfied in one of two ways. The movant may affirmatively produce evidence that negates an essential element of the non-moving party's claim. See Adickes [v. S.H. Kress & Co., 398 U.S. 144, 158, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970). Alternatively, the moving party may point to evidentiary materials already on file – such as answers to interrogatories, affidavits, or portions of depositions – that demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed.2d 265 (1986).

Carmona, 215 F.3d at 132 (footnote omitted). Where, as here, the moving party is arguing that the plaintiff will be unable to prove her case at trial, "[t]he nonmoving party, of course, must have had sufficient time and opportunity for discovery[.]" Id. at 133. Similarly, when the moving party is relying on its own witnesses' recollections of events, discovery is appropriate to test such recollections. In short, "[c]ourts are hesitant to allow pre-discovery motions for summary judgment such as the instant motion, particularly when discovery could uncover

evidence in the nonmoving party's favor."  Lee v. Conagra Brands, Inc., Civil Action No. 17-11042-NMG, 2021 WL 3131536, at *1 (D. Mass. July 23, 2021) (and cases cited).

As detailed below, this case raises issues of reasonableness that are traditionally left to the jury.  Not only is the motion for summary judgment premature, but the plaintiff has also established the existence of disputed facts.  Accordingly, summary judgment must be denied.

**B.   The Right to Privacy**

Count Ten of the Amended Complaint is entitled, "Inducing Breach of Fiduciary Duty and Invasion of Privacy."  Therein, Ms. Kilburn alleges that Harvard is liable under Massachusetts law as a "third party who induces a healthcare provider to disclose information that the third party knew or should have known was confidential[.]"  AC ¶ 325.  She also contends that Harvard is liable under Mass. Gen. Laws ch. 214, § 1B, on the grounds that "it is an actionable violation of one's right to privacy to procure, retain, or disclose private medical information without consent or in an otherwise unreasonable manner."  Id. ¶ 326.  Harvard's motion for summary judgment is premised on its assertion that it was "required" under its policies to obtain and disclose the therapy records, and that Ms. Kilburn was aware of and consented to this policy.  As detailed above, these facts are disputed.  It is far from clear that Harvard's own policy required it to obtain and disseminate information on which it did not rely in reaching its conclusions.  Moreover, it is not at all clear from Harvard's policies that it was entitled to rely on personal information that the claimant did not submit or have an opportunity to review.  Thus, the underlying premise of the motion for summary judgment fails on this record.  Other relevant facts are also in dispute.

**Inducing a Breach of Fiduciary Duty**

Mass. Gen. Laws ch. 214, § 1B provides that "[a] person shall have a right against

unreasonable, substantial or serious interference with his privacy."  Disclosure by medical

professionals of patient information without consent "would be sufficient to warrant a finding

of invasion of privacy" under the statute.  Tower v. Hirschhorn, 397 Mass. 581, 586-87, 492

N.E.2d 728, 732 (1986) (citing Bratt v. Int'l Bus. Machs. Corp., 392 Mass. 508, 522, 467 N.E.2d

126 (1984)).  Moreover, "a civil action will lie against anyone who, with the requisite state of

mind, induces a violation of the physician's duty of confidentiality and thereby causes injury or

loss to the patient[.]"  Alberts v. Devine, 395 Mass. 59, 60-61, 479 N.E.2d 113, 115 (1985).  To

establish liability for inducement, the plaintiff must prove that:

> (1) the defendant knew or reasonably should have known of the existence of the
> physician-patient relationship; (2) the defendant intended to induce the physician to
> disclose information about the patient or the defendant reasonably should have
> anticipated that his actions would induce the physician to disclose such information; and
> (3) the defendant did not reasonably believe that the physician could disclose that
> information to the defendant without violating the duty of confidentiality that the
> physician owed the patient.

Id. at 70-71, 479 N.E.2d at 121.  Harvard argues that it is entitled to summary judgment because

it has put forth facts in Ms. Povich's Affidavit that "make[ ] clear" that "Harvard did in fact

believe – and believed reasonably – that the therapist could provide the two pages of records

at issue without violating any duty of confidentiality to Kilburn."  Harvard Mem. at 16.

Moreover, Harvard argues that Ms. "Kilburn cannot produce 'specific facts,' sufficient to

establish that Harvard's belief was not reasonable" since Ms. Kilburn "urged ODR to speak to

her therapist because the therapist 'should have a bunch of notes or memories' that would

[19]

corroborate Kilburn's claims."  Id. (internal citation and record citations omitted).  These

arguments are unpersuasive on this record.

The record amply supports a finding that Harvard knew or should have known that Ms.

Kilburn's therapist required written, specific authorization before she was able to release

personal medical information.  Thus, according to Harvard, Ms. Shaffer specifically advised Ms.

Kilburn to provide her therapist with a waiver if she wished to have her therapist speak to ODR.

HSF ¶ 49.  Moreover, 45 C.F.R. § 164.508(a)(2) mandates that a therapist "must obtain an

authorization for any use or disclosure of psychotherapy notes" and that the authorization

must be in writing and meet specific requirements.  See id. § 164.508(b); see also Mass. Code

Regs. 27.16(9)(b). While Harvard claims that the regulations do not apply to it because it is not

a healthcare provider, see Harvard Mem. at 18-19, the issue is not whether Harvard was bound

by the regulation but whether it knew that Ms. Kilburn's therapist was bound by the

regulation.[7]  Given Ms. Shaffer's statement to Ms. Kilburn about providing her therapist with a

waiver so she would speak to ODR, Ms. Kilburn has, at a minimum, raised a genuine issue of

fact as to whether Harvard knew that her therapist required written authorization.

