UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MARGARET CZERWIENSKI, LILIA KILBURN and AMULYA MANDAVA, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) | CIVIL ACTION NO. 22-10202-JGD |
| | ) | |
| HARVARD UNIVERSITY and the PRESIDENT AND FELLOWS OF HARVARD COLLEGE, | ) ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF DECISION AND ORDER
## ON DEFENDANT'S MOTION TO DISMISS COUNTS
## ONE THROUGH NINE OF PLAINTIFF'S AMENDED COMPLAINT

March 31, 2023

DEIN, U.S.M.J.

## I.   INTRODUCTION

This case arises out of alleged incidents of sexual harassment and retaliation for

complaints of sexual harassment that were perpetrated by John Comaroff ("Comaroff"), a

world-renowned Professor of Anthropology at Harvard University ("Harvard" or "University"),

against female graduate students in the University's Anthropology Department.  The plaintiffs,

Margaret Czerwienski ("Czerwienski"), Lilia Kilburn ("Kilburn") and Amulya Mandava

("Mandava"), are doctoral students in the Anthropology Department and claim that they were

victims of Comaroff's abusive behavior.  They also claim that Harvard's long-term failure to

address reports of sexual harassment by Comaroff and other prominent male professors in the

Anthropology Department enabled Comaroff to engage in the alleged misconduct toward

them, and that Harvard's reluctance to investigate their complaints in a timely manner, as well

as deficiencies in Harvard's investigatory process, exacerbated their harm and perpetuated the hostile environment that exists for women in the University's graduate Anthropology program.

On February 8, 2022, the plaintiffs initiated the instant action against Harvard.[1]  By their ten-Count Amended Complaint ("Amended Complaint" or "Complaint"), the plaintiffs are seeking to hold the defendant liable under Title IX of the Education Amendments of 1972, as well as under Massachusetts statutory and common law.  The matter is before the court on "Defendant's Motion to Dismiss Counts One Through Nine of Plaintiffs' Amended Complaint" (Docket No. 53), by which Harvard has moved to dismiss the first nine Counts of the Amended Complaint, pursuant to Fed. R. Civ. P. 12(b)(6), for failure to state plausible claims for relief.[2]  For all the reasons detailed below, the defendants' motion is ALLOWED IN PART and DENIED IN PART.  Because the plaintiffs have failed to allege plausible claims against Harvard for gender discrimination under Title IX, Count Three of the Amended Complaint is dismissed.  However, Harvard's motion is otherwise denied.

## II.  STATEMENT OF FACTS

When ruling on a motion to dismiss that has been brought pursuant to Fed. R. Civ. P. 12(b)(6), "[t]he court must 'assume the truth of all well-pleaded facts and indulge all reasonable inferences that fit the plaintiff's stated theory of liability.'"  Redondo-Borges v. U.S. Dep't of Housing & Urban Dev., 421 F.3d 1, 5 (1st Cir. 2005) (quoting In re Colonial Mortg. Bankers Corp.,

---

[1] The defendants contend that Harvard University is not properly named as a defendant because it is not a corporate entity independent of the President and Fellows of Harvard College.  Nevertheless, the defendants refer to themselves collectively as "Harvard" and the "University," and this court will do the same.

[2] Harvard also filed a motion for summary judgment with respect to Count Ten of the Amended Complaint.  The court has addressed that motion in a separate Memorandum of Decision and Order.

324 F.3d 12, 15 (1st Cir. 2003)).  The facts may be derived not only from the Complaint, but also from "whatever documents are either annexed to it or fairly incorporated into it, and any relevant matters that are susceptible to judicial notice."  Id.  However, the court will "not credit 'bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like.'"  Id. (quoting Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996)).  Applying this standard to the instant case, the relevant facts are as follows.

**The Parties**

The defendant is a Massachusetts non-profit organization having a principal place of business in Cambridge, Massachusetts.  (AC ¶ 23).[3]  Harvard is one of the world's most prestigious academic institutions, and it has maintained that reputation by recruiting and employing the world's most prominent scholars.  (Id. ¶ 6).  Comaroff, a Professor of Anthropology and a Professor of African and African American Studies ("AAAS") at Harvard, is one such scholar.  (Id. ¶ 7).  He is a leading expert on Africa and the Global South, legal and political anthropology, crime and policing, the anthropology of colonialism and postcolonialism, and historical anthropology.  (Id.).  He has also served as a visiting professor at academic institutions throughout the world, and has mentored tenured professors in nearly all of the leading anthropology departments.  (Id.).

Plaintiff Mandava arrived at Harvard in 2012 to pursue her graduate studies, including a Ph.D. in the Anthropology Department.  (Id. ¶ 22).  She received a Bachelor of Arts with Honors in Anthropology from the University of Chicago and a Master's degree from the Harvard

---

[3] "AC" refers to the plaintiffs' Amended Complaint and Demand for Jury Trial (Docket No. 35).

Divinity School.  (Id.).  Since joining the Anthropology Department, Mandava has received a

number of prestigious grants in her field, including but not limited to, the Wenner-Gren

Dissertation Fieldwork Grant and the American Institute of Indian Studies Junior Fellowship.

(Id.).  As detailed below, Mandava claims that Comaroff threatened to derail her future job

prospects after he learned that she had spoken out about his sexual harassment of other

students.  She also claims that Harvard failed to take meaningful steps to protect her or the

other plaintiffs from Comaroff's continuing harassment and threats of retaliation.

Plaintiff Czerwienski is a doctoral student in Harvard's Anthropology Department.  (Id. ¶

20).  Prior to arriving at Harvard in 2014, Czerwienski received a Bachelor of Arts in Women's

Studies, a Master's degree in public health and a graduate certificate in Afroamerican and

African Studies from the University of Michigan.  (Id.).  She also conducted research at the

University of Michigan Medical School while working toward her Master's degree.  (Id.).  In

addition to her work as a teaching fellow and Ph.D. student at Harvard, Czerwienski is the

recipient of the National Science Foundation Doctoral Dissertation Research Improvement

Grant.  (Id.).  Like Mandava, Czerwienski claims that Comaroff threatened to take adverse

action against her after he learned that she had been speaking out about his sexual misconduct

toward female graduate students, and that Harvard failed to adequately address Comaroff's

misconduct or protect her from retaliation.

The third plaintiff, Kilburn, arrived at Harvard in 2017, and is also a doctoral student in

the University's Anthropology Department.  (Id. ¶ 21).  She received a Bachelor of Arts in

Anthropology from Amherst College and a Master's degree in Comparative Media Practice from

the Massachusetts Institute of Technology.  (Id.).  Her research while at Harvard has been

supported by multiple prestigious grants.  (Id.).  Kilburn alleges that she applied to Harvard so she could work with Comaroff and his wife, Professor Jean Comaroff, who is also a well-known professor in the Anthropology Department, and that she chose to attend Harvard following Comaroff's promise to serve as her mentor and provide pedagogic support.  (Id.).  She further alleges that Comaroff has made unwanted sexual advances toward her since the first time she arrived on Harvard's campus.  Additionally, as detailed herein, Kilburn claims that Harvard ignored her complaints about Comaroff's sexual harassment, allowed Comaroff to retaliate against her for filing a formal complaint against him, and obtained her confidential medical records without her consent and disclosed them to Comaroff and others.

### Comaroff's Alleged History of Sexual Harassment

The plaintiffs claim that Comaroff's behavior toward them was part of a long-term pattern of sexual harassment and retaliation against students, and that Harvard was on notice of his misconduct before it even hired him as a professor in the Anthropology Department. Thus, the plaintiffs claim that prior to becoming a professor at Harvard, Comaroff was employed for more than three decades at the University of Chicago ("UChicago").  (See id. ¶¶ 27-29, 41).  They further allege that throughout the course of his career at UChicago, Comaroff engaged in sexual relationships with female undergraduate and graduate students, sexually harassed and assaulted female undergraduate and graduate students, and retaliated against students who complained of or objected to his behavior.  (Id. ¶¶ 28-37).  The Amended Complaint provides numerous, specific examples of Comaroff's alleged conduct, which paint a picture of him as a sexual predator and a threat to the safety and well being of female students in UChicago's Anthropology Department.  (See id.).  In fact, according to the plaintiffs, graduate

students and faculty at UChicago considered Comaroff a "predator" and a "groomer," and his colleagues at the institution were pleased to see him go.  (Id. ¶ 8; see also id. ¶ 40).

Allegedly, Mandava was among the female students who was targeted by Comaroff when she was an undergraduate at UChicago.  (Id. ¶ 38).  The plaintiffs contend that in the winter of 2009, Comaroff pursued her during a study abroad trip to South Africa by repeatedly asking Mandava to sit next to him on long drives and commenting on the neckline of her clothing.  (Id.).  The interactions made Mandava uncomfortable and she spoke to another professor who was on the trip with the hope that he would intervene.  (Id.).  However, the professor allegedly told Mandava that Comaroff's actions were consistent with his usual behavior during study abroad trips, when Comaroff would develop a "crush" on a female student and focus on her "obsessively" throughout the duration of the program.   (Id.).

### Comaroff's Transition to Harvard

In about 2011, Comaroff received an offer to work as a tenured professor and fellow at Harvard beginning in 2012.  (Id. ¶¶ 40-41).  Allegedly, Comaroff's desire to leave UChicago was prompted by a threat from a student with whom Comaroff had a sexual relationship to file a complaint.  (Id. ¶ 39).  The plaintiffs claim that at about the time Harvard hired Comaroff, a number of individuals at Harvard received warnings about Comaroff's sexual misconduct toward students.  (Id. ¶¶ 42-43).  Those individuals allegedly included the former Chair of Harvard's Department of AAAS and Director of the Hutchins Center for AAAS; Seth Avakian, Ph.D. ("Avakian"), a Title IX Prevention Specialist at Harvard; Harvard's then-Director of Graduate Studies for the Anthropology Department; and Harvard's then-Administrator for the Anthropology Department.  (Id.).  Nevertheless, Harvard allegedly welcomed Comaroff and his

wife, Professor Jean Comaroff, into the Department of Anthropology and the Department of AAAS without any safeguards in place to protect its students from Comaroff's potential misconduct.  (Id. ¶ 46).

The plaintiffs contend that Comaroff resumed his practice of harassing female students after he arrived at Harvard.  In particular, the plaintiffs contend that in 2015, Comaroff made repeated and unwanted sexual advances toward at least two female graduate students.  (Id. ¶ 48).  With respect to the first student, who is identified in the Complaint as "Harvard Student 1," Comaroff allegedly commented repeatedly on the student's physical appearance during meetings and kissed her on the cheek.  (Id.).  With respect to the second student, who was one of Comaroff's advisees and is identified in the Amended Complaint as "Harvard Student 2," Comaroff allegedly made comments about her appearance, talked to her about his attraction to other female students, and discussed his sexual preferences and history with her.  (Id. ¶ 49).  In addition, he allegedly winked at her and drank out of her water bottle in class, referred to her as "my date" and kissed her on the forehead in front of other students.  (Id.).

According to the plaintiffs, Comaroff's harassment of Harvard Student 2 became more severe over time.  (Id. ¶ 50).  Specifically, the plaintiffs claim that Comaroff began cornering Harvard Student 2 in his office, brushing up against her, sitting unnecessarily close to her in meetings and touching her inappropriately.  (Id.).  During the fall 2016 semester, Comaroff allegedly harassed Harvard Student 2 repeatedly by kissing her on the mouth without her consent, grabbing her buttocks and sending her messages late at night seeking information about her sexual partners.  (Id.).   The plaintiffs claim that Harvard Student 2 eventually confronted Comaroff directly about his behavior during a meeting in his office, and that

Comaroff responded by kneeling in front of the student, laying his head on her chest and telling her he was impotent.  (Id. ¶ 51).

The plaintiffs assert that Comaroff also maintained his practice of retaliating against individuals who sought to expose or address his misconduct.  For example, the plaintiffs claim that Harvard Student 2 reported Comaroff's alleged harassment to a postdoctoral research fellow ("Harvard Post-Doc 1") who had been one of Comaroff's advisees at UChicago, and that Harvard Post-Doc 1 advised Harvard Student 2 to report Comaroff's conduct to Harvard's Title IX Office.  (Id. ¶ 52).  Allegedly, Comaroff learned about this advice, called Harvard Post-Doc 1 into his office and told him that if he continued "spreading gossip," Harvard Post-Doc 1 would "find it impossible" to obtain a permanent teaching position.  (Id. ¶ 53).  As detailed below, the plaintiffs allege that Comaroff similarly threatened to retaliate against Czerwienski, Mandava and Harvard Student 2 for speaking out about his inappropriate behavior, and that Harvard did nothing to protect students from Comaroff's misconduct.

**Plaintiffs' Attempts to Warn Others About Comaroff's Conduct**

In addition to speaking with Harvard Post-Doc 1 about Comaroff's conduct toward her, Harvard Student 2 discussed Comaroff's harassment with her classmate, plaintiff Czerwienski.  (Id. ¶ 55).  At about the same time, another Harvard student, who is identified in the Amended Complaint as "Harvard Student 3," told Czerwienski that Comaroff was winking and flirting with her in class and acting as if he had a crush on her, behavior that Czerwienski allegedly witnessed first-hand.  (Id.).  Czerwienski subsequently complained to her advisor, Professor Susan Greenhalgh, about Comaroff's harassment of Harvard Student 2.  (Id. ¶ 56).  She also expressed concern to Professor Greenhalgh about Comaroff's conduct toward Harvard Student 3.  (Id.).

[8]

Allegedly, Professor Greenhalgh was a mandatory reporter under Harvard's Title IX policies and should have reported Comaroff's behavior to Harvard's Title IX Office. (Id. ¶ 57). However, the plaintiffs contend that she had not been properly trained on her reporting obligations. (Id.). Allegedly, Professor Greenhalgh expressed concern but did not take any steps to address the matter. (Id.). The plaintiffs claim that Czerwienski then proceeded to warn other students about Comaroff's behavior and urged Harvard Student 2 to report the alleged harassment to Harvard's Title IX Office. (Id. ¶¶ 58-59).

According to the plaintiffs, Harvard Student 2 did report Comaroff's sexual harassment to a number of faculty members, as well as to Avakian, who was serving not only as the Program Officer for Title IX and Professional Conduct, but also as the Title IX Resource Coordinator for graduate students and faculty in Harvard's Faculty of Arts and Sciences ("FAS"). (Id. ¶ 60). In that capacity, Avakian allegedly was responsible for receiving reports from mandatory Title IX reporters within FAS. (Id.). Additionally, pursuant to Harvard's Sexual and Gender-Based Harassment Policy and its Sexual and Gender-Based Harassment Policy and Procedures for the FAS, Avakian allegedly was responsible for "identifying and responding to sexual harassment and its harm to equal educational opportunity" and for "stopping or preventing sexual or gender-based harassment." (Id. ¶ 62). He was also expected to forward complaints about sexual harassment to Harvard's Title IX Coordinator and work with her to "assess the information and determine what action, if any," the University should take. (Id.). However, the plaintiffs claim that Avakian failed to carry out these responsibilities, to protect students from Comaroff's harassment, or to initiate a formal investigation into Comaroff's actions. (Id. ¶ 63). They further claim that Harvard's failure to respond to reports of

Comaroff's sexual harassment enabled Comaroff to harass and threaten other students, including each of the plaintiffs.  (See id. ¶¶ 9-12, 68).

Allegedly, by the spring of 2017, plaintiff Mandava had also learned about Comaroff's conduct toward Harvard Student 2 and Harvard Student 3.  (Id. ¶ 65).  Like Czerwienski, Mandava began warning other students about Comaroff's sexual harassment, and reported what she had learned, as well as details about Comaroff's conduct while at UChicago, to a member of Harvard's faculty, Professor Ajantha Subramanian.  (Id. ¶¶ 65-66).  Professor Subramanian was a mandatory reporter under Harvard's Title IX policies, and should have reported Comaroff to the University's Title IX Office.  (Id. ¶ 67).  However, she allegedly informed Mandava that, based on her understanding of Harvard's policies, she could not act on any reports about Comaroff's improper behavior unless the students directly impacted by his harassment reported to her themselves.  (Id.).  Accordingly, Professor Subramanian expressed distress but allegedly took no concrete steps to address Mandava's concerns.  (Id.).

### Comaroff's Alleged Sexual Harassment Against Kilburn

In February 2017, plaintiff Kilburn, who had been admitted to Harvard's graduate Anthropology program, visited the University's campus.  (Id. ¶ 86).  As described above, Kilburn had applied to Harvard because she was hoping to work with the Comaroffs.  (Id. ¶ 21).  Accordingly, during her visit, Kilburn met with Comaroff and Professor Jean Comaroff off campus to discuss her acceptance to the program.  (Id. ¶ 86).  After the meeting, Comaroff offered to walk the plaintiff back to campus.  (Id.).  The plaintiffs claim that as Comaroff and Kilburn approached the building where Comaroff's office was located, Comaroff stepped in front of Kilburn, hugged her tightly so that the length of his body was pressed against hers, and

kissed her on the lips without her consent.  (Id.).  They also claim that as Comaroff was hugging

her, he whispered into Kilburn's ear that she should "go visit Columbia (University) but then

come back here."  (Id.).

Kilburn contends that she was distressed about Comaroff's improper behavior, and that

it caused her to fear for her potential future at Harvard.  (Id. ¶ 87).  Nevertheless, she had

allegedly dreamed of attending the Harvard program and knew nothing about Comaroff's

history so she decided to move forward and accepted the offer to attend Harvard.  (See id. ¶¶

87-88).  According to the plaintiffs, Comaroff continued to intimidate and sexually harass

Kilburn over the course of the following two years.  (See id. ¶ 85).

Kilburn began her doctoral program at Harvard in late August 2017.  (Id. ¶ 88).