There is also evidence, even at this pre-discovery stage, that Harvard should have

known that the therapist did not have the authorization she required, but that ODR

nevertheless interviewed the therapist at some length and obtained information which went

beyond anything that Ms. Kilburn had said the therapist could provide.  At the time ODR was

telling Ms. Kilburn to give her therapist a waiver, and Ms. Kilburn had not yet listed the

---

[7] It is unclear on this record whether Harvard, which has its own counseling center, will take the position that the ODR investigators did not know of the regulation.

therapist as a witness, ODR was also telling Ms. Kilburn not to contact any of her witnesses. See Kilburn Decl. ¶ 41.  Thus, ODR should have realized that Ms. Kilburn had not provided the necessary written authorization.  Moreover, in ODR's interview of the therapist, there was no indication that the therapist had written authorization to discuss matters with ODR.  The therapist referenced only having received "an email from Kilburn over the summer asking if I had documentation about what we talked about. . . ."  HSF ¶ 60.  The therapist denied receiving any other documents from Ms. Kilburn.  Harvard Ex. 16 at 2.  Nevertheless, ODR continued the interview, seeming to indicate that the interview would be helpful to Ms. Kilburn's claim. Certainly, the therapist could have been asked about the authorization before the interview began.  See Michnik-Zilberman v. Gordon's Liquor, Inc., 390 Mass. 6, 13, 453 N.E.2d 430, 435 (1983) (finding that liquor store was properly held liable for selling liquor to a minor when it failed to even ask for any identification and noting that "[h]ad such a request been made, this might well be a different case.").  These facts are sufficient at this stage to support a claim for wrongfully inducing a breach of fiduciary duty.

The need for further discovery on this issue is also apparent from Harvard's arguments concerning 34 C.F.R. § 106.45(b)(5), which was issued on May 19, 2020 and became effective on August 14, 2020.  The regulation requires "voluntary, written consent" to "access, consider, disclose, or otherwise use" a party's therapy records in Title IX proceedings.  34 C.F.R. § 106.45(b)(5).  The parties spend time arguing whether this regulation was binding on Harvard, since the challenged conduct took place before August 14, 2020, although the investigation was not concluded until August 2021.  See Harvard Mem. at 19-20.  That issue does not need to be resolved at this time.  For present purposes it is sufficient that Harvard was clearly able to

follow the regulation if it had chosen to do so.  <u>See</u> <u>Doe v. Rensselaer Polytechnic Inst.</u>, No.

1:20-CV-1185, 2020 WL 6118492, at *11 (N.D.N.Y. Oct. 16, 2020).  ODR included this

requirement in its investigation of events occurring after August 14, 2020.  <u>See</u> Pls. Ex. 2 at 73.

Moreover, ODR's knowledge of the regulation may be relevant to determining whether Harvard

believed it was acting reasonably in obtaining and disseminating the therapy records without

taking any steps to confirm that Ms. Kilburn had provided written consent to anyone.  Harvard

has not met its burden of proving that the facts are undisputed and that it is entitled to

summary judgment on the claim that it wrongfully induced Ms. Kilburn's therapist to disclose

private medical information.

### <u>Mass. Gen. Laws ch. 214, § 1B</u>

Harvard also contends that it is entitled to summary judgment on Count Ten because

"Harvard's limited disclosures of Kilburn's therapist's records in compliance with its policies

were not an unreasonable, substantial or[ ] serious interference with Kilburn's privacy rights,

particularly where Kilburn was informed of Harvard's policies and nonetheless directed Harvard

to these records."  Harvard Mem. at 17 (internal capitalization omitted).  "Generally, whether

an intrusion qualifies as unreasonable, as well as either substantial or serious, presents a

question of fact."  <u>Polay v. McMahon</u>, 468 Mass. 379, 383, 10 N.E.3d 1122, 1126 (2014).  This

case is no different.

Without belaboring the point, Harvard's written "policies" are far from clear in

informing parties that their personal therapy records would be obtained and disclosed without

their express consent.  The oral representations on which Harvard relies are equally ambiguous.

[22]

Even reading the "policies" liberally, it is not clear that Harvard should have disclosed records on which it did <u>not</u> rely to Professor Comaroff, who then used the records against the plaintiff.

Furthermore, but without limitation, from this record it is not clear that it was reasonable for Harvard to assume that Ms. Kilburn was willing to give up control over her personal, therapy records without knowing what they said.  At most, Ms. Kilburn had indicated that her therapist might have "a bunch of notes or memories" that supported her complaints against Professor Comaroff.  A factfinder may conclude that it was unreasonable for Harvard to assume that any disclosures beyond that were authorized.  <u>See</u> <u>Pressman v. Brigham Med. Grp. Found. Inc.</u>, 919 F. Supp. 516, 524 (D. Mass. 1996) (obtaining medical records beyond scope of consent states a claim for invasion of right to privacy and violation of Mass. Gen. Laws ch. 214, § 1B).

Further factual discovery is necessary before a decision can be made as to whether Harvard's actions were consistent with its policies or were reasonable.  Summary judgment is not appropriate at this time.

### IV.    <u>CONCLUSION</u>

For all the reasons detailed herein, "Harvard's Amended Motion for Partial Summary Judgment as to Count Ten" (Docket No. 47) is DENIED.

/ s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge

[23]