Sometime during her first day of the program, Kilburn met with Comaroff, who was then her

advisor, to discuss her intended study of a central African country.  (Id.).  Kilburn asserts that

during the meeting, Comaroff spent about five minutes describing how she would be raped and

killed if she were to go to South Africa, approximately 3,000 miles away from her country of

interest, due to Kilburn's involvement in a same-sex relationship.  (Id. ¶ 89).  Specifically,

according to the plaintiff, Comaroff told her that "there are many places where you would go

where you would be raped," "you would certainly be raped," and "you would be raped and

killed."  (Id.).  He also identified areas where so-called "corrective rapes" had occurred, and

repeatedly told Kilburn that she would be raped, killed, "left for dead," and that "they would

finish [her] off."  (Id.).  According to Kilburn, she sat frozen in shock as Comaroff made these

statements.  (Id.).  At the end of the meeting, Comaroff allegedly informed Kilburn that he had

"fought very hard" for her admission to Harvard and that she needed to trust him because he

had been advising students for fifty years.  (Id. ¶ 90).  The plaintiffs claim that this statement

was intended to remind Kilburn of the power that Comaroff had over her career in

Anthropology.  (Id.).

Not long thereafter, in late September 2017, Kilburn attended a brunch that was held

annually at Comaroff's home.  (Id. ¶ 92).  The plaintiffs allege that Comaroff greeted Kilburn

with a hug and a kiss on the cheek, singled her out for unwanted attention, placed his hand

uncomfortably low on her back to guide her through the house and again when he brought her

coffee, and expressed disappointment that she was not drinking alcohol.  (Id.).  They further

claim that when Kilburn attempted to retrieve her belongings and leave the house, Comaroff

followed and managed to corner her so that when she stood up from retrieving her bag, he

hugged her forcibly and kissed her on the mouth without her consent.  (Id. ¶ 93).  After pushing

him away and wiping her mouth, Kilburn noticed Comaroff smiling at her.  (Id.).

Allegedly, Kilburn was so disturbed by this incident that she began dressing more

conservatively and took steps to avoid Comaroff for the remainder of the semester.  (Id. ¶ 94).

She did not attend regular meetings with Comaroff, as was the typical practice of first year

graduate students.  (Id.).  She also stopped participating in a weekly African Studies workshop

that was led by the Comaroffs.  (Id.).  Kilburn viewed the workshop as a critical means of

expanding her network in her field of study, and the opportunity to participate in the workshop

was one of the reasons she chose to attend Harvard over other academic institutions.  (Id.).

Accordingly, Comaroff's actions allegedly had an adverse impact on her educational and career-

related activities.

**Comaroff's Alleged Threats Against Czerwienski and Mandava**

At about the same time, in late September or early October 2017, Harvard Student 2 informed Czerwienski that Comaroff had been sending her texts seeking information on Czerwienski's whereabouts and activities.  (Id. ¶ 69).  In his communications with Harvard Student 2, Comaroff allegedly discussed Czerwienski's knowledge of and opposition to his sexual conduct, and indicated that he viewed Czerwienski as a threat.  (Id.).  Moreover, he allegedly texted Harvard Student 2 about the classes Czerwienski was taking, the grants for which she was applying, and the fact that she had dropped his class.  (Id.).  Czerwienski claims that she was alarmed by this information and viewed Comaroff's statements to Harvard Student 2 as an expression of his intent to interfere with her academic progress.  (Id.).

The plaintiffs allege that Comaroff made more direct threats to harm Czerwienski and Mandava, both academically and professionally, during a meeting that took place between Mandava and Comaroff in mid-October 2017.  On that occasion, Mandava met with Comaroff in his office to discuss a grant application.  (Id. ¶ 70).   During the conversation, Comaroff allegedly told Mandava that graduate students, including Czerwienski, were spreading "nasty rumors" regarding his sexual encounters with students and that he knew Mandava had participated in the conversations.  (Id.).  After Mandava confirmed that she had warned others about Comaroff's misconduct, Comaroff allegedly claimed that he was impotent and had been sexually inactive for seven years.  (Id.).  Additionally, Comaroff allegedly told Mandava about three students who had circulated rumors about him, described how those students had later experienced difficulty finding jobs and warned Mandava that he would not want the same to happen to her.  (Id. ¶ 71).  He further warned Mandava that if she and Czerwienski continued to

[13]

"gossip" about him, he and his wife would hear about it from their students and Mandava would ruin her relationship with his wife, who was serving as Mandava's recommender. (Id. ¶¶ 72-73).

Given the Comaroffs' extensive contacts and outsized influence in the tight-knit field of anthropology, the plaintiffs took these threats seriously. (See id. ¶¶ 74-75). After Mandava told Czerwienski about Comaroff's warnings, both plaintiffs began to fear for their academic and professional futures and they both stopped warning other students about Comaroff's sexual misconduct. (Id. ¶¶ 76, 80). Moreover, Czerwienski allegedly terminated her advising relationship with Comaroff's wife, dropped a required course because the Comaroffs were the only professors teaching it at the time, and shifted her academic focus away from Africa in an effort to avoid the Comaroffs. (Id. ¶ 82). The plaintiffs claim that Mandava ultimately took a similar approach. Although she had relied on letters of recommendation from the Comaroffs for nearly every major application since college, Mandava allegedly ended her mentoring relationship with both professors, changed the focus of her dissertation, and declined to apply for a grant in the Comaroffs' area of expertise, all in an effort to avoid them. (Id. ¶ 83).

### Czerwienski's Report of Comaroff's Threats

Notwithstanding her concerns for her future at Harvard, Czerwienski reported Comaroff's threats to Avakian, the University's Title IX Resource Coordinator, on or about October 16, 2017. (Id. ¶ 77). She also told Avakian about Comaroff's alleged sexual harassment of female students. (Id.). The plaintiffs claim that Avakian responded by discouraging Czerwienski from filing a formal report with Harvard's Office for Dispute Resolution ("ODR"). (Id. ¶ 78). According to the plaintiffs, Avakian explained that it would be

futile to file such a complaint because it would not survive the initial stages of the ODR process.

(Id.).  Avakian's statements allegedly deterred Czerwienski from filing a formal complaint.  (Id.

¶¶ 78, 80).  However, Czerwienski asked Avakian to maintain a record of her report so he would

have it in the event Comaroff followed through on his threats of retaliation against her.  (Id. ¶

78).  Czerwienski and Mandava claim that they expected Harvard to take some kind of action,

even if only behind the scenes, to address Comaroff's misconduct, but they later learned it did

not.  (Id. ¶ 79).

### Comaroff's Alleged Continuing Harassment of Kilburn

The plaintiffs contend that at around the same time Czerwienski was speaking to

Avakian, Kilburn attempted to bring Comaroff's alleged misconduct to the University's attention

as well.  Kilburn claims that at some point in October 2017, she approached the Anthropology

Department's Graduate Program Administrator to ask whether the Administrator was aware of

instances in which Comaroff had made students feel uncomfortable.  (Id. ¶ 96).  Before she

could finish speaking, the Graduate Program Administrator allegedly interrupted and stated, in

language that mimicked Comaroff's own response to complaints about him, "[t]hose are just

nasty rumors!"  (Id.).  Kilburn later attempted to speak to Mandava about Comaroff's conduct,

but Mandava remained fearful of Comaroff's threats and was unwilling to become involved.

(Id. ¶ 97).  Consequently, Kilburn allegedly believed that her experience with Comaroff was

unique and that she should remain quiet about the harassment.  (Id. ¶ 98).

The plaintiffs contend that Comaroff continued to harass and intimidate Kilburn despite

her efforts to avoid him.  For example, in late 2017, Comaroff approached Kilburn after spotting

her in an atrium on campus and, notwithstanding her attempts to avoid him, touched her back

[15]

and insisted that she meet with him.  (Id. ¶ 100).  Then, during a required meeting in January 2018, Comaroff allegedly criticized Kilburn for avoiding meetings with him.  (Id. ¶ 101).  In about February 2018, Kilburn attended a departmental colloquium where Comaroff was also present.  (Id. ¶ 102).  As Comaroff was leaving the room, he allegedly approached Kilburn, who was seated in the back row, and squeezed her thigh in view of faculty and students.  (Id.).

The harassment allegedly continued throughout the fall of 2018 and into the spring of 2019.  Thus, the plaintiffs claim that throughout the fall semester, Comaroff repeatedly asked Kilburn to meet him off-campus for reasons unrelated to her academic work.  (Id. ¶ 103).  This made Kilburn anxious and uncomfortable.  (Id.).  By the spring semester, Comaroff was allegedly pressuring Kilburn to alter the focus of an upcoming project by insisting that she cover a topic in which Comaroff specialized rather than a topic in which her other advisor, Professor Nicholas Harkness, specialized.  (Id. ¶ 105).  During a meeting on the issue in which Kilburn explained why Comaroff's preferred topic was unworkable for her, Comaroff allegedly "exploded" and forbid Kilburn from working with Professor Harkness at all.  (Id.).  Finally, on about April 26, 2019, Kilburn was in the glassed-in waiting area of the Graduate Program Administrator's office when Comaroff saw her and tried to enter the waiting area.  (Id. ¶ 106).  Fearing another unprovoked sexual advance, Kilburn allegedly held the door closed and told Comaroff that she had a meeting.  (Id.).  Nevertheless, Comaroff attempted to force his way inside while Kilburn continued to hold the door shut.  (Id.).

### Kilburn's Complaint of Comaroff's Alleged Sexual Harassment

The April 26, 2019 incident established a breaking point for Kilburn, who feared she would have to leave the Harvard program if Comaroff continued to harass her.  (Id. ¶ 107).

Accordingly, the plaintiffs claim that later that day, Kilburn complained about Comaroff's harassment to two different professors.  (Id. ¶ 108).  Both professors were mandatory reporters who allegedly shared Kilburn's complaint with Harvard's Title IX Office.  (Id.).

On May 2, 2019, Kilburn met with Avakian, Harvard's Title IX Officer, to discuss her complaint about Comaroff's misconduct.  (Id. ¶¶ 109-10).  As she was describing her complaint, but before she had mentioned Comaroff's name, Avakian allegedly stated that he knew which faculty member Kilburn was describing.  (Id. ¶ 110).  Avakian also told Kilburn that "there was another student" who had previously filed a complaint and had "a similar issue w(ith) the same person[.]"  (Id.).  The plaintiffs contend, however, that Avakian took no steps to investigate Kilburn's complaint or address Comaroff's conduct toward her.  (Id. ¶ 111).  Instead, he put Kilburn in touch with Harvard Student 2, who spoke to Kilburn about her own, similar experience of sexual harassment from Comaroff.  (Id. ¶¶ 111-12).  Kilburn contends that this was the first time she learned that Comaroff had sexually harassed other students, that others had reported his behavior to the University, and that Harvard had failed to address the complaints.  (Id. ¶ 113).  She further claims that she was shocked by this information.  (Id.).

Kilburn subsequently met with Professor Subramanian, who was then the Chair of the Anthropology Department, and Professor Harkness, on May 6, 2019 and May 29, 2019, respectively, to report Comaroff's sexual misconduct toward her.  (Id. ¶ 109).  She also told Mandava about the sexual misconduct in June 2019, and Mandava spoke to Professors Subramanian and Harkness about Comaroff's alleged threats to retaliate against Mandava for speaking to others about his misconduct.  (Id. ¶ 114).  Allegedly, both of those professors are mandatory reporters under Harvard's Title IX policies and both eventually reported the

complaints to Avakian.  (Id. ¶ 115).  Once again, however, neither Avakian nor anyone else at

Harvard took steps to act on the allegations against Comaroff or protect the plaintiffs and other

students from further harm from him.  (See id.).  The plaintiffs allege that by the time Harvard

launched an investigation into Comaroff's behavior in May 2020, the Title IX Office had received

at least eight complaints of misconduct against him.  (See id. ¶¶ 117-18).  At least four of those

complaints were received in 2019.  (Id. ¶ 117).

Harvard Student 2 was one of the individuals whose complaint was filed with the Title IX

Office.  (See id. ¶ 64).  According to the plaintiffs, someone from that office leaked the

complaint, and Comaroff was able to obtain a copy from a contact of his.  (Id.).  In June 2019,

Comaroff allegedly read portions of the complaint back to Harvard Student 2 verbatim.  (Id.).

This allegedly intimidated Harvard Student 2 and dissuaded her from pursuing her complaint or

participating in a later investigation into Comaroff's treatment of the plaintiffs.  (Id.).

Additionally, Harvard Student 2 allegedly told Czerwienski that she would need to rely on

Comaroff's letter of recommendation for years to come.  (Id.).  The plaintiffs claim that

Harvard's failure to address this and various other complaints about Comaroff's misconduct left

the plaintiffs and others vulnerable to sexual harassment and retaliation.  (See id. ¶ 117).

**Filing of a Formal Complaint Against Comaroff**

In May 2020, Harvard's student newspaper, *The Harvard Crimson*, contacted the Title IX

Office to seek comment on an article that was about to be published regarding sexual

harassment by multiple professors in the school's Anthropology Department, including but not

limited to, Comaroff.  (Id. ¶ 118).  Two days later, on May 18, 2020, Avakian filed a formal

complaint against Comaroff with ODR on behalf of Czerwienski, Mandava, Kilburn and Harvard

[18]

Student 2, thereby triggering a formal investigation.  (Id. ¶ 119).  Avakian allegedly told the

plaintiffs about his decision to file a complaint on May 20, 2020.  (Id.).

One day later, on May 21, 2020, the plaintiffs learned about *The Harvard Crimson's* plan

to publish an article concerning Comaroff's harassment of students.  (Id.).  They also received

advice from faculty to share their own stories with the newspaper.  (Id. ¶ 120).  According to

the plaintiffs, Avakian told Kilburn that reporting her experience to the press would be more

effective than participating in the ODR process, and he encouraged her to speak to the press.

(Id.).  Similarly, Department Chair Subramanian allegedly urged all three plaintiffs to speak to

the press because it would give Harvard a reason to take action, and Dean Nina Zipser

encouraged the plaintiffs to report to the press because the publicity would give Dean Zipser

cover to confront Comaroff.  (Id.).  The plaintiffs assert that this advice motivated them to make

their stories public.  (Id. ¶ 121).

### Publicity Regarding Harassment in Harvard's Anthropology Department

On May 29, 2020, *The Harvard Crimson* published an article describing a decades-long

pattern of sexual harassment by male professors in Harvard's Anthropology Department.  (Id. ¶

122; see also id. ¶¶ 127-33, 135-38).  *The Chronicle of Higher Education* published a similar

article several months later.  (Id. ¶ 122).  The press reports described Comaroff's alleged sexual

harassment and retaliation against the plaintiffs, alleged sexual misconduct by two other

professors who had both served as chairs of the Anthropology Department, and Harvard's

alleged long-term indifference to complaints about the misconduct.  (See id. ¶¶ 122, 127-38).

Of particular significance to the plaintiffs' claims in this case, the articles allegedly revealed that

over the course of many years, students and others made numerous complaints of sexual

[19]

harassment and abuse to Harvard administrators, department heads and the Title IX Office, but Harvard discouraged the victims from filing formal complaints, repeatedly failed to perform formal investigations and declined to take any concrete steps to prevent further instances of harassment and retaliation by professors in the Anthropology Department.  (See id. ¶¶ 127-38).

The plaintiffs claim that after the publication of *The Harvard Crimson* article, a number of individuals contacted them to share their own stories of sexual harassment and retaliation by Comaroff and other professors in the Anthropology Department.  (Id. ¶ 124).  Those individuals included Harvard Student 1, Harvard Post-Doc 1, a student who had attended UChicago, a faculty member at another institution who claimed that Comaroff harassed her at a 2018 conference, and a Harvard Anthropology graduate identified in the Amended Complaint as "Harvard Student 4."  (Id. ¶¶ 124-25).  Allegedly, four of those individuals complained to Harvard about Comaroff's misconduct, but the University failed to take any meaningful action on their complaints.  (Id. ¶ 126).   The plaintiffs contend that this was the first time they had become aware of the scope of Comaroff's behavior and Harvard's failure to respond to prior reports of sexual harassment.  (Id. ¶ 123).  Thus, according to the plaintiffs,

> [b]efore the *Crimson's* reporting, Plaintiffs were aware only of the misconduct to which they and a few others had been subjected.  The *Crimson*, however, exposed both a broader pattern of abuse and that, for years, ODR, the Title IX Office, faculty, and administrators systematically refused to act on students' complaints. This inaction, in turn, facilitated new abuses (including Plaintffs'), all perpetrated under threats to the careers of additional female students.

(Id. ¶ 141).   In short, the plaintiffs claim that the article exposed a pattern of deliberate indifference by Harvard to complaints of sexual harassment against Comaroff and other members of the Harvard faculty.  (See id. ¶ 143).

**The Title IX Investigation**

On June 3, 2020, Avakian revised and resubmitted his formal complaint to ODR.  (Id. ¶ 147).  Because Harvard Student 2 was unwilling to pursue a complaint against Comaroff, Avakian allegedly removed her allegations from the revised complaint and submitted only Czerwienski's, Kilburn's and Mandava's allegations.  (Id.).  However, the plaintiffs allegedly learned shortly thereafter that Avakian's complaint had been dropped and that ODR would not pursue the claims unless the plaintiffs either filed formal complaints on their own behalf or convinced FAS to file complaints on their behalf.  (Id. ¶ 148).  Accordingly, in July 2020, Czerwienski, Kilburn and Mandava filed individual complaints against Comaroff, which triggered a formal ODR investigation.  (Id. ¶ 150; see also id. ¶¶ 159-62, 164, 166 (describing aspects of the ODR investigation)).  Allegedly, Harvard later revealed that if Avakian's complaint had remained the operative document, ODR could have considered evidence and allegations that other individuals had submitted to Avakian.  (Id. ¶ 151).  However, the plaintiffs' filing of their own complaints limited the scope of the investigation to the plaintiffs' personal experiences. (See id.).

The plaintiffs contend that as soon as Comaroff obtained information about their formal complaints, he took steps to influence the investigation.  For instance, the plaintiffs claim that Comaroff received a copy of Czerwienski's ODR complaint on or about August 6, 2020.  (Id. ¶ 153).  The complaint relied, in part, on messages that Harvard Student 2 had sent to Czerwienski in 2017, and in which Harvard Student 2 had provided details of Comaroff's alleged harassment.  (Id.).  Following his receipt of the complaint, Comaroff allegedly pressured Harvard Student 2 to delete those messages.  (Id.).  The plaintiffs note that Comaroff was about

[21]

to preside over Harvard Student 2's defense of her dissertation and had significant influence over her academic success.  (See id.).

On August 17, 2020, Czerwienski notified ODR about her concern that Comaroff was intimidating witnesses and destroying evidence but ODR allegedly did nothing to address Comaroff's conduct.  (See id. ¶¶ 154-57).  On the contrary, two days after ODR notified Comaroff of Czerwienski's spoliation allegations, Harvard Student 2 allegedly deleted additional messages in which she had described Comaroff's misconduct to Czerwienski.  (Id. ¶ 155).  Moreover, throughout the remainder of the summer, Comaroff and his supporters allegedly threatened other potential witnesses with repercussions if they provided evidence of Comaroff's improper behavior.  (Id. ¶ 156).  The plaintiffs claim that these actions violated Harvard's policies and they reported them to the ODR investigator, but Harvard refused to act. (Id. ¶ 157).

The plaintiffs contend that Comaroff also used the ODR process as a means to retaliate against Kilburn for filing a complaint.  (Id. ¶ 158).  Specifically, the plaintiffs contend that Comaroff named three of the most prominent scholars in Kilburn's field as witnesses in his defense, even though none of those scholars knew Kilburn or had any firsthand knowledge about any of the events that were relevant to her complaint.  (Id. ¶ 159).  In doing so, Comaroff ensured that they would be aware of his hostility toward Kilburn.  (Id.).  Additionally, he effectively prevented Kilburn from seeking them out as potential advisors or mentors, or relying on them as impartial reviewers.  (Id. ¶ 160).  The plaintiffs further contend that Comaroff named Professor George Meiu ("Meiu") as a witness to testify about the layout of a well-known seminar room, a subject which had no relevance to Comaroff's defense.  (Id. ¶ 161).  Meiu was

[22]

a member of Kilburn's dissertation committee, was responsible for presiding over her qualifying exams, and would determine whether Kilburn would ultimately receive a doctoral degree. (Id.). Although Mieu declined to testify on Comaroff's behalf, Kilburn claims he made it clear that he did not support her complaint. (Id.). She also claims that she was forced to delay her qualifying exams for months as a result of these circumstances. (Id.).

Allegedly, ODR interviewed these witnesses and found that they had no material information relating to Kilburn's complaint. (Id. ¶ 162). Nevertheless, according to Kilburn, ODR took no steps to prevent Comaroff from using the process to threaten her career. (Id.). Kilburn attempted to address the issue by complaining to Avakian and Kwok Yu, the Associate Dean who was overseeing the plaintiffs' Title IX complaints. (Id. ¶ 163). However, the Title IX Office allegedly took no apparent action in response to this matter. (Id.).

Kilburn claims that during the course of its investigation, ODR contacted her psychotherapist and obtained confidential information without first obtaining Kilburn's consent or written authorization. (Id. ¶¶ 164-66). In particular, Kilburn alleges that ODR obtained records from two psychotherapy sessions without seeking a signed authorization for the release of those records or confirming that her therapist had a properly executed request for their release. (Id. ¶¶ 164-65). She also maintains that ODR interviewed her therapist about matters unrelated to Kilburn's experiences with Comaroff, again without Kilburn's consent or written authorization. (Id. ¶¶ 164, 166). Moreover, Kilburn asserts that ODR refused to provide her with an unredacted copy of her therapy notes even though its investigator questioned her about the redacted contents during an interview, that it disclosed the confidential notes to Comaroff in connection with a draft report of its investigation, and that it

disseminated the notes to an unknown number of unidentified individuals when it included the notes as exhibits to the Final Report of its investigation.  (Id. ¶¶ 167-69).   Comaroff allegedly used the information contained in Kilburn's therapy records to argue that Kilburn's post-traumatic stress disorder must have led her to imagine that he was engaging in sexual harassment against her.  (Id. ¶ 168).  In Count Ten of the Amended Complaint, Kilburn claims that Harvard, by its conduct in obtaining and disseminating her confidential information, invaded Kilburn's privacy and induced her therapist to breach a fiduciary duty that was owed to the plaintiff.  (AC at Count Ten).  As described in Note 2 *supra*, Count Ten is the subject of a motion for summary judgment that Harvard filed in this case and which the court has addressed in a separate Memorandum of Decision and Order.

## The ODR Reports

ODR issued its findings from its investigation in August 2021, over a year after the plaintiffs filed their complaints.  (Id. ¶ 170).  The plaintiffs claim that ODR's reports revealed Harvard's "willful blindness to the overwhelming evidence that [Comaroff] engaged in a *pattern* of serial sexual harassment and retaliation that Harvard knew about but failed to stop."  (Id. ¶ 172 (emphasis in original)).  Additionally, they claim that ODR's findings illustrated the unfairness and inadequacy of Harvard's process and policies for handling complaints of sexual harassment.  (See id. ¶¶ 173-78, 211).

With respect to Mandava's complaint, in which she accused Comaroff of threatening her with retaliation for discussing his sexual misconduct, ODR resolved the matter in favor of Comaroff because it concluded that Mandava had not engaged in any protected activity.  (Id. ¶ 176).  In reaching this conclusion, ODR allegedly declined to credit Mandava's testimony that

she had complained about Comaroff's harassment to Professor Subramanian and to a number

of her fellow students, even though her testimony was supported by contemporaneous

messages referencing the conversations, because it found that there was insufficient

independent corroborating evidence. (Id.). It also declined to credit Mandava's description of

her conversation with Comaroff in which he allegedly told her that he knew about her

conversations with others. (Id.).

ODR also found in Comaroff's favor with respect to Czerwienski's complaint that

Comaroff threatened to retaliate against her for discussing his alleged sexual harassment. (Id.).

While ODR determined that, unlike Mandava, Czerwienski had engaged in protected activity by

talking to other students about Comaroff's alleged misconduct, it concluded that Comaroff had

no notice of such activity and, therefore, could not have threatened to retaliate against her on

the basis of her protected activity. (See id. ¶ 177). In reaching its conclusion, ODR allegedly

failed to credit Czerwienski's testimony that in the weeks leading up to Comaroff's threat,

Harvard Student 2 told Comaroff that Czerwienski was speaking to other students about his

alleged misconduct. (Id.). It also refused to consider any of Czerwienski's written

communications with Harvard Student 2, which contained evidence showing that Comaroff had

notice of Czerwienski's protected activity. (Id. ¶ 178). Moreover, according to the plaintiffs,

ODR disregarded much of Czerwienski's relevant testimony on the grounds that there was no

independent corroboration for her allegations. (Id.).

With respect to Kilburn's complaint against Comaroff for sexual harassment, ODR found

in favor of Kilburn on her claim that Comaroff harassed her by describing how she "would be

raped" in certain parts of Africa. (Id. ¶ 170). Specifically, ODR determined that Comaroff's

[25]

comments on this matter, which had taken place "over the course of approximately five minutes," constituted "severe" sexual harassment.  (Id.).  On the other hand, ODR found in favor of Comaroff on Kilburn's claims of additional, repeated instances of sexual harassment and assaults, including her claims of forced kissing and physical groping, even though Kilburn provided specific testimony describing these events and at least three separate witnesses confirmed her reports of harassment by Comaroff since 2017.  (Id. ¶¶ 171, 173).  ODR allegedly rejected Kilburn's testimony regarding this conduct on the grounds that it contained "inconsistencies."  (Id. ¶ 174).  However, the plaintiffs allege that the cited "inconsistencies" reflected an inaccurate description of the record or were so minor that they could not reasonably support ODR's findings.  (See id.).  They further allege that ODR's asserted inconsistencies "are, in reality, a pretext to avoid a finding of serial harassment and insulate Harvard from liability."  (Id.).  Moreover, the plaintiffs claim that ODR failed to even consider multiple incidents of harassment against Kilburn that did not involve non-consensual touching, such as Comaroff's repeated invitations to meet Kilburn off campus, his effort to force his way into the waiting area of the Graduate Program Administrator's office while Kilburn was holding the door shut, and his decision to forbid Kilburn from working with her advisor.  (Id. ¶ 175).  Kilburn also contends that the investigation was unfair because ODR refused to interview two thirds of the witnesses she identified, even though it interviewed or attempted to interview all of Comaroff's listed witnesses.  (Id. ¶ 173).

ODR did not recommend discipline for Comaroff and allegedly proposed no action that would prevent further harassment or retaliation against the plaintiffs.  (Id. ¶ 179).  Therefore, the plaintiffs appealed ODR's decisions to Harvard's appellate panel.  (Id. ¶ 180).  The appellate

panel found that no procedural violation had occurred.  (Id.).  Accordingly, it declined to

overturn ODR's findings and Harvard's Title IX Office informed the plaintiffs that "[t]he finding

and determinations reached in the course of (ODR's) investigation are ... final and cannot be re-

visited."  (Id.).

### Additional Proceedings Against Comaroff

After the ODR process was completed, FAS conducted a review to determine whether

Comaroff's comments to Kilburn about being raped or his October 2017 threats of retaliation

against Mandava and Czerwienski violated FAS' Professional Conduct Policy.  (Id. ¶ 182).  To

carry out this process, FAS hired an external factfinder to review ODR's final reports and the

record of ODR's investigation concerning Mandava's case.[4]  (Id.).  In December 2021, the

factfinder allegedly concluded, based on the evidence developed by ODR, that on October 13,

2017, Comaroff threatened Mandava to stop her from speaking to others about his sexual

harassment.  (Id. ¶ 183).  Accordingly, the external factfinder's conclusion directly conflicted

with ODR's determination that Mandava did not engage in protected activity.  The factfinder

also determined that Comaroff's statements to Mandava were "coercive" and violated FAS'

Professional Conduct Policy.  (Id.).

Thereafter, on January 20, 2022, the Dean of FAS, Claudine Gay, issued a written

statement in which she announced that following an investigation by ODR and FAS, Comaroff

"was found to have engaged in verbal conduct that violated the FAS Sexual and Gender-Based

Harassment Policy and the FAS Professional Conduct Policy."  (Id. ¶ 184).  Dean Gay provided

---

[4] The plaintiffs do not explain why the external factfinder who performed the FAS review did not
review the record of ODR's investigation into Czerwienski's and Kilburn's complaints.

no details regarding Comaroff's underlying conduct.  (Id.).  FAS placed Comaroff on leave for the

spring 2022 semester and relieved him from teaching required, but not elective, courses.  (Id. ¶

185).  Additionally, FAS prevented Comaroff from serving on dissertation committees, and from

advising students who did not have at least one other co-advisor during the 2022-2023

academic year.  (Id.).  However, the plaintiffs claim that Harvard took no steps to prevent

Comaroff from engaging in further harassment or retaliatory conduct.  (Id. ¶ 186).  Nor did it

take any steps to reduce the strength of his influence at the University upon his return to

campus for the fall 2022 semester.  (See id. ¶ 187).

### Fallout From the Investigations

The plaintiffs maintain that within hours after Dean Gay issued her statement, the

Comaroffs launched a campaign of retaliation against them.  (Id. ¶ 189).  Thus, on January 20,

2022, Professor Jean Comaroff allegedly disseminated a press release from her husband's

attorneys disparaging the plaintiffs and characterizing their challenge to Comaroff's misconduct

as an "attack on academic freedom."  (Id. ¶¶ 189, 191).  The press release was sent to a broad

segment of the Comaroffs' professional network, which included former students, Harvard

faculty and anthropology scholars with the power to impact the plaintiffs' careers.  (Id. ¶ 189).

It also included Czerwienski's advisor -- the individual responsible for determining whether

Czerwienski will receive her Ph.D.  (Id.).  The plaintiffs claim that within days after the

distribution of the press release, 38 Harvard faculty members, including members of the

Anthropology Department, signed a public letter that falsely characterized Comaroff's

statements about rape to Kilburn as "advice intended to protect an advisee from sexual

violence[,]" dismissed the external factfinder's conclusions and expressed dismay about

[28]

Harvard's decision to "sanction" Comaroff by investigating the plaintiffs' complaints against him.  (Id. ¶ 194).  Similarly, on February 3, 2022, the *Chronicle of Higher Education* published an open letter that was signed by 54 academicians from top universities around the world.  (Id. ¶ 195).  Allegedly, the letter characterized Comaroff's statements to Kilburn as advice "concern[ing] her personal security" and a warning "about gossiping about the department." (Id.).  It was also critical of the "stiff penalties" imposed on Comaroff for having been "found responsible solely for verbal sexual harassment."  (Id. (emphasis omitted)).

The plaintiffs claim that these letters, "distributed to academics with the power to influence Plaintiffs' careers, constitute textbook retaliation" and created a chilling effect by discouraging students seeking careers in academia from coming forward with complaints of sexual harassment.  (Id. ¶¶ 196-97).  Indeed, after the plaintiffs filed the instant action on February 8, 2022, thirty-five of the faculty members who had signed the public letter supporting Comaroff issued a retraction letter in which they allegedly admitted that their original letter had the potential "to intimidate students and inhibit them from divulging experiences of harm."  (Id. ¶ 197).  Nevertheless, Harvard allegedly made no effort to assure students that they would be protected from similar public retaliation if they complained about sexual harassment.  (Id. ¶ 198).  Instead, the plaintiffs claim that Harvard accused them of creating "a potential chilling effect on our community members' confidence in the investigatory process[,]" publicly questioned the plaintiffs' credibility, and asserted that this lawsuit, rather than its own mishandling of their complaints about sexual misconduct, would prevent students from speaking up.  (Id. ¶ 199).

[29]

**Plaintiffs' Claims of Improper Policies and Practices**

The plaintiffs assert that the ordeal they have suffered is the result of Harvard's policies and practices, which are aimed at protecting powerful faculty members at the expense of Harvard's students.  (Id. ¶ 203).  They accuse Harvard of maintaining at least seven such policies and practices, which are ongoing and based not only on the plaintiffs' own experiences, but also on the experiences of others who have complained about sexual harassment in the Anthropology Department.  (See id. ¶¶ 204-10).  As alleged in the Amended Complaint, those policies and practices may be categorized as follows:

- First, Harvard customarily does not investigate or otherwise act on credible reports of sexual harassment unless the survivor proceeds with a formal ODR complaint, even if Harvard has received prior complaints against the same professor.  (Id. ¶ 204).

- Second, Harvard forces its students to publicize their complaints through the media, at great personal and professional risk.  (Id. ¶ 205).

- Third, ODR ordinarily does not credit women's complaints unless they are corroborated by independent evidence, no matter how credible the complainant's testimony.  (Id. ¶ 206).

- Fourth, even as Harvard requires corroboration, its rules sharply restrict the written corroboration that complainants may offer.  (Id. ¶ 207).

- Fifth, Harvard does not take measures to protect students from professional retaliation.  (Id. ¶ 208).

- Sixth, Harvard failed to adequately train faculty in the [Anthropology] Department to report sexual harassment by faculty against students.  (Id. ¶ 209).

- Seventh, in the rare instances that Harvard does intervene in sexual abuse and abuse of power by faculty, the sanctions the school metes out are woefully inadequate, fail to further protect students, and, in many instances, punish women as well.  (Id. ¶ 210).

Although these alleged policies and practices were unknown to the plaintiffs before the events described in the Complaint, allegedly credible sources have repeatedly warned Harvard that its practices and procedures have been failing victims of sexual harassment and retaliation, and that they discourage students from pursuing legitimate complaints about sexual misconduct.  (See id. ¶¶ 211-22).  The warnings have included specific criticisms of the Title IX Office and ODR process from faculty members and students, recommendations from an external review committee, and information stemming from an annual survey regarding the existence of sexual harassment within FAS.  (See id. ¶¶ 212-15, 218-19, 221).  Allegedly, however, Harvard has failed to correct these problems and as a result, has fostered a culture in which powerful professors are able to abuse their power to victimize female students and those who speak up on their behalf.  (Id. ¶ 222).

### Alleged Harm Resulting From Harvard's Conduct

The plaintiffs contend that Harvard's inadequate response to Comaroff's pattern of abuse and retaliation has caused them significant emotional distress, and has harmed and will continue to harm their academic trajectories and career prospects.  (Id. ¶ 223).  They maintain that the burdensome ODR process forced them to delay their academic progress, that Harvard's failure to support them has hurt their ability to identify advisors and pursue their intended courses of study, and that Harvard's inadequate response to their complaints will hamper their ability to obtain funding for their research.  (Id. ¶¶ 224-27, 230).  They further maintain that even if they are able to complete their doctorates, they are likely to face severely restricted job prospects and limited earning potential in their chosen fields as a result of Harvard's conduct. (Id. ¶ 229).

Additional details relevant to this court's analysis are set forth below where appropriate.

### III. <u>ANALYSIS</u>

#### A. <u>Standard of Review</u>

Harvard has moved to dismiss Counts One through Nine of the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6).  Motions to dismiss under Rule 12(b)(6) test the sufficiency of the pleadings.  Thus, when confronted with such a motion, the court accepts as true all well-pleaded facts and draws all reasonable inferences in favor of the plaintiff.  <u>Redondo-Borges</u>, 421 F.3d at 5.  Dismissal is only appropriate if the complaint, so viewed, fails to allege "a plausible entitlement to relief."  <u>Rodríguez-Ortiz v. Margo Caribe, Inc.</u>, 490 F.3d 92, 95 (1st Cir. 2007) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 559, 127 S. Ct. 1955, 1967, 167 L. Ed. 2d 929 (2007)).

"The plausibility inquiry necessitates a two-step pavane."  <u>García-Catalán v. United States</u>, 734 F.3d 100, 103 (1st Cir. 2013).  "First, the court must distinguish 'the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).'"  <u>Id.</u> (quoting <u>Morales-Cruz v. Univ. of P.R.</u>, 676 F.3d 220, 224 (1st Cir. 2012)).  "Second, the court must determine whether the factual allegations are sufficient to support 'the reasonable inference that the defendant is liable for the misconduct alleged.'"  <u>Id.</u> (quoting <u>Haley v. City of Boston</u>, 657 F.3d 39, 46 (1st Cir. 2011)) (additional citation omitted). This second step requires the reviewing court to "draw on its judicial experience and common sense."  <u>Id.</u> (quoting <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 679, 129 S. Ct. 1937, 1950, 173 L. Ed. 2d 868 (2009)).  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need

detailed factual allegations," the plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]"  Bell Atl., 550 U.S. at 555, 127 S. Ct. at 1964-65 (citations omitted).  The factual allegations "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)[.]"  Id. at 555, 127 S. Ct. at 1965 (citations omitted).  For the reasons set forth below, this court finds that the plaintiffs have failed to state plausible claims against Harvard for gender discrimination in violation of Title IX, but that Harvard's motion to dismiss their remaining claims must be denied.

**B. Count One: Deliberate Indifference to Gender Discrimination and Hostile Educational Environment Under Title IX**

In Count One of their Amended Complaint, Mandava, Czerwienski and Kilburn have asserted claims against Harvard, pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 ("Title IX"), for deliberate indifference to gender discrimination and a hostile educational environment.[5]  (AC ¶¶ 232-43).  In support of these claims, the plaintiffs assert two theories of liability -- "pre-harassment" and "post-harassment" claims.  (See Pl. Opp. Mem. at 10-15 (describing claims asserted in Count One)).[6]  First, they allege that Harvard violated Title IX by maintaining a general policy of deliberate indifference to prior reports of sexual harassment by Comaroff and other faculty members in the Anthropology Department, which

---

[5] "Title IX provides that '[n]o person in the United States shall, on the basis of sex ... be subjected to discrimination under any education program or activity receiving Federal financial assistance.'"  Doe v. Trs. of Boston Coll., 892 F.3d 67, 89-90 (1st Cir. 2018) (quoting 20 U.S.C. § 1681(a)).  "This provision is enforceable 'through an implied private right of action.'"  Id. at 90 (quoting Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 281, 118 S. Ct. 1989, 141 L. Ed. 2d 277 (1998)).

[6] "Pl. Opp. Mem." refers to the Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion to Dismiss Counts One to Nine of Plaintiffs' Amended Complaint (Docket No. 68).

created a hostile educational environment and left the plaintiffs vulnerable to Comaroff's

sexual harassment and retaliation. As the plaintiffs allege in support of their pre-harassment

claims:

> Harvard has ... maintained an official policy, custom, and/or practice of deliberate
> indifference to a known overall risk of sexual harassment, retaliation, and gender-
> based disparate treatment against graduate students in the Anthropology
> Department. Specifically, Harvard has (among other things) failed to adequately
> train its employees to prevent, report, and correct sexual harassment and
> retaliation and to address its effects; failed to adequately act on multiple reports
> of sexual harassment and retaliation by multiple professors; maintained and
> enforced dispute resolution policies and processes that cause Harvard officials to
> fail to act on reports of sexual harassment and fail to deter systemic sexual
> harassment; and otherwise failed to implement adequate procedures to prevent,
> detect, monitor, and correct sexual harassment and retaliation.

(AC ¶ 237). Second, the plaintiffs allege that Harvard violated Title IX by failing to adequately

respond to their post-harassment complaints of sexual harassment and retaliation. (See id. ¶

238). Specifically, the plaintiffs claim that Harvard, through its policy and practice of deliberate

indifference, denied them "their rights to work and learn in an environment free of gender

discrimination and associated retaliation." (Id. ¶ 239). Harvard has moved to dismiss Count

One on the grounds that it is barred by the applicable statute of limitations and fails to state

plausible claims for relief against the University. (Def. Mem. at 11-20).[7] For the reasons that

follow, the motion to dismiss Count One is denied.

### 1. **Timeliness**

The defendants argue that all of the plaintiffs' claims against Harvard for deliberate

indifference and a hostile educational environment under Title IX are time-barred because they

---

[7] "Def. Mem." refers to the Defendant's Memorandum of Law in Support of Its Motion to Dismiss
Counts One Through Nine of Plaintiffs' Amended Complaint (Docket No. 54).

accrued more than three years prior to the filing of this action on February 8, 2022.  (Id. at 12).  "A defendant may assert a statute of limitations defense in a motion to dismiss if 'the facts establishing the defense are clear on the face of the plaintiff's pleadings.'"  Maffeo v. White Pine Invs., 537 F. Supp. 3d 45, 47 (D. Mass. 2021) (quoting Trans-Spec Truck Serv., Inc. v. Caterpillar Inc., 524 F.3d 315, 320 (1st Cir. 2008)).  "Granting a motion to dismiss on limitations grounds is appropriate, therefore, only when the complaint 'leave[s] no doubt that an asserted claim is time-barred.'"  Id. (alteration in original) (quoting LaChapelle v. Berkshire Life Ins. Co., 142 F.3d 507, 509 (1st Cir. 1998)).   This court finds that Harvard has failed to meet this standard with respect to Count One.

### The Applicable Statute of Limitations

"Title IX does not contain a statute of limitations."  Curto v. Edmundson, 392 F.3d 502, 504 (2d Cir. 2004).  Accordingly, courts ordinarily borrow the forum state's statute of limitations for personal injury actions.  See id. (explaining that circuit courts "that have confronted the issue have concluded that Title IX claims are most closely analogous to personal injury actions and, therefore, have borrowed the state statute of limitations for personal injury actions.");  Doe v. Town of Bourne, No. Civ. A. 02-11363-DPW, 2004 WL 1212075, at *11 (D. Mass. May 28, 2004) (finding that "Massachusetts's three-year statute of limitations for personal injury actions applies to the Title IX claims").  In the instant case, it is undisputed that the three-year statute of limitations applicable to personal injury actions in Massachusetts applies to the plaintiffs' Title IX claims.  (See Def. Mem. at 11; Pl. Opp. Mem. at 21).  Ordinarily, therefore, any Title IX deliberate indifference claim that accrued prior to February 8, 2019 would be time-barred.

[35]

The plaintiffs argue that February 8, 2019 "is not the cut-off date for Plaintiffs' claims, which were tolled for 105 days during the COVID-19 pandemic" by an order from the Massachusetts Supreme Judicial Court ("SJC"), and therefore "survive so long as they accrued after October 26, 2018."  (Pl. Opp. Mem. at 2-3).  The SJC's COVID-19 orders "tolled 'each and every civil statute of limitations' from March 17, 2020, until June 30, 2020."  Silva v. City of New Bedford, 602 F. Supp. 3d 186, 192-93 (D. Mass. 2022) (quoting Shaw's Supermarkets, Inc. v. Melendez, 488 Mass. 338, 342, 173 N.E.3d 356 (2021)).  In the instant case, Harvard does not dispute that if those orders apply to the plaintiffs' Title IX claims, they will lengthen the limitations period by 105 days and move the cut-off for accrual from February 8, 2019 to October 26, 2018.  (Def. Reply Mem. at 11 n.17).[8]  However, Harvard notes that no federal or state case has applied the SJC's tolling order to Title IX claims.  (Id.).  This court finds that the 105-day tolling period is applicable to the plaintiffs' Title IX claims, but even if it were not, it is not clear on the face of the Amended Complaint that the plaintiffs' deliberate indifference/hostile environment claims accrued prior to February 8, 2019.

"When a federal court applies a state's statute of limitations, it is obliged to follow the state's 'rule for tolling that statute of limitations.'"  Dillow v. Virginia Polytechnic Inst. & State Univ., No. 7:22cv00280, 2023 WL 2320765, at *10 (W.D. Va. Mar. 2, 2023) (quoting Scoggins v. Douglas, 760 F.2d 535, 537 (4th Cir. 1985)).  See also Ouellette v. Beaupre, 977 F.3d 127, 135 (1st Cir. 2020) (explaining that courts borrow the "state's designated limitations period for general personal injury torts, as well as its coordinate tolling rules" in actions brought under 42

---

[8] "Def. Reply Mem." refers to Defendant's Reply Brief in Further Support of Its Motion to Dismiss Counts One Through Nine of Plaintiffs' Amended Complaint (Docket No. 83).

U.S.C. § 1983 (internal quotations and citation omitted)).  Courts applying state statutes of

limitations in the Title IX context have adhered to this practice.  See, e.g., Dillow, 2023 WL

2320765, at *10 (adopting state tolling rules for Title IX and § 1983 claims); Twersky v. Yeshiva

Univ., 993 F. Supp. 2d 429, 437 (S.D.N.Y. 2014) ("'[t]he borrowing of a state-law statute of

limitations carries with it the borrowing of the state's coordinate tolling rules,' at least where

such rules are not inconsistent with the letter and purpose of relevant provisions of federal

law." (quoting Zimmerman v. Poly Prep Country Day Sch., 888 F. Supp. 2d 317, 333 (E.D.N.Y.

2012)), aff'd, 579 Fed. Appx. 7 (2d Cir. 2014).  Moreover, federal courts that have addressed the

issue have found that where COVID-19 tolling orders apply to a statute of limitations that is

borrowed in a Title IX action, those orders toll the limitations period for the Title IX claims.  See

Dillow, 2023 WL 2320765, at *10 (finding that COVID-19 tolling orders issued by the Supreme

Court of Virginia and applicable to all state statutes of limitations tolled the limitations period

applicable to plaintiff's Title IX claim); Doe v. State Univ. of N.Y. Purchase Coll., --- F. Supp. 3d ---

2022 WL 2972200, at *8 (S.D.N.Y. July 27, 2022) (ruling that executive orders, which were

issued during the COVID-19 pandemic and tolled the limitations period for claims brought

under the state's personal injury statute, also tolled the limitations period applicable to Title IX

claims).  Harvard has not presented any basis for declining to adopt the same approach here.

(See Def. Reply Mem. at 11 n.17).  Therefore, the SJC's COVID-19 tolling orders should apply to

Title IX claims, like those at issue in this case, that have been brought in Massachusetts.[9]

---

[9] This court's conclusion that the SJC's COVID-19 orders toll the limitations period applicable to the
plaintiffs' Title IX claims is consistent with Silva, in which another session of this court determined that
the SJC's tolling orders apply to claims brought under 42 U.S.C. § 1983.  Silva, 602 F. Supp. 3d at 190-91.
In that case, the court recognized that, as in the case of Title IX actions, the statute of limitations which
applies to § 1983 actions "is that which governs personal injury actions."  Silva, 602 F. Supp. 3d at 191.  It

**Accrual of Plaintiffs' Claims**

While state law governs the length of the limitations period, the accrual of Title IX claims "is governed by federal law[.]"  Town of Bourne, 2004 WL 1212075, at *11.  See also Snyder-Hill v. Ohio State Univ., 48 F.4th 686, 698 (6th Cir. 2022) (ruling that federal standards govern when the statute of limitations begins to run in a Title IX action); Jardín De Las Catalinas Ltd. P'ship v. Joyner, 766 F.3d 127, 133 (1st Cir. 2014) (ruling, in action brought under 42 U.S.C. § 1983, that "[u]nlike the limitations period, the date of accrual is determined strictly in accordance with federal law.").  Under federal law, including the law of the First Circuit, the "discovery rule" generally applies "absent a statutory directive to the contrary[.]"  Snyder-Hill, 48 F.4th at 698.  See also Ouellette, 977 F.3d at 136 n.7 (explaining that the federal discovery rule generally applies to cases brought in the First Circuit).  Accordingly, "accrual is delayed until the plaintiff knows, or should know, . . . both the fact of his or her injury and the injury's likely causal connection with the putative defendant."  Ouellette, 977 F.3d at 136.  See also Snyder-Hill, 48 F.4th at 698 (explaining that "[t]he general federal rule" in a Title IX action "is that 'the statute of limitations begins to run when the reasonable person knows, or in the exercise of due diligence should have known, both his injury and the cause of that injury.'"  (quoting Bishop v. Children's Ctr. for Developmental Enrichment, 618 F.3d 533, 536 (6th Cir. 2010) (additional quotations and citation omitted).

---

also determined, inter alia, that under the law of the First Circuit, the question of tolling in a § 1983 action is governed by state law, and that relevant case law from outside the Circuit "tends toward applying pandemic-related state tolling orders to section 1983 claims."  Id. at 193-94.  Furthermore, the court concluded that the SJC's COVID-19 tolling orders were not inconsistent with federal law.  Id. at 197.  Harvard has not shown why a similar ruling would be inappropriate here, especially when the federal court borrows the same state statute of limitations for Title IX claims as it does for § 1983 claims.

The parties disagree about the knowledge required to satisfy the discovery rule. Harvard argues that "the relevant injury is the harassment or abuse itself, such that a claim accrues when the plaintiff is harassed." (Def. Reply Mem. at 12 (footnote omitted)). Thus, Harvard contends that all of the plaintiffs' claims accrued in 2017, when each plaintiff alleges she was first harassed or threatened by Comaroff. (Id. at 13). If this is correct, the plaintiffs' claims would be barred by the statute of limitations because the plaintiffs did not initiate this litigation until February 8, 2022, well over three years and 105 days after the alleged incidents occurred. However, the plaintiffs argue that the knowledge relevant to the discovery rule concerns the deliberate indifference of the defendant rather than Comaroff's actions. (See Pl. Sur-Reply Mem. at 7-8).[10] They contend that their claims did not accrue until the May 29, 2020 publication of the *The Harvard Crimson* article revealing "Harvard's pattern of deliberate indifference to reports against faculty" in the Anthropology Department. (Pl. Opp. Mem. at 23 (quoting AC ¶ 143)). Therefore, under the plaintiffs' theory, their filing of the instant action in February 2022 was well within the applicable statute of limitations.

As the First Circuit has explained, there are some cases in which information about the plaintiff's injury and its causal connection to the defendant "is or should be apparent to the plaintiff at the time of the injury." Ouellette, 977 F.3d at 136. However, in other cases,

> an injury may lie dormant without manifestation until days, months, or even years after it has occurred. And in other cases still, the injury may be apparent, but the facts about causation may be in the control of the putative defendant, unavailable to the plaintiff or at least very difficult to obtain.

---

[10] "Pl. Sur-Reply Mem." refers to Plaintiffs' Sur-Reply in Opposition to Defendant's Motion to Dismiss (Docket No. 90).

Id. (quotations, citations and footnote omitted).   In either of the two latter scenarios, "the federal discovery rule delays accrual until 'a reasonably prudent person similarly situated' to the plaintiff would discover these two key pieces of factual information -- namely, the existence of the injury and its probable cause."  Id. (quoting Jardín de las Catalinas, 766 F.3d at 133).  This court finds that while the plaintiffs may have been aware of their harm at the moment they were subjected to Comaroff's misconduct, under the circumstances alleged in this case, any role that Harvard may have had in causing that harm would not have been apparent "from the face of things at the time of an injury[.]"  Id. at 139.

In a Title IX case such as the instant action, "a plaintiff's cause of action is against the school based on the school's actions or inactions, not the actions of the person who abused the plaintiff."  Snyder-Hill, 48 F.4th at 702.  Accordingly, "a plaintiff could not have been 'alerted ... to protect his or her rights' through a Title IX suit unless they had reason to believe that the institution did something (or failed to do something) that caused their injury."  Id. at 703 (quoting Johnson v. Memphis Light Gas & Water Div., 777 F.3d 838, 843 (6th Cir. 2015)).  Here, there can be no serious question that the plaintiffs were aware of Comaroff's abusive conduct toward them at or near the time it occurred.  However, they have not alleged any facts to suggest that at the time of that misconduct, there was any reason to believe that Harvard was at fault for their alleged harm.  The mere fact that Comaroff was employed by Harvard when he allegedly harassed and threatened the plaintiffs would not have alerted the plaintiffs to the University's alleged role in the discriminatory conduct.  See Snyder-Hill, 48 F.4th at 703 ("unlike in cases with direct respondeat superior liability in which a defendant's liability is easily discernable, an assault does not give a plaintiff knowledge of an institution's conduct" in a Title

IX action); Ouellette, 977 F.3d at 142 (the fact that the alleged abuser was the defendant's employee "and may have used that role to take advantage of [the plaintiff] hardly supports the inference that [the abuser's] higher-ups condoned his conduct, or even knew about it."). Therefore, for purposes of this case, accrual cannot be based solely on when the alleged harassment and threats of retaliation occurred.  It also depends upon when a reasonably prudent person in the plaintiffs' situation knew or should have known about facts concerning Harvard's alleged deliberate indifference.  See Karasek v. Regents of Univ. of Cal., 500 F. Supp. 3d 967, 979 (N.D. Cal. 2020) (explaining that for purposes of a pre-assault action under Title IX, the plaintiff must be put on notice of "not just the assault itself" but also of the deliberate indifference that caused the concrete injury).

<u>Accrual of Plaintiffs' Pre-Harassment Claims</u>

The plaintiffs' "principal theory under Title IX" is "that Harvard's practice of deliberate indifference to sexual harassment, and its failure to adequately respond to ***prior*** reports of harassment -- by Comaroff and others -- exposed Plaintiffs to Comaroff's behavior in the first place[.]"  (Pl. Opp. Mem. at 10 (emphasis in original)).  Pursuant to the discovery rule, such pre-harassment claims "do[ ] not accrue until a plaintiff knows or has reason to know of such a policy of deliberate indifference."  Karasek, 500 F. Supp. 3d at 981.  The plaintiffs contend that in this case, their pre-harassment claims "did not accrue until 2020, when the *Crimson* revealed 'Harvard's pattern of deliberate indifference to reports against faculty' in their department." (Pl. Opp. Mem. at 23).  The facts alleged in the Amended Complaint support the plaintiffs' argument.

[41]

The plaintiffs allege that prior to the May 29, 2020 publication of *The Harvard Crimson* article on sexual harassment in the Anthropology Department, they "were aware only of the misconduct to which they and a few others had been subjected." (AC ¶ 141). As described above, those few others consisted of Harvard Student 2 and Harvard Student 3. (See id. ¶¶ 55-56). However, the article exposed "a decades-long pattern of sexual abuse" perpetrated by Comaroff and two other professors in the Anthropology Department, and described how "for years, ODR, the Title IX Office, faculty, and administrators systematically refused to act on students' complaints." (Id. ¶¶ 122, 141). In particular, according to the Amended Complaint, the article revealed that over the course of many years, students and others made numerous complaints of sexual harassment and abuse to Harvard administrators, department heads and the University's Title IX Office, but that Harvard discouraged victims from filing formal complaints, repeatedly failed to conduct formal investigations and declined to take concrete steps to prevent future harassment and retaliation by professors in the Anthropology Department. (See id. ¶¶ 127-38). Consequently, the article uncovered "new revelations" about "Harvard's pattern of deliberate indifference to reports against faculty" in that Department. (Id. ¶ 143). On the other hand, there is no indication that the plaintiffs knew or had any reason to know of Harvard's alleged pattern and practice of deliberate indifference before the article was published. Accordingly, the Amended Complaint supports their assertion that their pre-harassment claims accrued no earlier than May 29, 2020, and that their filing of this litigation fewer than two years later was timely.

Harvard argues that even under the discovery rule, Czerwienski's and Mandava's pre-harassment deliberate indifference claims are barred by the statute of limitations because they

accrued in 2017.  (See Def. Reply Mem. at 13).  Specifically, Harvard posits that Czerwienski and

Mandava knew or should have known about Harvard's alleged policy of deliberate indifference

to reports of sexual harassment and misconduct by October 2017, when Comaroff allegedly

retaliated against them, because they "(1) knew that Comaroff was allegedly sexually harassing

Harvard Student 2 and pursuing Harvard Student 3; (2) had both reported Comaroff's alleged

behavior towards Harvard Students 2 and 3 to faculty; and (3) had been dissatisfied with

Harvard's response and thus had taken it upon themselves to start warning students about

Comaroff."  (Id.).  It also contends that their pre-harassment claims accrued in 2017 because

"[a]fter Comaroff allegedly retaliated against them, Czerwienski and Mandava immediately

reported his conduct to Avakian and *explicitly allege* that they found Avakian's response to this

report inadequate."  (Id.).

    This court finds Harvard's arguments unpersuasive.  As an initial matter, this court

cannot conclude, as a matter of law, "that a reasonably prudent person would have been put

on notice of the University's overarching policy of deliberate indifference merely by being

aware of specific [instances of] past [harassment] in the same [Department]."  Karasek, 500 F.

Supp. 3d at 981.  This is especially true here, where Czerwienski and Mandava reported

Comaroff's alleged misconduct toward Harvard Students 2 and 3 to members of Harvard's

faculty.  To state a plausible claim under Title IX, the plaintiffs must allege facts showing that "a

school official authorized to take corrective action had actual knowledge of the harassment, yet

exhibited deliberate indifference to it."  Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 66 (1st

Cir. 2002).  According to Harvard, faculty members have no such authority.  (Def. Mem. at 19

n.21).  Because the plaintiffs' reports to faculty members were inadequate to put Harvard on

notice of the alleged sexual harassment, it follows that the plaintiffs could not have been alerted to the existence of a policy of deliberate indifference when those faculty members failed to address the claims of misconduct.  See Karasek, 500 F. Supp. 3d at 981-82 (rejecting university's argument that plaintiff should have been aware of alleged policy of deliberate indifference where plaintiff's complaint of sexual misconduct "was made to a single employee whom the University represents was not its agent.").

As described above, Harvard also argues that Czerwienski and Mandava were on notice of an alleged policy of deliberate indifference when Avakian failed to take any action in response to Czerwienski's report of Comaroff's behavior on October 16, 2017.  (See Def. Mem. at 12; Def. Reply Mem. at 13).  This court finds that this argument is similarly unconvincing. While Harvard does not dispute that Avakian had sufficient authority to address discrimination and to take corrective measures (Def. Mem. at 12 n.17), "[i]t is unreasonable to conclude ... that a plaintiff's knowledge that her *individual* complaint was mishandled would reveal that the University has a broad de facto policy of deliberate indifference."  Karasek, 500 F. Supp. 3d at 981.  Nor would it be reasonable to conclude, based on Harvard's failure to address Comaroff's alleged harassment of Harvard Students 2 and 3, that the plaintiffs were put on notice that such a policy existed. "It is entirely possible for [sexual misconduct] to occur and for a school not to have created a heightened risk through a policy of deliberate indifference."  Id.  At most, Avakian's alleged failure to respond to Czerwienski's complaint raises questions of fact regarding the nature and scope of the plaintiffs' knowledge.  Therefore, this court cannot conclude, as a matter of law, that a reasonably prudent student viewing Harvard's response to Czerwienski's complaint of misconduct should have been on notice, in 2017, that Harvard had a

[44]

policy and practice of deliberate indifference to complaints of sexual misconduct in the

Anthropology Department.  Harvard has not shown that any of the plaintiffs' pre-harassment

claims should be dismissed on the grounds of untimeliness.

<u>Accrual of Plaintiff's Post-Harassment Claims</u>

The plaintiffs also claim that Harvard acted with deliberate indifference to their

individual claims of sexual harassment and retaliation.  Specifically, the plaintiffs claim that

Harvard's response to their 2019 complaints was inadequate and unreasonable because it

failed to investigate those complaints within a reasonable time period and only did so after it

learned that the press was prepared to report on Comaroff's misconduct; allowed Comaroff to

unfairly manipulate the 2020-21 investigatory process, spoliate evidence and intimidate

witnesses; and ignored clear and relevant evidence.  (<u>See</u> Pl. Opp. Mem. at 13-14 (citing

Amended Complaint)).  While Harvard does not dispute that Kilburn's post-harassment claims

of deliberate indifference are timely under the discovery rule,[11] it argues that Czerwienski's and

Mandava's post-harassment claims are time-barred because those plaintiffs knew, in 2017, that

Harvard was on notice of Comaroff's threats of retaliation against them but had failed to take

adequate steps to respond to their complaints.  (<u>See</u> Def. Mem. at 12).  This court finds that the

question as to when Czerwienski and Mandava knew or should have known that Harvard's

response to their complaints was inadequate is not clear on the face of the Amended

---

[11] The plaintiffs allege that the first time anyone at Harvard with authority to address discrimination
and institute corrective measures was informed of Comaroff's harassment of Kilburn occurred in late
April or early May 2019.  (<u>See</u> AC ¶¶ 108-09 (alleging that professors to whom Kilburn complained
shared her complaint with the Title IX Office, and that Kilburn met with Avakian on May 2, 2019 to
report Comaroff's sexual harassment)).  Because Kilburn could not have known about Harvard's
allegedly deliberate indifference to her post-harassment complaint prior to that time, her claims are
timely under the applicable statute of limitations.

Complaint, and that the issue whether their post-harassment claims for deliberate indifference accrued prior to the limitations period cannot be resolved without further development of the evidentiary record.

Under the discovery rule, the clock starts to run "once the plaintiff knows or should have known that [the University's] administrators 'with authority to take corrective action' knew of [the discriminatory] conduct and failed to respond appropriately." Snyder-Hill, 48 F.4th at 705 (quoting Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 290, 118 S. Ct. 1989, 141 L. Ed. 2d 277 (1998)). Here, the plaintiffs allege that on or about October 16, 2017, Czerwienski reported Comaroff's threats against Czerwienski and Mandava, as well as Comaroff's sexual harassment of other students, to Avakian. (AC ¶ 77). As Harvard's Title IX Resource Coordinator, Avakian had authority to address such conduct and take corrective measures. (See id.; Def. Mem. at 12 n.17). Therefore, Czerwienski and Mandava knew that Harvard was on notice of Comaroff's actions against them at that time. The plaintiffs further allege that while Avakian discouraged Czerwienski from filing a formal report with ODR, Czerwienski and Mandava "trusted that Harvard, informed of Professor Comaroff's repeated sexual harassment of other students and retaliation against them, would take action to stop his pattern of misconduct -- even if only behind the scenes. But, they later learned, Harvard did not." (AC ¶ 78-79). Harvard argues, based on these allegations, that plaintiffs' "own pleadings place the accrual date squarely in 2017." (Def. Reply Mem. at 13). This court finds that the pleadings are not so clear.

As an initial matter, it is not clear from these allegations or other alleged facts when Czerwienski and Mandava learned that Harvard had failed to take action behind the scenes to

[46]

stop Comaroff's pattern of sexual misconduct.  For example, the plaintiffs allege that Kilburn

"shared her experience of harassment with Ms. Mandava in June 2019[,]" and that Mandava

was "disturbed to learn that Professor Comaroff had continued his abuse[.]"  (AC ¶ 114).  These

allegations indicate that Mandava was unaware, until June 2019, that Harvard had failed to

take steps to address Comaroff's alleged misconduct.  Therefore, they are sufficient to raise an

issue of fact as to when Mandava's claims accrued.  Moreover, the Amended Complaint

demonstrates that in the fall of 2019 and spring of 2020, Avakian still viewed Czerwienski's and

Mandava's complaints of retaliation as matters that remained open for investigation.  Thus, the

plaintiffs allege that on November 20, 2019, Avakian sent Czerwienski an email in which he

stated, "I spoke with someone earlier this week about the concerns we've discussed and they

told me that you have been talking with a few students in AAAS who share similar concerns."

(Id. ¶ 116).  They further allege that on May 18, 2020, Avakian filed formal ODR complaints

against Comaroff on behalf of Czerwienski, Mandava, Kilburn and Harvard Student 2.  (Id. ¶

119).  The alleged fact that Avakian, and hence Harvard, viewed Czerwienski's and Mandava's

complaints of retaliation as open for consideration as late as May 2020 undermines Harvard's

assertion that the plaintiffs knew or should have known earlier that Harvard was not going to

address their complaints.  At a minimum, it raises issues of fact as to when their post-

harassment claims accrued.  Because this court cannot conclude, as a matter of law, that the

Amended Complaint "leave[s] no doubt" that Czerwienski's and Mandava's post-harassment

claims are time-barred, Harvard's motion to dismiss these claims on statute of limitations

grounds must be denied.[12]  See Maffeo, 537 F. Supp. 3d at 47 (quoting LaChapelle, 142 F.3d at 509).

### 2.   Sufficiency of the Allegations

Harvard has also moved to dismiss Count One on the grounds that the plaintiffs have failed to state plausible claims for relief against the University under Title IX.  (Def. Mem. at 16-20).  The First Circuit has recognized "two ways in which sexual harassment in the educational milieu can constitute gender-based discrimination actionable under Title IX."  Frazier, 276 F.3d at 65.  The first, which is "known as 'quid pro quo' harassment or discrimination, occurs most often when some benefit or adverse action ... is made to depend on providing sexual favors to someone in authority."  Wills v. Brown Univ., 184 F.3d 20, 25 (1st Cir. 1999) (quoting Lipsett v. Univ. of P.R., 864 F.2d 881, 898 (1st Cir. 1988)).  "The second, hostile environment harassment, covers acts of sexual harassment sufficiently severe and pervasive to compromise or interfere with educational opportunities normally available to students."  Frazier, 276 F.3d at 65.  Here, each of the plaintiffs is proceeding under a hostile environment theory.  This court finds that Harvard's motion to dismiss these claims on the merits must be denied.

### Elements of the Plaintiffs' Hostile Environment Claims

To prevail on a hostile environment claim based on sexual harassment of a student by a professor, the plaintiff "must show (1) that he or she was subject to 'severe, pervasive, and objectively offensive' sexual harassment" by the professor, "(2) that the harassment caused the

---

[12] In light of this court's ruling that the claims asserted in Count One are not time-barred as a matter of law under the discovery rule, it is not necessary at this time to address the plaintiffs' argument that their claims are timely under the continuing violation doctrine.  (See Pl. Opp. Mem. at 26-31).

plaintiff to be deprived of educational opportunities or benefits[,]" (3) that the school "knew of

the harassment, (4) in its programs or activities and (5) [the school] was deliberately indifferent

to the harassment such that its response (or lack thereof) is clearly unreasonable in light of the

known circumstances."  Porto v. Town of Tewksbury, 488 F.3d 67, 72-73 (1st Cir. 2007).

"[D]eliberate indifference" in this context "requires more than a showing that the institution's

response to harassment was less than ideal."  Fitzgerald v. Barnstable Sch. Comm., 504 F.3d

165, 171 (1st Cir. 2007), rev'd on other grounds, 555 U.S. 246, 129 S. Ct. 788, 172 L. Ed. 2d 582

(2009).  It "requires a showing that the institution's response was 'clearly unreasonable in light

of the known circumstances.'"  Id. (quoting Davis v. Monroe Cnty. Bd. of Educ., 526 U.S. 629,

648, 119 S. Ct. 1661, 1674, 143 L. Ed. 2d 839 (1999)).  "Relatedly, to 'subject' a student to

harassment, the institution's deliberate indifference must, at a minimum, have caused the

student to undergo harassment, made her more vulnerable to it, or made her more likely to

experience it."  Id.

In this case, the plaintiffs claim that Harvard "maintained an official policy, custom,

and/or practice of deliberate indifference to a known overall risk of sexual harassment,

retaliation, and gender-based disparate treatment against graduate students in the

Anthropology Department" that placed them at risk of sexual harassment and retaliation by

Comaroff.  (See AC ¶¶ 237-38).  Although it does not appear that the First Circuit has addressed

such a claim, at least one Circuit Court of Appeals has determined that pre-assault claims based

on an alleged policy of deliberate indifference

> should survive a motion to dismiss if the plaintiff plausibly alleges that (1) a school
> maintained a policy of deliberate indifference to reports of sexual misconduct, (2)
> which created a heightened risk of sexual harassment that was known or obvious
> (3) in a context subject to the school's control, and (4) as a result, the plaintiff

suffered harassment that was "so severe, pervasive, and objectively offensive that it can be said to [have] deprive[d] the [plaintiff] of access to the educational opportunities or benefits provided by the school."  *Davis*, 526 U.S. at 650, 119 S. Ct. 1661.

Karasek v. Regents of Univ. of Cal., 956 F.3d 1093, 1112 (9th Cir. 2020) ("Karasek II") (footnote omitted).

### Severity of Comaroff's Threats

Harvard argues, as an initial matter, that Czerwienski and Mandava have failed to allege facts showing that Comaroff's alleged threats against them were severe and pervasive.  (Def. Mem. at 17-18).  In particular, Harvard argues that Comaroff's October 2017 conversation with Mandava, in which he allegedly confronted Mandava about "nasty rumors" that she and Czerwienski had been spreading about his sexual encounters with students and suggested that she and Czerwienski would have trouble finding jobs if the rumors continued, "is an insufficient basis upon which to proceed against Harvard with a claim of a sexually hostile environment under Title IX."  (Id. at 17).  It also argues that "the same is true" with respect to the text messages that Comaroff allegedly sent to Harvard Student 2, in which he sought information about Czerwienski's whereabouts and activities, discussed the classes Czerwienski was taking and the grants for which she was applying, and indicated that he viewed Czerwienski as a threat.  (See id. at 17-18).  To satisfy this element of a hostile environment claim, the offending conduct "need only be severe enough to 'undermine[ ] and detract[ ] from the victim's educational experience' such that the victim is 'effectively denied equal access to an institution's resources and opportunities.'"  Doe v. Pawtucket Sch. Dep't, 969 F.3d 1, 10 (1st Cir.

2020) (quoting <u>Davis</u>, 526 U.S. at 651, 119 S. Ct. at 1675).  At this stage, the plaintiffs' factual

allegations are sufficient to satisfy this standard.[13]

"Whether gender-oriented conduct rises to the level of actionable 'harassment' ...

'depends on a constellation of surrounding circumstances, expectations, and relationships[.]'"

<u>Davis</u>, 526 U.S. at 651, 119 S. Ct. at 1675 (quoting <u>Oncale v. Sundowner Offshore Servs., Inc.,</u>

523 U.S. 75, 81-82, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998)).  "Conduct that might not be

actionable under Title IX if perpetrated by a student might be deemed more likely to exclude, or

discriminate against, the potential targets of the conduct if perpetuated by a person in

authority."  <u>Pawtucket Sch. Dep't</u>, 969 F.3d at 11.  As the plaintiffs in this case have alleged,

Comaroff is no ordinary professor in the Harvard Anthropology Department.  Rather, he is a

leading specialist in his field with contacts and influence at academic institutions throughout

the world.  (<u>See</u> AC ¶ 7).  As further alleged in the Amended Complaint, no one in a position of

authority at Harvard, including Avakian, was willing to confront Comaroff or take any action to

protect students from him, despite multiple complaints of sexual harassment and misconduct

against graduate students in the Anthropology Department.  (<u>See</u> AC ¶¶ 56-57, 60-64, 66-67,

77-78, 96, 108-11).  Under these circumstances, a factfinder could reasonably conclude that

Comaroff's threats against graduate students in his Department were severe enough, and so

pervaded their educational environment, that they undermined the victims' educational

---

[13] The parties dispute whether a plaintiff claiming a hostile environment must show that teacher-on-student harassment is both severe *and* pervasive or whether the plaintiff can succeed on such a claim if she demonstrates that the offending conduct was severe *or* pervasive.  (<u>See</u> Pl. Opp. Mem. at 17-18; Def. Reply Mem. at 6 n.10).  This court finds that it is not necessary to resolve this dispute at this point in the litigation because the plaintiffs have plausibly alleged that Comaroff's threats to them were "severe and pervasive enough to result in excluding, or discriminating against, a victim of that behavior."  <u>See</u> <u>Pawtucket Sch. Dep't</u>, 969 F.3d at 11.

opportunities.  In fact, Czerwienski and Mandava allege that they not only took Comaroff's

threats seriously, but also went to such great lengths to avoid further contact with him that

they sacrificed certain of their academic goals.  For example, Czerwienski claims that she ended

her advising relationship with Professor Jean Comaroff, dropped a required course because the

Comaroffs were the only professors who taught it at the time, and shifted her academic focus

away from Africa, her area of specialization.  (Id. ¶ 82).  Similarly, Mandava claims that she had

to end her mentoring relationship with both Comaroffs, change the focus of her dissertation

and decline to apply for a grant in the Comaroffs' area of expertise.  (Id. ¶ 83).  The plaintiffs

claim that these precautions altered the trajectories and caused harm to their academic

careers.  (See id. ¶¶ 75, 82-84).  In particular, the plaintiffs allege facts that, when taken as true,

demonstrate that losing the support of the Comaroffs was a significant blow to Czerwienski's

and Mandava's prospects for success in Harvard's Anthropology Department and in their

chosen careers.  (See id. ¶¶ 74-75 (describing Comaroff's ability to influence students' careers,

ability to obtain grant funding and publish their research)).

      To the extent Harvard argues that Czerwienski and Mandava have not met the "severe

and pervasive" element of their hostile environment claims because the Amended Complaint

alleges only "two incidents of purported harassment by Comaroff" (Def. Mem. at 17), its

argument is insufficient to warrant dismissal.  As an initial matter, Harvard's argument does not

reflect a fair reading of the Amended Complaint, which supports a reasonable inference that

Comaroff's alleged efforts to intimidate witnesses and destroy evidence during the ODR

investigation occurred in retaliation for Czerwienski's and Mandava's complaints against him.

(See AC ¶¶ 153-57).  Moreover, "there is no magic number of incidents required to establish a

hostile environment claim[.]"  Brodeur v. Claremont Sch. Dist., 626 F. Supp. 2d 195, 213 (D.N.H. 2009) (internal quotation marks and citations omitted).  While the frequency of the alleged misconduct may have "some bearing on the overall hostility of the educational environment," the court's analysis "ultimately depends on much more."  Id.  Here, the plaintiffs allege that Comaroff had an extraordinary amount of power and influence over the educational environment in which the plaintiffs were pursuing their degrees.  Even if this court were to accept Harvard's characterization of their allegations, Czerwienski and Mandava have plausibly alleged that Comaroff's threats, while limited in frequency, were sufficiently severe and pervasive under the circumstances to detract from their educational experiences.[14]  See Wills, 184 F.3d at 25 (explaining that "hostile environment" harassment or discrimination applies where the alleged misconduct is "sufficiently severe to interfere with the workplace or school opportunities normally available to the worker or student.").

Finally, this court notes that "matters of degree -- such as severity and pervasiveness -- are often best left to the jury."  Doe v. Sch. Dist. No. 1, Denver, Colo., 970 F.3d 1300, 1311-12 (10th Cir. 2020).  Accordingly, "'the severity and pervasiveness evaluation is particularly unsuited for summary judgment because it is quintessentially a question of fact,' and it is even less suited for dismissal on the pleadings."  Id. at 1312 (quoting O'Shea v. Yellow Tech. Servs.,

---

[14] Harvard suggests that Czerwienski has failed to satisfy the "severe and pervasive" element of her hostile environment claim because Comaroff's alleged threats were conveyed through texts to Harvard Student 2 and a discussion with Mandava rather than by way of a direct communication with Czerwienski. (See Def. Mem. at 17).  However, Harvard has not cited any authority to support such an argument and the available case law indicates that it provides no basis for dismissal of Czerwienski's claims.  See Planadeball v. Wyndham Vacation Resorts, Inc., 793 F.3d 169, 178 (1st Cir. 2015) (finding that a reasonable juror could infer that "multiple, consecutive threats, stated to an employee directly and to her co-worker who passed the message on to that employee," constituted a material adverse action for purposes of a Title IX retaliation claim).

Inc., 185 F.3d 1093, 1098 (10th Cir. 1999)).  For this reason as well, Harvard's motion to dismiss

Czerwienski's and Mandava's claims on this basis is denied.

### Existence of an Alleged Policy of Deliberate Indifference

Harvard also contends that Count One fails to state a claim because the plaintiffs have

not plausibly alleged that Harvard maintained a policy and practice of deliberate indifference to

sexual misconduct in the Anthropology Department.  (Def. Mem. at 18; Def. Reply Mem. at 3-

5).  This court disagrees.  First, the articles in *The Harvard Crimson* and *The Chronicle of Higher*

*Education* support a finding that Harvard engaged in a long-term pattern and practice of

indifference to complaints of sexual harassment against professors in that Department.  (See

AC ¶¶ 141-43).  As alleged, the articles described in detail how, over the course of many years,

students and others repeatedly complained of sexual harassment and abuse by professors in

the Anthropology Department to Harvard administrators, department heads and the Title IX

Office, but Harvard discouraged victims from filing formal complaints, repeatedly failed to

perform formal investigations and declined to take action to prevent further instances of

harassment and retaliation.  (See id. ¶¶ 127-38).  Because the risk of continuing harassment

arising out of these alleged circumstances would have been "'obvious,' the failure to remedy

that risk constituted an official policy of deliberate indifference that violated Title IX."  Karasek

II, 956 F.3d at 1113 (quoting Simpson v. Univ. of Colo. Boulder, 500 F.3d 1170, 1178, 1180 (10th

Cir. 2007)).

Additionally, the plaintiffs allege that Harvard carried out a number of specific policies

and practices that enabled powerful professors to victimize female students and those who

spoke up on their behalf.  (See AC ¶¶ 203-10).  In particular, but without limitation, the

[54]

plaintiffs allege that Harvard maintains a custom and practice pursuant to which it fails to investigate or act on credible reports of sexual harassment unless the victim files a formal ODR report.  (Id. ¶ 204).  They also maintain that Harvard fails to adequately train its faculty members to report sexual harassment by professors against students in the Anthropology Department, or to implement measures to protect students from retaliation by faculty members.  (Id. ¶¶ 208-09).  Furthermore, the plaintiffs allege that ODR will not credit women's complaints of sexual misconduct unless they are corroborated by independent evidence, while at the same time restricting the type of corroborating evidence it allows the victims to present. (Id. ¶¶ 206-07).  Allegedly, these policies and practices, which the plaintiffs describe in detail and claim have been ongoing for years and allowed Comaroff and other prominent professors to harass students without fear of being held accountable, left them vulnerable to Comaroff's misconduct, both before the plaintiffs complained and up through the ODR process.  (See id. ¶¶ 2-4, 18, 143, 186, 188-89, 203-10).  At this stage, these allegations are sufficient to support their policy-related claims.[15]

Nevertheless, Harvard argues that the challenged policies "are substantially the same of those found *not* deliberately indifferent" by another session of this court in the case of Leader v. President & Fellows of Harvard Coll., Civil Action No. 16-10254, 2018 WL 3213490 (D. Mass.

---

[15] Harvard contends that the plaintiffs' allegations are too conclusory to support their claim that Harvard maintained a policy of deliberate indifference to reports of sexual misconduct in the Anthropology Department that created a heightened risk of sexual harassment.  (See Def. Reply Mem. at 4).  This argument is unpersuasive.  To satisfy the notice pleading requirements of Rule 8(a) of the Federal Rules of Civil Procedure, "a complaint need only include 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"  Educadores Puertorriqueños en Acción v. Hernández, 367 F.3d 61, 66 (1st Cir. 2004) (quoting Fed. R. Civ. P. 8(a)(2)).  The plaintiffs' detailed allegations relating to Harvard's alleged policy and practice of deliberate indifference are more than sufficient to satisfy this standard.  (See AC ¶¶ 124-41, 203-10).

June 29, 2018).  (Def. Mem. at 18; see also Def. Reply Mem. at 1-2).  In that case, the plaintiff

filed  a Title IX claim against Harvard by which she asserted that Harvard "maintained a 'policy

of indifference' towards sexual misconduct on campus[.]"  Leader, 2018 WL 3213490, at *5.  On

summary judgment, the court ruled that Harvard was entitled to judgment as a matter of law

on this claim because the plaintiff failed to "point to any evidence in the record that Harvard

maintained such a policy."  Id.  While the plaintiff did present evidence showing "public

criticism of Harvard regarding its sexual assault policies," the court determined that "a

reasonable factfinder could not infer from such criticism that Harvard maintained a policy of

deliberate indifference."  Id.

Harvard has not shown, much less attempted to argue, that the Leader court's ruling is

binding in this case.  Additionally, the court's findings in that case were based on the specific

evidence -- or lack thereof -- presented on summary judgment.  Here, the plaintiffs have alleged

detailed facts in support of their claim that Harvard maintains a policy and practice of

indifference to claims of sexual harassment and retaliation in the Anthropology Department,

and that its policy and practice enabled Comaroff to engage in misconduct against them and

create a hostile educational environment.  (See AC ¶¶ 124-41, 203-10).  Leader does not

support Harvard's argument that this claim should be dismissed.

**Deliberate Indifference**

Next, Harvard argues that Count One must be dismissed because the plaintiffs have

failed to allege sufficient facts to establish deliberate indifference.  With respect to the

plaintiffs' pre-harassment claims, Harvard argues that the plaintiffs have failed to "plausibly

allege that a Harvard official authorized to take corrective action had 'actual knowledge' of

sexual harassment and either failed to act or exhibited deliberate indifference to it." (Def.

Reply Mem. at 2 (citation omitted)). With respect to the post-harassment claims, Harvard

argues that it "followed its policies and procedures as concerns about Comaroff were made by

the Plaintiffs" and that its actions with respect to the plaintiffs' complaints were not

unreasonable. (Def. Mem. at 18-20). These arguments are insufficient to warrant dismissal.

As detailed previously, the plaintiffs' pre-harassment claims are premised upon

Harvard's alleged policy and practice of deliberate indifference to reports of sexual misconduct.

Ordinarily,

> a plaintiff asserting a Title IX claim based on sexual harassment committed by a
> faculty member or peer must demonstrate that the school had "actual
> knowledge" of the harassment and responded with "deliberate indifference."
> *See Davis*, 526 U.S. at 650, 119 S. Ct. 1661. This ensures that a school is "liable in
> damages under Title IX only for its own misconduct," and not that of third
> parties. *Id.* at 640, 119 S. Ct. 1661.
>
> But the calculus shifts when a plaintiff alleges that a school's "official policy"
> violates Title IX. *See Gebser*, 534 U.S. at 290, 118 S. Ct. 1989. In that context, the
> school has "intentionally violate[d] the statute." *Davis*, 526 U.S. at 642, 119 S.
> Ct. 1661. A school need not have had actual knowledge of a specific instance of
> sexual misconduct or responded with deliberate indifference to that misconduct
> before damages liability may attach. *See Gebser*, 524 U.S. at 290, 118 S. Ct.
> 1989; *see also Mansourian v. Regents of Univ. of Cal.*, 602 F.3d 957, 967 (9th Cir.
> 2010) ("[W]here the official policy is one of deliberate indifference to a known
> overall risk of sexual harassment, notice of a particular harassment situation and
> an opportunity to cure it are not predicates for liability.").

Karasek II, 956 F.3d at 1112. Because the plaintiffs are not required to allege Harvard's actual

knowledge of Comaroff's sexual misconduct in order to maintain their pre-harassment claims

against the University, Harvard's motion to dismiss those claims is denied.

Even if the plaintiffs were required to allege Harvard's actual knowledge, their

Complaint would be sufficient to satisfy that requirement. The plaintiffs allege that in the fall of

2016, Harvard Student 2 reported Comaroff's sexual harassment to number faculty members,

who in turn conveyed her allegations to Avakian, who was serving as the Program Officer for

Title IX.  (AC ¶ 60).  They also allege that during the 2016-2017 academic year, Harvard Student

2 reported Comaroff's misconduct directly to Avakian.  (Id. ¶ 61).  The harassment allegedly

consisted of inappropriate comments and gestures, as well as unwelcome touching, forced

kissing and groping, and inappropriate late night text messages asking Harvard Student 2 about

her sexual partners.  (Id. ¶¶ 49-50).  The plaintiffs further allege that prior to Harvard Student

2's complaint, the Graduate Program Coordinator in the Harvard Anthropology Department had

warned Avakian repeatedly to keep an eye on Comaroff because he was known as someone

who consistently had sexual relationships with his students.  (Id. ¶ 43).  Nevertheless, Avakian

allegedly took no steps to initiate a formal investigation or prevent further misconduct in

response to the report of sexual harassment by Harvard Student 2.  (Id. ¶¶ 61-63).  These

allegations are adequate to support a plausible claim that Harvard had actual knowledge of

Comaroff's misconduct but was deliberately indifferent to the risk of sexual misconduct that he

posed to female graduate students in the Anthropology Department.  See Brodeur, 626 F. Supp.

2d at 208 (noting that "the majority of the federal case law" supports the view that a school's

notice of an alleged harasser's propensity toward sexual misconduct, "based on his reported

treatment of other students, amounts to actual knowledge of discrimination sufficient to

trigger liability for damages under Title IX." (internal quotation marks and citation omitted)).

    Harvard's arguments regarding the plaintiffs' post-harassment claims are also

insufficient to justify relief in its favor.  Harvard argues that even if the plaintiffs' allegations are

true, it cannot be held liable for deliberate indifference because it "followed its policies and

procedures as concerns about Comaroff were made by the Plaintiffs."  (Def. Mem. at 18-19).

Thus, Harvard contends that it was Avakian who first elected to file ODR complaints on behalf

of the plaintiffs in May 2020, and that Harvard engaged in a reasonable process for

investigating and addressing those complaints.  (Id. at 19-20).  Therefore, it claims that it

satisfied all of its obligations, as required by Title IX.  (Def. Reply Mem. at 5-6).

　　　　The defendant's arguments merely raise questions of fact that cannot be resolved at the

pleading stage of the lawsuit.  As detailed above, the plaintiffs have alleged that Harvard

maintains a policy of deliberate indifference to sexual misconduct.  Even assuming, as Harvard

contends, the University adhered to its ordinary policies and procedures in addressing the

plaintiffs' reports of sexual misconduct, this would not be sufficient to undermine the plaintiffs'

claim that the University was deliberately indifferent.  The plaintiffs allege that Czerwienski

reported Comaroff's misconduct to Avakian in October 2017, that Kilburn reported Comaroff's

misconduct to Avakian in May 2019, and that in June 2019, Mandava complained about

Comaroff's misconduct to two professors who eventually reported those complaints to Avakian.

(AC ¶¶ 77, 109, 114-15).  However, Harvard allegedly failed to address any of those complaints

until May 18, 2020, and then only after *The Harvard Crimson* sought comment from the Title IX

Office regarding sexual harassment by professors in the Anthropology Department, including

Comaroff.  (Id. ¶¶ 118-19).  The plaintiffs claim that Harvard's continuing delay in investigating

and acting on their complaints left them and other students in the Anthropology Department

vulnerable to further misconduct by Comaroff.  (See id. ¶¶ 116-17).  Thus, they have plausibly

alleged that Harvard's response to their complaints constituted deliberate indifference.  See

Doe 1 v. Howard Univ., 396 F. Supp. 3d 126, 139 (D.D.C. 2019) (finding that plaintiff stated a

plausible claim against college under Title IX where school failed to investigate for five months and only after claims of misconduct were publicized on Twitter).

Finally, Harvard contends that the plaintiffs' objections to the ODR process and its outcome are inadequate to support a claim for deliberate indifference because "Title IX does not guarantee that an investigation will yield the outcome [that a] complainant desires." (Def. Reply Mem. at 5 (quoting Doe v. Emerson Coll., 271 F. Supp. 3d 337, 355 (D. Mass. 2017)). While an unsatisfactory outcome to a Title IX investigation alone may not support a Title IX deliberate indifference claim, "an institutional response to harassment may be carried out so inartfully as to render it clearly unreasonable." Fitzgerald, 504 F.3d at 175. Here, the plaintiffs allege that in addition to its unreasonable delay in investigating their complaints, Harvard allowed Comaroff to intimidate witnesses, destroy evidence and manipulate the ODR process. (See AC ¶¶ 153-63). They also allege that Harvard's ODR investigators interviewed Kilburn's therapist and obtained Kilburn's private therapy records without the plaintiff's knowledge or consent, provided copies of the records to Comaroff, and distributed copies of them to other individuals at the University without informing Kilburn of the recipients' identities. (Id. ¶¶ 164-69). Furthermore the plaintiffs have presented alleged facts showing how ODR's final reports revealed the unreasonableness of Harvard's policies and processes for handling complaints of sexual misconduct. (See id. ¶¶ 173-78). Consequently, the issue whether Harvard acted with deliberate indifference must await further development of the record. Harvard's motion to dismiss Count One of the Amended Complaint is denied.

C.  **Count Two: Deliberate Indifference to Retaliation Under Title IX**

Count Two of the Amended Complaint consists of claims against Harvard for deliberate

indifference to the retaliatory acts of its employees, including Comaroff's alleged threats to

Mandava and Czerwienski in 2017; Comaroff's alleged retaliatory actions against the plaintiffs

during the ODR process; and the 2022 dissemination and publication of allegedly false and

misleading statements about the plaintiffs by Comaroff and his allies, including more than three

dozen members of Harvard's faculty.  (AC ¶ 248).  The plaintiffs allege, in support of this Count,

that Harvard was deliberately indifferent "to past acts of discrimination and failed to take

adequate measures to prevent retaliation against Plaintiffs."  (Id. ¶ 249).  They also allege that

"Harvard maintained a policy, custom, and practice of deliberate indifference to retaliation in

its educational programs" that not only made the plaintiffs vulnerable to retaliation, but also

dissuaded reasonable students from making or supporting charges of discrimination.  (Id. ¶¶

249-50).  Harvard is seeking to dismiss Count Two on the grounds that the plaintiffs have failed

to state plausible claims of retaliation against the institution and that Czerwienski's and

Mandava's claims are time-barred.  (Def. Mem. at 20-26).  For the reasons detailed below,

Harvard's motion is denied with respect to these claims.

### Nature of Plaintiffs' Claims

"Retaliation against a person because that person has complained of sex discrimination

is another form of intentional sex discrimination encompassed by Title IX's private cause of

action."  Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 173, 125 S. Ct. 1497, 1504, 161 L. Ed.

2d 361 (2005).  Specifically, the Supreme Court has ruled that "when a funding recipient

retaliates against a person *because* he complains of sex discrimination, this constitutes

[61]

intentional 'discrimination' 'on the basis of sex,' in violation of Title IX."  Id. at 174, 125 S. Ct. at

1504.  In this case, Harvard does not dispute that the plaintiffs' claims about Comaroff's alleged

misconduct constituted complaints about sex discrimination within the meaning of Title IX.

However, it argues that the University cannot be held liable for retaliating against the plaintiffs

for those complaints because the retaliatory actions alleged in this case were carried out by

Comaroff and other Harvard employees, and Title IX does not impose strict liability upon an

educational institution for the actions of its employees.  (See Def. Mem. at 21-23; Def. Reply

Mem. at 7-9).

    Harvard's argument misconstrues the nature of the plaintiffs' retaliation claims.  As

described above, the plaintiffs are not seeking to hold the defendant strictly liable for the

actions of its employees.  Rather, they claim that "Harvard discriminated against Plaintiffs

through its deliberate indifference to the retaliatory acts of its employees" and that "Harvard

maintained a policy, custom, and practice of deliberate indifference to retaliation in its

educational programs leaving Plaintiffs vulnerable to it."  (AC ¶¶ 248-49; see also Pl. Opp. Mem.

at 15-17 (arguing that Harvard may be held liable for deliberate indifference that subjects

students to retaliation)).  Courts that have addressed the issue have determined that

educational institutions may be subjected to liability for deliberate indifference to retaliation

for complaints regarding sex discrimination.  See, e.g., Sch. Dist. No. 1, Denver, Colo., 970 F.3d

at 1310-11 (finding that plaintiff stated a Title IX claim against school district for deliberate

indifference to retaliation by fellow students); Feminist Majority Found. v. Hurley, 911 F.3d 674,

696 (4th Cir. 2018) (ruling that plaintiff stated a claim against university under Title IX for

deliberate indifference to student-on-student retaliatory harassment); Papelino v. Albany Coll.

of Pharmacy of Union Univ., 633 F.3d 81, 92-93 (2d Cir. 2011) (concluding that a reasonable jury

could find in favor of plaintiff on Title IX claim against college based on retaliation by plaintiff's

professor).  Therefore, Harvard has not shown that Count Two should be dismissed on these

grounds.

**Timeliness**

Harvard next contends that Czerwienski's and Mandava's claims for retaliation based on

Comaroff's alleged 2017 threats against them must be dismissed as untimely under the

applicable statute of limitations.  (Def. Mem. at 23).  For the reasons described above with

respect to Count One, Harvard has failed to establish, under the discovery rule, that

Czerwienski's and Mandava's Title IX claims are time-barred as a matter of law.  Therefore,

Harvard's motion is denied with respect to this argument as well.

**Alleged Retaliation by Third Parties**

As described above, the plaintiffs allege, in support of Count Two, that Harvard was

deliberately indifferent to retaliatory acts of its employees, including the dissemination and

publication of allegedly misleading statements by Comaroff and his allies.  (See AC ¶ 248).  In

particular, the plaintiffs allege that "[i]n 2022, Professors John and Jean Comaroff and Professor

Janet Halley retaliated against Plaintiffs by disseminating a false or misleading statement that

would reasonably dissuade students from making complaints against faculty." (Id.).  They

further allege that in the same year, "38 Harvard faculty members retaliated against Plaintiffs

by publishing a false or misleading statement that would reasonably dissuade students from

making complaints against faculty (a protected activity)." (Id.).  Harvard argues that there is no

basis for holding a university liable for the conduct of faculty or others who respond to a matter

of public debate such as the outcome of a Title IX investigation.  (Def. Mem. at 24; Def. Reply

Mem. at 9).  Again, this court finds that Harvard's argument mischaracterizes the plaintiffs'

claim.

As described in detail in the Amended Complaint, the plaintiffs allege that the third-

party actions at issue occurred as part of Comaroff's "campaign of retaliation" against the

plaintiffs for complaining about his misconduct and pursuing the Title IX process.  (See AC ¶¶

189-95).  Thus, when viewed in light of the Complaint as a whole, the opinions allegedly

expressed by Harvard Law Professor Janet Halley and other members of Harvard's faculty were

the result of the Comaroffs' efforts to disparage the plaintiffs publicly and rally their broad

network of academicians around their allegedly false claim that the plaintiffs' complaints

against Comaroff constituted an "attack on academic freedom" rather than a legitimate

challenge to his improper behavior.  (See id. ¶ 194 (describing how "[t]he Comaroffs' efforts

paid off" when 38 Harvard faculty members signed "a public letter that minimized Professor

Comaroff's abuse and misrepresented the few factual findings ODR made.")).  Accordingly, the

plaintiffs provide plausible support for their claims against Harvard for deliberate indifference

to Comaroff's acts of retaliation.[16]  (See id. ¶ 248).

---

[16] In its Reply Memorandum, Harvard argues that the plaintiffs have failed to allege how the
opinions of its faculty members interfered with the plaintiffs' studies.  (Def. Reply Mem. at 9).  To prevail
on a retaliation claim under Title IX, the plaintiffs must allege, among other things, "that the alleged
retaliator ... undertook some action disadvantageous to the actor[.]"  Frazier, 276 F.3d at 67.  Here, the
plaintiffs claim that the public repudiations of their experiences, as expressed in the letters responding
to the Comaroffs' alleged campaign of retaliation, "will create countless roadblocks for [them] when
they apply for grants, funding, publications, and jobs at the institutions on which the signatories serve."
(AC ¶ 202).  This is sufficient to support a plausible claim for relief.

**Alleged Retaliatory Conduct Toward Kilburn**

The plaintiffs claim, in support of Count Two, that Harvard was deliberately indifferent to Comaroff's use of the ODR process as a means of retaliating against Kilburn for complaining about his sexual harassment.  In particular, the plaintiffs allege that in 2021, Comaroff retaliated against Kilburn for filing a formal complaint by, among other things, "baselessly naming prominent scholars in her field as witnesses in the ODR proceedings[.]"  (Id. ¶ 248).  Harvard argues that this claim is not actionable under Title IX because the statute and its implementing regulations require that parties involved in an investigation must have a full and fair opportunity to present witnesses on their behalf.  (Def. Mem. at 25).  Again, this court finds that the plaintiffs have alleged plausible grounds for relief.

Regulations promulgated by the Department of Education require federal funding recipients like Harvard to provide parties involved in a Title IX investigation with "an equal opportunity . . . to present witnesses, including fact and expert witnesses, and other inculpatory and exculpatory evidence[.]"  34 C.F.R. § 106.45(b)(5)(ii).  However, "[t]here is an important difference between defending oneself ... and threatening, intimidating, or otherwise interfering with someone's right to pursue a discrimination claim[.]"  Feminist Majority Found., 911 F.3d at 697 (quoting Dixon v. Int'l Brotherhood of Police Officers, 504 F.3d 73, 84 (1st Cir. 2007)).  Here, the plaintiffs allege that Comaroff named three of the most prominent scholars in Kilburn's field as witnesses for his defense, even though none of them knew Kilburn or had any firsthand knowledge of the events relevant to Kilburn's complaint.  (AC ¶¶ 159, 162).  They further allege that Comaroff attempted to name one of Kilburn's dissertation advisors to testify about an issue that allegedly had no relevance to his defense.  (Id. ¶ 161).  The plaintiffs claim that by

choosing these witnesses, Comaroff effectively prevented Kilburn from seeking them out as

potential advisors, mentors or impartial reviewers, and interfered with Kilburn's ability to

complete certain academic requirements in a timely manner.  (Id. ¶¶ 160-61).  They have

plausibly alleged that Comaroff's strategic selection of witnesses amounted to a malicious

effort to manipulate the ODR process and punish Kilburn for complaining about his sexual

harassment.  They have also alleged that Kilburn's complaints to the Title IX Office, by which

she asserted that Comaroff "was calling witnesses for the purpose of derailing her career[,]"

resulted in "no discernable action."  (Id. ¶ 163).  Accordingly, they have stated a plausible claim

against Harvard for deliberate indifference to Comaroff's alleged retaliation.

### Comaroff's Conduct Toward Harvard Student 2

Harvard's final challenge to Count Two concerns the plaintiffs' allegation that Harvard

was deliberately indifferent to Comaroff's 2020 conduct in retaliating against the plaintiffs "by

pressuring Harvard Student 2 not to participate in the investigation into their complaints."  (See

id. ¶ 248).  Harvard argues that the plaintiffs cannot rely on this alleged conduct to support

their retaliation claim because they "can only speculate that Comaroff's 'pressuring' of Harvard

Student 2 resulted in an adverse action from which they suffered."  (Def. Mem. at 25).

Therefore, according to Harvard, the "Plaintiffs fail to plausibly allege that Harvard Student 2's

nonparticipation is an 'action disadvantageous' to them, a threshold element of their retaliation

claim."  (Id. at 25-26 (quoting Frazier, 276 F.3d at 67)).  Harvard's motion is denied with respect

to this issue.

In order to state a prima facie claim for retaliation under Title IX, a plaintiff must allege

facts sufficient to show, among other things, "that the alleged retaliator . . . undertook some

[66]

action disadvantageous to the actor[.]"  Frazier, 276 F.3d at 67.  The plaintiffs allege that

Harvard Student 2 spoke to Czerwienski about Comaroff's harassment and served as the

impetus behind Czerwienski's decision to complain to her advisor and warn others in the

Anthropology Department about Comaroff's sexual harassment.  (See AC ¶¶ 55-56, 58).  They

also claim that the alleged harassment of Harvard Student 2 motivated Mandava to complain to

Professor Subramanian and warn other students about Comaroff's harassment, and that it was

Harvard Student 2 who initially informed Czerwienski that Comaroff considered her a threat

and was looking to interfere with her academic progress.  (Id. ¶¶ 65-66, 69).  Furthermore, the

plaintiffs allege that after Kilburn met with Avakian in May 2019, to complain about Comaroff's

sexual harassment against her, Avakian put Kilburn in touch with Harvard Student 2, who spoke

to Kilburn about her own, similar experience of sexual harassment from Comaroff.  (Id. ¶¶ 109-

12).  These allegations support a reasonable inference that Harvard Student 2's testimony

during the ODR process would have supported and strengthened each of the plaintiffs' claims

against Comaroff.  Given Harvard's alleged demand for independent, corroborating evidence to

support a Title IX complaint (see id. ¶ 206), it is also reasonable to infer that Harvard Student

2's testimony would have proved critical.  In any event, Harvard has not shown that conduct

directed toward a third party cannot support a claim for retaliation under Title IX.  See

Thompson v. N. Am. Stainless, LP., 562 U.S. 170, 178, 131 S. Ct. 863, 870, 178 L. Ed. 2d 694

(2011) (finding that retaliation occurred for purposes of Title VII where employer's actions

toward employee's fiance was "intended means of harming" employee for filing charge of sex

discrimination).  Consequently, this court finds that the plaintiffs should have an opportunity to

develop the evidentiary record on this matter, and that Harvard's motion to dismiss this claim

should be denied.

      **D.**      **Count Three: Gender Discrimination Under Title IX**

In Count Three of their Amended Complaint, the plaintiffs assert a claim against Harvard

for gender discrimination.  Therein, the plaintiffs allege that

> Harvard maintains official practices, policies, procedures, and customs applicable
> to cases of sexual and gender-based harassment and retaliation based on bias
> against women, against students who complain about gender-based harassment
> and retaliation, and/or in favor of men.  As a result, Harvard deprived Plaintiffs of
> the benefits of its educational programs and subjected them to discrimination
> based on their gender.

(AC ¶ 258).  Harvard has moved to dismiss Count Three on the grounds that the plaintiffs have

not alleged sufficient facts to establish that the alleged unfairness in the ODR process occurred

because of their gender.  (Def. Mem. at 26-28).  This court concludes that Count Three must be

dismissed on this basis.

A plaintiff attacking a university's disciplinary proceedings on the grounds of gender

discrimination under Title IX "must allege 1) 'particular facts sufficient to cast some articulable

doubt on the accuracy of the outcome of the disciplinary proceeding,' and 2) 'particularized

allegation[s] relating to the causal connection between the flawed outcome and gender bias.'"

Doe v. Harvard Univ., 462 F. Supp. 3d 51, 60 (D. Mass. 2020) (alteration in original) (quoting

Yusuf v. Vassar Coll., 35 F.3d 709, 715 (2d Cir. 1994)).  See also Doe v. Trs. of Boston Coll., 892

F.3d 67, 90 (1st Cir. 2018) (relying on the standard articulated in Yusuf, without specifically

adopting same, where parties agreed that Yusuf provided the applicable standard).[17]  Harvard

---

[17] "Neither the Supreme Court nor [the First] Circuit have adopted a framework for analyzing claims
by students challenging a university's disciplinary procedures as discriminatory under Title IX."  Trs. of

argues that "[e]ven if Plaintiffs had plausibly alleged 'articulable doubt' about the outcome of the ODR proceedings," they have failed to plead particularized factual allegations necessary to satisfy the second element of their claim.  (Def. Mem. at 28).  This court agrees for the reasons that follow.

To show the causal link between the outcome of a Title IX proceeding and gender bias, a plaintiff "cannot merely rest on superficial assertions of discrimination, but must establish that 'particular circumstances suggest[ ] that gender bias was a motivating factor.'"  Trs. of Boston Coll., 892 F.3d at 91 (alteration in original) (quoting Yusuf, 35 F.3d at 715).  "Such allegations might include, *inter alia*, statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender."  Yusuf, 35 F.3d at 715.  In this case, the plaintiffs contend that Harvard's alleged practice of failing to credit women's complaints unless they are corroborated by independent evidence is sufficient to meet this requirement because the practice relies on an "archaic assumption" about women.  (Pl. Opp. Mem. at 32-33).  As the plaintiffs allege in the Amended Complaint, "[t]here is a consensus among scholars that the archaic historical requirement of independent corroboration in cases of gender violence (and sexual assault in particular) rests on biases against women as lacking credibility."  (AC ¶ 206).  According to the plaintiffs, this practice, along with the other unfair policies and practices implemented by ODR

---

Boston Coll., 892 F.3d at 90.  Nevertheless, the parties in this case agree that the applicable standard is the same as the one applied by the courts in Doe v. Harvard Univ. and Yusuf.  (Def. Mem. at 26; Pl. Opp. Mem. at 32).  Accordingly, it is appropriate to apply this standard here.  See Trs. of Boston Coll., 892 F.3d at 90.

and employed in the plaintiffs' Title IX proceedings, "disproportionately harm women, who make up three quarters of complainants at Harvard."  (Pl. Opp. Mem. at 33 (citing AC ¶ 214)).

"'The 'archaic assumptions' standard, which has been applied where plaintiffs seek equal athletic opportunities, finds discriminatory intent in actions resulting from classifications based upon archaic assumptions' about gender."  Bleiler v. Coll. of Holy Cross, Civil Action No. 11-11541-DJC, 2013 WL 4714340, at *5 (D. Mass. Aug. 26, 2013) (quoting Mallory v. Ohio Univ., 76 Fed. Appx. 634, 638-39 (6th Cir. 2003)).  Courts have also considered allegations of archaic assumptions in evaluating claims of gender bias in Title IX disciplinary proceedings.  See, e.g., Verdu v. Trs. of Princeton Univ., Civ. Action No. 19-12484 (FLW), 2020 WL 1502849, at **4-5 (D.N.J. Mar. 30, 2020) (considering whether complaint alleged gender bias in university's disciplinary proceedings where plaintiff argued that university relied on "archaic gender stereotypes" to infantilize and unfairly protect women).  The problem with the plaintiffs' theory, however, is that they have failed to allege any facts, as opposed to conclusory allegations, to show that Harvard's alleged practice of failing to credit complaints of sexual misconduct without independent corroboration applies only to women who file complaints and not to men who file complaints of sexual misconduct.  Moreover, the plaintiffs' own allegations suggest that the challenged practice applies to anyone of any gender who pursues a claim of sexual harassment through the ODR process.  (See AC ¶ 206 (describing how Harvard previously had written procedures which explicitly required "independent corroborating evidence" to support claims of sexual assault, and how Harvard has since "removed that requirement from its *published* procedures, but it has persisted in practice.")).  Therefore, even if, as the plaintiffs allege, Harvard's practice of requiring independent corroboration for complaints of sexual

assault arose out of archaic assumptions about women's credibility, the plaintiffs have not

alleged specific facts or particular circumstances to support a plausible inference that Harvard

discriminated against them in the ODR proceedings because of their gender rather than

because they were complaining of sexual misconduct by a prominent faculty member.  See Doe

v. Harvard Univ., 462 F. Supp. 3d at 62 (finding that plaintiff's allegations failed to support a

claim of bias where complaint "[did] not allege that similarly situated individuals ... are treated

differently based on their gender"); Verdu, 2020 WL 1502849, at *5 (finding that complaint did

not support a plausible inference that outcome of disciplinary proceedings was due to plaintiff's

gender where plaintiff "has neither alleged statements by officials showing gender bias in his

disciplinary proceedings nor ... alleged any pattern or practice designed to produce gender-

specific outcomes" and allegations did not suggest "that gender was a motivating factor in the

University's decision.").

### E. Counts Four, Five and Six: Alleged Violations of the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 214, § 1C, and the Massachusetts Equal Rights Act

Counts Four, Five and Six of the Amended Complaint consist of state statutory claims

against Harvard.  Counts Four and Six, which consist of claims for violations of the

Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, § 11I ("MCRA"), and the Massachusetts

Equal Rights Act, Mass. Gen. Laws ch. 93, § 102 ("MERA"), have been brought on behalf of all

three plaintiffs, while Count Five, which consists of a claim for sexual harassment in violation of

Mass. Gen. Laws ch. 214, § 1C ("Section 1C"), has been brought on behalf of Kilburn.  Harvard

contends that the MCRA and MERA claims set forth in Counts Four and Six must be dismissed

because Section 1C provides the exclusive remedy for claims of sexual harassment and

therefore bars those claims.  (Def. Mem. at 28-29).  It further argues that all three of these

Counts should be dismissed because they are untimely under the applicable statute of limitations.  (Id. at 29-31).  Harvard's motion to dismiss these claims is denied for the reasons that follow.

## Exclusivity

Harvard first argues that Counts Four and Six must be dismissed because Kilburn's claim for sexual harassment under Section 1C bars recovery for the plaintiffs under the MCRA and/or MEFA.  (Id. at 28-29).  Section 1C, entitled "Right to freedom from sexual harassment," provides as follows:

> [a] person shall have the right to be free from sexual harassment, as defined in chapter one hundred and fifty-one B and one hundred and fifty-one C. The superior court shall have the jurisdiction to enforce this right and to award the damages and other relief provided in the third paragraph of section 9 of chapter 151B. Any such action shall be commenced in the superior court within the time allowed by said section 9 of said chapter 151B. No claim under this section that is also actionable under chapter 151B or chapter 151C shall be brought in superior court unless a complaint was timely filed with the Massachusetts commission against discrimination under said chapter 151B.

Mass. Gen. Laws ch. 214, § 1C.  The statute fills a gap in Massachusetts laws prohibiting sexual harassment "by 'extend[ing] to employees and students protection that is not otherwise available under [chapter] 151B and [chapter] 151C[.]'"  Harbi v. Mass. Inst. of Tech., Civil Action No. 16-12394-FDS, 2017 WL 3841483, at *6 (D. Mass. Sept. 1, 2017).  As it pertains to students, the statute extends statutory protection from sexual harassment to students who are neither applicants of a school nor enrolled in vocational school.  Id. at *7.  Significantly, "when G.L. c. 214, § 1C, applies to a claim of sexual harassment, it is the exclusive remedy" and "plaintiffs may not proceed with other statutory or common-law actions for sexual harassment."  Lowery

[72]

v. Klemm, 446 Mass. 572, 576, 845 N.E.2d 1124, 1127 (2006).  Harvard relies on the statute's

exclusivity to support its motion to dismiss the plaintiffs' claims under the MCRA and MERA.

The plaintiffs assert that Harvard's motion must be denied because Counts Four and Six

do not duplicate Kilburn's claim for sexual harassment under Section 1C.  (Pl. Opp. Mem. at 20).

As an initial matter, the plaintiffs argue that "Mandava and Czerwienski do not even allege a

claim for sexual harassment under § 1C, and Harvard does not contend that they could."  (Id.

(emphasis omitted)).  They also argue that Kilburn's claims under the MCRA and MERA "allege a

hostile environment that includes retaliation and, therefore, assert claims broader than her §

1C claim[.]"  (Id. (emphasis omitted)).  This court agrees that Counts Four and Six seek relief for

conduct beyond "sexual harassment," as defined under Section 1C, and are not duplicative of

Kilburn's claim.

The record demonstrates that Mandava's and Czerwienski's claims in this case are based

on alleged acts of retaliation rather than on sexual harassment.  Furthermore, as set forth in

Counts Four and Six of the Amended Complaint, the plaintiffs' claims under the MCRA and

MERA are based almost entirely on alleged acts of retaliation.  (See AC ¶¶ 269, 290).  Section 1C

does not purport to encompass such conduct.  As described above, the term "sexual

harassment," as used in Section 1C, is defined in Mass. Gen. Laws ch. 151B and 151C.  Mass.

Gen. Laws ch. 151C, which "defines 'sexual harassment' in the educational context[,]" Harbi,

2017 WL 3841483, at *6, provides as follows:

> [t]he term "sexual harassment" means *any sexual advances, requests for sexual
> favors and other verbal or physical conduct of a sexual nature* when: -- (i)
> submission to or rejection of such advances, requests or conduct is made either
> explicitly or implicitly a term or condition of the provision of the benefits,
> privileges or placement services or as a basis for the evaluation of academic
> achievement; or (ii) such advances, requests or conduct have the purpose or

effect of unreasonably interfering with an individual's education by creating an
intimidating, hostile, humiliating or sexually offensive educational environment.

Mass. Gen. Laws ch. 151C, § 1(e) (emphasis added). Therefore, "sexual harassment" for

purposes of Section 1C does not include retaliation for complaints of sexual harassment, and

neither Harvard nor any of the cases on which it relies suggest otherwise. (See Def. Mem. at

28-29). Where, as here, the plaintiffs are seeking recourse for conduct that is not encompassed

by Section 1C, "they may bring actions under other statutes[.]" See Lowery, 446 Mass. at 581,

845 N.E.2d at 1130-31. Therefore, Harvard has not shown that their claims under the MCRA

and MERA should be dismissed.

**Timeliness**

Harvard also argues that each of the plaintiffs' state statutory claims against Harvard

must be dismissed as untimely under the applicable three-year statute of limitations. (Def.

Mem. at 29-31). With respect to Czerwienski and Mandava, Harvard argues that their claims

accrued in the fall of 2017, when Comaroff allegedly threatened to retaliate against them for

complaining about his sexual misconduct and Harvard allegedly failed to respond. (Id. at 29-

30). It argues that Kilburn's claims accrued in the fall of 2018 because that is when "the

Amended Complaint alleges that the latest instance of actionable harassment directed at

Kilburn occurred." (Id. at 30). Because the plaintiffs did not initiate this action until February 8,

2022, Harvard argues that Counts Four, Five and Six are time-barred.

Under Massachusetts law, "[a]ctions arising on account of violations of any law intended

for the protection of civil rights ... shall be commenced only within three years next after the

cause of action accrues." Mass. Gen. Laws ch. 260, § 5B. Here, it is undisputed that the three-

year limitations period applies to the plaintiffs' claim under the MCRA, Section 1C and MERA.

(See Def. Mem. at 29; Pl. Opp. Mem. at 20-21).  The statute of limitations for such claims

"begins running once a plaintiff knows or has reason to know of the alleged wrongful acts."

Arsenault v. Otto, --- F. Supp. 3d ---, Civil Action No. 21-40122-TSH, 2022 WL 4329395, at *2 (D.

Mass. Sept. 19, 2022).  However,

> [a] plaintiff need not know the extent or severity of the harm suffered.  To start
> the limitations period a plaintiff need only have knowledge of all the facts
> necessary to make out his civil rights claim.  The limitations period begins on the
> date of the wrongful act, "unless the wrong is 'inherently unknowable.'  When the
> alleged injury is 'inherently unknowable,' the applicable statute of limitations may
> be tolled under the discovery rule."

Id.  (quoting Sampson v. Town of Salisbury, 441 F. Supp. 2d 271, 275-76 (D. Mass. 2006)).

The plaintiffs argue that their claims under the MCRA, Section 1C and MERA "did not

accrue until 2020, when the *Crimson* revealed 'Harvard's pattern of deliberate indifference to

reports against faculty' in their department."  (Pl. Opp. at 23 (quoting AC ¶ 143)).  The

Amended Complaint supports this argument.  With respect to each of their state statutory

claims, the plaintiffs allege that "Harvard enabled and ratified" the allegedly unlawful actions by

Comaroff and others "by failing to prevent them despite its knowledge of a substantial risk that

they would occur, and by failing to remedy them despite its knowledge that they had

occurred."  (AC ¶¶ 269, 290; see id.¶ 280).  For the reasons detailed above with respect to the

timeliness of the plaintiffs' Title IX claims, the plaintiffs have plausibly alleged that Harvard's

role in the alleged misconduct was inherently unknowable until 2020.  Because the facts

establishing Harvard's statute of limitations defense are not "clear on the face of the

plaintiff[s'] pleadings[,]" their motion to dismiss for untimeliness must be denied.  See Maffeo,

537 F. Supp. 3d at 47 (quoting Trans-Spec Truck Serv., Inc., 524 F.3d at 320).

[75]

F.  **Count Seven: Claims for Negligent Hiring, Retention, and Supervision**

Harvard also argues that Count Seven of the Amended Complaint, in which the plaintiffs

are seeking to hold the University liable for the negligent hiring, retention and supervision of

Comaroff, must be dismissed on the grounds that it is time-barred.  (Def. Mem. at 31-32).  It is

undisputed that the statute of limitations for such claims is three years.  (See id. at 31-32; Pl.

Opp. Mem. at 33).  In support of its motion to dismiss, Harvard contends that "Comaroff was

hired in 2012 -- approximately *ten years* before [the] Amended Complaint was filed -- and

Plaintiffs allege that they were aware of Harvard purportedly mishandling its supervision (and

presumably retention) of Comaroff by, at the *latest*, the Spring of 2017."  (Def. Mem. at 31-32

(emphasis in original)).  However, this court finds that the Amended Complaint raises questions

of fact as to when the plaintiffs knew or should have known of Harvard's allegedly improper

role in the hiring, retention and supervision of Comaroff, and that further development of the

record is warranted with respect to this issue.

"To state a claim for negligent hiring and supervision, [a] plaintiff must 'allege that [the

employer] knew, or should have known, that the offending employee had a proclivity to

commit the complained-of acts, and that the employer nevertheless failed to take corrective

action.'"  Bloomer, 2010 WL 3221969, at *9 (quoting Vicarelli v. Bus. Int'l, Inc., 973 F. Supp. 241,

246 (D. Mass. 1997)).  Because it is far from clear on the face of the Amended Complaint that

the plaintiffs knew or should have known, prior to publication of *The Harvard Crimson* article in

2020, about Harvard's alleged mishandling of sexual harassment complaints against Comaroff

or its alleged failure to supervise Comaroff's relationships with female students or otherwise

take corrective action, this court cannot conclude that the plaintiffs' claims accrued in 2017 or

at any other time outside the limitations period.  See Bowen v. Eli Lilly & Co., Inc., 408 Mass.

204, 205-06, 557 N.E.2d 739, 741 (1990) (describing application of the discovery rule in

Massachusetts, pursuant to which a cause of action accrues and the statute of limitations

begins to run "when a plaintiff discovers, or any earlier date when she should reasonably have

discovered, that she has been harmed or may have been harmed by the defendant's

conduct.").  Accordingly, Harvard's motion to dismiss Count Seven on the basis of untimeliness

is denied.

### G.  Count Eight: Claims for Breach of Contract

In Count Eight of the Amended Complaint, the plaintiffs are seeking to hold Harvard

liable for breach of contract based on Harvard's alleged failure to comply with the University's

policies regarding sexual and gender-based harassment, sexual misconduct, retaliation and

whistleblowers.  (AC ¶¶ 301-13).  Harvard has moved to dismiss these claims on the grounds

that they are based on generalized policy statements that are too vague and indefinite to

constitute binding contractual obligations.  (Def. Mem. at 32-34).  This court finds that the

alleged promises on which the plaintiffs rely in support of their claims are sufficiently specific to

establish plausible contractual obligations between Harvard and its students.  Accordingly,

Harvard's motion will be denied with respect to Count Eight.

"To prevail on a breach of contract claim [under Massachusetts law], a plaintiff must

first show 'that the parties reached a valid and binding agreement,' such that a contract is

formed."  G. v. Fay Sch., 931 F.3d 1, 12 (1st Cir. 2019) (quoting Coll v. PB Diagnostic Sys., Inc., 50

F.3d 1115, 1122 (1st Cir. 1995)).  "Such an agreement may be memorialized in a student

handbook" or other university publications, including policy guides and manuals.  Id. (citing

[77]

cases).  See also Guckenberger v. Boston Univ., 957 F. Supp. 306, 317 (D. Mass. 1997)

("Brochures, policy manuals, and other advertisements can form the basis of [a] contractual

agreement[ ]" between a student and a college).  "To determine whether select terms of a

student handbook are contractually enforceble, Massachusetts courts employ 'the standard of

reasonable expectation,' that is, 'what meaning the party making the manifestation ... should

reasonably expect the other party to give [the terms].'"  Fay Sch., 931 F.3d at 12 (quoting

Driscoll v. Bd. of Trs. of Milton Acad., 70 Mass. App. Ct. 285, 293, 873 N.E.2d 1177, 1185 (2007))

(additional quotation marks and citation omitted).  However, "[v]ague and generalized

representations are not contractually enforceable."  Id.

Here, the plaintiffs are relying on statements that Harvard allegedly made in its written

policies to support their claims for breach of contract.  (See AC ¶¶ 303-10).  Specifically, their

claims are based on promises that Harvard allegedly made in its Sexual and Gender-Based

Harassment Policy, to "prevent incidents of sexual and gender-based harassment from denying

or limiting an individual's ability to participate in or benefit from the University's programs[,]"

"provide prompt and equitable methods of investigation and resolution to stop discrimination,

remedy any harm, and prevent its recurrence[,]" and "keep the community safe and ... address

incidents of alleged harassment that it knows about or reasonably knows about."  (Pl. Opp.

Mem. at 34; see also AC ¶¶ 304-05).  They are also based on Harvard's alleged promise, which

is set forth in its Whistleblowing Policy, to "protect from retaliation members of the Harvard

community who make good faith reports of suspected violations of the law or University

policy."  (See Pl. Opp. Mem. at 34; AC ¶ 309).  These alleged statements are far more specific

than the types of "generalized, aspirational statements that are insufficiently definite to form a

[78]

contract."  See Fay Sch., 931 F.3d at 12 (finding that general statements regarding school's core

values, such as "[h]onesty, respect, responsibility, empathy, and kindness inform our conduct,"

"[m]utual respect and civility are a central aspect of healthy communities," and "[a]ll members

of the [school] community are committed to making a positive difference in the world[,]" as

well as aspirational statements regarding diversity, such as "[w]e expect all members of the

community to respect the rights of others and to behave appropriately at all times" and "[we]

seek[ ] to serve as a resource for understanding," were insufficient to form a contract); Brown

v. Suffolk Univ., Civil Action No. 19-40062-DHH, 2021 WL 2785047, at *6 (D. Mass. Mar. 31,

2021) (finding that statements in law school bulletin, which provided that school's "disability

services 'serves as a valuable resource for students with disabilities ... to promote an

understanding and awareness of accessibility issues ... in order to provide a supportive and

engaging setting for our students[,]'" were too indefinite to create contractual obligations).

They are also comparable to statements that courts have considered adequate to allege the

terms of a contract between an educational institution and its students.  See Doe v. Wentworth

Inst. of Tech., Inc., No. 1:21-cv-10840-IT, 2022 WL 1912883, at *6 (D. Mass. June 3, 2022)

(finding that plaintiff alleged the terms of a contract between herself and her college where she

alleged that the college breached its obligations set forth in its written policies by, *inter alia*,

"failing to conduct a prompt and impartial investigation"); Guckenberger, 957 F. Supp. at 312,

317 (finding that plaintiffs alleged the existence of a contract between university and its

students with learning disabilities where university's promotional materials represented "its

commitment to accommodating learning-disabled students and stated that the services and

accommodations provided ... would be available throughout the academic career" of students

[79]

with documented learning disabilities).  Furthermore, as detailed in the Amended Complaint, the plaintiffs have plausibly alleged that Harvard breached their reasonable expectations that the University would conform to the specific promises contained in its written policies by, among other things, failing to promptly respond to students' complaints of sexual harassment and retaliation by Comaroff, failing to implement fair procedures for completing their Title IX investigations, and failing to take affirmative steps to protect students from sexual misconduct and retaliation by a professor with a known proclivity for sexual harassment.  "Thus, there is sufficient allegation that Harvard failed to meet Plaintiff[s'] standard of reasonable expectations and, accordingly, Plaintiff[s'] claim[s] for breach of contract shall not be dismissed."  Doe v. Harvard Univ., 462 F. Supp. 3d at 66.

### H.  Count Nine: Claims for Breach of the Implied Covenant of Good Faith and Fair Dealing

Count Nine of the Amended Complaint is the final Count that Harvard challenges in its motion to dismiss.  Therein, the plaintiffs claim that Harvard breached the covenant of good faith and fair dealing implied in the contracts created under its policies by violating the reasonable expectations of the plaintiffs under those contracts.  (See AC ¶¶ 314-21).  Harvard argues that the plaintiffs have failed to state a claim based on this theory because they have failed to identify any specific contract provisions that created such expectations.  (See Def. Mem. at 34).  This court finds that Harvard's motion to dismiss Count Nine must be denied.

Under Massachusetts law, "[a] covenant of good faith and fair dealing is implied in every contract and a university has an obligation to adhere to this covenant when dealing with its students."  Doe v. Harvard Univ., 462 F. Supp. 3d at 66.  "The duty of good faith and fair dealing concerns the manner of performance" of the contract and its purpose "is to guarantee that the

parties remain faithful to the intended and agreed expectations of the parties in their performance." Doe v. W. New England Univ., 228 F. Supp. 3d 154, 180-81 (D. Mass. 2017) (quoting Uno Rests., Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376, 385, 805 N.E.2d 957, 964 (2004)).  "A breach of the implied covenant occurs, similar to a breach of the contract itself, when 'one party violates the reasonable expectations of the other.'" Doe v. Harvard Univ., 462 F. Supp. 3d at 66 (quoting W. New England Univ., 228 F. Supp. 3d at 181) (additional citation omitted).   Because the plaintiffs have "pleaded adequately that Harvard failed to meet the standard of reasonable expectations" arising from its written policy statements, they also have "pleaded adequately a breach of the covenant of good faith and fair dealing." Id.  See also Doe v. Brown Univ., 166 F. Supp. 3d 177, 196 (D.R.I. 2016) ("Because [plaintiff's] Complaint states a plausible claim for breach of contract, ... he similarly states a claim that this conduct violated the covenant of good faith and fair dealing inherent in that contract.").  The motion to dismiss Count Nine is therefore denied.

## IV.  CONCLUSION

For all the reasons detailed herein, the "Defendant's Motion to Dismiss Counts One Through Nine of Plaintiffs' Amended Complaint" (Docket No. 53) IS ALLOWED IN PART and DENIED IN PART.  Because the plaintiffs have failed to allege plausible claims against Harvard for gender discrimination under Title IX, Count Three of the Amended Complaint is dismissed. However, Harvard's motion is otherwise denied.

/ s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge